# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

## CONSOLIDATED NO'S 06CV1926 (TFH), 06CV1927 (TFH)
————————————————

## LOMA LINDA UNIVERSITY KIDNEY CENTER

**Plaintiff**

**v.**

## MICHAEL O. LEAVITT, SECRETARY OF HEALTH AND HUMAN SERVICES

**Defendant**
————————————————————————

## JOINT APPENDIX
## LOMA LINDA UNIVERSITY KIDNEY CENTER
## CASE NO. 06CV1926
————————————————

**JEFFREY A. LOVITKY**

Attorney at Law
1776 K. Street, N.W.,
Ste. 200
Washington, DC 20006
T: (202) 429-3393
F: (202) 318-4013

IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


LOMA LINDA UNIVERSITY          )
KIDNEY CENTER                  )
          Plaintiff      )
                          )
                          )
                          )
          vs.                 ) Case No. 1:06CV01926
                          )
                          )
MICHAEL O. LEAVITT, SECRETARY )
DEPARTMENT OF HEALTH AND       )
HUMAN SERVICES,                )
                          )
          Defendant.          )


# C E R T I F I C A T I O N

    I, Jacqueline R. Vaughn, Attorney Advisor, Centers for Medicare and Medicaid Services, Department of Health and Human Services, under authority delegated by the Secretary, certify that the documents attached constitute a true and accurate transcript of the official file as furnished by the Provider Reimbursement Review Board (PRRB). These documents are the record of the PRRB's proceedings and decision and the Administrator's review of that decision concerning monies claimed by Loma Linda University Kidney Center cost reporting period ending August 30, 2000, under Title XVIII of the Social Security Act, as amended.


Date: December 15, 2006                                     

                                  Jacqueline R. Vaughn



Loma Linda University Kidney Center
PRRB Decision No. 2006-D40

## COURT TRANSCRIPTS INDEX

|  | Page No(s) |
|---|---|
| Notice, dated September 15, 2006 of Administrator's Decision | 1 |
| Administrator's Decision, dated September 12, 2006 | 2-8 |
| Provider's Comments, dated August 21, 2006 | 9-14 |
| Notices, dated August 9 and August 17, 2006. that the Administrator will Review PRRB Decision No. 2006-D40 | 15-18 |
| Comments from Center for Medicare Management, dated August 7, 2006 | 19-21 |
| Notices, dated July 27, 2006 of PRRB Decision | 22-24 |
| PRRB Decision No. 2006-D40. dated July 27, 2006 | 25-32 |
| Provider's Post Hearing Brief, with Exhibits | 33-90 |
| Transcripts of Oral Hearing, held June 10, 2004 | 91-152 |
| Provider's List of Witnesses | 153-155 |
| Provider's Position Paper with Exhibits | 156-599 |
| Intermediary's Position Paper with Exhibits | 600-784 |
| Notices of Hearing, with Acknowledgements | 785-789 |
| Correspondence regarding Subpoenas | 790-800 |
| Correspondence regarding Issues | 801-802 |
| Correspondence regarding Mediation | 803-807 |
| Correspondence regarding Request for Documents and Interrogatories | 808-869 |
| Correspondence regarding Appeal | 870-871 |

Loma Linda University Kidney Center
PRRB Decision No. 2006-D40

COURT TRANSCRIPTS INDEX
(Continued)

|  | Page No(s) |
|---|---|
| PRRB's Acknowledgement and Instructions | 872-873 |
| Provider's Requests, for Hearing, with Notices of Program Reimbursement, and Supporting Documents | 874-888 |

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043



**CENTERS for MEDICARE & MEDICAID SERVICES**

**Office of the Attorney Advisor**

SEP 1 5 2006

**VIA CERTIFIED MAIL**


Mr. Jack Ahern
Ahern & Associates
841 C South Racine Avenue
Chicago, IL 60607


Re: <u>Loma Linda University Kidney Center</u>, PRRB Decision No. 2006-D40


Dear Mr. Ahern:

Enclosed is a copy of the Administrator's decision in the above case reversing the decision of the

Provider Reimbursement Review Board  This constitutes the final administrative decision of the

Secretary of the Health and Human Services.  Pursuant to Section 1878(f) of the Social Security

Act and 42 CFR 405.1877, the Provider may obtain judicial review by filing a civil action within

60 days of receipt of this decision.


Sincerely yours,

Jacqueline R. Vaughn
Attorney Advisor

Enclosure

cc·  Bernard M. Talbert, Esquire, Intermediary's Representative

# CENTERS FOR MEDICARE AND MEDICAID SERVICES

## *Decision of the Administrator*

| | |
|---|---|
| **In the case of:**<br><br>**Loma Linda University Kidney Center**<br>**Loma Linda, California**<br><br>Provider<br><br><br>vs.<br><br>**Blue Cross Blue Shield Association/**<br>**United Government Services, LLC - CA**<br><br>Intermediary | **Claim for:**<br><br>**Provider Cost Reimbursement**<br>**Determination of Reasonable**<br>**Costs for ESRD Window End**<br>**Date - August 30, 2000**<br><br><br><br>**Review of:**<br><br>**PRRB Dec. No. 2006-D40**<br>**Dated: July 27, 2006** |

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the decision of the Provider Reimbursement Review Board (Board). The review is during the 60-day period in Section 1878(f) (1) of the Social Security Act (Act), as amended (42 USC 1395oo (f)). The Provider and Center for Medicare Management (CMM) submitted comments in this case. Accordingly, this case is now before the Administrator for final administrative review.

## BACKGROUND

End Stage Renal Disease (ESRD) facilities are reimbursed for outpatient dialysis services under the composite payment rate system.[1] In the instant case, the ESRD window end date was August 30, 2000. The parties stipulated to the following facts.

---

[1] The term, "composite payment rate," and the term used in the regulations, "prospective payment rate" refer to the same payments. The prospective payment system (PPS) establishes a per-dialysis treatment composite payment rate, which consists of a labor portion and a non-labor portion. There are two base composite rates: one for hospital based ESRD facilities, and the other for independent facilities. Composite rates, including exception payment rates, remain in effect until CMS announces new payment rates. See 42 C.F.R. §.413.170(b) and § 2702 *et seq* of the Provider Reimbursement Manual (PRM).

The Provider, an outpatient renal dialysis facility, filed a composite rate exception request with its Intermediary, by letter dated August 28, 2000, seeking additional payment for outpatient dialysis services. The Provider sought a payment rate of $186.59 (or an increase of $51.64) for maintenance hemodialysis and $184.38 for home program peritoneal dialysis (or an increase of $49.43) under the atypical patient mix exception criteria.

By letter dated September 19, 2000, the Intermediary forwarded the Provider's composite rate exception request and its recommendation to CMS. By letter dated on November 15, 2000, CMS notified the Intermediary of its decision that the Provider should continue to be paid its composite rate of $134.95 for outpatient maintenance dialysis and home program dialysis. By letter dated November 29, 2000, the Provider was notified that CMS had denied its exception request. On April 16, 2001 the Provider timely appealed.

## ISSUE AND BOARD DECISION

The issue before the Administrator is whether the denial of the Provider's request for an exception to the end stage renal disease (ERSD) composite rate by the Centers for Medicare and Medicaid Services (CMS) was proper, or whether it should be deemed to have been approved pursuant to §1881(b)(7) of the Act.

The Board majority found that pursuant to §1881(b) (7) of the Act [42 U.S.C. §1395rr (b) (7) and 42 C.F.R. §413.180(h)], the exception request was automatically deemed approved as CMS' determination was sent to the Provider after the 60 working day deadline. The Board majority concluded, as noted in prior decisions,[2] since CMS strictly enforces the time limits regarding the submission of composite rate exceptions requests, CMS should also strictly self-enforce purported notice requirements when rendering a determination. The Board majority further found that, once an intermediary receives a provider's timely filed exception request, the burden shifts to CMS to render a decision within the 60 working day window, and to give the provider actual notice of its determination within that same 60 working day window. According to the Board majority, the statutory and regulatory time limit for disapproval should be interpreted as including all essential elements of the entire disapproval process, including transmission of the notice.

The Board majority found that CMS did not comply with the statute when it rendered its determination within the 60 working day window, but failed to issue actual notice until after the 60-day limit. Thus, as a result of the failure of CMS to notify the Provider of the determination within 60 working days as required by

---

[2] See e.g. Mount Clemens General Hospital, PRRB Dec. No. 2002-D26.

§1881(b) (7) the Provider's exception request is deemed approved.

Two members of the Board dissented on the grounds that the statute, regulations and program guidance required only that CMS render its determination not later than 60 days after the exception request is filed. In the instant case, that action did occur. The Dissent argued that CMS made its decision to deny Loma Linda's exception request within the 60 working day time limit specified in the statute, regulation, and manual. The Dissent acknowledged that in a previous case involving the 60-day limit issue (Mount Clemens General Hospital, PRRB Dec. No. 2002-D26), the Provider did not receive notice of the disapproval until 14 months after the end of the 60 day working period, and the Board found that such inordinate delay may seriously prejudiced that provider's rights, including the option to drop out of the program. The Dissent maintained, however, that in the present case the Provider did not submit its exception request until the final day of the opening "window," and prior to receipt of CMS' denial, the Provider made no inquiry of CMS regarding the decision. The Dissent argued that since CMS' denial was communicated to the Provider within seven working days after the end of the 60 working day period, no claim of prejudice of Provider's rights can reasonably be made. The Dissent argued that CMS' November 15, 2000 disapproval of Provider's exception request satisfied the regulatory requirements in that it was made within 60 working days after the request was filed with Provider's Intermediary, and was therefore timely.

## SUMMARY OF COMMENTS

CMM commented, requesting reversal of the Board's decision. CMM argued that the applicable statute, regulation and manual provision require that "an exception request is deemed approved unless it is disapproved within 60 working days after it is filed with its intermediary." CMM argued that CMS made its decision to deny the Provider's exception request within the 60 working day time limit specified in the statute, regulation and manual. CMM noted that prior decisions of the Administrator have upheld this position.[3] Thus, CMM concluded that CMS' November 15, 2000 disapproval of the Provider's exception request satisfied the regulatory requirements in that it was made within 60 working days after the request was filed timely with the Provider's Intermediary.

The Provider argued that the Board's decision was consistent with Medicare law and due process notions of agency notice. The Provider asserted that the notice of denial was submitted to the Intermediary after the 60 day deadline had already expired, as the Provider received notice of CMS' denial 67 days after it was filed. The Provider

---

[3] Tri-State Memorial Hospital, PRRB Dec. No. 2000-D25, rev'd Admr. May 11, 2000, and Charlotte Hungerford Hospital, PRRB Dec. No. 96-D64, rev'd Admr Nov 8, 1996.

asserted that prompt notification of the Intermediary was not made in the instant case, which differed substantially from the cases referenced by CMM.[4]

The Provider also claimed that pursuant to the record, the Intermediary was unable to find the November 15, 2000 letter which substantiates the exact date the denial notification letter was sent from CMS to the Intermediary. The Provider commented that a letter that is not in the record, and possibly not sent in a timely manner, cannot be the basis for satisfying the 60 day limit. The Provider contended that this case is similar to Board's Decision No. 2002-D26 (Mount Clemens General Hospital), which deemed that an ESRD exception request approved because notice of disapproval was not sent to the Provider within the 60 working day time period allowed for processing the exception, as mandated per §1881(b) (7) of the Social Security Act  The Board's decision to approve the Mt. Clemens exception was affirmed, on limited grounds, because the record did not clearly demonstrate that CMS disapproved a provider's request within the 60-day time limit.

The Provider also contended that in the instant case, CMS did not send its notification to the Intermediary until after the 60-day deadline expired. As such, even assuming arguendo that notification of the Provider is not subject to the 60-day time limit, the Provider argued that CMS has not satisfied its requirement to provide notification to the Intermediary within the 60 day period. The Provider claimed that the fact that the Intermediary is unable to produce a copy of the November 15 letter in response to the Board's subpoena raises substantial doubts as to when the letter was created. The Provider concluded its comments by requesting that the Administrator affirm the Board's decision to approve the Provider's exception request.

## DISCUSSION

The entire record furnished by the Board has been examined, including all correspondence, position papers, exhibits, and subsequent submissions. All comments timely received have been included in the record and considered.

In general, Medicare Part A reimburses approved providers of renal dialysis services on a prospective payment rate basis pursuant to §1881(b) of the Act, and 42 C.F.R. 413.170 et seq.  However, providers may apply for exceptions to the prospective payment composite rate pursuant to §1881(b) of the Act, and the implementing regulations at §413.170.[5]  The criteria for granting an exception is set forth at

---

[4] Tri-State Memorial Hospital, PRRB Dec. No. 2000-D25, rev'd Admr  May 11, 2000, and Charlotte Hungerford Hospital, PRRB Dec. No. 96-D64, rev'd Admr. Nov. 8, 1996

[5] See also §2720 of the PRM

§413.170(g), which states that an exception request may be granted if the Provider demonstrates with "convincing objective evidence" that its per treatment costs are reasonable and allowable, and directly attributable to any of the listed criteria. The regulations at §413.170(f) establish that the burden falls upon the provider to demonstrate to the satisfaction of CMS that it has met the criteria for receiving an exception to the prospective payment rate.

In this case, however, the parties dispute not the merits of the denial of the Provider's exception request, but rather the interpretation of the pertinent statutory language governing the timing of CMS determination on composite rate exception requests. The determinative language is found at §1881(b) (7) of the Act, which states:

> [E]ach application for such exception shall be deemed to be approved <u>unless the Secretary disapproves it</u> not later than 60 working days after the date the application is filed. [Emphasis added.]

The Provider did not receive notice of the Board's decision until November 29, 2000. The Provider argues that, because it did not receive notice of CMS' decision within 60 working days after it filed the exception request, the language at §1881(b)(7) renders its request accepted in full as a "deemed approval." CMM argues that the statutory language requires that CMS' disapproval must be only rendered within the 60 days or the exception will be deemed approved.

The Administrator finds that the statute states that an exception request "shall be deemed to be approved unless the Secretary <u>disapproves</u> it not later than 60 working days after the date the application is filed." [Emphasis added] The statute does not state that the actual notice of the disapproval must be <u>received</u> by the provider within 60 working days after the application is filed. The Administrator notes that the key word in §1881(b) (7) is "disapproves," which is defined in ordinary use as "to refuse to approve; reject."[6] The Administrator finds the plain language of the statute using the word "disapproves" requires that CMS render the disapproval of the ESRD exception request within the 60-working day statutory period. The statute does not require that the Provider receive the disapproval, or have notice of the disapproval, within that statutory time period. Thus, the Administrator finds the Board erred in holding that the exception request was deemed approved because the Provider did not receive notice of the disapproval within the 60-working day period.[7]

---

[6] <u>See</u> American Heritage Dictionary, 4th Ed. (Houghton Mifflin) (2000).
[7] In reference to the Provider's comments regarding a previous case involving the 60-day limit issue (Mount Clemens General Hospital, PRRB Dec. No 2002-D26), the Administrator applied the word "disapproved" as above. The Administrator found, in

Thus, the Administrator finds that CMS' November 15, 2000 disapproval of Provider's exception request satisfied the statutory requirements in that it was made within 60 working days after the request was filed with Provider's Intermediary. Therefore, the Administrator finds the disapproval of the request was timely.

---

that case, that the record did not show that CMS' disapproval was rendered within the statutory 60 day time frame.

## DECISION

The decision of the Board is reversed in accordance with the foregoing opinion.

THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF
THE SECRETARY OF HEALTH AND HUMAN SERVICES.

Date: 7/12/00

Leslie V. Norwalk, Esq.
Deputy Administrator
Centers for Medicare & Medicaid Services

## *Ahern & Associates*

841 C South Racine Ave.      Phone: (312) 997-2177
Chicago, IL 60607            Fax:   (312) 942-9578
                             Email: AhernConsulting@aol.com

Sent Via Fax to:      (410) 786 - 0043

Sent Via FedEx:       Airbill Number 8383 8261 0159

Date:                 August 21, 2006

From:                 Jack Ahern
                      Provider Representative
                      Loma Linda University Kidney Center

Re:                   Provider Reimbursement Review Board
                      Decision No.        2006-D40,
                      Decision Date:      July 27, 2006
                      Provider:           Loma Linda University Kidney Center
                      Provider Number:    05-2550

To:                   Jacqueline R. Vaughn
                      Attorney Advisor

The Provider respectfully requests that the Board decision be affirmed in the above referenced case.

LLUKC Provider Comment                                    Page 1 of 6

In the CMS comment submitted to the Administrator, dated Aug 7, 2006, requesting the Board's decision be reversed, CMS does not contest that the applicable statute, regulation and manual provision require that "an exception request is deemed approved unless it is disapproved within 60 working days after it is filed with its intermediary." CMS also does not contest that the Provider received notice of CMS' denial 67 days after it was filed. Nor does CMS contest the PRRB's finding that notice of denial was submitted to the Intermediary after the 60 day deadline had already expired.

CMS asserts that in order to contest the tardiness of exception request disapproval, a claim of prejudice of the Provider's rights must reasonably be made. In essence, CMS contends that if the Provider is not financially or otherwise harmed by late notification, then the time limit for notification exceeds the 60-day limit, and may be extended indefinitely until that point at which the Provider is seriously damaged. However, as the Board concluded in this PRRB decision, 2006-D40, notification is an essential part of the process of exception request adjudication and without notification, the decision process is incomplete, and the decision itself is left unfinished. Moreover, nowhere in the applicable statute, regulation, and manual provisions is there a provision that notification can be delayed until serious damage is incurred by the Provider.

With regards to Administrator review, CMS references several similar cases in which the Administrator reversed PRRB decisions favorable to a provider. These were cases in which CMS failed to completely process an exception request within the 60-day limit. With regard to PRRB decision No. 2000 – D25, *Tri-State Memorial Hospital v. Blue Cross and Blue Shield Association,* the Administrator noted that *"The record included a file copy of the letter, clearly date stamped June 6, 1994 i.e. within 60 working days of the Intermediary's April 11, 1994 receipt of the provider's request."* CMS also cited an earlier PRRB Case, No. 96-D64, *Charlotte Hungerford Hospital v. Blue Cross and Blue Shield Association / Blue Cross and Blue Shield of Connecticut,* in which the Administrator's reversal is predicated on the assumption that the decision of the CMS Division of Chronic care was "communicated promptly," to the CMS Intermediary.

The facts of the Loma Linda University Kidney Center case differ substantially from the above citations because prompt notification of the Intermediary was not made.  CMS argued before the Board that the denial was transmitted to the intermediary before the 60 working day deadline expired.  See PRRB Decision at page 4.  However, the PRRB explicitly rejected this factual contention.  Thus, the PRRB found as follows:  *"The Board majority finds that pursuant to 42 U.S.C. 1395rr(b)(7) and 42 C.F.R. 413 180(h), the exception request was automatically deemed approved, as CMS' determination was sent to the Intermediary after the 60 day working deadline."*  Moreover, CMS appears to have abandoned its prior contention that it made notification to the intermediary within the 60 day period, as that contention is not repeated in its request for review by the Administrator.

In fact, note 7, page 3 of the PRRB decision states that *"The Board notes that on September 19, 2005, the Board issued a subpoena duces tecum to the Intermediary requesting the envelope containing CMS' November 15, 2000 letter as well as any and all other evidence in the Intermediary's possession which substantiates the exact date such letter was mailed from CMS to the Intermediary.  On October 4, 2005, the Intermediary responded that it was unable to find the November 15, 2005 letter."*  Logically, a letter that is not in the record, ostensibly never existed, or possibly was not sent in a timely manner, cannot be the basis for satisfying the 60-day limit.

The Provider also wishes to draw the Administrator's attention to the more recent Administrator decision to affirm a decision, favorable to a provider, on the 60-day limit issue.  PRRB decision No. 2002-D26 (July 9, 2002), **Mt. Clemens General Hospital v. Blue Cross and Blue Shield**, deemed that an End Stage Renal Disease exception request be deemed approved because notice of disapproval was not sent to the Provider within the 60 working day time period allowed for processing the exception, as mandated per *§1881(b)(7) of the Social Security Act.*

LLUKC Provider Comment                                              Page 3 of 6

The Board's decision to approve the Mt. Clemens exception was affirmed, on limited grounds, by the CMS Administrator on September 6, 2002, <u>because the record did not clearly demonstrate that CMS disapproved a provider's request within the 60-day time limit</u>.  The background of the Mt. Clemens case is that the Provider was not notified in writing of the status of the composite rate exception request within the 60-day time limit. However, the parties agree that CMS's disapproval took place <u>within</u> the 60-day window.

As with the Loma Linda University Kidney Center case, CMS requested that the Administrator reverse the Board's decision, claiming that §1881(b)(7) of the Act, requires that an exception request be deemed approved due to failure to meet the 60-day time limit,  if and only if, it is not <u>disapproved</u> within 60 working days of the filing date. CMS argued further that the provider notification of disapproval is not subject to the 60-day time limitation.

While concurring with CMS that notification is not subject to the 60-day time constraint, the Administrator noted that  *"an issue not addressed by the Board is whether CMS disapproved the ESRD exception request within the 60-working day period."*  The Administrator's rationale for affirming the Board's decision to approve the Mt. Clemens exception request was founded in the facts of the case:  *"The Administrator finds that, applying the correct interpretation of the law to the record in this case, <u>the record does not clearly demonstrate that the CMS disapproval was rendered within the 60-working day statutory timeframe</u> because of the various clerical and administrative errors reflected by the documents. Accordingly, the Administrator finds that the Provider's ESRD exception request is deemed approved."*  [emphasis added]

The Provider therefore respectfully requests that the Administrator likewise consider the facts of the Loma Linda University Kidney Center case.   Per the Board's decision, CMS did not send its notification to the intermediary until after the 60 day deadline expired. As such, even assuming *arguendo* that notification of the Provider is not subject to the 60-day time limit, CMS has not satisfied its requirement to provide notification to the Intermediary within the 60 day period. Indeed, the fact that the Intermediary is unable to

012

produce a copy of the November 15 letter in response to the PRRB's subpoena raises substantial doubts as to when that letter was created.

Finally, CMS has not referenced any part of the record to support its August 7, 2006 claim that: "prior to receipt of CMS' denial, the Provider made no inquiry of CMS regarding the decision." In fact, there is no requirement that the Provider should, or must, contact CMS within the 60-day limit to obtain notification of a denial. Moreover, per the Board's findings, the Intermediary itself had no notice of a decision prior to the end of the 60-day period.

In closing, the Provider respectfully requests that considering the intent of the 60-day limit and the facts of this case, the Administrator affirm the Board's decision to approve the Provider's exception request.

Respectfully,

Jack Ahern

Provider Representative
841C S. Racine Ave
Chicago, Il 60607

## CERTIFICATE OF SERVICE

This is to certify that copies have been sent to the following parties via U.S. Mail:

Janet P. Samen
Director, Division of Chronic Care Management
Chronic Care Policy Group
Center for Medicare Management
Centers for Medicare and Medicaid Services
7500 Security Boulevard
Baltimore, MD  21244 - 1850

Bernard M. Talbert Esq.
Blue Cross and Blue Shield Association
225 North Michigan Avenue
Chicago, IL 60601-7680

Mr. George Garcia
United Government Services
P.O.  Box 9150
Oxnard, CA 93031

Jack Ahern
Provider Representative
841C  S. Racine Ave
Chicago, Il 60607

August 21, 2006

014

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Phone 410-786-3176 Facsimile 410-786-0043

**CMS/**
CENTERS for MEDICARE & MEDICAID SERVICES

**Office of the Attorney Advisor**

**VIA FACSIMILE**

AUG 1 7 2006

Bernard M. Talbert, Esq.
Blue Cross and Blue Shield Association
225 N. Michigan Avenue
Chicago, IL 60601-7680

Re:    Loma Linda University Kidney Center, PRRB Dec. No. 2006D-40 (07/27/06)
       (FYE 08/30/2000)

Dear Mr. Talbert:

This is to notify you that the Notice of Review (NOR) faxed on August 9, 2006 has been rescinded. The Provider Reimbursement Review Board's (Board) re-issued the above referenced case on August 11, 2006. Comments have been received from the Centers for Medicare Management, Centers for Medicare & Medicaid Services. These comments seek the Administrator's review of the Board decision concerning the Provider's request for an exception to the end-stage renal disease (ESRD) composite rates. Accordingly, this case will be before the Administrator within the next few weeks to determine whether to reverse, affirm, modify or remand the Board's decision. Involved will be whether the Board's decision is in keeping with the pertinent laws, regulations, and other criteria cited by the Board and by the parties in their comments. The Board's decision will be reviewed in light of prior decisions of the Administrator and relevant court decisions.

The governing regulations published at 42 C.F.R. § 405.1875 explains the procedures in conducting final agency review of decisions made by the Board. You have a right to submit comments within 15 days of your receipt of this letter. **If you do submit comments, we would appreciate your faxing them to this office at (410) 786-0043, in order to ensure receipt of the comments by this office.** An Administrator's decision must be rendered within 60 days after the Provider received the Board's decision. I will promptly send you a copy of the decision after it is rendered.

                              Sincerely,

                              Jacqueline R. Vaughn
                              Attorney Advisor

cc:    Jack Ahern, Provider's Representative
       Center for Medicare Management, CMS

15

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard. Mail Stop C3-01-20
Baltimore. Maryland 21244-1850
Phone 410-786-3176 Facsimile 410-786-0043



**Office of the Attorney Advisor**

**VIA FACSIMILE**
AUG 1 7 2006

Jack Ahern
Ahern & Associates
841 South Racine Avenue, Suite C
Chicago. IL 60607

Re:   <u>Loma Linda University Kidney Center</u>, PRRB Dec. No. 2006D-40 (07/27/06)
      (FYE 08/30/2000)

Dear Mr. Ahern.

This is to notify you that the Notice of Review (NOR) faxed on August 9, 2006 has been rescinded.   The Provider Reimbursement Review Board's (Board) re-issued the above referenced case on August 11. 2006.   Comments have been received from the Centers for Medicare Management. Centers for Medicare & Medicaid Services.   These comments seek the Administrator's review of the Board decision concerning the Provider's request for an exception to the end-stage renal disease (ESRD) composite rates.   Accordingly, this case will be before the Administrator within the next few weeks to determine whether to reverse, affirm. modify or remand the Board's decision.   Involved will be whether the Board's decision is in keeping with the pertinent laws, regulations. and other criteria cited by the Board and by the parties in their comments.   The Board's decision will be reviewed in light of prior decisions of the Administrator and relevant court decisions.

The governing regulations published at 42 C.F.R. § 405.1875 explains the procedures in conducting final agency review of decisions made by the Board.   You have a right to submit comments within 15 days of your receipt of this letter.   **If you do submit comments, we would appreciate your faxing them to this office at (410) 786-0043, in order to ensure receipt of the comments by this office.**   An Administrator's decision must be rendered within 60 days after the Provider received the Board's decision.   I will promptly send you a copy of the decision after it is rendered.

Sincerely,

Jacqueline R. Vaughn
Attorney Advisor

cc:   Bernard M. Talbert, Esq., Intermediary's Representative
      Center for Medicare Management, CMS



DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Phone 410-786-3176 Facsimile 410-786-0043

CENTERS for MEDICARE & MEDICAID SERVICES

**Office of the Attorney Advisor**
**VIA FACSIMILE**

Jack Ahern                          AUG - 9 2006
Ahern & Associates
841 South Racine Avenue, Suite C
Chicago, IL 60607

Re:    Loma Linda University Kidney Center, PRRB Dec. No. 2006D-40 (07/27/06)
       (FYE 08/30/2000)

Dear Mr. Ahern:

This is to notify you that comment have been timely received from the Centers for Medicare Management, Centers for Medicare & Medicaid Services. These comments seek the Administrator's review of the Provider Reimbursement Review Board's (Board) decision concerning the Provider's request for an exception to the ESRD composite rates. Accordingly, this case will be before the Administrator within the next few weeks to determine whether to reverse, affirm, modify or remand the Board's decision. Involved will be whether the Board's decision is in keeping with the pertinent laws, regulations, and other criteria cited by the Board and by the parties in their comments. The Board's decision will be reviewed in light of prior decisions of the Administrator and relevant court decisions.

The governing regulations published at 42 C.F.R. § 405.1875 explains the procedures in conducting final agency review of decisions made by the Board. You have a right to submit comments within 15 days of your receipt of this letter. **If you do submit comments, we would appreciate your faxing them to this office at (410) 786-0043, in order to ensure receipt of the comments by this office.** An Administrator's decision must be rendered within 60 days after the Provider received the Board's decision. I will promptly send you a copy of the decision after it is rendered.

Sincerely,

Jacqueline R. Vaughn
Attorney Advisor

cc:    Bernard M. Talbert, Esq., Intermediary's Representative
       Center for Medicare Management, CMS

017

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Phone 410-786-3176 Facsimile 410-786-0043



**Office of the Attorney Advisor**
**VIA FACSIMILE**

Bernard M. Talbert, Esq.                    AUG - 9 2006
Blue Cross and Blue Shield Association
225 N. Michigan Avenue
Chicago, IL 60601-7680

Re:    <u>Loma Linda University Kidney Center</u>, PRRB Dec. No. 2006D-40 (07/27/06)
       (FYE 08/30/2000)

Dear Mr. Talbert:

This is to notify you that comment have been timely received from the Centers for Medicare Management, Centers for Medicare & Medicaid Services. These comments seek the Administrator's review of the Provider Reimbursement Review Board's (Board) decision concerning the Provider's request for an exception to the end-stage renal disease (ESRD) composite rates. Accordingly, this case will be before the Administrator within the next few weeks to determine whether to reverse, affirm, modify or remand the Board's decision. Involved will be whether the Board's decision is in keeping with the pertinent laws, regulations, and other criteria cited by the Board and by the parties in their comments. The Board's decision will be reviewed in light of prior decisions of the Administrator and relevant court decisions.

The governing regulations published at 42 C.F.R. § 405.1875 explains the procedures in conducting final agency review of decisions made by the Board. You have a right to submit comments within 15 days of your receipt of this letter. **If you do submit comments, we would appreciate your faxing them to this office at (410) 786-0043, in order to ensure receipt of the comments by this office.** An Administrator's decision must be rendered within 60 days after the Provider received the Board's decision. I will promptly send you a copy of the decision after it is rendered

                          Sincerely,

                          Jacqueline R. Vaughn
                          Attorney Advisor


cc:    Jack Ahern, Provider's Representative
       Center for Medicare Management, CMS

DEPARTMENT OF HEALTH & HUMAN SERVICES

Centers for Medicare & Medicaid Services

7500 Security Boulevard
Baltimore, MD  21244-1850

Date.        August 7, 2006

From:        Director
             Division of Chronic Care Management
             Chronic Care Policy Group
             Center for Medicare Management

Subject:     Loma Linda University Kidney Center (Provider), Provider
             Reimbursement Review Board (Board) Decision No.2006-D40, Case No
             01-2872, July 27, 2006

To.          Director
             Office of the Attorney Advisor

CMS respectfully disagrees with the Board's thin majority decision (representing 3 out of
5 Board members-2 Board members gave a dissenting opinion) that the Provider's
exception request must be deemed approved because the Provider was not notified of
CMS' decision disapproving the request within 60 working days.

The applicable statute, regulation and manual provision require that "an exception request
is deemed approved unless it is disapproved within 60 working days after it is filed with
its intermediary." CMS made its decision to deny the Provider's exception request within
the 60 working day time limit specified in the statute, regulation and manual

The exception request at issue in this case was submitted on August 28, 2000.  CMS
made its determination to deny the request on November 15, 2000  The Provider
maintains that to be timely, the 60 working day limit required that it receive notification
of CMS' final determination on or before November 24, 2000, but that the denial was not
communicated to the Provider until November 29, 2000. *(Please note, however, that the
60th working day after August 28, 2000 is November 20, 2000, not November 24 per the
Provider's count of working days )*  Therefore, the Provider did not receive notice of
CMS' denial of the exception request until 67 working days after it was filed

Board member Blodgett acknowledged that in a previous case involving the 60-day limit
issue (Mount Clemens General Hospital, PRRB Dec. No. 2002-D26), he agreed with the
Board majority that the provider's exception request should have been deemed approved
However, in the Mount Clemens case the provider did not receive notice of the
disapproval until 14 months after the end of the 60 working day period, and the Board
majority found that such an inordinate delay may have seriously prejudiced that
provider's rights, including its option to drop out of the program.

In this case, the Provider did not submit its exception request until the final day of the
180 day "exception window".  Moreover, prior to receipt of CMS' denial, the Provider

made no inquiry of CMS regarding the decision. Since CMS' denial was communicated to the Provider within seven working days after the end of the 60 working day period, no claim of prejudice of Provider's rights can reasonably be made.

We believe, as did the dissenting opinion of two Board members, that CMS' November 15, 2000 disapproval of the Provider's exception request satisfied the regulatory requirements in that it was made within 60 working days after the request was filed timely with the Provider's Intermediary. Therefore, we believe that the disapproval of the Provider's request was timely.

Please note, to support CMS's request to reverse the above Board decision, we are citing two previous HCFA Administrator's Decisions that reversed previous unfavorable Board decisions on the exact same "60 work day" issue.

The first Decision was rendered on November 8, 1996, Charlotte Hungerford Hospital v Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Connecticut.

In this case, PRRB Dec. No. 96-D64, the Board held that HCFA's denial of the provider's exception request was not proper. The provider submitted an exception request which the Intermediary accepted as complete on February 2, 1990. Although HCFA denied the provider's exception request on April 12, 1990 because it lacked necessary documentation and was therefore incomplete, neither HCFA nor the Intermediary communicated the denial to the provider until May 21, 1990. The period from February 2, 1990 to May 21, 1990 is 75 working days. The Board disagreed with the Intermediary's argument that HCFA disapproved the provider's exception request within 60 working days and that notification to the provider is not relevant. HCFA's denial of the exception request was communicated promptly to the Intermediary, but due to a misunderstanding, the Intermediary did not relay notification of the denial to the provider. The provider learned of HCFA's denial of the exception request on May 21, 1990, when it telephoned the Intermediary, inquiring as to the status of the exception request. Following the telephone call, the Intermediary telefaxed that same day a copy of HCFA's April 12, 1990 denial of the exception request. The Board found that the provider's request should be deemed approved under section 1881(b)(7) because the provider was not notified of HCFA's disapproval of the request until after 60 working days from the date its exception request was filed. The Administrator, however, does not agree with the Board's finding that the provider's request for exception should be deemed approved. The Administrator disagrees with the Board's finding that section 1881(b)(7) provides that an exception request will be deemed approved unless notification of the disapproval is given within 60 working days of the filing of the application. The Administration finds that the plain language of section 1881(b)(7) states that a provider's request for an exception is deemed approved only if the Secretary fails to *disapprove* it within 60 working days of the filing of the request; there is no requirement that the Secretary notify the provider of its disapproval within 60 working days.

The second Decision was rendered on May 8, 2000, Tri-State Memorial Hospital v. Blue Cross and Blue Shield Association.

In this case, PRRB Decision No. 2000-D25, the Board held that HCFA's denial of the provider's exception request was not proper. The provider submitted an exception request which the Intermediary accepted as complete on April 11, 1994. The Board found that HCFA's June 6, 1994 denial of the provider's exception was not received by the provider until September 17, 1994. The Board noted that the Intermediary acknowledged it did not receive a copy of HCFA's June 6, 1994 denial letter until it followed up with HCFA for the determination pursuant to the provider's August 17, 1994 letter. With respect to the timeliness, the Administrator finds that the record supports that HCFA's denial was made within 60 working days of the provider's exception request filing. The record includes a file copy of the letter, clearly date stamped June 6, 1994, i.e., within 60 working days of the Intermediary's April 11, 1994 receipt of the provider's request. The statute states only that an exception request "shall be deemed approved unless the Secretary disapproves not later than 60 working days after the date the application is filed". The statute does not require that the disapproval must be received by the provider within 60 working days after the application is filed. Thus, in light of the statutory language and HCFA's unrebutted evidence that the denial letter was on June 6, 1994, the Administrator finds that HCFA met the requirement of disapproving the provider's exception request in a timely manner.

For the reasons cited above, CMS met the requirement of disapproving the Provider's exception request in a timely manner, and we respectfully request that the Board decision be reversed.

Janet P Samen

This is to certify that copies have been sent to the following parties:

Mr Jack Ahern
Ahern & Associates
841 South Racine Avenue, Suite C
Chicago, IL 60607

Bernard M Talbert, Esq.
Blue Cross & Blue Shield Association
225 North Michigan Avenue
Chicago, IL 60601-7680

Mr. George Garcia
United Government Services
P.O. Box 9150
Oxnard, CA 93031-9150



DEPARTMENT OF HEALTH AND HUMAN SERVICES
PROVIDER REIMBURSEMENT REVIEW BOARD
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671                    FAX: 410-786-5298

Suzanne Cochran, Esq, Chairperson
Gary B. Blodgett, D.D.S
Elaine Crews Powell, CPA
Anjali Mulchandani-West
Yvette C. Hayes

Refer to

JUL 2 7 2006

Case No.:   01-2872
Decision No.:   2006-D40

**CERTIFIED MAIL**

Mr. Jack Ahern
President
Ahern & Associates
841 South Racine Avenue
Suite C
Chicago, IL  60607

RE:   Loma Linda University Kidney Center
      Provider No.:   05-2550
      ESRD Window End Date - August 30, 2000

Dear Mr. Ahern:

A copy of the Provider Reimbursement Review Board's decision on
the above-referenced appeal is enclosed.  Please see enclosure
for review and appeal information.

If you have any questions, please call (410) 786-2671.

Sincerely,


Paul J. Crofton, Director
Division of Hearings and Decisions


5 Enclosures
    Final Decision Review and Appeal Information
    Decision
    42 USC 139500(f)
    42 CFR 405.1875 and 405.1877

| OFFICE | SURNAME | DATE | OFFICE | SURNAME | DATE |
|--------|---------|------|--------|---------|------|
| Cohen, C | | 7/7/06 | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**File Copy**

022

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671          FAX: 410-786-5298

Suzanne Cochran, Esq., Chairperson
Gary B Blodgett, D D S
Elaine Crews Powell, CPA
Anjali Mulchandani-West
Yvette C. Hayes

Refer to

JUL 27 2006

Case No.: 01-2872
Decision No. 2006-D40

**CERTIFIED MAIL**

Mr. Bernard M. Talbert, Esquire
Associate Counsel
BlueCross BlueShield Association
225 North Michigan Avenue
Chicago, IL  60601-7680

RE:  Loma Linda University Kidney Center
     Provider No.:  05-2550
     ESRD Window End Date - August 30, 2000

Dear Mr. Talbert:

A copy of the Provider Reimbursement Review Board's decision on the
above-referenced appeal is enclosed.  Please see enclosure for review
and appeal information.

If you have any questions, please call (410) 786-2671.

Sincerely,


Paul J. Crofton, Director
Division of Hearings and Decisions

cc:  United Government Services, LLC-CA

5 Enclosures
    Final Decision Review and Appeal Information
    Decision
    42 USC. 139500(f)
    42 CFR 405.1875 and 405.1877

| OFFICE | SURNAME | DATE | OFFICE | SURNAME | DATE |
|--------|---------|------|--------|---------|------|
| Color | PC | 7/27/06 | | | |
| | PC | 7/27 | | | |
| | | | | | |
| | | | | | |

**File Copy**

023

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671          FAX: 410-786-5298

Suzanne Cochran, Esq., Chairperson
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Anjali Mulchandani-West
Yvette C. Hayes

JUL 2 7 2006

Refer to Case No.:  01-2872
Decision No.:  2006-D40


Dr. Mark B. McClellan, M.D., Ph.D.
Administrator
Centers for Medicare and Medicaid Services
7500 Security Boulevard
Mailstop:  C5-16-03
Baltimore, Maryland 21244-1850


RE:  Loma Linda University Kidney Center
     Provider No.:  05-2550
     ESRD Window End Date - August 30, 2000

Dear Dr. McClellan:

A copy of the Provider Reimbursement Review Board's decision on
the above-referenced appeal is enclosed.

Also, by copy hereof, the decision and the official case file
containing all items listed in the index are forwarded to the
Attorney Advisor to be returned intact upon completion of the
"Own Motion" review.

Additional information will be furnished upon request.

If you have any questions, please call (410) 786-2671.

Sincerely,



Paul J. Crofton, Director
Division of Hearings and Decisions

Enclosure

cc:  Deputy Chief Counsel for Litigation
     Director, Centers for Medicare Management
     Attorney Advisor

| OFFICE | SURNAME | DATE | OFFICE | SURNAME | DATE |
|--------|---------|------|--------|---------|------|
|        | r.b.k   | 1/1  |        |         |      |
|        | PC      | 7/2  |        |         |      |
|        |         |      |        |         |      |
|        |         |      |        |         |      |

File
Copy

# PROVIDER REIMBURSEMENT REVIEW BOARD DECISION

2006-D40

**PROVIDER -**
Loma Linda University Kidney Center
Loma Linda, California

Provider No.: 05-2550

**vs.**

**INTERMEDIARY -**
BlueCross BlueShield Association/
United Government Services, LLC - CA

**DATE OF HEARING -**
June 10, 2004

**ESRD Window End Date -**
August 30, 2000

**CASE NO.:** 01-2872

## INDEX

| | Page No |
|---|---|
| Issue.............................................................................................................. | 2 |
| Medicare Statutory and Regulatory Background.................................................... | 2 |
| Statement of the Case and Procedural History...................................................... | 3 |
| Findings of Fact, Conclusions of Law and Discussion........................................... | 4 |
| Decision and Order............................................................................................. | 5 |
| Dissenting Opinions of Gary B. Blodgett, D.D.S and Elaine Crews Powell, C.P.A............... | 7 |

| OFFICE | SURNAME | DATE | OFFICE | SURNAME | DATE |
|---|---|---|---|---|---|
| B Colv~ | 7/18/06 | | | | |
| Cathy | 7/11/6 | | | | |

**File Copy**

ISSUE:

Whether the denial of the Provider's request for an exception to the end stage renal disease (ESRD) composite rate by the Centers for Medicare and Medicaid Services (CMS) was proper.

MEDICARE STATUTORY AND REGULATORY BACKGROUND:

This is a dispute over the amount of Medicare payments due a provider of dialysis services for ESRD.

The Medicare program was established to provide health insurance to the aged and disabled. 42 U.S.C. §§1395-1395cc. The Centers for Medicare and Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA), is the operating component of the Department of Health and Human Services charged with administering the Medicare program. CMS' payment and audit functions under the Medicare program are contracted out to insurance companies known as fiscal intermediaries. Fiscal intermediaries determine payment amounts due the providers under Medicare law and under interpretive guidelines published by CMS. See 42 U.S.C. §1395h, 42 C.F.R. §§413.20(b) and 413.24(b).

ESRD facilities are reimbursed for outpatient dialysis services under the "composite rate" system.[1] Under this system, a provider of dialysis services receives a prospectively determined payment for each dialysis treatment that it furnishes. An ESRD facility must accept the composite prospective payment rate established by CMS as payment in full for covered outpatient dialysis unless it qualifies for one of the exceptions in accordance with the procedures established under 42 C.F.R. §413.180, et seq.

Regarding the exception request, 42 U.S.C. §1395rr(b)(7) states, in relevant part, that:

> Each application for such an exception shall be deemed to be approved unless the Secretary disapproves it by no later than 60 working days after the date the application is filed.

Similarly, 42 C.F.R. §413.180(h)(2000)[2] states:

> Approval of an exception request. An exception request is deemed approved unless it is disapproved within 60 working days after it is filed with the intermediary.

This case involves whether the denial was timely under these provision.

---

[1] 42 U.S.C. §1395rr and the regulations at 42 C.F.R. §413.180 et seq.
[2] 70 Fed. Reg. 70116, 70331 (November 21, 2005), recodified this subsection, in full text, effective January 1, 2006, to 42 C.F.R. §413.80(g).

CN: 01-2872

## STATEMENT OF THE CASE AND PROCEDURAL HISTORY:

Loma Linda University Kidney Center (Provider) is located in Loma Linda, California.
The Provider performs in-facility hemodialysis as well as home peritoneal dialysis for its
patients. The Provider has filed an appeal pertaining to the denial of the Provider's
application for relief from the composite payment rate established for its Medicare
certified renal dialysis facility.

The procedural history of this case upon which the Board's findings and conclusions are
based is as follows:

August 28, 2000 –The record indicates that the Provider's request for an
exception to the composite payment rate[3] was received by United Government Services,
LLC-CA (Intermediary) on this date.[4] The Provider sought an exception amount of
$186 59 (or an increase of $51.64 for maintenance hemodialysis) and of $184.38 for
home program peritoneal dialysis (or an increase of $49.43) under the atypical patient
mix exception criteria.[5]

September 19, 2000- The Intermediary issues a letter to CMS recommending a
composite rate of $181.52 for maintenance hemodialysis and $179.55 for home program
peritoneal dialysis.[6]

November 15, 2000- CMS issues a letter to the Intermediary stating that the
Provider should continue to be paid its composite rate of $134.95 for outpatient
maintenance and home program dialysis.[7]

November 29, 2000- The Intermediary issues an exception request denial to the
Provider[8] enclosing CMS's November 15, 2000 letter.

April 16, 2001- The Provider subsequently filed a timely request for a hearing
with the Provider Reimbursement Review Board (Board) and has met the jurisdictional
requirements of 42 C.F R. §§405.1835-1841

---

[3] Provider Exhibit (Ex.) 1
[4] See references in Intermediary Ex. 1, Provider Exs. 2 and 6.
[5] Provider Ex. 1, p.3 (Exception Request).
[6] See references at Intermediary Ex 1, Provider Ex. 2 (copy of September 19, 2000 letter
is not in this record)
[7] See Intermediary Ex.1, Provider Ex.2 at 9. The Board notes that on September 19, 2005,
the Board issued a subpoena duces tecum to the Intermediary requesting the envelope
containing CMS' November 15, 2000 letter as well as any and all other evidence in the
Intermediary's possession which substantiates the exact date such letter was mailed
from CMS to the Intermediary  On October 4, 2005, the Intermediary responded that it
was unable to find the November 15, 2005 letter.
[8] Provider Ex. 3

CN: 01-2872

The Provider was represented by Jack Ahern and Jeffrey A. Lovitky, Esq. The
Intermediary was represented by Bernard Talbert, Esquire, of Blue Cross and Blue Shield
Association.

Provider position:

The Provider contends that because it did not receive notification of the denial of its
exception request within 60 working days after the date the application was filed, the
request should be approved pursuant to 42 U.S.C. §1395rr(b)(7) and 42 C.F.R.
§413.180(h). The Provider explains that to have been timely, " . the 60 working days
limit required that notification of the CMS determination    [be] received by the
Provider on or before November 24, 2000."[9] The Provider notes that the denial was not
communicated to the Provider until the Intermediary's letter dated November 29, 2000
letter; moreover, as there is no evidence that the notification was faxed or sent via
overnight mail, it would be reasonable to conclude that the receipt of notification would
have added 5 additional days to the process. Also, the Intermediary's belief that the
Exception Request was timely processed by virtue of CMS' November 15, 2000 letter
contradicts Congress' intent to simplify and expedite the exception request process.
Moreover, previous PRRB decisions established that the date of the CMS decision did
not necessarily stop the 60 working days clock [10]

Intermediary/CMS position:

The Intermediary argues that the denial was timely made by CMS and transmitted before
the 60 working-day deadline expired.[11] Moreover, the Administrator has rejected the
Provider's position that actual notice of CMS' disapproval must be received by the
Provider within 60 working days.[12]

FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION:

The Board majority finds that pursuant to 42 U.S.C. §1395rr(b)(7) and 42 C.F.R.
§413.180(h), the exception request was automatically deemed approved, as CMS'
determination was sent to the Intermediary after the 60 working day deadline.

Congress imposed the deadline in the statute, thereby indicating its concern about CMS
delays. Prior Board cases and the legislative history illustrate that Congress' concern was

---

[9] Provider Post-Hearing Brief at 22, Provider Ex. 6

[10] Supra, note 9  Tri-State Memorial Hospital v. Blue Cross and Blue Shield Association
et.al., PRRB Dec. No. 2000-D-25 (Mar. 6, 2000), modified CMS Admr. (May 8,
2000).

[11] Tr. at 21-23

[12] Charlotte Hungerford Hospital v. Blue Cross and Blue Shield Ass'n et.al, PRRB Dec.
No 1996-D64 (Sept. 11, 1996), rev'd CMS Admr. Dec. (November 8, 1996); Mt.
Clemens General Hospital, PRRB Dec. No. 2002-D26 (July 9, 2002) aff'd. on limited
grounds. CMS Admr. (Sept. 6, 2002)

well-founded.[13]   Congressional intent is frustrated if CMS fails to timely send notice of its decisions. The 60-day limit is meaningless without communication. As the Board has noted in prior decisions,[14] the regulation has been interpreted as allowing CMS to strictly enforce time limits applicable to providers making an exception request.[15] It is only reasonable that the same strict enforcement principles found in the same regulation apply to time limits for CMS.

If CMS had promulgated a regulation that addressed time limits for the full process, including notice, and that established a regulatory grace period for transmission of the decision within a reasonable time after the decision was made, such regulation would likely pass muster as being consistent with the statute. But CMS chose instead to establish a cumbersome two-tiered notification system despite the statutory 60-day limit and to describe the action required only as "disapproval." Because the regulations are silent as to time limits for other steps in the process, we believe that the statutory and regulatory time limit for "disapproval" must therefore be interpreted as including all essential elements of the entire disapproval process, including transmission of the notice. The notice was not sent until after the 60-day limit; therefore, it must be deemed approved.

The Board majority does not dispute that the deeming regulation could be read literally as only requiring the CMS *decision* to be made within the 60-day period. Indeed, a literal reading would not even require that CMS' determination be made in writing within the 60-day time limit. However, that interpretation ignores the reality that notice is essential to the exception process and to fundamental notions of due process. Notice is not a mere formality; it triggers appeal rights and permits the Provider to reasonably budget or restructure to avoid future losses.

DECISION AND ORDER:

As a result of the failure of CMS to notify the Provider of the determination within 60 working days as required by 42 U.S.C §1395rr(b)(7), the Provider's exception request is deemed approved. Accordingly, the substantive issue as to whether the exception denial was otherwise proper is moot.[16]

---

[13] See e.g. Mount Clemens General Hospital v. Blue Cross and Blue Shield Association/United Government Services. PRRB Dec No 2002-D26, July 9, 2002 ; Providers Post-Hearing Brief at 24
[14] Id.
[15] Children's Hospital of Buffalo v. Shalala, No 00-6187, 2001 App. Lexis 979 (Jan. 24, 2001).
[16] See Provider Post-Hearing Brief at 20-21 The Provider claims that the Intermediary's failure to reach a conclusion on all determinative issues (i e , atypical patient mix) is insufficient to meet the 60-day processing deadline.

Page 6                                                        CN: 01-2872

BOARD MEMBERS PARTICIPATING:

Suzanne Cochran, Esq.
Gary B. Blodgett, D.D S. (dissenting)
Elaine Crews Powell, C.P A. (dissenting)
Anjali Mulchandani-West
Yvette C. Hayes

FOR THE BOARD:

JUL 2 7 2006

                    Suzanne Cochran  Esq.
                    Chairperson

Dissenting Opinion of Gary B. Blodgett, D.D S  and Elaine Crews Powell, C.P.A.

We respectfully disagree with the majority's opinion that the Provider's exception request must be deemed approved because the Provider was not notified of CMS' decision disapproving the request within 60 working days.

The applicable statute, regulation and manual provision require that "an exception request is deemed approved unless it is disapproved within 60 working days after it is filed with its intermediary." No mention is made regarding timely notifying the provider of the decision. CMS made its decision to deny Loma Linda's exception request within the 60 working day time limit specified in the statute, regulation and manual.

The exception request at issue in this case was submitted on August 28, 2000. CMS made its determination to deny the request on November 15, 2000. The Provider maintains that to be timely, the 60 working day limit required that it receive notification of CMS' final determination on or before November 24, 2000, but that the denial was not communicated to the Provider until November 29, 2000. (We note, however, that the 60th working day after August 28, 2000 is November 20, 2000, not November 24th per the Provider's count of working days.) Therefore, the Provider did not receive notice of CMS' denial of the exception request until 67 working days after it was filed.

Board member Blodgett acknowledges that in a previous case involving the 60-day limit issue (Mount Clemens General Hospital, PRRB Dec. No. 2002-D26), he agreed with the Board majority that the provider's exception request should have been deemed approved. However, in the Mount Clemens case the provider did not receive notice of the disapproval until **14 months** after the end of the 60 working day period, and the Board majority found that such an inordinate delay may have seriously prejudiced that provider's rights, including its option to drop out of the program.

In the present case the Provider did not submit its exception request until the final day of the opening "window." Moreover, prior to receipt of CMS' denial, Provider made no inquiry of CMS regarding the decision. Since CMS' denial was communicated to the Provider within seven working days after the end of the 60 working day period, no claim of prejudice of Provider's rights can reasonably be made.

We find that CMS' November 15, 2000 disapproval of Provider's exception request satisfied the regulatory requirements in that it was made within 60 working days after the request was filed with Provider's Intermediary. Therefore, the disapproval of the request was timely.

Since the Board Majority deemed the exception request approved, we agree that the substantive issue as to whether the denial of Provider's exception request was proper is moot.

Page 8                                                        CN: 01-2872

_____
Gary B. Blodgett, D.D.S.



_____
Elaine Crews Powell, C.P.A

# Ahern & Associates

841 C South Racine Ave.          Phone: (312) 997-2177
Chicago, IL 60607                Fax:    (312) 942-9578
                                 Email: AhernConsulting@aol.com

August 6, 2004

Via Federal Express No  8464 4455 0208

Larry Hoffman
Provider Reimbursement Review Board
2520 Lord Baltimore Drive
Suite L
Baltimore, MD 21244-2670

RECEIVED
AUG ' ' 2004
PROVIDER REIMBURSEMENT
REVIEW BOARD

RECEIVED
AUG 0 9 2004
PROVIDER REIMBURSEMENT
REVIEW BOARD

Re:  **Post-Hearing Brief for Loma Linda University KIDNEY Center**
     **Provider Number:**       05-2550
     **PRRB Case Number:**      01-2872

Dear Larry

Enclosed are six (6) copies of the Provider's Post-Hearing Brief for the Loma Linda University **Kidney** Center PRRB Hearing held June 10, 2004 in Baltimore

The six copies of the post-hearing brief are being sent to the board as requested

If you have any questions, please do not hesitate to call me at (312) 997-2177

Sincerely,

Jack Ahern
President

Cc     Bernard Talbert, Esq , via FedEx No  8464 4455 0182
       Steve Mohr, LLUMC, via FedEx No  8464 4455 0230
       Marge Strutt, LLKC, via FedEx No   8464 4455 0230

Encl    Loma Linda University **Kidney** Center Post-Hearing Brief, PRRB Case 01-2872

JKA/mw

# Loma Linda University Kidney Center

## Post Hearing Brief

Provider No:        05-2550
PRRB Case No:   01-2872

## Ahern & Associates

|  |  |
|---|---|
| 841 C South Racine Ave. | Phone: (312) 997-2177 |
| Chicago, IL 60607 | Fax:   (312) 942-9578 |
|  | Email: AhernConsulting@aol.com |

August 6, 2004

RECEIVED

AUG 0 9 2004

PROVIDER REIMBURSEMENT
REVIEW BOARD

Via Federal Express No 8464 4455 0208

Larry Hoffman
Provider Reimbursement Review Board
2520 Lord Baltimore Drive
Suite L
Baltimore, MD 21244-2670

Re:    **Post-Hearing Brief for Loma Linda University KIDNEY Center**
       **Provider Number:**      05-2550
       **PRRB Case Number:**     01-2872

Dear Larry

Enclosed are six (6) copies of the Provider's Post-Hearing Brief for the Loma Linda University **Kidney** Center PRRB Hearing held June 10, 2004 in Baltimore.

The six copies of the post-hearing brief are being sent to the board as requested

If you have any questions, please do not hesitate to call me at (312) 997-2177

Sincerely,

Jack Ahern
President

Cc·    Bernard Talbert, Esq., via FedEx No. 8464 4455 0182
       Steve Mohr, LLUMC, via FedEx No. 8464 4455 0230
       Marge Strutt, LLKC, via FedEx No.  8464 4455 0230

Encl.    Loma Linda University **Kidney** Center Post-Hearing Brief, PRRB Case 01-2872

JKA/mw

035

Post-Hearing Brief

# **Contents**

**I.     Introduction**

**II.    Statement of the Issue**

**III.   Summary of the Facts**

**IV.    Contentions of the Parties**

    **A. Provider's Contentions:**

        1. **Provider Satisfied the Atypical Service Intensity Criteria**

           a) Provider Met CFR Atypicality Requirements

           b) Provider Satisfied PRM Atypicality Criteria

           c) CMS Agrees that the Provider serves an Atypical Patient Mix

           d) Provider Has Atypical Supply Cost

           e) CMS Incorrectly Required Periodic Time Sampling

           f) CMS's Standards are Arbitrary and Unduly Subjective.

               1) Standards are Grossly Inconsistent with respect to Time Studies

               2) Standards are Inconsistent with respect to Atypical Time.

               3) Arbitrary with respect to whether Patient Acuity will be reviewed.



    2   **Cost related Issues were not grounds for denial.**

    3.  <u>**The Exception Request Was Not Processed Within 60 Days, and As Such Should Be Approved.**</u>

        a)  The Exception Request has Never been fully processed

        **b)**  The Provider Was Not Notified Within The 60-Day Time Limit.

## B. Intermediary's Contentions

1. Periodic Time Sampling Standards Apply to Atypical Time
2. Provider Failed to Correctly Allocate Time to Treatment Modes
3. Requesting Separate Rates for Hemo and Home Modes violates Medicare Program Instructions.
4. The Provider failed to explain Variances in "salary treatments"
5. The Provider failed to explain Hour per Treatment Variances

6. That the Provider's supply costs failed to exceed the $33 median threshold for an exception.

## V.    Citations of Law, Regulations, and Program Instructions

## VI.   Proposed Findings and Conclusions

## VII.  Suggested Board Decision.

## VIII. *List of Provider Exhibits*

\* The List of Provider's Exhibits was provided by FedEx to the Board with copies of the additional Provider's Exhibits. It is being provided again here as a convenience to the reviewers

Intro

# BEFORE THE PROVIDER REIMBURSEMENT REVIEW BOARD
## BALTIMORE, MARYLAND

| | |
|---|---|
| LOMA LINDA UNIVERSITY KIDNEY CENTER ) ) ) ) PROVIDER No. 05-2550 ) ) (Provider) ) ) vs. ) ) UNITED GOVERNMENT SERVICES ) ) (Fiscal Intermediary) ) | PRRB Case No. 01-2872 ESRD |

## PROVIDER'S POST HEARING BRIEF

## I.  INTRODUCTION

**Post Hearing Brief is Supplemental in Nature**

This post hearing brief has been prepared to supplement, but generally not duplicate, the depth of argument and detail presented in the previously submitted final position paper with accompanying exhibits.

As such, the Provider respectfully asks that, when reaching its decision, the Board should fully consider and review <u>both</u> the information presented in the

Provider's final position paper and the testimony and additional exhibits presented at the hearing and addressed in this brief.

## Central Elements of Board's Decision

The Board cannot perfect, based on further analysis or testimony presented at the hearing, either the provider's exception request or the CMS decision. The Board must decide however, on several related but separate aspects of this case:

1.    Does the Provider have an atypically acute patient population?

2.    Did the Provider satisfy its burden of Proof that it has costs that exceed the norm due to patient atypicality?

3.    Did CMS fail to process the exception in a timely manner when applying the regulatory 60 day processing limit:

    a.  Counting the process days from submission to date of Provider notification?

    b.  Counting the process days from submission to the present. Considering the fact that, when adjudicating the Exception Request, CMS failed to decide conclusively whether or not the Provider's patient population had sufficient atypical patient characteristics to merit an exception?

**Page Number References and Exception Request References**

Finally, as a practical matter, unless otherwise noted, **all page references correspond to the "__hand written__" numbers in the lower right hand corner of the exhibit or attachment referenced.** The hand written numbers are generally not duplicated and hopefully will clarify what page is being referenced. To reduce confusion, "Exhibits" attached to the Provider's Exception Request will be referenced as "Attachments" to Provider Exhibit P-1.

Issue

## II. STATEMENT OF THE ISSUE

Representatives from Loma Linda University Kidney Center ("LLUKC" or "Provider") and United Government Services ("Intermediary") participated in a hearing before the Provider Reimbursement Review Board (the "Board") or ("PRRB") on June 10, 2004 for the PRRB to decide the following issue.

1)    Whether the Centers for Medicare and Medicaid Services (CMS, formerly CMS) incorrectly denied Loma Linda University Kidney Center's (LLUKC) request for an exception to the ESRD composite rate.



### III.  STATEMENT OF FACTS

LLUKC provides dialysis to pediatric and adult residents of Loma Linda, California and surrounding areas.  LLUKC is free – standing dialysis clinic. LLUKC provides in-facility hemodialysis to a predominately adult patient population. LLUKC also provides home peritoneal dialysis to a mixed population of adult and pediatric patients.

The Exception Request was prepared by consultants, Ernst and Young, LLP with input and data from LLUMC clinical staff. On August 28, 2000, LLUKC submitted an exception to the composite rate for maintenance dialysis service to United Government Services, LLC ("Fiscal Intermediary"). The Provider sought an exception amount of $186.59 per treatment for hemodialysis and $ 184.38 per peritoneal hemo equivalent treatment.  The basis for the provider's request was atypical service intensity. The Intermediary sent the exception request to CMS's (formerly HCFA) Division of Chronic Care Management. CMS, through its Division of Chronic Care Management, advised its Intermediary that it was rejecting the Intermediary's recommendation to approve the exception request. *[P-2]* Per references in the CMS internal correspondence, *[P-2]* dated,

November 15, 2000, the Intermediary had initially recommended approval
of the Provider's exception request and recommended rates of $ 181.52 for
Hemodialysis and $179.55 for Peritoneal. Despite several requests, *[P-9, 10,
11 &12]* the Intermediary's correspondence has not been released to the
Provider's representative, hence at the time of this filing, the date and details
of the letter are unknown to the Provider.

On November 29, 2000, the Provider was notified that the exception request
had been denied in its entirety by CMS. *[P-3]* On April 16, 2001, LLUKC
timely filed an appeal to the Provider Reimbursement Review Board
pursuant to 42 CFR § 413.194. For the following reasons, LLUKC asserts
that HCFA improperly rejected the Provider's exception request.



# IV.  CONTENTIONS OF THE PARTIES

## A. PROVIDER'S CONTENTIONS

## 1. Provider Satisfied the Atypical Service Intensity Criteria

### (a) Provider Met CFR Atypicality Requirements

The conditions for an atypical service intensity exception, as laid out in the

Code of Federal Regulations (CFR) correspond to a higher than normal

medical resource consumption, addressing both the quantity and quality of

treatments:

> "*A facility must demonstrate that a* **substantial proportion** *of the facility's outpatient maintenance dialysis* **treatments** *involve* **atypically intense** *dialysis services,* _special dialysis procedures,_ *or* _supplies_ *that are medically necessary to* _meet special medical_ _needs_ *of the facility's patients* " See 42 CFR § 413.184(a)(1) [Emphasis added]

Unfortunately, the regulations have not provided numerical definitions for

the adjectival qualifiers "substantial" or "intense " Absent numerical

standards, these terms nonetheless can reasonably be interpreted in the

context of the examples provided by the same regulation

> "... *Examples that may qualify under this criterion are more intense dialysis services that are medically necessary for patients such as--*

*(i) Patients who have been referred from other facilities on a temporary basis for more intense care during a period of medical instability and who return to the original facility after stabilization;*

*(ii) Pediatric patients who require a significantly higher staff-to-patient ratio than typical adult patients; or*

*(iii) Patients with medical conditions that are not commonly treated by ESRD facilities and that complicate the dialysis procedure.*

See 42 CFR § 413.184(a) (1)

The Provider's exception request established that it very closely matches all three of the above scenarios specifically mentioned in both 42 CFR § 413.184(a)(1) and PRM § 2725.1.A :

- "Frequently patients are referred to LLUKC by hospital discharge planners or other dialysis facilities because their condition is considered too unstable for dialysis in other free-standing facilities." *[P-1, Narrative (p7)]*

- "LLUKC is one of the only units in the area that accepts these special needs adult patients" *[P-1, Narrative (p7)]*

  See also
  *P-1, Attachment 3, Patient Data Summary*
  *P-1, Attachment 3B, Temporary Patient Transfers]*


- "The average staffing ratio for facilities that treat typical patients is 4 patients to 1 staff. As evidenced in Exhibit 10, LLUKC has a higher average staffing ratio of 2.45 to 1 staff." *P-1, Narrative, (p5)*

  *See also*

  *P-1, Attachment 3, Patient Data Summary.*
  *P-1, Attachment 9A, Atypical Minutes ]*

*P-1, Attachment 10, Staff to Pt ratio for FYE 12/31/99.)*

- "During fiscal year 1999, LLUKC had 18 pediatric patients including 6

  babies, 12 months old and younger *[see P-1: Narrative, (p12),*

  *Attachments 3A, 9]*

- Multiple key clinical statistics used by CMS to assess acuity
corroborate the contention that the Provider handles a patient population that
requires "atypically intense dialysis services" *[See Exhibit P-1, p 2,*
*Narrative, "National Average Comparison"]*

|  | LLUKC (FY 1999) | National Average |
|---|---|---|
| Hemodialysis -Diabetic Patients | 45.32% | 34.44% |
| Hemodialysis Hypertensive Patients | 78.33% | 24.76% |
| Hemodialysis – over 64 years old | 38.92% | 28.88% |
| Hemodialysis – below 20 years old | 0.49% | 0.31% |
| Hemodialysis Inpatient Admits | 32.03 % | 27.31 % |
| CAPD / CCPD -Diabetic Patients | 32.08 % | 34.44 % |
| CAPD / CCPD Hypertensive Patients | 54.72 % | 24.76 % |
| CAPD / CCPD – over 64 years old | 15.09 % | 2.61 % |
| CAPD / CCPD – below 20 years old | 33.96 % | 0.24 % |

Close review of the clinical statistics shown above reveal that LLUKC's
Hemodialysis patients are older, more frequently diabetic, and much more
frequently Hypertensive. LLUKC's home program patients show a bimodal

atypical age profile with <u>more than 5 times the normal percentage of older patients and more than 141 times the norm of pediatric patients.</u>

### (b) Provider Satisfied PRM Atypicality Criteria

Chapter 27 of the Provider Reimbursement Manual (PRM) lists two criteria, <u>either of which</u> is, in and of itself, sufficient justification for an exception to the composite rate. *[See I-3, pp 55-56, PRM § 2725.1 B]*

## PRM § 2725.1 B.1 - Atypically High Nursing Hours per Treatment

> *B.   Criteria --In order for an exception to be granted, **any one** of the following criteria must be met.* [Emphasis Added]
>
> *1   Nursing Service Hours Per Treatment --The provider must submit data which demonstrate that its patients will receive significantly more nursing (refers to RNs, LPNs, technicians, and aides) hours (based on total hours as explained in §2721.B.1 e.) per treatment than patients receive in other facilities.   The increased hours of nursing service must be justified by data that demonstrate that the higher hours per treatment and thus the higher per treatment costs are necessitated by the special needs of the patients such as those referred to in the above listing.   For example, documentation must show that higher per treatment costs are incurred because of increased nursing hours resulting from services furnished to a substantial number of patients with more complex medical needs or that more nursing care results in fewer inpatient admissions*

2. *Number of Employees in Outpatient Renal Area.*-- . .

With regard to PRM § 2725 1 B.1, Nursing hours per treatment, the Provider has calculated additional clinical labor time by totaling the atypical nursing time associated with its patients. *[See exhibit 9, Summary of Atypical Minutes and Salary Costs]*  The Provider's clinical staff used their best clinical judgment to assess atypical time.

> *'The patient care staff prepared this list and identified additional number of nursing minutes per activity and the number of times each activity is performed annually. As these activities do not occur with every dialysis treatment, the renal dialysis staff identified the frequency of these items for their patient population. These activities represent exacerbation of patient's diagnosis and do not occur with routine dialysis treatment and are therefore atypical services.* [Exception Request narrative, (p 7)]

Exception Request narrative, pp 7-14, provides narrative justification developed by the nursing staff.   LLUKC's clinical staff had no CMS approved normative standard when determining atypical vs. non-atypical. Nonetheless exercising their best professional judgment and performing timings for atypical interventions, clearly provided the nexus between atypical patient acuity and consumption of clinical labor as required by PRM § 2725 1 B.1    The timings are best professional judgment estimates of atypical time, yet their effect on the CMS approved

exception amount is usually of little practical consequence. As Mr

Michael Powell, the CMS witness, testified: due to lack of normative

data, CMS does not, in practice, base its approval amount on the

Provider's calculation of atypical labor time. *(Tr. 236 - 237)* An

additional difficulty is that there are no national standards for what is, or

is not, atypical. *(Tr. 238 – 239)*

As reproduced below, CMS calculated average hours per treatment *[P-2,*

*(p21)]*

| FY | Hemo | H.P. CAPD | H.P. CCPD | **Average Hr. Per Tr.** |
|------|------|------|------|------|
| 2000 | 2.93 | 2.94 | 2.94 | **4.57** |
| 1999 | 2.48 | 2.48 | 2 48 | **3.90** |
| 1998 | .87 | .87 | .87 | **3.12** |
| 1997 | 1.11 | 1 11 | 1.11 | **3.24** |

In each case, even including home program, the Provider has exceeded

the 3.00 norm CMS has used to determine atypicality. *[Provider exhibit*

*P-18, CMS Denial Letters referencing 3.0 Hour Labor Norm, (p 190) ]*

The provider demonstrated that its average hours per treatment were,

consistently above the 3 0 hour norm used for approval / disapproval by

054

CMS. If CMS chose to take issue with anecdotal time determinations, CMS should nonetheless have granted the amount of time in excess of its own standard of 3.00 hours per treatment.

**PRM § 2725.1 B.2 - Atypically High Nursing Staff-to-patient Ratio:**

The Provider also met the second PRM criteria, as quoted below, which addresses atypical clinical resource consumption as measured by the staff-to-patient ratio: *[See I-3, p56, PRM § 2725.1 B.2]*

> 2. *Number of Employees in Outpatient Renal Area.--Data must be submitted that show that higher staff-to-patient ratios represent nursing assessment/intervention based upon patient acuity levels. The provider must show that the additional nursing hours per treatment is not the result of an excess number of employees in the outpatient maintenance renal area, compared to facilities treating a similar patient mix. HCFA uses cost report data and information from the ESRD Medical Information System (MIS) relative to providers treating patients nationwide.*

LLUKC's overall staff-to-patient ratio of 0.41, (0.41 = 1 staff to 2.45 patients), exceeds the norm of 0.25, (0.25=1 to 4), claimed in the exception *[P-1,( p5), Narrative; Attachment 10]* and further justified by the Provider's witness. *(Tr. 67 – 69.)* Even assuming a lower norm of 0.33, (0.33=1 to 3), the Provider's staff-patient-ratio is notably higher. In addition the Provider

has documented that a higher percentage of its staff are necessarily of a

higher licensure level (Registered Nurse vs. Licensed Practical Nurse or

Dialysis Technician) and that this is necessitated by patient acuity. *[P-1,*

*(p5), Narrative; Attachment 10]*

### (c ) CMS Agrees that the Provider serves an Atypical Patient Mix

The original CMS reviewer *[P-2, Denial Letter, (p21)]* stated: "it appears

that LLUKC *could* possibly have an atypical patient mix." However, the

CMS witness, Mr. Powell, reviewed the entire Exception Request, (*Tr. 158,*

*line 24),* and has commented on the atypicality question.  In fact, in response

to a question from Board Member Mr. Hoover, Mr. Powell has specifically

testified, *(Tr. 241),* that the Provider undoubtedly serves an atypical patient

population and that the only substantive problem regarded documentation of

costs:

> Q.    *Probably not, so the Board doesn't have to be concerned with*
> *atypicality?*
>
> A.    *I don't think so on either one of them.*
>
> Q.    *Okay.*
>
> A.    *The cost issues are just blatantly horrendous.*
>
> Q.    *Well, that's for us to determine.*
>
> A.    *Well that's just my opinion.*

056

Q.     Yeah I understand. But still the Board has to make a decision
on that. But I just want to be sure that it's CMS's position that
this Provider has met the atypicality standard, and I don't have
– as a Board member I don't have to go into that analysis.

A.     I think that's right.


(d)  **The Provider Has Atypical Supply Cost.**

CMS denied supply relief of $ 3 / treatment based on the completely

inaccurate assumption that this Provider re-used <u>all</u> dialyzers 20 times.  The

20 re-use figure was taken from the Provider's cost report and was a

**maximum** number of re-uses. (*Tr. 73-75)* As required by (42CFR

413.184(b)(2)(ii)(B), the Provider supplied CMS with the "make and model

of each dialyzer and its component cost", *[P-1, Attachment 16A].*  The

component cost ranged from $ 11 to $ 28.00. CMS had no basis for

assuming each dialyzer type was used with equivalent frequency. (*Tr. 73-75)*

CMS also failed to factor in the cost of supplies consumed in re-using the

dialyzer.


CMS also erroneously used the listing of <u>routine</u> supplies  required per

(42CFR 413.184(b)(2)(ii)(A)  provided in *P-1, Attachment 16,* as a basis for

denial, citing the fact that costs did not total to **more** than the CMS median

cost of  $ 33. CMS erred in three respects:

- The "norm" of $ 33 is over 20 years old and had not been updated, (*Tr. 212)*;

- The total cost for a list of routine supplies is not intended by 42CFR 413.184(b)(2)(ii)(A) to be an average cost per treatment, nor can it be since some supplies are "either / or" e.g. either a catheter or a fistula is used, but not both. (*Tr. 76 – 77)*

- 42 **CFR §413.180, (b)** states that the basis for an exception is projected costs. The listing of supplies *[P-1, Attachment 16]* is simply a list of routine supplies.

**(e) CMS Incorrectly Required Periodic Time Sampling**

CMS had no basis for requiring <u>atypical</u> intervention time studies that satisfied the same periodic time sampling standards mandated for cost reports.*[P-2, (p22)]* The manual provision CMS cited, PRM 2313, pertains to cost reports – not atypical patient care time. Accurate time studies, following periodic time sampling standards (all patients followed for one entire week per month) are prohibitively expensive in terms of labor consumption. *(Tr. 132 – 137.)*

Even if the Provider could afford the time study cost, CMS has not

established, in any form, what items are, or are not, atypical; so the Provider

has no reasonable basis to know which items CMS needs timed. The

Provider's atypical timings were developed by professional clinicians with

considerable first hand knowledge of the patient mix. *(Tr. 34-38, 65) [P-1,*

*Narrative, p6]* The times were indeed auditable. *(Tr.6 – 66.)*


Reviewing past determinations by CMS, which were made under

substantially the same set of rules, shows that periodic time sampling is not

an essential element of an atypical time determination. If fact, CMS did not

require this periodic time sampling, either in 1990 or in 1994, to approve the

exception requests submitted by another, sister facility: Loma Linda

University Medical Center. *[1990: P-8, Approval letter & P-9, Time*

*determination; P-13, 1994 Approval Letter & P-4, 1994 Time*

*Determinations and Patient Categories].*

Finally, the CMS witness, Mr. Powell, unequivocally stated that time studies

are neither useful nor required for an approval:

> ***Time studies have nothing to do with any exception request I've ever***
> ***adjudicated or my fellow workers*** *because we've had in the past*
> *many, many attempts like the attempts the were made in these to*
> *justify the atypical time by the nurse based on interviews in the*
> *preparation of the exception request, never met the test for a valid*

*time study so we never used it, **and yet we approved a very high
percentage of exception requests without using those** (Tr. 236 - 237)*

## (f) CMS's Standards are Arbitrary and Unduly Subjective.

Lack of clear, objective standards reduces the adjudication process to an
entirely subjective level which violates the consistency demanded by the
Principles of Prospective Payment System as describe in 42 CFR 413.172
and 42 CFR 413.180(a).

### 1)    Standards are Grossly Inconsistent with respect to Time
### Studies

The process used by CMS to review exception requests has not ensured any

reasonable level consistency. For instance, above, CMS's witness adamantly

confirmed, (both on his own behalf and that of his colleagues), that time

studies <u>are not,</u> <u>and have never been required</u> for approval. Yet Mr. Logue,

the author of the denial letter, specifically cited lack of time studies as a

basis for denial:

> *The Provider has not presented any time studies to adequately support
> its patient care staff's identification of the additional time spent by
> nursing staff.  Therefore, based on the above, the **provider has failed
> to adequately document the additional nursing staff services
> rendered to its atypical patient mix**. Data based on patient care
> staff interviews that cannot be audited is not acceptable. In the event*

*that a time study is used in the future, the general Medicare principles
regulating the adequacy of periodic time sampling is described in
2313 of the PRM must be furnished. **Therefore, we are unable to
approve $ 8.50 for atypical salary cost per treatment due to atypical
minutes incurred.** [Emphasis Added]*

**2)    Standards are Inconsistent with Respect to Atypical time.**
Clearly, CMS is holding some providers to a 3.0 hour nursing labor per
treatment threshold to establish atypicality *[P- 18, (p 194)]* while ignoring
this threshold when LLUKC exceeds it.

**3)    Arbitrary with respect to whether Patient Acuity will be
reviewed.**

CMS has not been able to clarify when cost report and other errors are grave
enough to, in and of themselves, preclude approval or review of atypicality.
*(Tr. 221)*

061

## 2.    Cost related Issues were not grounds for denial

CMS has claimed that it does not address patient atypicality unless the cost related issues render an exception request otherwise worthy of possible approval and further consideration. (Tr. 187, 194, 221) In fact, CMS refused to address any information presented by the Provider's sister facility, LLUMC, citing deficiencies in cost reports. Regarding LLUKC, CMS processed patient information and reached the ambiguous conclusion of "possible" atypicality. If CMS is applying the same processing standard to LLUKC as it did to LLUMC, then the very act of processing or addressing patient acuity must be indicative that other issues were non-fatal.

## 3. The Exception Request Was Not Processed Within 60 Days, And As Such Should Be Approved.

The Provider has two parallel, but otherwise unrelated reasons to support the claim that the Exception Request was not processed in a timely manner:

**(a) The Exception Request has Never been fully processed**

The Provider notes that CMS addressed the cost issues but never reached a conclusion regarding the determinative issue of atypical patient acuity. CMS simply stated the Provider "*could* possibly have an atypical patient mix." *[P-2, (p21)]* CMS had ample clinical data to a rule on atypicality, which is

central to adjudication of an Atypical Service Intensity Exception Request.
Full processing mandates adjudication, not merely speculation regarding
atypicality. The Board ruling in the *Maury County Dialysis Associates v.*
*Blue Cross and Blue Shield Association,* **PRRB Hearing** Dec. No. 91-D42,
April 25, 1991, confirms that a partial CMS adjudication, addressing only
one of the determinative issues of an exception, while reaching no
conclusion on other determinative issues, is not sufficient to meet the 60 day
processing deadline. To be approved for increase payment, the Provider
must demonstrate both higher costs and sicker patients. It follows then that
full adjudication must address both issues. Moreover a linkage is required by
regulation and so cost issues cannot be adjudicated absent consideration of
patient acuity.

**(b) The Provider Was Not Notified Within The 60-Day Time Limit.**

Although LLUKC's exception request was submitted on August 28, 2000,
LLUKC did not receive a response from CMS until November 29, 2000

> 42 CFR § 413.180(h) clearly states.
> *"Approval of an exception request. An exception request is deemed*
> *approved unless it is disapproved within 60 working days after it is*
> *filed with its intermediary."*

The Provider contends that if the Intermediary and CMS do not notify it of their decision to deny its Exception Request in 60 working days, it must be deemed approved. The exception request was timely submitted on August 28, 2000. On November 15, 2000 *[P-2, Denial Letter]* CMS made its determination to deny the exception request. However, this denial was not communicated to the Provider until a letter dated November 29, 2000 *[P-3, Provider Notification]* which is 3 days after the 60 working day period allowed by statute. Since, there is no evidence the notification was faxed or sent via overnight courier, it must be assumed that it was sent via the standard method of U.S. mail. Thus it is reasonable to conclude that reception of the notification would add another 5 days to the process. A count totaling the days between the date of submission of the Exception Request and date of the letter to the Provider has been prepared *[P-6, Processing Days]*. To be timely, the 60 working days limit required that notification of the CMS final determination is <u>received</u> by the Provider on, or before, November 24, 2000.

The Intermediary asserts that the Exception Request had been processed by CMS on November 15, 2000, within the 60 day period. However, there was

064

merely a failure to notify the Provider of CMS's decision. *(Tr. 23)* The

Provider asserts that this argument is without merit. The Provider asserts that

the processing of the Exception Request does not end until the Provider is

notified; otherwise, the statutory requirement for prompt notification to the

Provider has no meaning.

The Provider has conducted exhaustive legal research on this subject. To

date, this issue has not been squarely addressed by any federal court.

Therefore, the sole legal authority on this point consists of prior PRRB and

Administrator decisions, and most importantly, the legislative history of the

statute itself. After reviewing these sources, there can be little doubt that the

deemed approval rule is based upon notification to the provider, and not

action by CMS.

The statutory authority for the 60 day approval requirement is contained in

Section 9335(a)(2)(B) of the Omnibus Budget Reconciliation Act of 1986

(P.L. 99-509), and codified at 42 USCS § 1395rr(b)(7). The statute provides

in pertinent part as follows:

> *"Each application for such an exception shall be deemed to be approved unless the Secretary disapproves it by not later than 60 working days after the date the application is filed."*

The Conference Committee report notes that the provision originated in the House of Representatives, and was acceded to by the Senate during the reconciliation process.  See House Report No. 99-1012 (Comm. of Conference), accompanying H.R. 5300.  House Report No. 99-727 (Comm. on the Budget), accompanying HR 5300, noted that *"numerous complaints have been received that the exceptions process is cumbersome, and that the rules are ambiguous and difficult to comply with, and that determinations are long delayed."*  See Report of the Committee on the Budget to accompany HR 5300, page 76.  Further, the Report states as follows:  *"The Committee bill provides for the appeals process to be streamlined so that an exception would be deemed approved unless the Secretary disapproved it by not later than 45 working days from the date the application was filed with the intermediary.  The Committee intends that the fiscal intermediaries will complete within 15 working days their recommendation so that HHS will have 30 days to make its decision."*  Id. at 454.

The House provision was subsequently enacted into law, with an amendment to give the Secretary 60 working days to process exception requests.

It is evident from the above that Congress viewed delays in processing exception requests as part of an overall problem relating to the cumbersome nature of the entire process. Thus, the congressional intent was both to simplify the process, and to expedite the resolution of exception requests.

It is beyond doubt that the legislative purpose would be utterly defeated if the intermediary were permitted an indefinite amount of time to notify the Provider as to the resolution of its exception request. During this period Providers would have no way of knowing whether their request had been approved or denied. The Provider's budgeting and fiscal processes would be placed in a state of indefinite suspension. Providers whose requests had been approved by CMS could be indefinitely delayed in the collection of reimbursements to which they had already been found to be entitled. Provider's whose request had been denied would be unaware of that fact, and therefore would be unable to make any alternative arrangements with respect to their dialysis units, including potentially opting out of the dialysis program.

Moreover, previous decisions of the PRRB are generally in accord with this view. In *Charlotte Hungerford Hospital v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Connecticut*, PRRB Dec. No. 96-D64, September 11, 1996, Medicare and Medicaid Guide (CCH) P 44,647, *rev'd* HCFA Administrator Decision, November 8, 1996, Medicare and Medicaid Guide (CCH) P 44,978, the PRRB found that the failure to notify the Provider within the 60 day period deprived the Provider of an opportunity to correct deficiencies in its request. The PRRB found that had the Provider been notified within the 60 days period, it would still have had sufficient time available within the period of the exception window to correct any deficiencies in its request. In the instant case, Provider concedes that no such corrections could have been made as the window closed on the date of its submission, i.e., August 28, 2000. However, the Board's decision nonetheless establishes that the date of determination by CMS is not controlling as to the applicability of the deemed approval requirement.

In *Mount Clemens General Hospital v. Blue Cross and Blue Shield Association/United Government Services*, PRRB Dec. No. 2002-D26, July 9, 2002, Medicare and Medicaid Guide (CCH) P 80,886, *aff'd* HCFA

Administrator Decision, September 6, 2002, Medicare and Medicaid Guide (CCH) P 80.943, the PRRB clearly held that the provider must receive notification within 60 days of submittal; otherwise, the request will be deemed approved.

The facts of <u>Mt. Clemens</u> were particularly egregious. In <u>Mount Clemens</u>, supra, the provider did not receive <u>notification</u> for more than 14 months after the decision had been rendered by CMS. The PRRB held that this delay was clearly prejudicial, given that the Provider could have opted out of the program had it been provided with earlier notification.

Finally, in *Tri State Memorial Hospital v. Blue Cross and Blue Shield Association/Blue Cross of Washington/Alaska*, PRRB Dec. No. 2000-D25, March 6, 2000, Medicare and Medicaid Guide (CCH) P 80,402, *rev'd* HCFA Administrator Decision, May 8, 2000, Medicare and Medicaid Guide (CCH) P 80,642, HCFA's determination was not received for several months after the 60 working day deadline. As in <u>Charlotte Hungerford</u>, the PRRB concluded that this deprived the Provider of an opportunity to submit timely corrections to any perceived deficiencies in its exception request.

These three decisions establish as a general proposition that the PRRB does not view the date of the CMS decision as necessarily stopping the 60 working day clock. Provider recognizes that each of these cases have unique factual circumstances which are perhaps distinguishable from the instant case. However, the overall thrust of the PRRB decision is that the date of the CMS decision does not stop the 60 working day clock, particularly where the Provider is able to demonstrate prejudice resulting from any delay.

However, the Provider contends that the issue of prejudice is essentially irrelevant in determining whether the CMS decision stops the clock. Clearly, Congress did not intend that the applicability of the deemed approval rule be dependent on the facts of each specific case. Rather, Congress established a hard and fast deadline; i.e. 60 working days. The fact that a deadline exists is evident. This deadline must necessarily be either (a) the date of the CMS decision, or (b) the date of notification to provider. As PRRB's decisions clearly establish that it is not the former, Provider asserts that the applicable deadline must necessarily be the latter, i.e. the date of Provider notification. Any other construction will clearly violate the legislative purpose underlying the statute.

Finally, CMS has put into place a system which requires two separate notifications; i.e., one from CMS to the intermediary, and the other from the intermediary to the provider. Any delays resulting from this system should easily have been obviated by CMS simply making direct notification to the provider. Under these circumstances, the delays in notification to the provider should be chargeable to CMS

Ultimately, it was a CMS decision to implement a cumbersome system of providing provider notification, notwithstanding the clear legislative direction to the contrary. Accordingly, for this reason alone, provider should be given the benefit of the 60-day rule, and its exception request should be deemed approved.

Intermed.

## B. INTERMEDIARY'S CONTENTIONS

The Intermediary contends that:

**1.    Periodic Time Sampling Standards Apply to Atypical Time**

However, CMS has <u>no regulatory basis for this demand</u>, because the manual provision cited, PRM 2313 cited, does not pertain to exception requests. In fact, it pertains to cost reports, not atypical nursing labor calculations. Moreover, regarding time studies, the CMS witness blatantly contradicted the CMS reviewer's position as stated in the denial letter.

**2.    Provider Failed to Correctly Allocate Time to Treatment Modes**

CMS cited errors in training time allocation, however, these treatments represent only 0.59% of total treatments rendered and have no material effect.

**3.    Requesting Separate Rates for Hemo and Home Modes violates Medicare Program Instructions.**

CMS did not cite any authority precluding requesting two rates. Neither applicable regulations nor the manual instructions preclude requesting different rates for different modes of dialysis. Moreover, the difference

between the requested Hemo and Peritoneal rate was only $2.21 and could easily be weighted into one request of $ 186.05.


4.    **Provider failed to explain Variances in "salary treatments"**

The above reference, *[P-2, (p22)]*, most likely referred to treatment increases of 1.3% which are minimal and need not be justified. Increases in nursing salaries are in keeping with commonly known industry wide shortages of nurses.  The cost report salary amounts were based on payroll information which was explained fully in the narrative *[P-1,(3) and Attachment 11, Payroll Information for FY 1999]* and explained again on the projection itself *[P-1, Attachment 1,(p4)]* which has a paragraph entitled "Explanation."  Each year's cost variance analysis *[P-1, (p 1-4)]*  had a section titled "Explanation" which, apparently, the CMS reviewer did not read and which explained in detail the reasons for variances.


5.    **The Provider failed to explain Hour per Treatment Variances**

The hours per treatment were taken from cost report information. The explanations cited above also addressed increased nursing time due to increasing patient acuity.

074

**6. That the Provider's supply costs failed to exceed the $ 33 median threshold for an exception.**

However, CMS erred **factually** with regard to supplies, by incorrectly assuming that the Provider re-used <u>all</u> dialyzers 20 times. CMS used this assumption to divide the Provider's dialyzer cost by a re-use count of 20. Moreover, CMS erred **procedurally** by basing its determination of atypical supply cost on a list of routine supplies rather than projected supply costs.



076

# V. CITATIONS OF LAW, REGULATIONS AND PROGRAM INSTRUCTIONS

1. Law --

    42 U.S.C. § 1395rr(b)(7)

2. Regulations –

    42 CFR § 413.172

    42 CFR § 413.180

    42 CFR § 413.180(a)

    42 CFR § 413.180(b)

    42 CFR § 413.180(h)

    42 CFR § 413.184(a)(1)

    42 CFR § 413.184(b)(2)(ii)(A)

    42 CFR § 413.184(b)(2)(ii)(B)

    42 CFR § 413.194

3. Program Instructions:  Provider Reimbursement Manual Part 1, CMS Pub 15-1 –

    PRM § 2313

PRM § 2725.1.A

PRM § 2725.1 B

PRM § 2725.1 B.1

PRM § 2725.1 B.2

078



079

# VI.  PROPOSED FINDINGS AND CONCLUSIONS

1.  The Provider submitted adequate documentation to justify its claim that it serves an atypically sick patient population.

2.  45.32% of the Provider's Hemodialysis patients were diabetic which substantially exceeds the national norm of 34.44%.

3.  78.33% of the Provider's Hemodialysis patients were Hypertensive which substantially exceeds the national norm of 24.76%.

4.  38.92% of the Provider's Hemodialysis patients were over 64 years old which substantially exceeds the national norm of 28.88%.

5.  33.96% of the Provider's CAPD / CCPD patients were below 20 years old which substantially exceeds the national norm of 0.24% below 20 years old.

6.  The Provider submitted adequate documentation to justify its claim that it incurs costs in excess of the norm due to serving an atypically sick patient population.

7.    CMS has not ruled on the atypicality of LLUKC's patient population and as such has not processed the exception request.

8.    Provider's exception request was submitted on August 28, 2000.

9.    In a letter dated November 15, 2000 CMS, Division of Chronic Care Management, notified its Fiscal Intermediary that it was denying the Provider's exception request.

10.   In a letter dated November 29, 2000 the CMS Fiscal Intermediary notified the Provider of the exception request denial.

11.   CMS has not processed the Exception Request within the requisite 60 day time limit.

12.   CMS erred materially in its determination by using re-use counts to calculate the Provider's supply cost per treatment.

13.    CMS has no basis to require time studies of atypical nursing time used

in exception requests that meet the periodic time sampling standards

for time studies used in cost reports.



## VII. SUGGESTED BOARD DECISION

The Board finds that CMS improperly denied the Provider's exception request for the following reasons:

(a)   The Exception Request was not processed within the statutory 60-day limit because CMS failed to determine if the patient population was atypical.

(b)   The Exception Request was not processed within the statutory 60-day limit because CMS failed to notify the Provider in a timely manner.

(c)   CMS based its determination on material errors with respect to supply cost per treatment.

(d)   CMS failed to consider explanations of labor and cost variances, referenced in the Exception Request narrative and detailed in its attachments.

(e)    CMS based its determination on a time study requirement not supported by regulation or manual provisions pertaining to exception requests.

(f)    In accordance with 42 CFR § 413.180(h) the Provider's Exception Request is deemed approved at the amount requested. The amount requested for all modes of maintenance dialysis was a composite rate of $ **186.05**.   A composite rate of $ 186.05, based on FY 2000 projected treatments, is equivalent to the requested amounts of $186.59 per hemodialysis treatment and $ 184.38 per CAPD and CCPD hemo equivalent treatment.

| | Requested Rate | Projected Treat. FY 2000 | % | Weighted Rate |
|---|---|---|---|---|
| Hemo | $186 59 | 14,644 | 75 57% | $141.00 |
| Peritoneal | $184 38 | 4,735 | 24 43% | $45.05 |
| | Var = $2.21 | 19,379 | 100.00% | **$186.05** |

085

(g)    The exception rate of $ **186.05** is retroactive to the submission date of

August 28, 2000.

Respectfully Submitted,

*Jack Ahern*

Jack Ahern

841 C
South Racine Avenue
Chicago, Illinois 60607
312 997 2177

Provider Representative

Dated August 6, 2004

086

# CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 6th day of August 2004,

I caused to be delivered via Federal Express, a copy of the foregoing

Provider's Post-Hearing brief to:


Bernard M. Talbert, Esq.
C/o Blue Cross and Blue Shield Association
225 N. Michigan Avenue
9th Floor
Chicago, IL 60601
Via FedEx Number 8464 4455 0182


_____
Mary E. Wiesner

153

MICHAEL POWELL,
having been first duly sworn, was
called as a witness herein and was
examined and testified as follows:
                    ***
             DIRECT EXAMINATION
BY MR. TALBERT·
        Q. Just for the record why
don't you restate your name, and
spell your last name.
        A  Michael Powell, P-O-W-E-L-
L.
        Q. And where are you employed,
Mr. Powell?
        A. CMS.
        Q. And what is CMS?
        A. Centers for Medicare and
Medicaid Services.
        Q. And was that -- that's a
branch or subdivision of what
government unit?
        A. Our government, United
States government, HHS.
        Q. HHS.  Was CMS known by
another name at some point in time?

154

        A. Previously it was known as
HCFA.
        Q. And just how long
continuously have you worked for HCFA
or CMS?
        A. Approximately 28 years.
        Q. Now do you have a -- are
you assigned to a specific work unit?
        A. Yes.
        Q. And what is that unit?
        A. It's known as DCCM, which
is Division of Chronic Care
Management.
        Q. And does that unit oversee
the renal dialysis reimbursement
program?
        A. Yes.
        Q. And how long have you
worked specifically with renal
dialysis issues?
        A. About 26 years.
        Q. And what are your primary
responsibilities regarding renal
dialysis?
        A. Doing what I do today,

155

testifying at hearings, adjudicating
exception requests, pre-composite,
post-composite, training staff and
adjudicating exception requests, and
assisting ROGC for court trials for
federal district court and federal
appeals court trials, and work on
different aspects of changing rates
periodically.  We're in the middle of
that now, and opening up exception
windows.  We're in the middle of a
window now for pediatric facilities.
        Q. Could you give us a summary
of your education and work experience
getting you to the point where you
started working with the Medicare
renal dialysis program?
        A. Sure.
        Q. I graduated from Loyola
College of Baltimore in 1969 with a
BA in accounting.  I worked seven
years in two different public
accounting firms.  After that I went
to work as an administrator for Johns
Hopkins Hospital.  I worked there for

156

a couple of years, and then I was
hired by the Securities and Exchange
Commission in Washington, and
reviewed 33 and 34 Act filings for a
couple of years, and then I took a
job with the Division of Direct
Reimbursement in Medicare in
Baltimore.
        Q. Let me give you a copy of
the Intermediary's supplement exhibit
packet.
        A. I think I have it.
        Q. You got one there.  What is
the document marked as Intermediary
Exhibit 4?
        A. That's a program memorandum
for Intermediaries.
        Q. And did that open up the
window that we're talking about?
        A. Yes, it did.  In fact, I
happen to be the author of this
document.  You can tell from page 3
it has my name and phone number if
you have any questions about it.
        Q. And when was the window in

157

1 which to submit exception requests?
2     A. It was an 180-day window
3 that started March 1, 2000, and ended
4 August 28, 2000.
5     Q. And it should be clear from
6 the exception request but when were
7 the two exceptions that we're
8 considering today filed?
9     A. August 28, 2000.
10     Q. When the exception request
11 came in, who was it assigned to?
12     A. Joseph Loge in my office.
13     Q. And tell us a little bit
14 about the assignment process within
15 your office.
16     A. Yeah.  We've had exceptions
17 pre-1983 which were known as pre-
18 composite rate exceptions.  We've had
19 ten different windows of opportunity
20 for people to file for exceptions
21 between '83 and 2001, and usually
22 what happens is people that get
23 assigned the exceptions, and usually
24 the senior staff get assigned the
25 more sophisticated exceptions they

158

1 usually repeat when the same
2 facilities come back in for
3 exceptions in subsequent periods, and
4 that's usually how they're assigned.
5     Q. And would you consider Mr.
6 Loge to be one of the more
7 experienced reviewers at the time?
8     A. Yes, I would.
9     Q. And do you know if he was
10 assigned previous exception requests
11 by the appealing Providers?
12     A. Yes, I believe he was.
13     Q. Now does Mr. Loge still
14 work with your group?
15     A. No, he retired about a year
16 ago.
17     Q. And did you kind of pick
18 this up as an extra assignment to go
19 in and appear at this hearing because
20 he's no longer available?
21     A. Yes.
22     Q. Just generally what did you
23 do to get yourself ready?
24     A. Well, I reviewed everything
25 that he would have reviewed in

159

1 preparing his denial letters and of
2 course brushed up on the regs and the
3 interpretation of the regs.
4     Q. Now if you would have
5 available for the next series of
6 questions the denial letter for the
7 kidney center for the freestanding
8 unit, and the exception request.  The
9 exception request is Provider Exhibit
10 1 in that case, and the denial letter
11 is either Intermediary Exhibit 1 or
12 Provider Exhibit 2 so I guess it's
13 probably more convenient to go to the
14 two Providers.  Kind of keep those in
15 front of you.
16                    ***
17 THE CHAIRMAN:
18        I'm sorry.  Mr. Talbert, it
19        sounds like you're going to be
20        getting into the specifics at
21        this point.
22 MR. TALBERT:
23        The specifics of the first
24        one, yeah.
25 THE CHAIRMAN:

160

1        Okay.  This seems like a
2        perfect time then for us to
3        take a break, and we won't
4        have to interrupt Mr. Powell
5        in the middle of that line.
6 MR. TALBERT:
7        Okay.
8 THE CHAIRMAN:
9        And we'll plan to come back in
10        15 minutes.
11 MR. TALBERT:
12        Okay.
13 THE CHAIRMAN:
14        Thank you.
15                    ***
16 [Off the record]
17 [On the record]
18                    ***
19 THE CHAIRMAN:
20        Go ahead, Mr. Talbert.
21 MR. TALBERT:
22        I was asking Mr. Powell to
23        have the November 15, 2000
24        denial letter on Provider
25        052550 and the exception

197

1   discussion of issues with the method
2   with the attempts to quantify time
3   the same -- raise the same issues as
4   you talked about under...
5        A.  Yes.  We never considered
6   those as being pertinent.
7                    ***
8   MR. TALBERT:
9        I have no further questions.
10       I tender the witness for cross
11   examination.
12   THE CHAIRMAN:
13       Mr. Ahern.
14                   ***
15       CROSS EXAMINATION
16   BY MR. AHERN:
17       Q.  Mr. Powell, do you know if
18   Mr Loge had any clinical
19   qualifications?  Was he perhaps a
20   registered nurse or had clinical
21   training or background?
22       A.  I don't believe he did.
23       Q.  Do you know what his
24   educational and professional
25   background was?

198

1        A.  No, I don't.
2        Q.  Okay.  Is there a model
3   exception request...
4        A.  Excuse me.  I know that he
5   was a former IRS agent for a number
6   of years.  I'm sorry.
7        Q.  Well, that may be of
8   interest.  A lot of the debate here
9   is about how the exception request
10   calculated atypicality, and I have
11   sat on this side for several cases,
12   and when I prepared for this case I
13   went back years and years and years,
14   similar disputes, similar questions.
15   How are you connecting your atypical
16   patients with your cost, and how are
17   you calculating.  And so the question
18   I ask you with your experience, is
19   there a model exception request akin
20   to the model compliance program.  We
21   have models all throughout regulatory
22   world.  Is there a model exception
23   request that states this is how you
24   have to calculate the atypicality,
25   this is how the time study is to be

199

1   done, these are the atypicality
2   standards if you -- in terms of -- if
3   you are 5 percent above the standard
4   you're atypical, if you're 4 percent
5   you're not.  Is there any concrete
6   way or -- let's just leave it with
7   that.  Is there a model exception
8   request out there for Providers to
9   use?  They know this is the right way
10   to calculate atypicality and the cost
11   -- and the connection with that.
12       A.  Well, I wrote the 1997 reg
13   that's the current reg for exception
14   requests that's in the Code of
15   Federal Regulations, and I can tell
16   you that in the preamble because I
17   wrote it that there's a discussion on
18   how to justify an atypical exception
19   request.
20       Q.  But is there a model?  Is
21   there...
22       A.  There is no model that I
23   know of.
24       Q.  Is there a help line so
25   that a Provider could call and say,

200

1   look, I'm trying to do this.  I'm
2   going to invest a lot of time and
3   energy.  I want to do it the right
4   way.  Can you please review what I'm
5   doing and tell me if this is going to
6   apply.
7        A.  Other than phone calls that
8   are made directly to the people that
9   adjudicate the exception requests,
10   and they can call any of us directly
11   who have adjudicated their requests
12   in the past, and we're glad to assist
13   them in any way in the preparation of
14   future requests or current requests,
15   I don't know of any model.  Each
16   exception request is usually unique
17   and stands on its own.
18       Q.  So if a Provider is going
19   to prepare an exception request where
20   do they start?  Where do they -- how
21   would they do this in terms of
22   knowing which documentation should be
23   included and how specifically to
24   format that documentation and present
25   it?

201

A. Well, I think they should
start with the regulations, the
interpretations to the regulations.
They can study any of the Board cases
that are in CCH and any of those
decisions that are there, any Board
decisions, any reversals of the
Administrator, any appeal decisions.
They can access approved exception
requests under FOIA for examples of
how to do it correctly.

Q. How long does it take to
get an FOI request through?

A. I don't know.  I've never
done one.

Q. Would you be surprised it
could take up to two to three years?

A. I probably wouldn't be
surprised about that.

Q. How long is the exception
request window?

A. Well, we have great spaces
in between windows that give people a
great amount of time.

Q. But the Provider, once the

202

window was opened...

A. I'm sorry, what?

Q. Once the window is opened,
how long is that window?

A. The window is 180 days but
we've had ten windows.  We're on our
11th window.

Q. So a Provider who has not
contacted the Freedom of Information
people and tried to get one of these
approved exceptions would not have
time to do that during the window, is
that correct?

A. Well, there's other ways
they could possibly try to get it.

Q. Why wouldn't your office
simply present the right way to do it
with the specifics such as how to
list your supplies.  Today one of the
issues was the regulations asked for
a list of supplies.  The Provider
supplied a list of supplies but
nothing in the regulations
distinguished between whether you
should include every possible supply

203

or something like this.  Why wouldn't
your office provide to the Provider
community a model with a list of
supplies the way you want to see it
to adjudicate an exception request
uniformly and fairly?

A. Let me tell you what it
says in our regulations about how
supplies should be spelled out.  Just
give me a minute here.  I'm almost
there.  In this blue binder that my
attorney has prepared under tab I-3,
which is the Chapter 27 of the PRM,
on page 2740 we detail what it is
that we want for supplies, and it
says under item three, supply costs,
the Provider must also show that an
excess supply cost for treatment is
related to the special needs of the
patients and not the result of
inefficiency.

***

MR. TALBERT:

If I can just interrupt my own
witness for a moment.  On the

204

bottom right-hand corner
there's a handwritten number
What is that?

MR. POWELL:

Oh, I'm sorry.  56, page 56.
In order to be acceptable
documentation must be
submitted that demonstrates
the Provider acted prudently,
that is, utilized bulk
purchase discounts when
available.  When it is found
the facility is not using the
amount of the exception
otherwise permitted is
reduced.  HCFA uses as a
guideline manufacture and
supply or price list in cost
report.  I think there's
something even more
definitive.  Bear with me a
second here.

MR. AHERN:

I think I can continue with
the questioning line unless...

205

MR. POWELL:

    Here.  I'm sorry.  Under
    Section 2721, item six,
    supplies, the facility must
    furnish a complete list of
    supplies used routinely in
    dialysis treatment.  This list
    must include the make and
    model number of dialyzer, and
    component cost of each
    dialyzer, and must reconcile
    with the supply cost per
    treatment reported on the cost
    report.  So the list of
    supplies that is supposed to
    be given is the one that's
    supposed to be used routinely
    in the dialysis treatment.
            ***
BY MR. AHERN:
    Q.  Okay.  Now the question
is...
    A.  If there is no such list
then you have to supply more than one
list.

206

    Q.  The question is why
wouldn't you have a sample for a
Provider who cannot -- a Provider to
look at and see the specific format.
We had an issue today, perm cath
versus a fistula.  This is a clinical
issue that if perhaps you could have
a model of how to present this
information, and my question is, is
there -- you obviously said there is
no model.  You referenced
regulations, regulations with a
description.  A description is
instructions.  A model is we've done
it, and this is how it is.
    A.  I've already answered the
model question, and I said that we
don't have a model.
    Q.  Okay.
    A.  You want to know...
            ***
THE CHAIRMAN:
    Mr. Ahern, this may be a
    matter that's more appropriate
    for argument.

207

MR. AHERN:
    Sure.  Okay.
THE CHAIRMAN:
    Whether or not there should be
    or not.
MR. AHERN:
    Okay.
            ***
BY MR. AHERN:
    Q.  Do you know if there's a
model cost report developed by CMS?
    A.  I believe there is.
    Q.  Right.  Does it use the
same forms that a Provider would use
in preparing a cost report?
    A.  Yes.
    Q.  Thank you.  With regards to
an exception...
    A.  It's part of the request.
The cost reports are the same, all
cost reports.
    Q.  I was talking about just a
Medicare cost report.
    A.  Just that part that we use
in our request.

208

    Q.  Actually I'm talking about
the entire medical center.  We'll
move on.  We'll move on.  With
regards to adjudication of an
exception request, is the burden of
proof on the Provider?
    A.  Yes.
    Q.  Okay.  How do you know when
the burden of proof has been
satisfied?
    A.  When we're satisfied that
the Provider has dotted all the Is,
crossed all the Ts, and convinced us
that they're entitled to an
exception.
    Q.  Is that to say the level of
certainty that you would need for a
criminal case beyond a reasonable
doubt?
    A.  That's a good question, and
I'm not in any position to answer
that.
    Q.  But how can you adjudicate
an exception request if you don't
know when the burden of proof has

142

209

1   been met?
2       A. Because that's up to
3   individual abilities to make that
4   determination plus the person that
5   reviews them reviews all of them and
6   has reviewed all of them since we
7   first started processing exceptions.
8   We've had the same reviewer.
9       Q. So you have a great deal of
10  discretion and a great deal of
11  personal judgment as to whether the
12  burden of proof has been met, is that
13  right?
14      A. No, I don't agree with that
15  because I just told you that we've
16  had the same reviewer who has
17  reviewed all our exception requests
18  since the beginning of time so our
19  discretion and our determination is
20  reviewed by him to maintain
21  consistency within our office.
22      Q. Who is that person?
23      A. That person is Gene
24  Richter.
25      Q. And Gene Richter is your

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

210

1   golden standard of whether the burden
2   of proof has been met?
3       A. He is and has been.
4       Q. Did he review this
5   decision?
6       A. He reviewed every decision.
7       Q. Okay.
8       A. Because without his review
9   it doesn't go out of the office.
10      Q. So do you know what his
11  standard is for when the burden of
12  proof is met?
13      A. I have a pretty good idea.
14      Q. What is it?
15      A. I can't put it into words.
16  I can just tell you when I adjudicate
17  a request and I feel comfortable to
18  approve it or deny it that usually
19  I'm on the same page with them on
20  that determination.
21      Q. So you rely a great deal on
22  history on past decisions on specific
23  exception requests. You use
24  precedence in other words?
25      A. Yeah, we want to be

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

211

1   consistent in what we do.
2       Q. Okay. So in order to insure
3   consistency you use Gene Richter's
4   memory?
5       A. We use Gene Richter's
6   judgment, expertise, and memory
7       Q. Okay.
8       A. Plus we have all the prior
9   documentation for everything we've
10  done.
11      Q. You do?
12      A. Yeah, we do.
13      Q. Okay.
14      A. We have access to it. We
15  don't have it in front of us.
16      Q. With regards to the supply
17  issue, and I'm not going to rehash
18  the reuse item, is it true that a $33
19  standard was used in adjudicating
20  this exception?
21      A. It was mentioned in the
22  letter as the national average figure
23  that we use.
24      Q. Right.
25      A. It's the reasonable cost

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

212

1   figure that we use.
2       Q. And what is it based on?
3       A. It's based on audits that
4   were done back in the '80s.
5       Q. And has it been updated?
6       A. It's never been updated.
7       Q. Is it the same as was used
8   in 1990?
9       A. Yes.
10      Q. Was it the same as was used
11  in 1983?
12      A. Yes.
13      Q. So this $33 standard is out
14  of date?
15      A. In your opinion it's out of
16  date. I didn't agree with that.
17      Q. It's never been updated
18  since 1983, and we're in the year
19  2004, and you feel it's still an
20  adequate standard?
21      A. Yes, I do.
22      Q. Okay. And likewise for the
23  labor standard of $40, is that also
24  from 1983?
25      A. Yes.

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

213

Q. Okay. And it's never been updated?

A. That's correct.

Q Could it have been updated?

A. Could it have been?

Q. Yes.

A. Yes.

Q. If you sent auditors in to review cost reports for dialysis facilities, would you give them a $40 standard for labor and a $33 standard for supplies as a median?

A. I wouldn't send auditors in to make those determinations.

Q. If an auditor were sent in to make determinations with regards to whether a cost report's costs were out of line with the median, would you recommend that the auditor use a $40 standard for labor and a $33 standard for supplies?

A. The beginning of your question was if?

Q. Yes.

A. The answer is I don't know.

214

***

THE CHAIRMAN:

Are we talking about general cost reports or ESRD facilities?

MR. AHERN:

This is renal dialysis, and the Chapter 27 specifies in its reference to both denial letters that if you have labor in excess of $40 you're considered atypical. If you have supplies in excess of $33 you're considered atypical, and with the reuse calculations used to reduce the supply cost the recalculated supply cost fell below the $33 threshold, and so that was the basis for the denial. So the $33 standard is in Chapter 27. It's also in the denial letters. It's based on 1983 data, and it's being used to determine

215

whether these supply costs are atypical or not, and likewise with the $40 labor standard.

THE CHAIRMAN:

Wouldn't those standards not being updated work in the Provider's favor at least as often as it would the opposite?

MR. AHERN:

They can work in both directions. I think labor -- supply costs have gone down, and labor costs have gone up. So I think on one hand they work for, on another hand they work against.

THE CHAIRMAN:

I think you have established that these have not been updated. I don't know that these arguments with the witness about whether or not they should be or not is fruitful for this hearing. It

216

may be something you want to address in your post-hearing brief. But I seriously doubt if we'll have any, I've referred to them before as Perry Mason moments where a witness, an adverse witness, disagrees with the opponent and vice versa.

MR. AHERN:

I can understand. I've certainly given Mr. Talbert a run for his money at certain moments. The point I'm making is just that these thresholds are being used today. They're referenced as a national median in the present tense in the denial letter, but they're not present tense. They're 1983 national medians, and they're not being presented as such and I don't think that's accurate. With regards to the...

217

MR. POWELL:

Do you want me to address that
a little bit more?  I can make
a simple statement.

MR. AHERN:

I don't see any need to pursue
it.  If the Board wants to...

THE CHAIRMAN:

I don't think it's
particularly relevant for this
-- I think it's more
appropriate in a post-hearing
brief in argument.

MR. AHERN:

Right.

*  *  *

BY MR. AHERN:

Q.  Moving on to the next issue
for me  Let me just see what's next
here.  Insofar as I heard your
testimony it seemed to me you
indicated that with hindsight the
exception request for the medical
center should not have reached your
desk or the desk of your department,

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

218

is that correct?

A.  I believe I testified to
that.

Q.  But the fact is it did, is
that...

A.  It didn't reach my desk.
It reached Mr. Loge's.

Q.  Mr. Loge's desk.  So would
you in any way infer that the
exception request has not been
processed or would you -- in your
opinion has this exception request
been processed and adjudicated?

A.  I believe it has been.

Q.  Okay.  With regards to the
hospital facility and the inpatient
issue, you mentioned mistakes in the
as-filed cost report where both total
costs and total treatments were
included for inpatient and outpatient
on one line.  If the Provider had
submitted an amended cost report with
the exception was there any guarantee
that that would have been accepted?

A.  By whom?

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

219

Q.  By the Intermediary

A.  I'm not in a position to
answer what the Intermediary would
have accepted or not accepted.
That's their determination.

Q.  Are you aware of any that
have not been accepted when amended
cost reports were submitted with
exception requests?

A.  I'm aware of when amended
cost reports come into our office
with an exception request, and they
haven't been accepted by the
Intermediary that we don't utilize
them.

Q.  Are you aware of times that
Providers have submitted them to the
Intermediaries and the Intermediaries
have refused to accept them?

A.  I'm not aware of that.

Q.  You're not aware of that.
When adjudicating an exception
request, when is it that it is
appropriate to bypass the clinical
data and simply focus on problems

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

220

with the cost reporting issues with
the cost report?

A.  When is it appropriate?

Q.  To bypass the atypical
issue and to deny the exception
request simply on the cost reporting
problems.

A.  Like what was done in one
of these requests here?

Q.  That's right.

A.  It's appropriate when the
cost report is as bad as this one is.

Q.  And what standard -- what
does as bad mean?

A.  I mean that I stated that
this exception request should never
have been sent in to our office
because the Intermediary should have
found those mistakes and known that
they didn't get any amended cost
reports and known that our rules
don't allow amended cost reports to
be included in an exception request.

Q.  So if the Intermediary errs
by passing on the exception to your

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

221

```
 1   office then you deem that's severe
 2   enough to deny it without looking at
 3   the atypicality issue, is that right?
 4        A.  In this situation the
 5   answer is yes.
 6        Q.  And is your thinking
 7   identical to that or do you have any
 8   way of standardizing your thinking or
 9   corroborating that Mr. Loge would
10   answer similarly?  In other words...
11        A.  He did answer similarly,
12   and I have made the same
13   determinations in the past myself.
14        Q.  So in your opinion for the
15   kidney center any problems with the
16   cost report were not severe enough to
17   not look at the atypicality
18   notwithstanding the various
19   challenges to financial information,
20   et cetera in the cost report?
21        A.  Obviously it wasn't for Mr.
22   Loge.
23        Q.  But is there any standard,
24   is there any objective standard of
25   when it is acceptable?  You used
```

222

```
 1   terms like as bad, Intermediary
 2   should have.  Is there any technical
 3   standard like if the inpatient
 4   treatments are not broken out we will
 5   not look at this exception, is there
 6   a policy of that, a written policy?
 7        A.  There are written policies
 8   in the Intermediary -- in Chapter 27
 9   of the PRM, the Intermediary review,
10   and part of that review is to
11   determine if the Provider presented
12   reasonable cost.  And the way these
13   cost reports were prepared reasonable
14   cost was not presented and it should
15   not have been accepted.
16        Q.  Is an exception based on
17   projected cost or historical cost?
18        A.  Say that again, please.
19        Q.  Is an exception based on --
20   an approval amount limited or based
21   on projected cost or historical cost?
22        A.  An exception is supposed to
23   be based on projected cost but it's
24   not always done that way.  First of
25   all, you have Providers that request
```

223

```
 1   less than that or historical cost
 2   rather than a projected cost like was
 3   done in one of these.  And then for
 4   other reasons you may not accept the
 5   projected cost report because maybe
 6   they have some great differences
 7   between the as-filed and the
 8   projected, and they didn't explain it
 9   and we don't have to accept the
10   projected numbers.
11        Q.  But in the regulatory
12   instructions, Chapter 27, the
13   exception request is supposed to be
14   based on projected costs?
15        A.  That's correct.  It's
16   supposed to be based on that.
17        Q.  So if by mistake or for
18   some reason projected costs are lower
19   than historical costs notwithstanding
20   whatever might have happened in the
21   past, you would limit the exception b
22   projected costs?
23        A.  No.  I don't agree with
24   that.
25        Q.  You would actually give
```

224

```
 1   them more than...
 2        A.  If the Provider requests
 3   less than the projected cost, we will
 4   limit their exception to what they
 5   requested.
 6        Q.  If their projected costs
 7   are less than historical cost.
 8        A.  And they request the
 9   projected cost?
10        Q.  Right.
11        A.  We'll grant them the
12   projected cost.
13        Q.  So the projected cost are
14   the basis for the approval all else
15   being equal?
16        A.  Not if the Provider has
17   requested less.
18        Q.  Okay.  But if the Provider
19   projects a 3 percent increase it's
20   perfectly reasonable, perfectly
21   explained, no variances that seem
22   irrational, you will base the
23   approval on that 3 percent projection
24   for the next year, is that correct?
25        A.  That's correct.
```

225

Q. That's correct. With regards to the medical center hospital there's no dispute that the inpatient treatments were not included. With the projected cost report included in the hospital exception request, my understanding is your dispute with that is only that the inpatient treatments which are broken out in the projected report are broken out using treatments, is that correct?

A. I think I have a problem with that in the projected cost report but that was not the only problem I had.

Q. Was there another problem with the projected cost report?

A. I don't know. I don't remember exactly everything he wrote about the projected cost report.

Q. Okay.

A. But that was definitely a problem in accepting the projected cost report.

226

Q. To me that -- when I read through that was the only problem with the projection.

* * *

THE CHAIRMAN:
Mr. Ahern, we're going to take a break.

MR. AHERN:
Okay.

THE CHAIRMAN:
We're off the record.

* * *

[Off the record]
[On the record]

* * *

THE CHAIRMAN:
We're back on the record. Mr. Ahern, you may continue.

MR. AHERN:
The danger of giving me time is now I have at least two questions.

* * *

BY MR. AHERN:
Q. What is in your mind the

227

purpose of an exception request?

A. To grant an exception.

Q. Why would you grant an exception? That's not -- the fundamental purpose of an exception is an exception request...

A. The reason we have an exception request process...

Q. From your point of view, the exception request process, what is the purpose...

A. Is to grant an exception.

Q. For those Providers...

A. Who make exception requests.

Q. That would seem rather circular but I'll accept that. You mentioned that 13, am I right, 13 percent of patients at the hospital were pediatric, is that right?

A. I said less than.

Q. Less than. Okay. And why did you mention that? What is your purpose of mentioning that? What conclusion are you drawing from that

228

statement?

A. The reason I mentioned the statement -- is that one of your questions?

Q. Yeah.

A. The reason I mentioned the statement is because there's been a lot of talk about these pediatric patients as if this facility is all about pediatric patients. It's not. Because the pediatric patients, I want to make it clear, represent less than 13 percent of the patients that are getting treatments at that facility.

Q. What percent of treatments are pediatric?

A. I don't know.

Q. Can you turn to page 54 of the hospital exception request, Exhibit 3 -- I mean Exhibit 3, and it's referred to as 54. There's so many numbers here it's a little difficult but it's the last page. This is the hospital dialysis unit

229

exception request.
     A. The hospital.
     Q. Dialysis unit exception
request.
     A. Is that the independent of
the hospital?
     Q. The hospital.
     A. 050327, because my
statistics related to the independent
facility.  The statistics that I
quoted you.
     Q. The 13 percent.
     A. The less than 13 percent.
     Q. Were for the...
     A. Oh, they were for the
hospital.
     Q. They were for the hospital.
     A. They were for the hospital.
That's the smaller facility.  It's
hard.  I get them mixed up.
     Q. It is very confusing.
     A. It's hard to think that the
hospital is the smaller facility.
     Q. That's why I put...
     A. Right.  Now what do you

230

want me to refer to?
     Q. Exhibit -- well, do you
want to reframe your conclusion that
less than 13 percent if you had the
wrong facility in mind?
     A. No.  I have the right
numbers.
     Q. Okay.  If you turn to
Exhibit -- attachment three of
Exhibit 1 for the hospital.
     A. Is that the exception
request?
     Q. Yes.
     A. I have it.
     Q. Okay.  Under pediatric
treatments we see a variety of -- we
see a total of 1,406 treatments for
pediatric treatments that have
interventions and an additional 430
treatments that are other pediatric
interventions, and I'm taking
advantage of what Ms. Strutt told me
in interpreting it that the total
number of pediatric treatments here
is roughly 1,800 pediatric

231

treatments, and yet total treatments
including adults is 2,558 treatments.
     A. And where is this
information because I can't find it?
     Q. It's on the last page.
     A. The last page of Exhibit 3.
               ***
MR. TALBERT:
     What's the page number, the
     handwritten page number?
MR. AHERN:
     54.
MR. POWELL:
     I don't see these numbers
     here.
MR. AHERN:
     Down at the bottom, the very
     last -- are you looking at the
     hospital exception request?
MR. POWELL:
     0327, yes.
MR. AHERN:
     Exhibit 3B.
MR. POWELL:
     Exhibit 3.

232

MR. AHERN:
     3B.
MR. POWELL:
     3B?
MR. AHERN:
     Yeah.
MR. POWELL:
     I'm on 3, 3A -- 3B.
MR. AHERN:
     There we go.
MR. POWELL:
     I got to 3B.
               ***
BY MR. AHERN:
     Q. My interpretation based on
what Ms. Strutt told me is that the
1,406 treatments can be added to the
430 treatments, both of which are
under the general title of pediatric
to create that proportion of
treatments that are in fact
pediatric.  In simple terms if
approximately 80 percent of the
treatments are rendered to pediatric
patients then would you still say

148

233

that this is essentially not a
pediatric unit or that the pediatric
percent is very relatively small,
it's less than 13 percent because
less than 13 -- the impact -- would
you then say the impact of pediatric
patients is still negligible?
    A. The only reason I addressed
the issue is because I didn't look at
any of the patient -- I didn't study
any patient data because Mr. Loge
ignored the patient data. The only
reason I addressed it is because of
Ms. Strutt's testimony. That's the
only reason I addressed it because so
much was made about the pediatric
patients. And my statistics still
stand from the standpoint of number
of patients.
    Q. Yes, but do you think that
that number of patients statistic
tells -- gives a true indication of
what's going on at the unit in terms
of how much time is invested...
    A. Not in terms of treatments

234

it doesn't. I agree with you. But
what percentage did you say it was?
    Q. I was just using rough
terms. I think it's roughly...
    A. Well, let's get a more
accurate interpretation. Do you have
a calculator?
    Q. Let's just...
                ***
THE CHAIRMAN:
        Let's just use the actual
        numbers, and we'll let the
        Board figure that out.
MR. AHERN:
        Okay. Okay.
                ***
BY MR. AHERN:
    Q. So you agree then that
percent of treatments if it's
extremely -- if percent of treatments
is drastically different than percent
of patients then in this case at
least percent of treatments probably
paints a more true picture of the
nature of the unit being pediatric or

235

not, would you agree?
    A. I'm not going to answer
that because it's a moot point
because it was never addressed
because the cost reports were so bad.
    Q. Okay. So you have no
opinion on the matter?
    A. I really am not going to
give you an opinion because I haven't
studied these numbers.
                ***
MR. AHERN:
        Okay. I have no more
        questions.
THE CHAIRMAN:
        Mr. Talbert.
MR. TALBERT:
        I have no further questions
THE CHAIRMAN:
        All right. We will permit
        Board questions. Ms.
        Mulchandani.
MS. MULCHANDANI:
        Yeah, I just have one
        question.

236

                ***
BY MS. MULCHANDANI:
    Q. Mr. Powell, I think you
mentioned that for both of the
exception requests there were a
variety of reasons why they were
denied. Some of them you mentioned
though on their own, they would not
have been denied if that was the only
reason, an example being the lack of
time studies. You said on its own if
that's the only thing that they
didn't have then they probably
wouldn't be rejected because you
accepted exception requests without
time studies. Was that your
testimony earlier or did I...
    A. No. I think you
misunderstood my testimony.
    Q. Okay.
    A. Unless I misstated it. But
I can make it clear for you.
    Q. Sure.
    A. The time studies have
nothing to do with any exception



*Loma Linda University*

*Medical Center*

# FY 2000

# *KIDNEY CENTER*

# PROVIDER # 05-2550

# Provider Reimbursement Review Board

# CASE # 01-2872 ESRD

# **FINAL POSITION PAPER**

(VOLUME 1 OF 2)

# BEFORE THE PROVIDER REIMBURSEMENT REVIEW BOARD
## BALTIMORE, MARYLAND

| | |
|---|---|
| LOMA LINDA UNIVERSITY<br>KIDNEY CENTER )<br> )<br> )<br> )<br>PROVIDER No. 05-2550 )<br> )<br>(Provider) )<br> )<br>vs. )<br> )<br>UNITED GOVERNMENT SERVICES )<br> )<br>(Fiscal Intermediary) ) | PRRB Case No.<br>01-2872 ESRD<br><br>RECEIVED<br><br>DEC 0 3 2001<br><br>PROVIDER REIMBURSEMENT<br>REVIEW BOARD |

## PROVIDER'S FINAL POSITION PAPER

### List of Issues

1)    The issue is whether HCFA incorrectly denied Loma Linda

University Kidney Center's (LLUKC) request for an exception to

the ESRD composite rate.

### Amounts in Controversy

The reimbursement effect of the FYE 2000 exception request is to increase

payment by $ 51.64 for Hemodialysis and $ 49.43 for Peritoneal Dialysis.

The cumulative reimbursement effect will vary with the duration of the

LLUKC Final Position Paper, Case 01-2872: Page 1 of 15

exception, which depends on the length of time CMS (formerly HCFA) permits the exception to remain in effect.  However, even a single year's increased reimbursement at the requested rate would have resulted in more than $ 10,000 of additional revenue for LLUKC.

## Jurisdiction

The Provider Reimbursement Review Board ("PRRB") has jurisdiction over this matter pursuant to the provisions of 42 CFR § 413.194.

## Statement of Facts

On August 28, 2000, LLUKC submitted an exception to the composite rate for maintenance dialysis service to United Government Services, LLC ("Fiscal Intermediary"). The Provider sought an exception amount of $186.59 per treatment for hemodialysis and $ 184.38 per peritoneal hemo equivalent treatment.  The basis for the provider's request was atypical service intensity.

The Intermediary recommended rates of $ 181.52 for Hemodialysis and $179.55 for Peritoneal and sent the exception request to HCFA's Division of Chronic Care Management. Despite several requests, the Intermediary's correspondence has not been released to the Provider's representative, hence

LLUKC Final Position Paper, Case 01-2872: Page 2 of 15

at the time of this filing, the date and details of the letter are unknown to the Provider.

On November 29, 2000, the Provider was notified that the exception request had been denied in its entirety by HCFA.

On April 16, 2001, LLUKC timely filed an appeal to the Provider Reimbursement Review Board pursuant to 42 CFR § 413.194. For the following reasons, LLUKC asserts that HCFA improperly rejected the Provider's exception request.

## ARGUMENT

## I.    Provider Satisfied the Atypical Service Intensity Criteria

The criteria for submission of exception requests on the basis of atypical service intensity are stated in 42 CFR § 413.184. Further, the Provider Reimbursement Manual provides additional authority with respect to composite rate exceptions based on atypical service intensity. See PRM §2725.1.

The applicable regulation states in pertinent part as follows:

> "A facility must demonstrate that a substantial proportion of the
> facility's outpatient maintenance dialysis treatments involve atypically

*intense dialysis services, special dialysis procedures, or supplies that*

*are medically necessary to meet special medical needs of the facility's*

*patients. "* See 42 CFR § 413.184(a)(1).

The regulations require the provider to submit documentation pertaining to

eleven separate categories of information reflecting on a patient's condition.

However, these regulations clearly do not require a provider to demonstrate

atypicality with respect to each of these eleven separate categories. Rather,

it is the totality of the circumstances which must be evaluated by HCFA in

deciding whether to grant the request.

The Provider's exception request clearly articulates the basis of the

composite rate exception and provides solid evidence that several key

indicators demonstrate a higher than national average level of patient acuity.

The exception request delineates those clinical factors that are strongly

indicative of an atypical patient population. The section of the Provider's

narrative entitled "National Average Comparison" [See Exhibit P-1]

summarizes these clinical indicators:

|                                       | LLUKC (FY 1999) | National Average [1] |
|---------------------------------------|-----------------|----------------------|
| Hemodialysis -Diabetic Patients       | 45.32%          | 34.44%               |
| Hemodialysis Hypertensive Patients    | 78.33%          | 24.76%               |
| Hemodialysis – over 64 years old      | 38.92%          | 28.88%               |
| Hemodialysis – below 20 years old     | 0.49%           | 0.31%                |
| Hemodialysis Inpatient Admits         | 32.03 %         | 27.31 %              |
| CAPD / CCPD -Diabetic Patients        | 32.08 %         | 34.44 %              |
| CAPD / CCPD Hypertensive Patients     | 54.72 %         | 24.76 %              |
| CAPD / CCPD – over 64 years old       | 15.09 %         | 2.61 %               |
| CAPD / CCPD – below 20 years old      | 33.96 %         | 0.24 %               |
|                                       |                 |                      |
| Mortality Rate                        | 15.7 %          | 16.00 %              |
| Transplant Patients                   | 2.91%           | 3.43 %               |

(1) Source: United States Renal Data System, 1999 Annual Data Report (USRDS) (Based on 1997 data).

Close review of the clinical statistics shown above reveal that LLUKC's Hemodialysis patients are older, more frequently diabetic, and much more frequently Hypertensive.  LLUKC's home program patients shows a bimodal atypical age profile with <u>more than 5 times the normal percentage of older patients and more than 141 times the norm of pediatric patients.</u>

Each older patient statistically offsets the percent of younger patients.

Consider a hypothetical patient population consisting of twenty 100-year-old

men and twenty new born girls would have an average age of 50 years old

split evenly between male and female. As with LLUKC, in this hypothetical

case a median age of 50 might be interpreted by HCFA to reflect that this

population is not all that atypical. *"LLUKC's average age is almost in the*

*middle of the national average."* [Provider Exhibit P-2]  However,

immensely more labor would be required to handle this bimodal age

distribution which is by no means "average."  For LLUKC to have higher

than normal percents of both younger and older patients requires that relative

to national norms, few patients are in the healthier and more cost effective

mid-age range assumed in setting the composite rate. More supporting detail

regarding  atypicality is contained in the Exception Request narrative and

exhibits.

Clearly, LLUKC has proffered very compelling evidence that it treats

atypically sick patients and, as such, has demonstrated compliance with the

criteria for atypical service intensity as prescribed in 42 CFR § 413.184, as

well as the implementing provisions of PRM § 2725.1. Notably HCFA states

"*based on the patient data submitted by LLUKC, it appears that LLUKC* *could* *possibly haven an atypical patient mix.*" [See Provider Exhibit P – 2]

### a)    Atypical Costs Were Sufficiently Demonstrated.

PRM § 2721.B requires that a provider submit: "*supporting material documenting the reasons that may justify its costs in excess of its composite rate(s). In addition, the facility must separately identify those items and services that are in excess of the composite rate.*" LLUKC submitted a plentitude of documentation that justified its costs in excess of the composite rate.

The cost reporting issues pertaining to home office costs would have no impact whatsoever on the exception amount unless HCFA decided to grant additional relief based on overhead costs. Clearly, HCFA decided to deny an overhead exception; not merely because of cost reporting issues, but also because of concerns about linkage between sicker patients and increased overhead costs:

*The Medicare principles of cost finding do not apply to Loma Linda University Kidney Center because it is a freestanding facility. You cannot step-down cost from a hospital to a freestanding facility.*

*Also, Loma Linda University Kidney Center has not submitted any documentation explaining how Loma Linda University Kidney Center's*

LLUKC Final Position Paper, Case 01-2872: Page 7 of 15

*costs related to its ESRD patient care. Unsubstantiated general statements are not sufficient documentation for the granting of an exception amount. Therefore, we are unable to grant an exception amount for overhead.* [See Provider Exhibit P- 2]

**b)      The Hours Per Treatment Were Accurate And Exceeded The**

**Norms Used By HCFA To Adjudicate Exception Requests.**

The only remaining substantive issue raised by HCFA is how many hours were allocated to home training. The Provider concedes that more hours should have been allocated to home training; however, even with a higher allocation to home training there would be a minimal effect on the maintenance hours per treatment.

The number of home training treatments and hours is very, very, very small relative to the maintenance treatments. In Fiscal Year 1999 LLUKC had only 115 home training treatments that represent 0.59% of the total 19,264 total treatments rendered annually by LLUKC. Thus an increase in the allocation of time to these 115 home training treatments from 1.25 hours to 8 hours would have virtually no effect on the average hours per maintenance session. In simple terms, the average hours per treatment for maintenance hemodialysis are essentially accurate and far exceed the national norm of 3.00 hours per treatment used by HCFA in adjudicating exception requests. [Additional exhibits will be submitted to the Board prior to the hearing

referencing the use of the 3.0 hour norm by HCFA personnel in the adjudication of exception requests]

Despite the minor inaccuracy of under allocation to home modes, HCFA should have assessed the materiality of the error, made a reasonable adjustment and approved the Exception Request. It should be noted that HCFA did, in fact, make use of what HCFA considered reasonable assumptions when it used a reuse rate of 20 times per dialyzer to lower the supply cost per treatment below the $ 33 threshold for an exception. HCFA should have likewise used a reasonable adjustment to modify the nursing labor cost per treatment.  Such a test, in combination with labor cost information submitted with the exception [Exhibit P-1] that substantiate the nursing labor costs, would have shown that LLUKC incurs costs far in excess of the norm.

c)    **HCFA's Challenge to Provider's Supply Costs is Erroneous**

HCFA denied the Provider's request for an exception amount based on supplies by the inappropriate and inaccurate use of information provided on the S-5 schedule of the Cost Report:

> *"We totaled the supply list shown at Exhibit 16 without the dialyzer and arrived a total cost of $ 24.71 for supplies, then we included the*

LLUKC Final Position Paper, Case 01-2872: Page 9 of 15

> *dialyzer CPT of $ 0.97 for a total supply cost of $25.68. Since this*
> *supply cost of $ 26.00 is less than the national average of $ 33, we*
> *would be unable to grant an exception amount for supplies, even if the*
> *criterion were met."*

HCFA' s use of the 20 re-use per dialyzer assumption was inaccurate.

Firstly, a straight average assumes that all dialyzers are used on an equal

percent of patients (100% / 7 dialyzers = 14.3% of patients on each dialyzer)

when in reality dialyzers are used based on the unique needs of patients that

are not equally distributed.  Secondly, the price of dialyzers is not equally

distributed by model, Exhibit 16A of the exception request shows dialyzer

prices ranging by model from the Baxter PSN 120 @ $11.00 to the Baxter

CT 190G @ 28.00. Finally, no cost of reuse materials has been factored in.

If the cost of reuse solutions consumed with each reuse is about $ 1.00 then

20 reuses, using HCFA's figure would equate to a cost of ($19.35/20) +

$20.00 = $20.97 for the dialyzer alone. Adding the cost of other supplies at

$25.68 per treatment would put LLUKC over the $ 33 threshold with a total

incremental supply cost of $45.67.   The point of these calculations is to

show that when HCFA used the 20 reuses figure to calculate dialyzer cost

HCFA failed accept that there are supplies consumed each time a dialzyer is

re-used.

Also, HCFA used the 20 re-use figure as if it were perfectly accurate even

though no support whatsoever for this figure was included with the

LLUKC Final Position Paper, Case 01-2872: Page 10 of 15

168

Exception Request. While willing to accept the Provider's unsupported word

on the number of reuses, HCFA has chosen to reject well supported

information about additional nursing time to treat atypically ill patients

because *"The provider has not presented any time studies to adequately*

*support its patient care staff's identification of the additional time spent by*

*nursing staff."* [Provider Exhibit P-2]


**d)      The Time Studies Supplied Were Sufficient**

HCFA took issue with the determination of how the incremental additional

labor cost associated with treating the atypical patient was calculated:

> *The provider has not presented any time studies to adequately support*
> *its patient care staff's identification of the additional time spent by*
> *nursing staff. Therefore, based on the above, the provider has failed to*
> *adequately document the additional nursing services rendered to its*
> *atypical patient mix. Data based on patient care staff interviews that*
> *cannot be verified or audited is not acceptable. In the event that a*
> *time study is used in the future, the general Medicare principles*
> *regarding the adequacy of periodic time sampling described in § 2313*
> *of the PRM must be furnished.  Therefore we are unable to approve*
> *the $ 8.50 for atypical salary cost per treatment due to atypical*
> *minutes incurred. {emphasis added}* [Provider Exhibit P-2]


Firstly, § 2313 cited by HCFA  pertains to cost reporting information for

Medicare cost reports which are submitted on an annual basis, not to

evidence presented in an exception request submitted during a exception

request window which opens at periods as long as six years from each other:

LLUKC Final Position Paper, Case 01-2872: Page 11 of 15

169

MED-MANUAL, §2313. CHANGING BASES FOR ALLOCATING COST CENTERS OR ORDER
IN WHICH COST CENTERS ARE ALLOCATED.
§2313. CHANGING BASES FOR ALLOCATING COST CENTERS OR ORDER IN WHICH
COST CENTERS ARE ALLOCATED.,
Provider Reimbursement Manual, Part 1 (HCFA-Pub. 15-1)

When a provider wishes to change its statistical allocation basis for a particular cost center and/or the order
in which the cost centers are allocated because it believes the change will result in more appropriate and
more accurate allocations, the provider must make a written request to its intermediary for approval of the
change ninety (90) days prior to the end of that cost reporting period  The intermediary has sixty (60) days
from receipt of the request to make a decision or the change is automatically accepted.  The provider must
include with the request all supporting documentation to establish that the new method is more accurate.  If
the provider is requesting the simplified method (hospitals only), as described in HCFA Pub. 15-II, Chapter
36, §3617, the provider must demonstrate that the maintenance of the new statistics is less costly.  The
change should not result in inappropriately shifting costs.  Hospitals should be cognizant of this particularly
to avoid violating the capital consistency rule under the hospital inpatient capital prospective payment
system.

Secondly, the methods used in this exception to document incremental

atypical labor are essentially the same as those in the exception requests

submitted by LLUKC's hospital affiliate,  Loma Linda University Medical

Center (LLUMC),  to HCFA in 1990 and 1994. In both cases the exception

requests were approved. [See Provider Exhibits 4 & 5] In fact, the same

HCFA analyst who in 1994 approved of LLUMC's use of staff estimates of

additional time spent with patients deemed identical methodology as "not

acceptable" in 2000.  In fact, during the more than a decade of exception

request processing covering, HCFA has neither by regulation nor by

memorandum provided an approved method for determining atypical

nursing time. However, the Provider will submit to the Board prior to the

hearing evidence that many other providers have been granted approvals

based on incremental time justification similar in form and substance as that

submitted with LLUKC's Exception Request.

## II    The Exception Request Was Not Processed Within 60 Days,

## And, As Such, Should Be Approved.

Although LLUKC's exception request was submitted on August 28, 2000,

LLUKC did not receive a response from HCFA until November 29, 2000,

which exceeds the 60-day time limit imposed for processing a renal dialysis

exception request:

42 CFR § 413.180(h) clearly states:

*"Approval of an exception request. An exception request is deemed*

*approved unless it is disapproved within 60 working days after it is filed*

*with its intermediary."*

As the PRRB has already ruled in a similar case regarding HCFA's failure to

process an exception request in a timely matter:

> Under Sec. 1881(b)(7) of the Social Security Act and *Provider*
> *Reimbursement Manual* Sec. 2720, *et seq.*, an exception request must
> be processed within 60 working days after the request is filed with the
> intermediary or it will be deemed approved. In this case, the period of
> time taken to deny the request was properly measured from February
> 2, 1990, when the intermediary accepted the request as complete, to
> May 21, 1990, when the hospital learned of HCFA's denial. Although
> HCFA made its determination that documentation was lacking within
> the 60 working day time period and sent a letter informing the
> intermediary of its decision, the intermediary did not notify the
> hospital of the denial until after the required time frame had elapsed.
> PRRB-DEC, MED-GUIDE 1996-2 MED-GUIDE-TB ¶44,647,

LLUKC Final Position Paper, Case 01-2872: Page 14 of 15

Charlotte Hungerford Hospital (Torrington, Conn.) v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Connecticut.

## CONCLUSION

In conclusion, the Provider submitted adequate documentation to justify its claim that it serves an atypically sick patient population and incurs costs in excess of the national norm of $ 40 per treatment used by HCFA to adjudicate exception requests. LLUKC provided ample evidence to fulfill the burden of proof. HCFA, on the other hand, has neither justification for rejecting the atypicality of LLUKC's patient population nor for refusing to accept the time studies used to estimate the additional cost of treating these patients. Finally, HCFA failed to process the Exception Request within the requisite 60-day time limit. As such the exception should have been approved in its entirety.

Respectfully Submitted

*Jack Ahern*

Jack Ahern

841 C  South Racine Avenue
Chicago, Illinois 60607
312 997 2177

Provider Representative
Dated November 29, 2001

LLUKC Final Position Paper, Case 01-2872: Page 15 of 15

# CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 29th day of November

2001, I caused to be delivered via Federal Express a copy of the foregoing

Provider's Final Position Paper to:


United Government Services, LLC – CA
Ms. Antoinette Biglang-Awa, Manager
Provider Audit / Reimbursement Appeals
5151 Camino Ruiz, Building B
Camarillo, CA  93012 – 8696

Mr. Wilson Leong,
Director, Blue Cross Blue Shield Association
225 N. Michigan Avenue
Chicago, IL 60601-7680


_Jack Ahern_
Jack Ahern

# BEFORE THE PROVIDER REIMBURSEMENT REVIEW BOARD
## BALTIMORE, MARYLAND

| | |
|---|---|
| LOMA LINDA UNIVERSITY<br>MEDICAL CENTER<br>PROVIDER No. 05-2550<br><br>(Provider)<br><br>vs.<br><br>UNITED GOVERNMENT SERVICES<br>(Fiscal Intermediary) | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

PRRB Case No.
01-2872 ESRD

## PROVIDER'S EXHIBIT LIST

| Tab | Date | Contents |
|---|---|---|
| P - 1 | 28 Aug 00<br>(Separately<br>Bound) | Provider's Exception Request, together with all supporting exhibits. This request constitutes the basis for the Provider's Claim for additional compensation under the Medicare Program. The validity of this Exception Request is the subject matter of this proceeding. All patient identifying information has been removed from this document. |
| P-2 | 15 Nov 00 | Letter from HCFA's Division of Chronic Care Management to HCFA Intermediary. This document is relevant because it reflects HCFA's denial of Provider's Exception Request. |
| P-3 | 29 Nov 00 | Letter from HCFA Intermediary to Provider transmitting denial of Exception Request. This document is relevant because it furnishes the basis upon which this appeal is brought and because it documents that the Provider was not notified within the mandated 60 day limit. |
| P-4 | 15 June, 94 | Atypical Service Intensity Exception Request Approval Letter. This document is relevant because it shows that at HCFA has previously accepted and approved of exception requests using incremental nursing time determinations that are based on interviews with clinical staff. |
| P-5 | 1994 | Incremental Time for Atypical Nursing Services 1994. This document is relevant because it shows the nature and substance of the previously submitted incremental nursing time determinations based on interviews with clinical staff. |

Page 1 of 1

Provider Exhibit 1

| Tab | Date | Contents |
|-----|------|----------|
| **P - 1** | 28 Aug 00 (Separately Bound) | Provider's Exception Request, together with all supporting exhibits. This request constitutes the basis for the Provider's Claim for additional compensation under the Medicare Program. The validity of this Exception Request is the subject matter of this proceeding. All patient identifying information has been removed from this document. |

Provider Exhibit 2

| Tab | Date | Contents |
|-----|------|----------|
| P-2 | 15 Nov 00 | Letter from HCFA's Division of Chronic Care Management to HCFA Intermediary. This document is relevant because it reflects HCFA's denial of Provider's Exception Request. |



Page 1 of 18

DEPARTMENT OF HEALTH & HUMAN SERVICES                    Health Care Financing Administration

7500 SECURITY BOULEVARD
BALTIMORE MD 21244-1850

RECEIVED
NOV 27 2000

P/M _____ // /6 _____

November 15, 2000

Mr. Michael S. Foxx, Manager
Provider Audit Department
Medicare Part A Intermediary
P.O. Box 9159
Oxnard, California 93031-9150

Dear Mr. Foxx:

I am responding to your letter dated September 19, 2000, concerning the exception request filed under the prospective (composite rate) payment system by Loma Linda University Kidney Center (LLUKC), provider number 05-2550  LLUKC's exception request was received in your office on August 28, 2000  LLUKC has requested an exception amount of $186.59 or an increase of $51.64 for maintenance hemodialysis and $184 38 for home program peritoneal dialysis or an increase of $49 43 under the atypical patient mix exception criteria. Based on your review of the documentation submitted by LLUKC, you recommended a composite payment rate of $181.52 for maintenance hemodialysis and $179 55 for home program peritoneal dialysis. As a result of our review of the documentation submitted by LLUKC and your office, we have the following comments.

Atypical Patient Mix

In order to determine whether a facility has an atypical patient population mix, we consider the following patient characteristics - age, mortality rate, diabetes, hepatitis, transplants, patient transfers (referrals), as described in 42 CFR 413 184(b) and § 2725 1 C of the Provider Reimbursement Manual (PRM) and any other patient information and/or data submitted by the facility.

LLUKC has 256 ESRD patients with an average age of 52 9 per Exhibit 1  The average of LLUKC's ESRD patients is in line with national data. The national average of ESRD patients age 54 and under is 44.2%  The national average of ESRD patients age 55 and over is 55 8%

LLUKC has a 35.93% (92/256) diabetic ESRD patient population per Exhibit 3  The national average for diabetic patients for 1997 was 33%.

②/18

180

2

LLUKC has a Hypertension rate of 62.1% (159/256) per Exhibit 3. The national average for hypertension for 1997 was 25%.

LLUKC has a 10.5% (27/256) mortality rate per Exhibit 4. The national ESRD mortality rate for 1997 was 16.03% (48,118/300139).

LLUKC has a transplant rate of 1.95% (5/256) per Exhibit 6. The national average transplant for 1997 was 2.91% (8752/300,139). However, LLUKC reported that it has already transplanted 3 patients in FY 00 and has a transplant waiting list of 30 patients.

The average length of hospital stay for LLUKC's ESRD patients was 6.67days. The national average length of hospital stay for ESRD patients in 1997 was 8.3 days.

Further, LLUKC claims that 85 patients or 33.2% (85/256) of its ESRD patients require ambulation assistance, 17 patients that require isolation, 40 cardiac patients, 18 home program pediatric patients, and 78 patients with neuropathic problems.

LLUKC's average age is almost in the middle of the national average. LLUKC's mortality rate, transplant rate, and average length of hospital stay are less than the national average. LLUKC's diabetic rate is slightly higher than the national average. LLUKC's hypertension rate is much higher than the national average. Based on the patient data submitted by LLUKC, it appears that LLUKC *could* possibly have an atypical patient mix.

## Cost Justification

LLUKC requested exception amounts for salaries, employee benefits, supplies and overhead for maintenance hemodialysis and home program peritoneal dialysis, separately, as shown on page 3 of its narrative under the heading entitled Current and Requested Exception Amount. The composite payment rate is a comprehensive payment rate for all modes of infacility dialysis and home dialysis [§2702 of the Provider Reimbursement Manual (PRM)]. Therefore, the provider has failed to file its exception request in accordance with Medicare Program instructions.

## Salaries

On page 3 of its narrative, LLUKC requested $20.13 for maintenance hemodialysis and $18.46 for home program peritoneal dialysis based on its Exhibit 9.



3

## Maintenance Hemodialysis and Home Program Peritoneal Dialysis

On pages 6 of its narrative under Atypical Activities, the provider stated that we present in Exhibit 9 a list of diagnoses and related activities that require additional nursing assistance. The patient care staff prepared this list and identified the additional number of nursing minutes per activity and the number of times each activity is performed annually for both maintenance hemodialysis and home program peritoneal dialysis.

In reviewing the documentation submitted, some of the services listed as atypical appear to be similar to the type of services rendered by all facilities such as, taking BP's and weighing patients. Also, these listings and minutes were based on the information obtained from the patient care staff after the fact and, consequently, cannot be audited or verified

The provider has not presented any time studies to adequately support its patient care staff's identification of the additional time spent by the nursing staff. Therefore, based on the above, the provider has failed to adequately document the additional nursing staff services rendered to its atypical patient mix. Data based on staff interviews that cannot be verified or audited is not acceptable. In the event that a time study is used in the future, the general Medicare principles regarding the adequacy of periodic time sampling is described in §2313 of the PRM must be furnished. Therefore, we are unable to approve the $8 50 for atypical salary cost per treatment due to atypical minutes incurred.

At Exhibit 9, the provider has also requested an additional $11.64 per nursing staff mix. The $11.64 is based on mathematical computations using the provider's Exhibits 10 and 11. On page 5 of its narrative and Exhibit 10, the provider stated that the average staffing ratio for facilities that treat typical patients is 4 patients to 1 staff. The provider did not furnish its source of information. Therefore, the validity of this mathematical computation is questionable. Consequently, we are unable to approve the $11.64 for atypical salary cost per treatment due to staffing mix.

Further, based on our experience, home program patients are healthier patients than infacility patients and require less nursing time and services. Therefore, we are unable to approve the $18.46 for atypical salary cost per treatment due to atypical minutes incurred.

## Cost and Treatment Count Comparison

The salary cost per treatment went from $56 87 ($1,081,152/19,012) in FY 99 to $70 41 ($1,356,433/19,264) in FY 00 for an increase of $13 54 or a **23.8% increase** ($13.54/$56.87) The number of salary treatments went from 19,012 in FY 99 to 19,264 in FY 00 for an increase of 252 treatments or a **1.3% increase** (252/19,012) The provider furnished no explanation as to why the cost per treatment for salaries increased so much, while the increase for treatments was very small.



## Supplies

On page 3 of its narrative, LLUKC requested $3 for supplies for both hemodialysis and home program peritoneal dialysis based on its Exhibit 1. The financial data shown at Exhibit 1 for FY 97, FY 98, FY 99, and FY 00 includes all the costs and treatments for maintenance hemodialysis, home program peritoneal dialysis and both training modalities Including the training modalities for a composite rate exception request is not correct.

In making our review of the request for additional supplies, we used the provider's Exhibits 16 and 23.

At Exhibit 16, we reviewed the supply list furnished and did not notice anything unusual or out of the ordinary that would cause us to grant an exception for supplies.

At Exhibit 23, we noted that the Worksheet S-1 on the FY 99 cost report shows that LLUKC re-uses its dialyzers 20 times. Exhibit 16A shows that LLUKC used 7 different types of dialyzers The average cost of these dialyzers is $19.35 ($135 50/7). The average treatment cost per dialyzer is $.97 ($19.35/20). We totaled the supply list shown at Exhibit 16 without the dialyzer cost and arrived at a total cost of $24.71 for supplies, then we included the dialyzer average cost of $.97 for a total supply cost of $25.68 Since this supply cost of $25.68 is less than the national average of $33, we are unable to grant an exception amount for supplies.

## Overhead

On page 3 of its narrative, LLUKC requested $22 for overhead for both hemodialysis and home program peritoneal dialysis based on its Exhibit 1. The financial data shown at Exhibit 1 for FY 97, FY 98, FY 99, and FY 00 includes all the costs and treatments for maintenance hemodialysis, home program peritoneal dialysis and both training modalities. Including the training modalities for a composite rate exception request is not correct.

In making our review of the request for overhead, we reviewed page 5 of the provider's narrative under the heading Overhead Costs. The provider stated that its overhead costs include administrative and general costs, housekeeping, repairs, and maintenance costs allocated from a related organization, LLUMC, in accordance with the Medicare principles of reimbursement. Examples of these allocated costs include non-patient telephone data processing, purchasing, patient admitting, business office and medical record costs.



LLUMC refers to Loma Linda University Medical Center, provider number 05-0327, a hospital. The provider has requested an exception for overhead costs that were allocated to it from Loma Linda University Medical Center in accordance with the Medicare principles of reimbursement. The principles of cost finding do not apply to Loma Linda University Kidney Center because it is a freestanding facility. You cannot step-down cost from a hospital to a freestanding facility. Also, Loma Linda University Kidney Center has not submitted any documentation explaining how Loma Linda University Medical Center's costs related to its ESRD patient care. Unsubstantiated general statements are not sufficient documentation for the granting of an exception amount. Therefore, we are unable to grant an exception amount for overhead.

Hours Per Treatment

The cost reports for FY 97, 98, 99, and 00 reflected the following hours per treatment for maintenance hemodialysis, home program CAPD, home program CCPD, and the aggregate hours for all maintenance and home program dialysis (See Attachment 1).

| FY | Hemo. | H.P CAPD | H.P. CCPD | Avg Hr. Per Trt. |
|----|-------|----------|-----------|------------------|
| 00 | 5.09  | 2.93     | 2.94      | 4 57             |
| 99 | 4.29  | 2.48     | 2.48      | 3.90             |
| 98 | 3 70  | .87      | .87       | 3 12             |
| 97 | 3 88  | 1.11     | 1.11      | 3.24             |

The average hour per treatment for each modality and the aggregate went down from FY 97 to FY 98 but from FY 98 to FY 99 and then to FY 00 the average treatment time for each modality and the aggregate for all maintenance and home program dialysis has been increasing. From FY 98 to FY 00 the average treatment time for hemodialysis increased 1.36 (5.09 – 3.70) hours. H.P. CAPD increased 2.06 (2.93 - .87) hours, H P CCPD increases 2.07 hours (2.94 - 87), and the over-all aggregate increased by 1.45 (4.57 - 3.12) hours. The provider has not explained why its average treatment time has been increasing. In any future exception request, the provider should explain why its average hourly dialysis treatment time has been increasing and what steps it has taken to increase efficiency

When we approved LLUKC's training request in 1994, the provider stated that training staff time is based on multiplying 8 hours by the number of training sessions (See Attachment 2) The cost reports for FY 97, 98, 99, and 00 reflected the following hours per treatment for CAPD training, CCPD training and the aggregate training hours (See



6

Attachment 3). These training hours are significantly less than the eight hours used by LLUKC in its previous exception submittal.

| FY | Trg. CAPD | Trg. CCPD | Avg Hr. Per Trt. |
|----|-----------|-----------|------------------|
| 00 | 1.44 | 1.15 | 1.25 |
| 99 | 1.35 | 1.27 | 1.06 |
| 98 | .22 | .57 | .39 |
| 97 | .48 | 1.01 | .48 |

We compared these training treatment times to the maintenance hemodialysis and home program treatment times above. The training time for CAPD and CCPD and the aggregate training time for both modalities for FY 97, 98, 99 and 00 are less than the time for maintenance hemodialysis time and home program for both CAPD and CCPD for FY 97, 98, 99 and 00. Based on our experience, training treatments require much more time than maintenance hemodialysis and home program treatments. Therefore, we believe that the LLUKC is not allocating its treatment time correctly to its various treatment modalities

Training CAPD and CCPD

LLUKC did not request a training exception rate. However, on June 20, 1994, this provider received an exception for its CAPD training in the amount of $426.66 and for its CCPD training on the amount of $460.05 (See Attachment 4)

A review of LLUKC's cost reports reported the following CPTs for training:

| FY | CAPD | CCPD |
|----|------|------|
| 97 | $943.56 | $1,073.94 |
| 98 | $237.30 | $ 180.29 |
| 99 | $184.19 | $ 133.24 |
| 00 | $151.02 | $ 117.87 |

Since the provider has not requested an exception to its training rate and since the provider's cost per treatment (CPT) for CAPD training and CCPD training has fallen below its previously approved rate, it cannot ask to retain its previously approved rate for these training modalities in accordance with 42 CFR 413.180 (e).

A review of the requests for retention of an exception approval that were submitted to HCFA by its intermediaries showed that this provider filed a request to retain its CAPD and CCPD training approvals with your office on February 28, 2000 because its training program has remained basically the same and the cost report for 1998 shows that the cost per treatment is not less than the previously approved exception amount (See Attachment 5). Based on your review of the provider's letter and documentation submitted to your office, you allowed this provider to retain its previously approved training rates per your letter dated March 13, 2000 (See Attachment 6).

⑦

185

7

Based on the documentation submitted with this exception request, HCFA determined that the provider's training program has not remained the same. HCFA's Attachment 2 shows that the provider based its training sessions on 8 hours in its 1994 exception request, while the documentation submitted with this request shows that the provider's treatment time is significantly less than the 8 hours previously reported. Also, the CPT for CAPD and CCPD training for FY 98, 99, and 00 is significantly less than the previously approved training rates. Consequently, the provider must be paid its composite rate plus the add-on for CAPD training and CCPD training. As March 1, 2000, the provider's CAPD training rate is $146.95 ($134.95 + $12.00) and the provider's CCPD training rate is $154.95 ($134.95 + $20.00). In the event that you have over paid these training modalities since March 1, 2000, please re-coup any overpayments that you may have made. The previously approved exception amounts for CAPD training and CCPD training terminated as of the close of business on the date prior to the effective date of the new exception cycle, namely, February 29, 2000 (See Program Memorandum A-99-59).

<u>Recommendations</u>

Based on the foregoing, you may consider making the following recommendations to LLUKC because LLUKC may wish to file another exception request under the Atypical Patient Mix in the future.

The burden of proof for justifying an exception request rests with the provider not HCFA nor its intermediary [See 42 CFR 413.180 (g)]   Neither HCFA nor its intermediary is responsible for perfecting the provider's exception request.

Although an in-depth time analysis by modality is not required, it would be helpful in reviewing any future exception request.

It is in the provider's best interest to file as soon as possible. When a provider files on the last day of the exception window, the provider does not have the opportunity to file another exception request. Had the provider filed early in the exception window, it would have had the opportunity to file another exception request. Also, any approved exception amount is effective on the date that the intermediary receives a fully documented and acceptable exception request.

Finally, the provider should be advised that due to the short legislative time span of 60 working days in which to process an exception request and issue a final decision, all information related to the exception request must be submitted with the original exception The responsibility for furnishing an exception request with all required documentation rests with the facility.  HCFA approves or denies the exception request based on the documentation submitted. No additional information is requested.



8

<u>Other</u>

This provider has received ESRD exception approvals under the 5th ESRD window, which also carried over to the 6th ESRD window, and the 7th ESRD window for CAPD and CCPD training. This is the first time that LLUKC has requested an exception request for atypical services for its outpatient and home program maintenance dialysis. A check of the financial data in the prior exception request showed that LLUKC's CPT for its it outpatient and home program maintenance dialysis was less than its composite rate; therefore, LLUKC did not request an exception for its it outpatient and home program maintenance dialysis costs. HCFA prepared a CPT analysis of the financial data furnished with this exception request and the prior exception request (See Attachment 7). This analysis showed that the number of treatments decreased by 139 from the actual FY92 (19,403) cost reporting period to the projected FY 00 (19,264) cost reporting period, while the cost increased by $1,948,739 from FY 92 ($1,912,747) to FY 00 ($3,861,486). While treatments have stayed consistent (actual decrease in 1997 and 1998) around 19,000 treatments per year, the total costs and CPT have increased considerably.

In light of the cost increases with a fairly stable treatment count, you should determine if an onsite review per § 2720.5 of the PRM is required to verify that the provider is properly allocating costs between the various treatment modalities and is operating an efficient ESRD program. In the event the provider should file an exception request in the future, you may want to thoroughly review the provider's ESRD program before making any recommendation.

<u>Payment Rate</u>

Based on the above analysis, the provider's exception request is denied. The provider should continue to be paid its composite rate of $134.95 for outpatient maintenance and home program dialysis. If the provider wishes to appeal this decision, the applicable regulation is 42 CFR 413.194 (b).

If you have any questions concerning our response, please contact me on (410) 786-4561.

Sincerely,

Joseph Logue
Health Insurance Specialist
Division of Chronic Care Management

Attachments

(9)

L.L.U. KIDNEY CENTER



**MEDICARE**
Part A Intermediary
Phone (805) 384-7200

November 29, 2000

Ms Corinna Goron, Controller
Loma Linda University Kidney Center
11234 Anderson St. Room 1170
Loma Linda, Ca 92354

**Subject: *Denial for an Exception to the ESRD composite rates under the Atypical***
***Services Criterion***

*Provider: Loma Linda University Kidney Center*
*Provider NO: 05-2550*

Dear Ms. Goron:

Your request for an exception to the ESRD composite rate under the atypical services criterion
has been denied. Enclosed is a copy of HCFA's letter dated November 15, 2000 noting the
reasons for the denial.

In accordance with reimbursement determinations, the provider is entitled to a formal appeal
under 42 CFR 413 194(b) on issues of the provider's request for exception if it disagrees with the
determination. Your appeal must be made within 180 calendar days from the date of this
notification letter.

If you have any questions regarding this notification, please contact me at (805) 381-7112, or
Lon Mendez at (805) 384-7225.

Sincerely,

Mike Foxx, Manager
Provider Audit Department

**Enclosures**

C: Joseph Logue, HCFA

**Blue Cross of California** P O Box 9150 Oxnard California 93031-9150 · A HCFA CONTRACTED INTERMEDIARY
An Independent Licensee of the BlueCross Association



*Loma Linda University*

*Medical Center*

## FY 2000

### *KIDNEY CENTER*

### PROVIDER # 05-2550

### Final Position Paper

### EXHIBIT 1

### EXCEPTION REQUEST

## Provider Reimbursement Review Board

### CASE # 01-2872 ESRD

(VOLUME 2 OF 2)

235

## INTRODUCTION

The Loma Linda University Kidney Center (LLUKC) is a non-profit free-standing renal dialysis facility located in Loma Linda, California. It operates twenty (20) stations in its outpatient dialysis unit and provides Hemodialysis to mostly adult patients and Peritoneal dialysis to both adult and pediatric patients. The LLUKC Medicare provider number is 05-2550 with Medicare certification date of December 2, 1977. LLUKC hereby requests, by means of this document, an exception to the composite payment rate for outpatient Hemodialysis and Peritoneal dialysis in accordance with Medicare regulations as set forth below.

### Regulatory Basis

Section 1861(v)(1) of the Social Security Act (the Act) defines the concept of reasonable cost under the Medicare principles of reimbursement. Section 1881(b)(2) and (b)(7) of the Act specifies facilities that furnish dialysis services to Medicare patients with End-Stage Renal Dialysis (ESRD) are paid a prospectively determined rate for each treatment.

The Code of Federal Regulations, 42 CFR 413.170 identifies the scope under which Health Care Finance Administration (HCFA) is authorized to establish a prospective payment system for outpatient maintenance dialysis furnished in an ESRD facility. The specific criteria to qualify for an exception to the ESRD facility's prospective payment rate are identified at 42 CFR 413.182. This code specifies that a provider may obtain relief under the following conditions:

- Atypical service intensity
- Isolated essential facility
- Extraordinary circumstances
- Self-dialysis training costs
- Frequency of dialysis

RECEIVED

DT    3 2001

PROVIDER REIMBURSEMENT
REVIEW BOARD

LLUKC is requesting an exception to the ESRD facility's prospective payment rate based upon an "Atypical Service Intensity." The atypical services result from LLUKC providing care to a high percentage of diabetic and hypertensive/hypotensive patients, patients requiring assistance, patients with clotted access and other complex patient care cases as discussed in detail below. LLUKC's renal patient population also include patients who are unable to receive treatment from other nearby facilities due to their special needs such as the need to be dialyzed flat on a bed. A typical renal dialysis facility is equipped to dialyze patients in a sitting position only. Documentation is provided herein to support this request in the remaining sections of this report.

| Post-it® Fax Note | 7671 | Date 11-21-01 | # of pages ▶ 16 |
|---|---|---|---|
| To JACK | | From ARJUN | |
| Co./Dept. | | Co LLUKC | |
| Phone # | | Phone # 909 558 4025 | |
| Fax # 312 997 2177 | | Fax # 909 558 4025 | |

**National Average Comparison**

Below is a comparison of LLUKC patients with the national average:

|  | LLUKC (FY 1999) | National Average (1) |
|---|---|---|
| Hemodialysis – Diabetic Patients (Exhibit 3) | 45.32% | 34.44% |
| Hemodialysis – Hypertensive Patients (Exhibit 3) | 78.33% | 24.76% |
| Hemodialysis – over 64 years old (Exhibit 3) | 38.92% | 28.88% |
| Hemodialysis – below 20 years (Exhibit 3) | 0.49% | 0.31% |
| Hemodialysis Inpatient Admits (Exhibit 5) | 32.03% | 27.31% |
| CAPD/CCPD – Diabetic Patients (Exhibit 3A) | 32.08% | 34.44% |
| CAPD/CCPD – Hypertensive Patients (Exhibit 3A) | 54.72% | 24.76% |
| CAPD/CCPD – over 64 years old (Exhibit 3A) | 15.09% | 2.61% |
| CAPD/CCPD – below 20 years old (Exhibit 3A) | 33.96% | 0.24% |
| Mortality Rate (Exhibit 4) | 15.70% | 16.00% |
| Transplant Patients (Exhibit 6) | 2.91% | 3.43% |

(1) Source: United States Renal Data System, 1999 Annual Data Report (USRDS) (Based on 1997 data). Refer to Exhibit 21.

As shown above, LLUKC indeed treats a higher percentage of diabetic and hypertensive patients and slightly higher geriatric hemodialysis and peritoneal dialysis patients. Elderly patients often require assistance with ambulation, obtaining weights pre and post dialysis because of poor vision, typically have less stable dialysis treatments because of weakening cardiac status, and experience more frequent hypotensive incidents than that of younger patients. It will be noted also, that LLUKC's peritoneal pediatric population is significantly greater than the national average. The atypical activities relating to peritoneal pediatric patients are discussed below. Additionally, Exhibit 5 shows an average length of stay for dialysis patient hospital admissions of 6.67 days whereas the average length of stay for Loma Linda University Medical Center (LLUMC) for its adults and pediatrics patients for fiscal year 1999 is only 4.21 days. Furthermore, a higher percentage of first admission during the year for its hemodialysis patients is also shown above. These factors illustrate the fact that LLUKC is servicing an acutely ill population which requires additional time as discussed below

**Approach to the Exception Request**

In accordance with PRM-1, Chapter 27, numerous statistical data were gathered and analytical procedures were performed to document the necessity of the exception request. These procedures are described briefly as follows.

1. Compare the fiscal year 2000 projected cost per treatment with the composite rate and with fiscal year 1997, 1998 and 1999 cost per treatment to show historical trend and determine the reasonableness of the costs in excess of the composite rate.

2

2. Describe the different atypical activities and determine the additional time involved in providing outpatient dialysis treatment to LLUKC patients to justify the excess costs incurred

3. Describe and determine the additional labor cost per hour involved in providing outpatient dialysis treatment to the atypical LLUKC patients to justify the excess costs incurred.

4. Describe and determine the additional employee benefit, overhead and supply costs involved in providing outpatient dialysis treatment to the LLUKC patients.

5. Statistically show that LLUKC treats a higher percentage of patients with medical and social complexities when compared with the national averages from the 1999 United States Renal Data System (USRDS) Annual Report.

## CURRENT RATE AND REQUESTED EXCEPTION AMOUNT

Based on the information contained in this document, the following is a summary of our current and requested exception adjustment due to the atypically intense dialysis services which exceed the composite payment rate

|  |  | Hemodialysis |  | Peritoneal |
|---|---|---|---|---|
| A. Current Rate (FY 2000) | $ | 134.95 | $ | 134.95 |
| B. Atypical Salary Cost Per Treatment (Exhibit 9) | | 20.13 | | 18.46 |
| C. Atypical Employee Benefit Cost Per Treatment (Per Exhibit 1 - FY 2000 = 32.35% of Salaries) | | 6.51 | | 5.97 |
| D. Atypical Overhead Cost Per Treatment (Exhibit 1) | | 22.00 | | 22.00 |
| E. Atypical Supplies Cost Per Treatment (Exhibit 1) | | 3.00 | | 3.00 |
| Total Requested Exception Amount | $ | 186.59 | $ | 184.38 |

## COST INFORMATION

We are enclosing for your review our Medicare cost report for the fiscal years ending 12/31/97, 12/31/98 and 12/31/99 (Exhibits 23, 24 and 25). We also prepared a pro-forma cost report for the fiscal year ending 12/31/00 (Exhibit 2). The cost reports were used as basis to compare projected per treatment costs for the past three years to determine its reasonableness and support the fact that LLUKC's costs historically exceed the composite rate. Our projection for fiscal year 12/31/00 is based on actual costs, labor hours and patient treatment information for the five-month period ending 5/31/00 annualized for the whole year. Loma Linda University Medical Center (LLUMC), a related organization, provides most of the administrative and general services. Overhead costs are mostly allocated from a related organization based on the step-down methodology in accordance with Medicare principles. The projected overhead allocation

3

3

238

for fiscal year ending 12/31/00 was based on the fiscal year ending 12/31/99 filed Medicare cost report allocation adjusted based on the percentage of change between fiscal years 1998 and 1999.

### Cost Per Treatment Comparison

The cost comparison of our outpatient and home programs for fiscal years 1997, 1998, 1999 and projected 2000 including explanations for significant changes can be found in Exhibit 1. Direct costs are captured separately for hemodialysis and peritoneal dialysis. Overhead costs are, however, allocated on a statistical basis in accordance with Medicare principles. We have developed a cost per treatment analysis for three years so that a comparison from one year to the next can be viewed and determined that the progression of costs is rational. The cost per treatment for our program is based on a blended cost between the modalities of outpatient maintenance hemodialysis and home peritoneal dialysis. LLUKC's projected cost and number of treatments for fiscal year 2000 as calculated in Exhibit 1 are presented as follows:

|  | Projected for FY 2000 | | |
| Modality | Cost | Treatments | Cost per Treatment |
| --- | --- | --- | --- |
| OP Maintenance Hemo | $ 3,086,679 | 14,644 | $   210.78 |
| Peritoneal Dialysis | 792,218 | 4,735 | 167.31 |
| Total (Blended) | $ 3,878,897 | 19,379 | $   200.16 |
| Composite Rate for Free-standing Facilities |  |  | $   134.95 |
| **Costs in Excess of the Composite Rate** |  |  | $   65.21 |

As required by PRM-1, Chapter 27, we compared our fiscal year 2000 projected costs with the prior year using HCFA recommended standards and categories. Additionally, we compared these costs with HCFA median cost treatment data as indicated in PRM-1 Section 2723.3. As shown in Exhibit 1, we noted that the cost per treatment for the past three years ranges from $162.00 to $183.00. We believe that the projected cost per treatment of $200.16 is reasonable when compared with previous years and historically had been above the composite rate. Discussed in the succeeding paragraphs are the justifications for the atypical costs for each component, i.e., salaries (both hour and rate differentials), employee benefits, supplies and overhead costs.

### A. Salaries and Employee Benefit Cost Comparison

It is our understanding that per HCFA median cost data, patient care labor blended rate and employee benefit costs are $40.00 and $7.00 per treatment, respectively. Our projected salaries costs for fiscal year 2000 as shown in Exhibit 1 equate to approximately $70.00 per treatment. Our employee benefit costs, a function of the salaries, is approximately $25.00 per treatment.

4

4

The direct patient care labor and benefit costs exceeding the median is attributed to the severity of illness in our patient population. The direct nursing labor costs and hours for each modality reflect the actual time spent by the nursing staff in the renal dialysis unit. LLUKC's payroll system directly charges the other departments for any time that the nursing staff may have spent outside of the renal dialysis unit. The Patient Data Summary for the fiscal year ending 12/31/99 shown in Exhibit 3 provides information on LLUKC's patient mix, percentage of diabetic and hypertensive patients, and patients requiring assistance. LLUKC also treats an average of 18 Peritoneal pediatric patients who typically require more nursing staff time to deal with their more complex medical and social problems. Exhibit 9 provides a summary of the different atypical activities and the related amount of additional time in minutes associated with caring for each type of patient, i.e., adult hemodialysis, peritoneal adult and peritoneal pediatrics. The "Atypical Activities" section of this narrative describes in detail each of these activities and provides justification for the additional nursing time. The average staffing ratio for facilities that treat typical patients is 4 patients to 1 staff. As evidenced in Exhibit 10, LLUKC has a higher average staffing ratio of 2.45 patients to 1 staff. Additionally, a typical facility of the same size as LLUKC, operating 20 stations, has one registered nurse (RN) on staff. Based on 4 to 1 ratio, total FTEs required for 20 patients being dialyzed in 20 stations is 5 including 1 RN or 20% RN. As shown in Exhibit 10, LLUKC uses an average of 9.03 RNs or 4.7% of FTEs on staff per shift as a result of patient acuity. The additional total salaries and benefits costs related to additional staff time incurred and the staffing mix is approximately $390,116 ($26.64 X 14,644 treatments) and for peritoneal dialysis patients is approximately $115,676 ($24.43 X 4,735 treatments). We believe the requested incremental salary and benefits costs per treatment as shown above for hemodialysis and peritoneal dialysis, fairly represent the additional labor and benefits costs associated with treatment of our patient mix and operating our facility. A yearly comparison and explanation of significant variances of the salary and benefit costs for fiscal years 1997, 1998, 1999 and 2000 are presented in Exhibit 1

## B. Overhead Costs

The national median cost per treatment for overhead excluding employee benefits is $47.00. Our projected overhead costs for fiscal year 2000 equate to approximately $69.00 per treatment (from Exhibit 1) LLUKC's overhead costs include administrative and general costs, capital costs, housekeeping, repairs and maintenance costs allocated from a related organization, LLUMC, in accordance with the Medicare principles of reimbursement. Examples of these allocated costs include non-patient telephone, data processing, purchasing, patient admitting, business office and medical records costs. In accordance with Medicare's step-down allocation methodology, most of these costs are allocated by LLUMC based on accumulated direct patient costs. LLUKC receives a significant portion of this overhead cost allocation just as a function of its high direct costs incurred associated with providing care to patients with complexities. Therefore, we believe the overhead cost per treatment is justified and related to the treatment of atypical patients.

5

## C. Supply Costs

The national median cost per treatment for supplies is $33.00. Our projected supply costs for fiscal year 2000 equate to approximately $36.00 per treatment (from Exhibit 1). We believe the documentation regarding the severity of illness of our patient population supports our supply cost per treatment. Additionally, LLUKC acts as a prudent buyer of supplies as evidenced by its being part of a purchasing group and avails itself of a volume discount. The $3.00 overage is a small percentage increase when you compare our acutely ill population to that of other facilities.

As required by PRM-1 Section 2721, we present in Exhibit 16 a list of supplies typically used in a single dialysis treatment and a listing of dialyzer used with the make and model. It also requires that we reconcile the supply cost per treatment with the reported cost report in Exhibit 1. LLUKC provides dialysis to patients with different ages, diagnoses and complications. The supply cost per treatment on the cost report is an overall average of all supplies used for all patients and may vary for each type of patient.

## ATYPICAL ACTIVITES

The Code of Federal Regulations 42 CFR 413.182 (a)(1) states:

"A facility must demonstrate that a substantial proportion of the facility's outpatient maintenance dialysis treatments involve atypically intense dialysis services...Examples that may qualify under this criterion are more intense dialysis services that are medically necessary for patients such as:

(i)   Patients who are referred from other facilities on a temporary basis for more intense care during a period of medical instability and who return to the original facility after stabilization.

(ii)  Pediatric patients who require a significantly higher patient to staff ratio than typical adult patients.

(iii) Patients who are not commonly treated by most dialysis facilities, because of complex medical needs which complicate the dialysis procedure, and thereby directly increase the cost.

In compliance with 42 CFR 413.182, we are submitting the following written justification and evidence supporting the atypically intense and medically necessary services provided to LLUKC renal dialysis patients. The succeeding paragraphs explain how LLUKC meets all of the above criteria.

We present in Exhibit 9 a list of diagnoses and related activities that require additional nursing assistance. The patient care staff prepared this list and identified the additional number of nursing minutes per activity and the number of times each activity is performed annually. As these activities do not occur with every dialysis treatment, the

6

6

241

241

renal dialysis staff identified the frequency of these items for their patient population. These activities represent exacerbations of patient's diagnoses, and do not occur with routine dialysis treatment and are therefore atypical services The related costs are not included in the composite rate paid by Medicare and represent an exception.

## HEMODIALYSIS PATIENTS

### Temporary Patient Transfers

Frequently patients are referred to LLUKC by hospital discharge planners or other dialysis facilities because their condition is considered too unstable for dialysis in other free-standing facilities. These patients are recently diagnosed and stable, but have chronic complex problems and frequently have problems with clotted access due to advanced peripheral vascular and extreme weakness post surgery. These patients are included and identified in Exhibit 3 but separately listed in Exhibit 3B

A review of transfers who require temporary treatment at LLUKC indicates the following reasons for transfer. rehab patients requiring dialysis in a bed due to recent amputation, hip fracture. recovering from recent surgery that has left them extremely weakened, large pressure sores whose condition would be exacerbated in a chair, and poorly functioning vascular access requiring specific patient positioning to achieve blood flow. These patients are unable to receive treatment from other free-standing facilities due to these special needs. LLUKC is one of the only units in the area that accepts these special needs adult patients. The pre and post and intra-dialytic additional minutes required to treat these patients are approximately 4,050 minutes (Exhibit 9).

### Patients Requiring Assistance

Many patients at LLUKC require some type of ambulation assistance. Typical patient population include patients walking into facilities without assistance. Atypical patients require a variety of transfer assistance including walkers or canes, wheelchairs. stretchers and ambulance transportation.

Upon arrival to the dialysis facility, each patient must be weighed and transferred to a dialysis chair. Dialysis cannot be performed in wheelchairs due to numerous hypotensive episodes. Hypotensive episodes require patients to be placed in "shock" or Trendelenburg position where the legs and feet are higher than the heart and head. Trendelenburg position cannot be accomplished in a wheelchair.

For patients using walkers and wheelchairs, the weighing and transfer process is time consuming Patients using walkers or canes require a minimum of 1:1 assistance while those confined to a wheelchair require 1 1 or 2.1 assistance. Wheelchair scales are available to accommodate patients that can not support themselves long enough to be weighed. This process requires additional nursing time to weigh the wheelchair with and without the patient, then to subtract the wheelchair weight from the combined weight.

7

Additionally, wheelchair bound patients are encouraged to use the bathroom prior to being connected to the dialysis machine to avoid interruptions during their treatment. This requires additional assistance by the dialysis unit staff.

Patients transported by stretcher and ambulance are obviously more ill by the nature of transportation. Stretchers present additional obstacles to the weighing process. Ambulance transport requires additional nursing time to call for the ambulance when patients are ready for discharge and to provide a condition report to the medics.

Exhibit 3 identifies the patients and the type of assistance required. LLUKC treats a high percentage (41.87% or 85 patients based on FY 1999 data in Exhibit 3) of patients needing some type of assistance. The additional nursing time for ambulation assistance is presented in Exhibit 9. This represents a total of 108,353 extra nursing minutes (1,806 hours) per year.

## Neuropathic Problem Management

Neuropathy is a degenerative condition affecting the nervous system. Many patients with progressive neuropathy develop sensory deficits. Special nursing precautions are necessary to avoid injury because early warnings of discomfort and pain are diminished. Patients may also have heightened pain sensory necessitating special nursing interventions to continually comfort patients in pain and patients that cannot be still. Patients develop extreme weakness and may move very slowly, requiring additional staff assistance time. Eating disorders develop due to changed and/or diminished taste sensations requiring nursing intervention regarding nutritional well being. Some patients develop partial and/or total blindness requiring additional staff assistance time. In fiscal year 1999, there were 78 patients at LLUKC (53 patients as of 5/31/00) with neuropathic problems as identified in Exhibit 3. The additional atypical time required for each treatment is between 4-5 minutes. Total additional atypical time is 30,995 minutes (Exhibit 9).

## Access Management

The typical access for hemodialysis is a fistula or a graft. We present in Exhibit 8 a listing of patients and the type of catheter used. The access is cleaned in an aseptic fashion and cannulated with fistula needles prior to each dialysis treatment. A temporary access is used when a patient's fistula or graft is not working, or when permanent access has been deemed medically impossible. LLUKC had 7,929 episodes of access problem during fiscal year 1999. Additional time required to deal with the problem is 15 minutes for a total of 11,894 minutes per year (Exhibit 9).

8

**New Patients Training**

LLUH receives an average of 8 new referral patients per year. Exhibit 3 identifies the new renal patients admitted for fiscal year ending 12/31/99. Each new patient receives an additional 25 minutes of special dialysis-related training in the process, treatment modalities, life-style, diet, medications, advance directives for the first two weeks of treatment. Total additional atypical time for the special training is 1,200 minutes (Exhibit 9).

**Diabetic Management**

Frequently, diabetic patients require insulin twice per day at home. They learn to check their own glucose and adjust their diet or call their physician if glucose readings are abnormal. Occasionally while on dialysis, intervention is required to check glucose levels, give medications or feed patients for unusual glucose levels. The additional nursing time required to give IV or oral glucose and monitor this intervention is 5 minutes per occurrence. Testing glucose levels during dialysis requires between 6 and 10 minutes. Treating wounds associated with diabetic circulatory problems requires 15 to 20 minutes—depending on the extent of the wound. Scheduling an MD follow-up appointment and/or referral appointment requires 10 minutes. Calling an MD for orders to treat hypoglycemia requires between 5 and 7 minutes. Teaching patients/families to test glucose at home requires 15 minutes. Calling home to request glucose information requires 5 minutes. Scheduling eye consultations requires 5 minutes. Scheduling podiatry consultations requires 5 minutes and assisting blind patients requires 10 to 30 minutes. Exhibit 3 identifies the patients with diabetes. During 1999, there were 92 patients (62 patients as of 5/31/00) who received 6,761 treatments. The additional time due to diabetes issues is 21,936 minutes per year (Exhibit 9).

**Amputation Management**

Patients with progressed peripheral vascular disease and non-healing wounds may develop gangrene and require amputation of a limb. Fresh amputees require additional nursing intervention for emotional support, stump care, prosthetic attention, and teaching. In 1999, there were 196 treatments provided to patients with amputation problem. The additional atypical minutes required to deal with amputation issues is 4,410 minutes.

**Hypertension Management**

Hypertensive patients generally experience a rise in blood pressure prior to initiation of dialysis. This occurs because of fluid gain in between dialysis treatments. Hypertension/high blood pressure adjusts to usual level during/after dialysis and with medication control. Occasionally during dialysis, hypertension reaches dangerously high levels requiring immediate oral, intramuscular, or intravenous medication. The blood pressure must be checked more frequently after medication administration to assure the blood pressure does not drop too low. Sometimes high blood pressure affects post dialysis hemostasis of the access. Patients access site will bleed for prolonged periods of

9

9

time because of the high pressure within their arteries and veins. The additional nursing minutes required to care for exacerbation of hypertensive episodes includes: an additional 3 to 5 minutes to give anti-hypertensive medications, 15 minutes to teach patient/family to monitor blood pressure at home, and 5 minutes to call MD for orders to treat hypertension. Exhibit 3 identifies the 159 patients (108 patients as of 5/31/00) with hypertension problem in 1999. Based on the total treatment of 11,363 provided to these patients during 1999, the total average additional time required to manage hypertension is 23,521 minutes (Exhibit 9).

**Hypotension Management**

Hypotensive low blood pressure episodes require additional nursing time to provide medication(s), additional fluids and evaluate the patient responses to these treatments. Severe episodes of hypotension require hypotonic solution to be administered. Additional staff time is required to evaluate the problem; obtain a physician's order for the medication; and obtain, administer, and document the administering of medication. Additionally, vital signs are monitored more frequently – every 15 minutes as opposed to every 30 minutes following administration of the medication and/or upon discovery of hypotension Most patients have a tendency to become hypotensive during treatment. This occurs approximately 45% of the time. Total additional time averages 12 minutes per episode. Total atypical time due to hypotension is 88,140 minutes.

**Cardiac Problem Management**

Cardiac problems may be exacerbated during dialysis treatments. The dialysis treatment removes approximately one unit of blood from the body for cleaning at a time, and renal patients are anemic to begin with. Occasionally, this is a stress that extremely poor cardiac muscle cannot tolerate, resulting in chest pain. When chest pain occurs, the dialysis nurses must provide oxygen therapy, medication or adjust the treatment to prevent the patient from having a myocardial infarction (heart attack). Nursing time for treating exacerbation of cardiac illness includes 2 minutes to apply oxygen therapy, 5 minutes to give medications for chest pain, 10 minutes to call an MD for orders to treat problems such as chest pain, 2 minutes for increased additional vital signs monitoring, The total atypical minutes to deal with cardiac problem is 17,436 (Exhibit 9).

**Infectious Disease Management**

Protective techniques such as gloving, masking, skin and/or graft preparations for needle sticks, and special needle disposal procedures are examples of routine precautions for every dialysis patient Additional isolation precautions may be necessary to protect the staff and other patients from communicable diseases such as hepatitis, active tuberculosis, and viral pneumonia. Special isolation precautions may also be necessary to protect patients with especially weak/compromised immune systems from possible contagions from staff, other patients, and from the environment in general. For these circumstances, a specific isolation room is provided with an appropriate air filtration system. Prior to entering the isolation room staff follow isolation technique to gown, glove, mask, and

10

cover shoes upon entering the room. The staff must discard the attire upon leaving the room for any reason, and must repeat the proper dressing process to re-enter isolation. Additional time to dress for isolation requires 15 minutes per treatment. Additional time to clean the room and equipment is 10 minutes per treatment. Additionally, one staff is usually assigned to the isolation patient rooms to minimize cross contamination exposure. Exhibit 3 identifies the 17 patients who required isolation three times per week due to Hepatitis B in 1999. Total additional time is 39,000 minutes (Exhibit 9).

**Language/Communication Barrier Management**

During fiscal year 1999, there were 28 adult patients (Exhibit 3) who do not speak English such that additional staff time is required to locate an interpreter to communicate through the interpreter. The time it takes for interpretation is 10 minutes of additional atypical staff time required to manage communication barriers each treatment. The number of treatments provided to these patients during the year is 2,695 for a total of 26,950 atypical minutes.

**Extended Care Facility Patients**

The State of California requires nursing homes/extended care facilities (ECF) to have contracts with dialysis facilities on how patient information is shared back and forth. At the beginning of each treatment the nurse receives a form that indicates the medical changes that have occurred on the patient since the last treatment. At the end of each treatment the dialysis nurse completes a form that is faxed to the ECF relaying medical changes that have occurred during the treatment. These forms also include medications given, medication dosage changes, etc. Patients in nursing homes are typically weaker, have medical complications that require increased nursing time to provide care. The documentation described above are not typically prepared for other patients. Additional nursing time to complete the documentation and provide the care is a minimum of 7 minutes per treatment. Per Exhibit 3, there were 25 ECF patients in 1999 who received 2,015 treatments. Total atypical minutes are 14,950 (Exhibit 9).

**Patient to Staff Ratio Management**

The national staff to patient coverage for typical adults is 1 staff to 4 adult patients. LLUKC adult dialysis unit requires a staff to patient ratio of 1:2.45 (Exhibit 10) because of the complexities of the patients. The related atypical minutes due to increased staffing ratio are factored into the atypical minutes for each atypical activity. For example, if an activity requires an additional 5 minutes and two staff are involved, the minutes indicated in Exhibit 9 would be 10 minutes. Additionally, a facility of the same size as LLUKC operating 20 stations, typically has one registered nurse (RN) or 20% of all FTE's on staff per patient shift for hemodialysis. As shown in Exhibit 10, LLUKC has an average of 9.03 or 47.13% RN on staff per shift as a result of the higher patient acuity. We calculated the atypical salary costs due to staffing mix to be approximately $11.64 per treatment (Exhibit 10).

11

/¢

## HOME PERITONEAL DIALYSIS

LLUKC treats both adult as well as pediatric peritoneal dialysis patients. We present these patients in Exhibit 3A for the fiscal year ending 12/31/99. Most renal dialysis facilities typically do not include children in their peritoneal patient population, particularly infants. During fiscal year 1999, LLUKC had 18 pediatric patients including 6 babies, 12 months old and younger. Due to the complex medical and social needs of its peritoneal dialysis patients, additional staff time is required to provide the atypical services described in the succeeding paragraphs during clinic visits and telephone consultation or follow-up. Exhibit 9 also lists these atypical activities and the related minutes required. LLUKC's peritoneal dialysis patients rely heavily on the nursing staff for support and consultation while patients at other facilities typically would have to call their physicians directly for consultation. As evidence of LLUKC's efforts in properly managing the support provided to its patients, LLUKC is recognized as a model unit by Baxter, Inc, for supervision of patients that results in low peritonitis rates and for high dwell volumes that result in meeting and surpassing national standards of adequate dialysis. The ultimate outcome is low occurrence of peritonitis, decreased hospitalizations, and overall cost savings to the Medicare program after taking into consideration the additional cost incurred by LLUKC to prevent the exacerbation of the patient diagnoses.

### Home Peritoneal Dialysis Support—Children

Additional services provided at the free-standing facility includes support for pediatric home peritoneal dialysis patients which typically require additional nursing time not only to provide support to the patients themselves but also to deal with the care giver at home. Many of these children are tiny babies ranging from 1.4 kg to 10kg, and others are very young children under 6 years of age.

### A. During Clinic Visits

Children require 2 hours of nursing time for each monthly visit. For ages 18 months and below, more frequent visits of up to 12 visits a month are necessary. During fiscal year 1999, there were 6 patients under the age of 18 months (5 patients as of 5/31/00). Nursing staff intervention includes training, teaching, and managing monthly visits for laboratory and medication evaluation and changes, as well as management of the following: supplies, seizure and stroke precaution, diabetes, amputations, hypertension, hypotension, cardiac problems, infectious diseases, wound care, physical assessments, dialysis prescriptions, medical record review for hospitalizations/peritonitis episodes/adequacy of dialysis, fluid balances, peritonitis treatment/follow up, eating disorders, mental illness/depression, hospital discharge follow up, anemia, pregnancy, non-compliance issues, emotional support, diet, and scheduling of additional tests, labs, or infusions. Typically, a clinic visit takes about 40 minutes or a total of 80 atypical minutes per visit per patient. The total atypical minutes per year are estimated to be 28,800 for 6 children after taking into account the increased frequency of visits (Exhibit 9).

12

## B. During Telephone Consultation or Follow-up

Additional staff support includes telephone assistance for emotional support, and managing dialysis, diet, medications, changes as well as refills, machine problems, non-compliance issues, hypertension, hypotension, supplies, peritonitis treatment and follow up, lab results, a variety of physical complaints, fluid balance, anemia, iron infusion scheduling, eating disorders, diabetes, constipation, restless leg syndrome, mental illness/depression, hospital discharge follow up, and a four-hour retraining session each year. Average atypical staff time required per peritoneal patient per week is 93 minutes. There were 18 pediatric patients in fiscal year 1999 (13 as of 5/31/00) requiring nursing support. The additional staff time required to support peritoneal dialysis for the pediatric patients is 87,048 minutes (93 minutes per week X 52 weeks X 18 patients) (Exhibit 9).

## Language/Communication Barrier Management – Children

There is usually at least one pediatric patient per year who does not speak English such that additional staff time is required to locate an interpreter to communicate through the interpreter. Additional atypical staff time required to manage communication barriers includes 2 additional seven-hour training sessions, additional 4 hours on each annual retraining day, additional 45 minutes to one clinic visit each month, and an additional 15 minutes for each telephone call on an average of 32 calls a month to or from the patient. There is one non-English speaking pediatric patient at this time for an additional 7,860 minutes per year.

## Home Peritoneal Dialysis – Adult

The nursing staff offers support to adult patients undergoing home peritoneal dialysis as follows:

## A. During Clinic Visits

Adult patients are required at least one clinic visit monthly. Support includes training, teaching, and monthly visits for laboratory and medication evaluation and changes, as well as management of the following: home supplies, seizure and stroke precaution, diabetes, amputations, hypertension, hypotension, cardiac problems, infectious diseases, wound care, physical assessments, dialysis prescriptions, medical record review for hospitalizations/peritonitis episodes/adequacy of dialysis, fluid balances, peritonitis treatment/follow up, eating disorders, mental illness/depression, hospital discharge follow up, anemia, pregnancy, non-compliance issues, emotional support, diet, and scheduling of additional tests, labs, or infusions and a seven-hour adequacy test twice a year. Total atypical minutes incurred during clinic visits is an average of 20 minutes per patient. Total adult peritoneal dialysis patient population for the year is 34 (excluding one pregnant patient below) for a total of 8,160 atypical minutes for the year.

13

/3

LLUKC currently has one patient requiring nursing support of peritoneal dialysis who is pregnant. Pregnancy complicates metabolic function and involves changes in various other systems necessitating more frequent nursing assessment and intervention. This patient must present for visit twice a month instead of the typical once a month visit and requires more intense weekly staff support. Total additional atypical time required for this patient is 142 minutes per month for a total of 1,704 minutes for this one patient.

**B. During Telephone Consultation and Follow-up**

Additional staff support includes telephone assistance for emotional support, and managing dialysis, diet, medications (changes as well as refills), machine problems, non-compliance issues, hypertension, hypotension, supplies, peritonitis treatment and follow up, lab results, a variety of physical complaints, fluid balance, anemia, iron infusion scheduling, eating disorders, diabetes, pregnancy, constipation, restless leg syndrome, mental illness/depression, hospital discharge follow up. Average atypical staff time required per peritoneal patient per week is 35 minutes. There were 35 adult patients in fiscal year 1999 (32 as of 5/31/00) requiring nursing support. The additional staff time required to support peritoneal dialysis for the 35 patients is 63,700 minutes. (35 minutes per week X 52 weeks X 35 patients)

**Language/Communication Barrier Management – Adult Peritoneal Dialysis**

There is usually at least one adult patient per year who does not speak English such that additional staff time is required to locate an interpreter to communicate through the interpreter. Additional atypical staff time required to manage communication barriers includes two additional seven-hour training sessions, additional 4 hours on each annual retraining day, and additional 45 minutes to one clinic visit each month, and an additional 10 minutes for each telephone call made 4 times a week to or from the patient or 3,600 minutes per patient. There are two non-English speaking adult patients at this time for a total of 7,400 atypical minutes per year (Exhibit 9).

**SUPPLEMENTAL INFORMATION**

In accordance with the requirements for cost documentation outlined in PRM Section 2721; we have enclosed the following information

**1. Personnel**

Number of employees and total salary for each employee (Exhibit 11A)
Number of employers hired and terminated (Exhibit 12)
Job descriptions and responsibilities (Exhibit 13)

14

*14*

## 2. Staffing Pattern

Staff per shift (Exhibit 10)
Patients per shift (Exhibit 10)
Patient to staff ratio for fiscal year ending 12/31/99 (Exhibit 10)
Productive and Non Productive Nursing hours (Exhibit 11)

## 3. Overhead

Most of LLUKC's administrative and general services are provided by LLUMC. Overhead costs are allocated to LLUKC in accordance with the Medicare principles of reimbursement. The total overhead costs are then allocated to each modality of service on statistical allocation basis accepted by Medicare.

## 4. Routine Laboratory Tests (Exhibit 14)

We have enclosed a list of the laboratory tests used routinely in the dialysis procedure and separately billable tests in Exhibit 17.

## 5. Routine Pharmacy Items (Exhibit 15)

We have enclosed a list of those pharmacy items furnished to our dialysis patients included in the composite rate and those not included in the composite rate (Exhibit 18).

## 6. Supplies (Exhibit 16)

We have enclosed a list of supplies used routinely in a single dialysis treatment. We have also enclosed a schedule that lists the make and model number of the dialyzer and cost of dialyzer included in the Renal Dialysis cost center. We also provided a listing of separately billable supplies which are used to provide separately billable drugs in Exhibit 19.

## 7. Machine Depreciation (Exhibit 20)

We have enclosed a listing of machines, dates of purchase, estimated useful life and method of depreciation.

## 8. Routine Ancillary Costs

We have excluded non-routine items and services from our allowable costs as they are not considered part of the dialysis service costs that are used in computing the composite rate. Exhibits 17, 18 and 19 include a listing of separately billable drugs, supplies and laboratory tests.

15

### 9. Inpatient/Outpatient Costs

The facility is a free-standing facility and does not provide dialysis services to inpatient. No inpatient dialysis costs are included in the allowable costs.

### 10. Home Program and Training Costs

LLUKC captures in a separate cost center (department 8192) all costs directly related to providing support care to its home peritoneal dialysis patients.

### 11. The 1999 Medicare Cost Report (Exhibit 23)

Exhibit 23 is included for comparative purposes and was used as a baseline for projecting the 2000 year overhead costs allocation.

### 12. Abbreviation (Exhibit 22)

Definition to help explain the diagnoses listed on the Patient Data Summaries.

16                                    16

## LIST OF EXHIBITS

Exhibit 1:   Comparison of Cost Per Treatment
Exhibit 2:   Projection for FYE 12/31/000 and Detail Support
Exhibit 3:   Patient Data Summary for FYE 12/31/99 and YTD 5/31/00 - Hemodialysis and Peritoneal Dialysis
Exhibit 4:   Patient Mortality Data Summary for FYE 12/31/99 and YTD 5/31/00
Exhibit 5:   Inpatient Admits Summary for FYE 12/31/99 and YTD 5/31/00
Exhibit 6:   Transplant Patients and Awaiting Transplant for FYE 12/31/99 and YTD 5/31/00
Exhibit 7:   Patient Transfer Summary for FYE 12/31/99 and YTD 5/31/00
Exhibit 8:   Patients Utilizing Catheters for FYE 12/31/99 and YTD 5/31/00
Exhibit 9:   Atypical Nursing Services for Hemodialysis and Peritoneal Dialysis
Exhibit 10:  Patient to Staff Ratio for FYE 12/31/99 and YTD 5/31/00
Exhibit 11:  Payroll Report for FYE 12/31/99 and YTD 5/31/00
Exhibit 12:  New Hires and Terminated Employees for FYE 12/31/99 and YTD 5/31/00
Exhibit 13:  Job Description and Responsibilities
Exhibit 14:  Routine Laboratory Tests
Exhibit 15:  Routine Pharmacy Used
Exhibit 16:  Routine Supplies Used in a Single Treatment and List of Dialyzer Used
Exhibit 17:  Separately Billable Laboratory Tests
Exhibit 18:  Separately Billable Drugs
Exhibit 19:  Separately Billable Supplies
Exhibit 20:  Major Movable Equipment and Machine Depreciation for FYE 12/31/99 and YTD 3/31/00
Exhibit 21:  USRDS Tables
Exhibit 22:  Abbreviation Definition
Exhibit 23:  Medicare Cost Report for FYE 12/31/99

| Post-it® Fax Note | 7671 | Date | # of pages |
|---|---|---|---|
| To  JACK | | From  ARJUN | |
| Co./Dept. | | Co. | |
| Phone # | | Phone # | |
| Fax #  212 997 2172 | | Fax #  929 558 4089 | |

[7

Provider Exhibit P-6

# September 2000 Exception Request Processing Days

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| 27 | Aug. 28 <br> Exception Request Received by CMS Fiscal Intermediary | Aug. 29 <br> **Day 1** | Aug. 30 <br> **Day 2** | Aug. 31 <br> **Day 3** | 1 <br> **Day 4** | 2 |
| 3 | 4 <br> **Labor Day** | 5 <br> **Day 5** | 6 <br> **Day 6** | 7 <br> **Day 7** | 8 <br> **Day 8** | 9 |
| 10 | 11 <br> **Day 9** | 12 <br> **Day 10** | 13 <br> **Day 11** | 14 <br> **Day 12** | 15 <br> **Day 13** | 16 |
| 17 | 18 <br> **Day 14** | 19 <br> **Day 15** | 20 <br> **Day 16** | 21 <br> **Day 17** | 22 <br> **Day 18** | 23 |
| 24 | 25 <br> **Day 19** | 26 <br> **Day 20** | 27 <br> **Day 21** | 28 <br> **Day 22** | 29 <br> **Day 23** | 30 |
| | 2 | 3 | 4 | 5 | 6 | |

LLUKC

p. 72

440

Case 1:06-cv-01926-TFH-DAR    Document 28    Filed 12/18/2007    Page 154 of 208

## October 2000

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| 1 | 2 **Day 24** | 3 **Day 25** | 4 **Day 26** | 5 **Day 27** | 6 **Day 28** | 7 |
| 8 | 9 **Columbus Day** | 10 **Day 29** | 11 **Day 30** | 12 **Day 31** | 13 **Day 32** | 14 |
| 15 | 16 **Day 33** | 17 **Day 34** | 18 **Day 35** | 19 **Day 36** | 20 **Day 37** | 21 |
| 22 | 23 **Day 38** | 24 **Day 39** | 25 **Day 40** | 26 **Day 41** | 27 **Day 42** | 28 |
| 29 | 30 **Day 43** | 31 **Day 44** | | | | |

LLUKC

p. 73

**Page 2**

441

**Provider Exhibit**

Loma Linda University Kidney Center

# November 2000

Exception Request Processing Days

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| 29 | 30 | 31 | 1<br><br>**Day 45** | 2<br><br>**Day 46** | 3<br><br>**Day 47** | 4 |
| 5 | 6<br><br>**Day 48** | 7<br><br>**Day 49** | 8<br><br>**Day 50** | 9<br><br>**Day 51** | 10<br><br>**Veterans Day** | 11 |
| 12 | 13<br><br>**Day 52** | 14<br><br>**Day 53** | 15<br><br>**Day 54** | 16<br><br>**Day 55** | 17<br><br>**Day 56** | 18 |
| 19 | 20<br><br>**Day 57** | 21<br><br>**Day 58** | 22<br><br>**Day 59** | 23<br><br>**Thanks-Giving Day** | 24<br><br>**Day 60** | 25 |
| 26 | 27<br><br>**Day 61** | 28<br><br>**Day 62** | 29<br><br>Letter of Denial From Fiscal Intermediary Sent to Provider | 30 | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |

LLUKC

P.74



**MEDICARE**
Part A Intermediary
Phone (805) 384-7200

November 29, 2000

Ms. Corinna Goron, Controller
Loma Linda University Kidney Center
11234 Anderson St. Room 1170
Loma Linda, Ca 92354

*Subject: Denial for an Exception to the ESRD composite rates under the Atypical
        Services Criterion*

*Provider:  Loma Linda University Kidney Center*
*Provider NO: 05-2550*

Dear Ms. Goron:

Your request for an exception to the ESRD composite rate under the atypical services criterion
has been denied. Enclosed is a copy of HCFA's letter dated November 15, 2000 noting the
reasons for the denial.

In accordance with reimbursement determinations, the provider is entitled to a formal appeal
under 42 CFR 413.194(b) on issues of the provider's request for exception if it disagrees with the
determination.  Your appeal must be made within 180 calendar days from the date of this
notification letter.

If you have any questions regarding this notification, please contact me at (805) 381-7112, or
Lon Mendez at (805) 384-7225.

Sincerely,

Mike Foxx, Manager
Provider Audit Department

**Enclosures**

C: Joseph Logue, HCFA



**Blue Cross** of California, P.O. Box 9150, Oxnard, California 93031-9150 - A HCFA CONTRACTED INTERMEDIARY
An Independent Licensee of the BlueCross Association

p. 75

443

Case 01-2872, FedEx Airbills: 8349 9803 9806-UGS, 8349 9803 9791-CMS, June 11, 2002

P-9

## BEFORE THE PROVIDER REIMBURSEMENT REVIEW BOARD
## BALTIMORE, MARYLAND

| | |
|---|---|
| **LOMA LINDA UNIVERSITY**<br>**KIDNEY CENTER** )<br>)<br>) | |
| **Provider No. 05-2550** ) | |
| ) | |
| **(Provider)** ) | **PRRB Case No. 01-2872** |
| ) | |
| **vs.** ) | |
| ) | |
| **UNITED GOVERNMENT SERVICES** ) | |
| ) | |
| **(Fiscal Intermediary)** ) | |

## PROVIDER'S FIRST REQUEST FOR
## PRODUCTION OF DOCUMENTS

Pursuant to rules of the Provider Reimbursement Review Board, Provider hereby submits the following Request for Production of Documents. The documents are to be produced within thirty (30) days after service at the offices of <u>Jack Ahern, 841C South Racine Avenue, Chicago, Illinois, 60607</u> as provided in the rules of the Provider Reimbursement Review Board.

1.  This Request for Production of Documents is continuing in nature. If Intermediary does not have present, sufficient knowledge for a response or a complete response, or if at any time after Intermediary does not have present, sufficient knowledge for a response or a complete response, or if at any times after Intermediary produces documents pursuant to this request, any information becomes available which calls for any supplement or amendment to, or any

modification, deletion, explanation, or amplification of a previous response, Intermediary is requested to furnish such additional information as soon as possible after it becomes available.

2. The responses should be based on information known to Intermediary or to Intermediary's agents, attorneys, employees, servants, directors, officers, representatives, divisions, branches, or sub-divisions. For purpose of this request, the term "representative" is not limited only to employees of the Centers for Medicare and Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA), but may include any employee of the United States government.

3. Where documents are requested, such request includes documents in the possession of each individual who acts, or who has acted at relevant times, as Intermediary's employee, agent, or representative.

4. The phrase "all documents" shall mean each and every document within a stated category known to Intermediary, and/or documents reasonably subject to identification. Documents which can be located on premises other than Intermediary's premises are specifically included. For purposes of this request, the terms "all documents" shall include any document within the possession of the Centers for Medicare and Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA) or any other agency of the United States government.

5. If any objection is raised with respect to the Request for Production of Documents, or any part thereof, Intermediary shall state with specificity the grounds upon which each such objection is based. Any documents or portions of documents which are being withheld upon any basis, including a claim of privilege, shall be specifically identified as such by providing the identity of any individuals who prepared such documents and the identity of any individuals to whom such documents were furnished, along with the dates thereof. Notwithstanding a claim that a document is privileged, any document so withheld must be produced with the portion claimed to be protected excised.

Case 01-2872, FedEx Airbills: 8349 9803 9806-UGS, 8349 9803 9791-CMS, June 11, 2002

6. To the extent that Intermediary believes that any of the information sought constitutes trade secrets or other confidential information, Provider will agree to entry of an appropriate protective order limiting the use of such information.

7. Specify which documents are produced in response to each of the numbered paragraphs.

## Definitions

1. "Document" or "documents" or "documentation" means any record, letter, memorandum, telegram, telex, fax, handwritten note, working paper, or any other written, recorded, or transcribed matter. Such definition shall include inter alia, recordings, transcripts, and/or summaries of oral communications, telephonic or otherwise, computer tapes, printouts and computer discs or information stored on computer memory.

2. The term "you" refers to the Intermediary, including any agents, employees, or representatives thereof, and to any agent, employee, or representative of the Health Care Financing Administration.

3. The term "HCFA" or "Health Care Financing Administration" refers to the agency now known as the Centers for Medicare & Medicaid Services.

4. The term "Provider" refers to the party named as such in the caption of this case.

89

Case 01-2872, FedEx Airbills:  8349 9803 9806-UGS, 8349 9803 9791-CMS, June 11, 2002

## Document Request

1.  This specific Document Production Request refers to the following statement in the letter from Mr. Joseph Logue of HCFA to Mr. Michael Foxx of Blue Cross of California, dated November 15, 2000, denying the Provider's request for an exception to the composite rate for maintenance dialysis services as follows:

    *"I am responding to your letter dated September 19, 2000"*

    a.  Please provide a copy of the above referenced letter, dated September 19, 2000.

    b.  Please provide all documents, including, but not limited to, all worksheets, computer spreadsheets, and memo's associated with, or attached to, or referencing, the above referenced letter from Mr. Michael Foxx, dated September 19, 2000.

    c.  Please provide all documents, including, but not limited to, all worksheets, computer spreadsheets, and memo's associated with, or attached to, or referencing, the above referenced letter, from Mr. Joseph Logue of HCFA, dated November 15, 2000.

2.  This specific Document Production Request refers to the following statement in HCFA's letter dated November 15, 2000 denying the Provider's request for an exception to the composite rate for maintenance dialysis services as follows:

    *"LLUKC has 256 ESRD patients with an average age of 52.9 per Exhibit 1. The average of LLUKC's ESRD patients is in line with national data. The national average of ESRD patients age 54 and under is 44.2%. The national average of ESRD patients age 55 and over is 55.8%"*

Case 01-2872, FedEx Airbills: 8349 9803 9806-UGS, 8349 9803 9791-CMS, June 11, 2002

a. Please furnish all documents used, supporting, or relied upon in developing the national age average referenced above.

b. Please furnish all documents reflecting the sample of facilities from which data was used to arrive at the national age average referenced above.

c. With respect to each such facility identified in the immediately preceding Document Production Request, please provide a summary of the cost report information for that facility used by HCFA in arriving at the national age average referenced above.

d. Please furnish all documents examining or reflecting upon the continuing validity of the national age average referenced above subsequent to its development.

e. Please provide all documents identifying the person(s) responsible for the preparation of any analysis or study used or relied upon in developing the national age average referenced above.

f. Please furnish all documents used or relied upon in determining the statistical validity of the national age average referenced above.

g. Please furnish any documentation relevant to or reflecting upon the existence of any national or regional data pertaining to ESRD patients, created by HCFA, created in cooperation with HCFA, or available to HCFA pertaining to the age other than the national age average referenced in HCFA's November 15, 2000, letter to Mr. Foxx.

h. Please furnish any documentation used by HCFA to correlate the age of dialysis patients with the cost of delivering a dialysis treatment.

    i.  Please furnish any documentation relevant to or reflecting the distribution of pediatric patients among all the facilities included in the national average. This information would show which facilities have pediatric patients and what percent of the patient population at these facilities are pediatric.

    j.  If the national average does include all Medicare Patients, please furnish any documentation relevant to or reflecting the distribution of pediatric patients among all Medicare approved facilities in the nation.

3.  This specific Document Production Request refers to the following statement in HCFA's letter dated <u>November 15, 2000,</u> denying the Provider's request for an exception to the composite rate for maintenance dialysis services as follows:

*"LLUKC has a 35.93% (92/256) diabetic ESRD patient population per Exhibit 3. The national average for diabetic patients for 1997 was 33%."*

    a.  Please furnish all documents used, supporting, or relied upon in developing the national diabetic average referenced above.

    b.  Please furnish all documents reflecting the sample of facilities from which data was used to arrive at the national diabetic average referenced above.

    c.  With respect to each such facility identified in the immediately preceding Document Production Request, please provide a summary of the cost report information for that facility used by HCFA in arriving at the national diabetic average referenced above.

d.  Please furnish all documents examining or reflecting upon the continuing validity of the national diabetic average referenced above subsequent to its development.

e.  Please provide all documents identifying the person(s) responsible for the preparation of any analysis or study used or relied upon in developing the national diabetic average referenced above.

f.  Please furnish all documents used or relied upon in determining the statistical validity of the national diabetic average referenced above.

g.  Please furnish any documentation relevant to or reflecting upon the existence of any national or regional data pertaining to ESRD patients, created by HCFA, created in cooperation with HCFA, or available to HCFA pertaining to the percentage of diabetic patients other than the national diabetic average referenced in HCFA's November 15, 2000, letter to Mr. Foxx.

h.  Please furnish any documentation relevant to or reflecting the incidence of diabetes among pediatric ESRD patients.

i.  Please furnish any documentation used by HCFA to correlate the incidence of diabetes among ESRD patients with the cost of delivering a dialysis treatment.

4.  This specific Document Production Request refers to the following statement in HCFA's letter dated November 15, 2000, denying the Provider's request for an exception to the composite rate for maintenance dialysis services as follows:

> "LLUKC has a Hypertension rate of 62.1 % (159/256) per Exhibit 3. The national average for hypertension for 1997 was 25%"

a. Please furnish all documents used, supporting, or relied upon in developing the national averages for hypertension referenced above.

b. Please furnish all documents reflecting the sample of facilities from which data was used to arrive at the national average for hypertension.

c. With respect to each such facility identified in the immediately preceding Document Production Request, please provide a summary of the cost report information for that facility used by HCFA in arriving at the national average for hypertension.

d. Please furnish all documents examining or reflecting upon the continuing validity of the national average for hypertension subsequent to its development.

e. Please provide all documents identifying the person(s) responsible for the preparation of any analysis or study used or relied upon in developing the national average for hypertension.

f. Please furnish all documents used or relied upon in determining the statistical validity of the national average for hypertension.

g. Please furnish any documentation relevant to or reflecting upon the existence of any national average for hypertension other than the national average for hypertension identified above.

h. Please furnish any documentation relevant to or reflecting the incidence of hypertension among pediatric ESRD patients.

*941*

Case 01-2872, FedEx Airbills: 8349 9803 9806-UGS, 8349 9803 9791-CMS, June 11, 2002

    i.  Please furnish any documentation used by HCFA to correlate the incidence of hypertension among ESRD patients with the cost of delivering a dialysis treatment.

5.  This specific Document Production Request refers to the following statement in HCFA's letter dated <u>November 15, 2000,</u> denying the Provider's request for an exception to the composite rate for maintenance dialysis services as follows:

> *"LLUKC has a 10.5% (27/256) mortality rate per Exhibit 4. The national ESRD mortality rate for 1997 was 16.03% (48,118 / 300139)."*

    a.  Please furnish all documents used, supporting, or relied upon in developing the national averages for mortality referenced above.

    b.  Please furnish all documents reflecting the sample of facilities from which data was used to arrive at the national average for mortality.

    c.  With respect to each such facility identified in the immediately preceding Document Production Request, please provide a summary of the cost report information for that facility used by HCFA in arriving at the national average for mortality.

    d.  Please furnish all documents examining or reflecting upon the continuing validity of the national average for mortality subsequent to its development.

    e.  Please provide all documents identifying the person(s) responsible for the preparation of any analysis or study used or relied upon in developing the national average for mortality.

*95*

    f.  Please furnish all documents used or relied upon in determining the statistical validity of the national average for mortality.

    g.  Please furnish any documentation relevant to or reflecting upon the existence of any national average for mortality other than the national average for mortality identified above.

    h.  Please furnish any documentation relevant to or reflecting the mortality rate among pediatric ESRD patients.

    i.  Please furnish any documentation used by HCFA to correlate the mortality rate of ESRD patients with the cost of delivering a dialysis treatment.

6.  This specific Document Production Request refers to the following statement in HCFA's letter dated <u>November 15, 2000,</u> denying the Provider's request for an exception to the composite rate for maintenance dialysis services as follows:

> *"LLUKC has a transplant rate of 1.95% (5 / 256) per Exhibit 6. The national average transplant for 1997 was 2.91% (8752 / 300,139). However, LLUKC reported that it has already transplanted 3 patients in FY 00 and has a transplant waiting list of 30 patients. "*

    a.  Please furnish all documents used, supporting, or relied upon in developing the national averages for the transplant rate referenced above.

    b.  Please furnish all documents reflecting the sample of facilities from which data was used to arrive at the national average for transplant rate.

c.  With respect to each such facility identified in the immediately preceding Document Production Request, please provide a summary of the cost report information for that facility used by HCFA in arriving at the national average for transplant rate.

d.  Please furnish all documents examining or reflecting upon the continuing validity of the national average for transplant rate subsequent to its development.

e.  Please provide all documents identifying the person(s) responsible for the preparation of any analysis or study used or relied upon in developing the national average for transplant rate.

f.  Please furnish all documents used or relied upon in determining the statistical validity of the national average for transplant rate.

g.  Please furnish any documentation relevant to or reflecting upon the existence of any national average for transplant rate other than the national average for transplant rate identified above.

h.  Please furnish any documentation relevant to or reflecting the transplant rate among pediatric ESRD patients.

i.  Please furnish any documentation used by Mr. Logue to correlate the number of transplants with either the acuity of patients or the amount of labor required to treat ESRD patients.

91

Case 01-2872, FedEx Airbills: 8349 9803 9806-UGS, 8349 9803 9791-CMS, June 11, 2002

7.  This specific Document Production Request refers to the following statement in HCFA's letter dated <u>November 15, 2000,</u> denying the Provider's request for an exception to the composite rate for maintenance dialysis services as follows:

> *"The average length of hospital stay for LLUKC's ESRD patients was 6.67 days. The national average length of hospital stay for ESRD patients in 1997 was 8.3 days."*

a.  Please furnish all documents used, supporting, or relied upon in developing the average length of stay figures referenced above.

b.  Please furnish all documents reflecting the sample of facilities from which data was used to arrive at the average length of stay figures referenced above.

c.  With respect to each such facility identified in the immediately preceding Document Production Request, please provide a summary of the cost report information for that facility used by HCFA in arriving at the average length of stay figures referenced above.

d.  Please furnish all documents examining or reflecting upon the continuing validity of the average length of stay figures referenced above subsequent to their development.

e.  Please provide all documents identifying the person(s) responsible for the preparation of any analysis or study used or relied upon in developing the average length of stay figures referenced above.

f.  Please furnish all documents used or relied upon in determining the statistical validity of the average length of stay figures referenced above.

    g. Please furnish any documentation relevant to or reflecting upon the existence of any average length of stay figures other than the average length of stay figures referenced above.

    h. Please furnish any documentation relevant to or reflecting the average length of stay for pediatric ESRD patients.

    i. Please furnish any documentation used by HCFA to correlate the average length of stay for pediatric ESRD patients with the cost of delivering a dialysis treatment.

8. This specific Document Production Request refers to the following statement in HCFA's letter dated <u>November 15, 2000,</u> denying the Provider's request for an exception to the composite rate for maintenance dialysis services as follows:

> *"Further, based on our experience, home program patients are healthier patients than infacility patients and require less nursing time and services. Therefore, we are unable to approve the $ 18.46 for atypical salary cost per treatment due to atypical minutes incurred."*

    a. Please provide any documents that support the above statement.

9. This specific Document Production Request refers to the following statement in HCFA's letter dated <u>November 15, 2000,</u> denying the Provider's request for an exception to the composite rate for maintenance dialysis services as follows:

*"Data based on staff interviews that cannot be verified or audited is not acceptable. In the event that a time study is used in the future, the general Medicare principles regarding the adequacy of periodic time sampling is described in §2313 of the PRM must be furnished. Therefore, we are unable to approve the $8.50 for atypical salary cost per treatment due to atypical minutes incurred"*

    a.  Please provide any documents, regulations or instructions of any sort that require the application of § 2313 of the PRM to the atypical service intensity exception request criteria.

    b.  Please provide any documents, regulations or instructions of any sort that preclude the use of staff interviews in time calculations used to demonstrate labor above the norm in an atypical service intensity exception request.

10. This specific Document Production Request refers to Section 2723.3 of HCFA Pub. 15-1, relied upon in HCFA's letter dated <u>November 15, 2000,</u> denying Provider's request for an exception to the composite rate for maintenance dialysis services, which states in pertinent part as follows:

*In addition to the peer comparison submitted by the intermediary, HCFA uses national data and general program statistics in evaluating the reasonableness of a facility's component costs shown in its exception request. HCFA's median cost per treatment data is as follows:*

| Cost Component | Amount |
|---|---|
| *Salaries* | *$40* |
| *Supplies* | *$33* |
| *Overhead excluding Employee Benefits* | *$47* |
| *Overhead including Employee Benefits* | *$54* |
| *Employee Benefits* | *$ 7* |
| *Laboratory* | *$ 3* |

    a.  Please furnish all documents used, supporting, or relied upon in developing the cost standards referenced above.

b.  Please furnish all documents reflecting the sample of facilities from which data was used to arrive at the cost standards referenced above.

c.  With respect to each such facility identified in the immediately preceding Document Production Request, please provide a summary of the cost report information for that facility used by HCFA in arriving at the cost standards referenced above.

d.  Please furnish all documents examining or reflecting upon the continuing validity of the cost standards referenced above subsequent to their development.

e.  Please provide all documents identifying the person(s) responsible for the preparation of any analysis or study used or relied upon in developing the cost standards referenced above.

f.  Please furnish all documents used or relied upon in determining the statistical validity of the cost standards referenced above.

g.  Please furnish any documentation relevant to or reflecting upon the existence of any cost standards other than the cost standards referenced above.

11. The document request pertains to the guidance and instructions provided to the HCFA reviewer regarding the adjudication and review of exception requests in present and prior windows:

a.  Please provide any documents directly or indirectly pertaining to the method of adjudication of Atypical Service Intensity and Home training renal dialysis exception requests by the reviewer, Mr. Joseph Logue or his colleagues.

/ 0/

Page 15 of 18

472

    b.  This document request includes instructions given to reviewers, advice, guidance, standards, template letters of review which could be adapted to individual cases, check lists of items needed for approval, and check lists of items resulting in a denial.

    c.  Since the denial letter from HCFA contains documents pertaining to **Loma Linda Kidney Center's** Exception Request filed in 1990, this document request includes all training materials provided to Mr. Logue or his colleagues since 1986.

12.  The following document request pertains to the time limit for processing and adjudicating an exception request:

    a.  Please provide any documents referencing the time limits on processing and adjudicating a renal dialysis exception request. This request includes, but is not limited to instructions given to reviewers, advice, and any other sort of guidance. Since the denial letter from HCFA contains documents pertaining to **Loma Linda Kidney Center's** Exception Request filed in 1990, this document request includes all documents since 1986.

    b.  Please provide documents regarding any prior claims that the processing deadline was not met.

    c.  Please produce any documents pertaining to, or resulting from the claim in the following case in which the PRRB ruled that the 60 day limit had been exceeded: PRRB-DEC, MED-GUIDE 1996-2 MED-GUIDE-TB ¶44,647, **Charlotte Hungerford Hospital (Torrington, Conn.) v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Connecticut.**

Case 01-2872, FedEx Airbills: 8349 9803 9806-UGS, 8349 9803 9791-CMS, June 11, 2002

13. Please provide a list of Providers who filed exception requests during the exception request window closing August 28, 2000, detailing provider name and provider number, amount requested, whether it was approved or denied, amount approved, as well as criteria (Atypical Service Intensity, Home Training, Isolated Essential Facility, Frequency of Dialysis, etc.).

14. Please provide approval and denial letters, including transmittal letters from the Fiscal Intermediary for the Providers who filed exception request during the exception request window closing August 28, 2000.

15. Please provide the time study and cost report detail for those providers who received approvals based on the Atypical Service Intensity Criteria during all exception request windows since 1989.

Respectfully submitted this 11th day of June

Jack Ahern
841C South Racine Avenue
Chicago, Illinois 60607
Telephone: (312) 997-2177
Provider Representative

/03

474

Case 01-2872, FedEx Airbills: 8349 9803 9806-UGS, 8349 9803 9791-CMS, June 11, 2002

## Certificate of Service

I hereby certify under penalty of perjury that on this 11th day of June, I caused to be delivered via FedEx to United Government Services and Centers for Medicare and Medicaid Services and via US mail to Blue Cross Blue Shield Association a copy of the foregoing **Loma Linda University Kidney Center's** First Request for Production of Documents to:

Ms. Antoinette Biglang-Awa
United Government Services, LLC-CA
5151 Camino Ruiz, Building B
Camarillo, CA 93012-8696
Via FedEx Airbill No. 8349 9803 9806

Mr. Wilson Leong
Director, Blue Cross Blue Shield Association
225 N. Michigan Avenue
Chicago, IL 60601-7680
Via US Mail

Mr. William E. Cymer
Division of Chronic Care Management
Centers for Medicare & Medicaid Services
7500 Security Blvd.
Baltimore, MD 21244-1850
Via FedEx Airbill No. 8349 9803 9791

_____
Mary Wiesner



| PART A INTERMEDIARY | NATIONAL FQHC INTERMEDIARY | MEDICARE |
|---|---|---|
| REGIONAL HOME HEALTH INTERMEDIARY | | PHONE 805-367-0800 |

**CENTERS for MEDICARE & MEDICAID SERVICES**

June 25, 2002

Mr. Jack Ahern, President
Ahern & Associates
841 C South Racine Ave.
Chicago, Illinois 60607

RE:    **Request for Documents –First Request**
**Loma Linda Kidney Center**
**Provider No. 05-0327**
**FYE: 12/31/00**
**PRRB Case No. 01-2872**

Dear Mr. Ahern:

In response to your Submission of the Request for Documents  for the subject Provider, attached are our responses and documentation.  Please note HCFA is being identified as CMS in our responses.

For any questions please Contact Dave Collins, CPA at (805) 367- 0572.

Sincerely,,

Antoinette Biglang-Awa, CPA
Manager
Provider Audit Department

Attachments

Cc:    Wilson Leong, BCBSA
Steve Kirsh, PRRB

126

UNITED GOVERNMENT SERVICES, LLC.

P.O. Box 9150, Oxnard, California 93031-9150 • Corporate Headquarters located in Milwaukee, WI
A CMS CONTRACTED INTERMEDIARY

500

**Responses to Requests for Documentation**

1.  You refer to a letter-dated 11/15/2000 from HCFA to Ms. Brenda Merriweather, responding
    to her letter-dated 9/18/2000. Regarding your request for a copy of this letter:

    a.  At the time of this response the applicable files containing the 9/18/2000 letter has
        not been located. Upon obtaining the documents this will be forwarded to you.

    b.  Regarding the worksheets, computer spreadsheets, and memo's associated to the
        9/18/2000 letter, at the time of this response the applicable files containing the
        9/18/2000 letter has not been located. Upon obtaining the documents this will be
        forwarded to you.

    c.  Regarding the worksheets, computer spreadsheets, and memo's associated to CMS's
        11/15/2000 letter, at the time of this response the applicable files containing this
        information has not been located. Upon obtaining the documents this will be
        forwarded to you.

2.  This specific Document Production Request refers to the following statement in HCFA's
    letter dated November 15, 2000, denying the Provider's request for an exception to the
    composite rate for maintenance dialysis services as follows: ***"Based on our experience,
    inpatient treatments are more costly than outpatient treatments."***

    a.  Documents supporting the above statement must be obtained from CMS.

3.  This specific Document Production Request refers to the following statement in HCFA's
    letter dated November 15, 2000, denying the Provider's request for an exception to the
    composite rate for maintenance dialysis services as follows: ***"Data based on patient care
    staff interviews that cannot be audited is not acceptable. In the event that a time study is
    used in the future, the general Medicare principles regarding the adequacy of periodic
    time sampling is described in 2313 of the PRM must be furnished."***

    a.  Documents, regulations or instructions that require the application of 2313 of the
        PRM to the atypical service intensity population must be acquired from CMS.

    b.  Documents, regulations or instructions that preclude the use of staff interviews in
        time calculations used to demonstrate labor above the norm in an atypical services
        intensity exception request must be acquired from CMS.

    c.  Copies of all other renal dialysis exception requests containing time studies
        conforming to the criteria described in 2313 of the PRM should be addressed to
        CMS.

    d.  Copies of all other renal dialysis exception requests containing time studies based on
        patient care staff interviews that were approved should be addressed to CMS.

e.  Copies of all documents, regulations or instructions of any sort that demonstrate the time study methodology to be used in an atypical intensity renal dialysis exception request should be addressed to CMS.

4.  This specific Document Production Request refers to Section 2723.3 of HCFA Pub. 15-1, relied upon the HCFA's letter dated November 15, 2000, denying Provider's request for an exception to the composite rate for maintenance dialysis services, which states in pertinent part as follows: ***In addition to the peer comparison submitted by the intermediary, HCFA used national data and general program statistics in evaluating the reasonableness of a facility's component costs shown in its exception request. HCFA's median cost per treatment data is as follows:***

| *Cost Component* | *Amount* |
|---|---|
| *Salaries* | *$40* |
| *Supplies* | *$33* |
| *Overhead excluding EB* | *$47* |
| *Overhead including EB* | *$54* |
| *Employee Benefits* | *$ 7* |
| *Laboratory* | *$ 3* |

a.  Documents used, supporting, or relied upon in developing the cost standards above should be obtained from CMS.

b.  Documents reflecting the sample of facilities from which data was used to arrive at the cost standards above should be obtained from CMS.

c.  Documents requested in (b) above supported by a summary of the cost report information for each facility in arriving at the cost standards referenced above should be obtained from CMS.

d.  Documents examining or reflecting upon the continuing validity of the cost standards referenced above subsequent to their development should be obtained from CMS.

e.  Regarding the identification of person(s) responsible for preparation of any analysis or study used or relied upon in developing the cost standards referenced above should be obtained from CMS.

f.  Documents used or relied upon in determining the statistical validity of the cost standards referenced above should be obtained from CMS.

g.  Documentation relevant to or reflecting upon the existence of any cost standards other than the cost standards reference above should be obtained from CMS.

5.  Regarding guidance and instructions provided to the HCFA reviewer regarding the adjudication and review of exception requests in present or prior windows:

128

a.  Documents pertaining to the method of adjudication of renal dialysis exception requests in general by the reviewer, Mr. Joseph Logue and his colleagues must be addressed to CMS.

b.  Documents pertaining to all those Atypical Service Intensity exception requests that were approved by the reviewer, Mr. Joseph Logue and his colleagues should be addressed to CMS.

c.  Instructions given to reviewers, advice, guidance, standards, template letters of review, which could be adapted to individual cases, check lists of items needed for approval, and checklists of items resulting in a denial must be obtained from CMS.

d.  Regarding the document request pertaining to Loma Linda University Medical Center for 1990 and 1994 should be obtained from CMS.

6.  The following document request pertains to the time limit for processing and adjudicating an exception request:

a.  Regarding documents referencing the time limits on processing and adjudicating a renal dialysis exception request, To recap the hours at the Intermediary level is not reasonable to expend the time to locate and recap time sheets. At the CMS level, this should be obtained from them.

b.  Regarding documents on any prior claims by any provider that the processing deadline was not met, to obtain such data is not possible as there is no central recording or storage place to obtain and summarize such data.

c.  Regarding your request to produce any documents pertaining to, or resulting from the claim in the following case in which the PRRB ruled that the 60 day limit had been exceeded: PRRB – DEC, Charlotte Hungerford Hospital (Torrington, Conn) v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Connecticut, this information is not available and should be requested from Blue Shield of Connecticut and/or BCBSA.

7.  Regarding a list of Providers who filed exception requests during the exception request window closing August 28, 2000, detailing provider name and provider number, amount requested, whether it was approved or denied, amount approved, as well as criteria (Atypical Service Intensity, Home Training, Isolated Essential Facility, Frequency of Dialysis, etc.).

  **Response**---Is not attainable as requests are reviewed and handled individually by audit groups and is not centralized. To obtain would result in an unreasonable amount of time and effort.

8.  Approval and denial letters, including transmittal letters from the Fiscal Intermediary for the Providers who filed exception requests during the exception request window closing August 28, 2000.

129

**Response---** Is not attainable as requests are reviewed and handled individually by audit groups and is not centralized.  To obtain would result in an unreasonable amount of time and effort.

9.    Time study and cost report detail for those providers who received approvals based on the Atypical Service Intensity Criteria during all exception request window since 1989.

**Response---** Is not attainable as requests are reviewed and handled individually by audit groups and is not centralized.  To obtain would result in an unreasonable amount of time and effort.

130

## Certificate of Service

I hearby certify under penalty of perjury that on this 25th day of June, I caused to be delivered via US mail to Ahern & Associates and via US mail to Blue Cross Blue Shield Association a copy of the foregoing United Government Services, Inc. responses to Loma Linda University Medical Centers First Request for Production of Documents to:

Mr. Jack Ahern
Ahern & Associates
841 C South Racine Ave.
Chicago, Il 60607

Mr. Wilson Leong
Managing Director
Blue Cross Blue Shield Association
225 N. Michigan Ave.
Chicago, Il. 60601-7680

Mr. Steve Kirsh, Director
Provider Reimbursement Review Board
2520 Lord Baltimore Dr. Suite L
Baltimore, MD 21244-2670

131

**DEPARTMENT OF HEALTH & HUMAN SERVICES**     Health Care Financing Administration

_____

7500 SECURITY BOULEVARD
BALTIMORE MD 21244-1850

*X1685*

**RECEIVED**
PADCR2C

NOV 2 7 2000

P/M _____ 11/16

November 15, 2000

Mr. Michael S. Foxx, Manager
Provider Audit Department
Medicare Part A Intermediary
P.O. Box 9159
Oxnard, California 93031-9150

Dear Mr. Foxx:

I am responding to your letter dated September 19, 2000, concerning the exception request filed under the prospective (composite rate) payment system by Loma Linda University Kidney Center (LLUKC), provider number 05-2550. LLUKC's exception request was received in your office on August 28, 2000. LLUKC has requested an exception amount of $186.59 or an increase of $51.64 for maintenance hemodialysis and $184.38 for home program peritoneal dialysis or an increase of $49.43 under the atypical patient mix exception criteria. Based on your review of the documentation submitted by LLUKC, you recommended a composite payment rate of $181.52 for maintenance hemodialysis and $179.55 for home program peritoneal dialysis. As a result of our review of the documentation submitted by LLUKC and your office, we have the following comments.

Atypical Patient Mix

In order to determine whether a facility has an atypical patient population mix, we consider the following patient characteristics - age, mortality rate, diabetes, hepatitis, transplants, patient transfers (referrals), as described in 42 CFR 413.184(b) and § 2725.1.C of the Provider Reimbursement Manual (PRM) and any other patient information and/or data submitted by the facility.

LLUKC has 256 ESRD patients with an average age of 52.9 per Exhibit 1. The average of LLUKC's ESRD patients is in line with national data. The national average of ESRD patients age 54 and under is 44.2%. The national average of ESRD patients age 55 and over is 55.8%.

LLUKC has a 35.93% (92/256) diabetic ESRD patient population per Exhibit 3. The national average for diabetic patients for 1997 was 33%.

634 I-1

2

LLUKC has a Hypertension rate of 62.1% (159/256) per Exhibit 3. The national average for hypertension for 1997 was 25%.

LLUKC has a 10.5% (27/256) mortality rate per Exhibit 4. The national ESRD mortality rate for 1997 was 16.03% (48,118/300139).

LLUKC has a transplant rate of 1.95% (5/256) per Exhibit 6. The national average transplant for 1997 was 2.91% (8752/300,139). However, LLUKC reported that it has already transplanted 3 patients in FY 00 and has a transplant waiting list of 30 patients.

The average length of hospital stay for LLUKC's ESRD patients was 6.67days. The national average length of hospital stay for ESRD patients in 1997 was 8.3 days.

Further, LLUKC claims that 85 patients or 33.2% (85/256) of its ESRD patients require ambulation assistance, 17 patients that require isolation, 40 cardiac patients, 18 home program pediatric patients, and 78 patients with neuropathic problems.

LLUKC's average age is almost in the middle of the national average. LLUKC's mortality rate, transplant rate, and average length of hospital stay are less than the national average. LLUKC's diabetic rate is slightly higher than the national average. LLUKC's hypertension rate is much higher than the national average. Based on the patient data submitted by LLUKC, it appears that LLUKC *could* possibly have an atypical patient mix.

Cost Justification

LLUKC requested exception amounts for salaries, employee benefits, supplies and overhead for maintenance hemodialysis and home program peritoneal dialysis, separately, as shown on page 3 of its narrative under the heading entitled Current and Requested Exception Amount. The composite payment rate is a comprehensive payment rate for all modes of infacility dialysis and home dialysis [§2702 of the Provider Reimbursement Manual (PRM)]. Therefore, the provider has failed to file its exception request in accordance with Medicare Program instructions.

Salaries

On page 3 of its narrative, LLUKC requested $20.13 for maintenance hemodialysis and $18.46 for home program peritoneal dialysis based on its Exhibit 9.

### Maintenance Hemodialysis and Home Program Peritoneal Dialysis

On pages 6 of its narrative under Atypical Activities, the provider stated that we present in Exhibit 9 a list of diagnoses and related activities that require additional nursing assistance. The patient care staff prepared this list and identified the additional number of nursing minutes per activity and the number of times each activity is performed annually for both maintenance hemodialysis and home program peritoneal dialysis.

In reviewing the documentation submitted, some of the services listed as atypical appear to be similar to the type of services rendered by all facilities such as, taking BP's and weighing patients. Also, these listings and minutes were based on the information obtained from the patient care staff after the fact and, consequently, cannot be audited or verified.

The provider has not presented any time studies to adequately support its patient care staff's identification of the additional time spent by the nursing staff. Therefore, based on the above, the provider has failed to adequately document the additional nursing staff services rendered to its atypical patient mix. Data based on staff interviews that cannot be verified or audited is not acceptable. In the event that a time study is used in the future, the general Medicare principles regarding the adequacy of periodic time sampling is described in §2313 of the PRM must be furnished. Therefore, we are unable to approve the $8.50 for atypical salary cost per treatment due to atypical minutes incurred.

At Exhibit 9, the provider has also requested an additional $11.64 per nursing staff mix. The $11.64 is based on mathematical computations using the provider's Exhibits 10 and 11. On page 5 of its narrative and Exhibit 10, the provider stated that the average staffing ratio for facilities that treat typical patients is 4 patients to 1 staff. The provider did not furnish its source of information. Therefore, the validity of this mathematical computation is questionable. Consequently, we are unable to approve the $11.64 for atypical salary cost per treatment due to staffing mix.

Further, based on our experience, home program patients are healthier patients than infacility patients and require less nursing time and services. Therefore, we are unable to approve the $18.46 for atypical salary cost per treatment due to atypical minutes incurred.

### Cost and Treatment Count Comparison

The salary cost per treatment went from $56.87 ($1,081,152/19,012) in FY 99 to $70.41 ($1,356,433/19,264) in FY 00 for an increase of $13.54 or a **23.8% increase** ($13.54/$56.87). The number of salary treatments went from 19,012 in FY 99 to 19,264 in FY 00 for an increase of 252 treatments or a **1.3% increase** (252/19,012). The provider furnished no explanation as to why the cost per treatment for salaries increased so much, while the increase for treatments was very small.

4

### Supplies

On page 3 of its narrative, LLUKC requested $3 for supplies for both hemodialysis and home program peritoneal dialysis based on its Exhibit 1. The financial data shown at Exhibit 1 for FY 97, FY 98, FY 99, and FY 00 includes all the costs and treatments for maintenance hemodialysis, home program peritoneal dialysis and both training modalities. Including the training modalities for a composite rate exception request is not correct.

In making our review of the request for additional supplies, we used the provider's Exhibits 16 and 23.

At Exhibit 16, we reviewed the supply list furnished and did not notice anything unusual or out of the ordinary that would cause us to grant an exception for supplies.

At Exhibit 23, we noted that the Worksheet S-1 on the FY 99 cost report shows that LLUKC re-uses its dialyzers 20 times. Exhibit 16A shows that LLUKC used 7 different types of dialyzers. The average cost of these dialyzers is $19.35 ($135.50/7). The average treatment cost per dialyzer is $.97 ($19.35/20). We totaled the supply list shown at Exhibit 16 without the dialyzer cost and arrived at a total cost of $24.71 for supplies, then we included the dialyzer average cost of $.97 for a total supply cost of $25.68. Since this supply cost of $25.68 is less than the national average of $33, we are unable to grant an exception amount for supplies.

### Overhead

On page 3 of its narrative, LLUKC requested $22 for overhead for both hemodialysis and home program peritoneal dialysis based on its Exhibit 1. The financial data shown at Exhibit 1 for FY 97, FY 98, FY 99, and FY 00 includes all the costs and treatments for maintenance hemodialysis, home program peritoneal dialysis and both training modalities. Including the training modalities for a composite rate exception request is not correct.

In making our review of the request for overhead, we reviewed page 5 of the provider's narrative under the heading Overhead Costs. The provider stated that its overhead costs include administrative and general costs, housekeeping, repairs, and maintenance costs allocated from a related organization, LLUMC, in accordance with the Medicare principles of reimbursement. Examples of these allocated costs include non-patient telephone data processing, purchasing, patient admitting, business office and medical record costs.

5

LLUMC refers to Loma Linda University Medical Center, provider number 05-0327, a hospital.  The provider has requested an exception for overhead costs that were allocated to it from Loma Linda University Medical Center in accordance with the Medicare principles of reimbursement.  The principles of cost finding do not apply to Loma Linda University Kidney Center because it is a freestanding facility. You cannot step-down cost from a hospital to a freestanding facility. Also, Loma Linda University Kidney Center has not submitted any documentation explaining how Loma Linda University Medical Center's costs related to its ESRD patient care. Unsubstantiated general statements are not sufficient documentation for the granting of an exception amount. Therefore, we are unable to grant an exception amount for overhead.

Hours Per Treatment

The cost reports for FY 97, 98, 99, and 00 reflected the following hours per treatment for maintenance hemodialysis, home program CAPD, home program CCPD, and the aggregate hours for all maintenance and home program dialysis (See Attachment 1).

| FY | Hemo. | H.P. CAPD | H.P. CCPD | Avg. Hr. Per Trt. |
|----|-------|-----------|-----------|--------------------|
| 00 | 5.09 | 2.93 | 2.94 | 4.57 |
| 99 | 4.29 | 2.48 | 2.48 | 3.90 |
| 98 | 3.70 | .87 | .87 | 3.12 |
| 97 | 3.88 | 1.11 | 1.11 | 3.24 |

The average hour per treatment for each modality and the aggregate went down from FY 97 to FY 98 but from FY 98 to FY 99 and then to FY 00 the average treatment time for each modality and the aggregate for all maintenance and home program dialysis has been increasing. From FY 98 to FY 00 the average treatment time for hemodialysis increased 1.36 (5.09 – 3.70) hours, H.P. CAPD increased 2.06 (2.93 - .87) hours, H.P. CCPD increases 2.07 hours (2.94 - .87), and the over-all aggregate increased by 1.45 (4.57 - 3.12) hours.   The provider has not explained why its average treatment time has been increasing.  In any future exception request, the provider should explain why its average hourly dialysis treatment time has been increasing and what steps it has taken to increase efficiency.

When we approved LLUKC's training request in 1994, the provider stated that training staff time is based on multiplying 8 hours by the number of training sessions (See Attachment 2). The cost reports for FY 97, 98, 99, and 00 reflected the following hours per treatment for CAPD training, CCPD training and the aggregate training hours (See

6

Attachment 3). These training hours are significantly less than the eight hours used by LLUKC in its previous exception submittal.

| FY | Trg. CAPD | Trg. CCPD | Avg. Hr. Per Trt. |
|----|-----------|-----------|-------------------|
| 00 | 1.44 | 1.15 | 1.25 |
| 99 | 1.35 | 1.27 | 1.06 |
| 98 | .22 | .57 | .39 |
| 97 | .48 | 1.01 | .48 |

We compared these training treatment times to the maintenance hemodialysis and home program treatment times above. The training time for CAPD and CCPD and the aggregate training time for both modalities for FY 97, 98, 99 and 00 are less than the time for maintenance hemodialysis time and home program for both CAPD and CCPD for FY 97, 98, 99 and 00. Based on our experience, training treatments require much more time than maintenance hemodialysis and home program treatments. Therefore, we believe that the LLUKC is not allocating its treatment time correctly to its various treatment modalities.

Training CAPD and CCPD

LLUKC did not request a training exception rate. However, on June 20, 1994, this provider received an exception for its CAPD training in the amount of $426.66 and for its CCPD training on the amount of $460.05 (See Attachment 4).

A review of LLUKC's cost reports reported the following CPTs for training:

| FY | CAPD | CCPD |
|----|-------|-------|
| 97 | $943.56 | $1,073.94 |
| 98 | $237.30 | $ 180.29 |
| 99 | $184.19 | $ 133.24 |
| 00 | $151.02 | $ 117.87 |

Since the provider has not requested an exception to its training rate and since the provider's cost per treatment (CPT) for CAPD training and CCPD training has fallen below its previously approved rate, it cannot ask to retain its previously approved rate for these training modalities in accordance with 42 CFR 413.180 (e).

A review of the requests for retention of an exception approval that were submitted to HCFA by its intermediaries showed that this provider filed a request to retain its CAPD and CCPD training approvals with your office on February 28, 2000 because its training program has remained basically the same and the cost report for 1998 shows that the cost per treatment is not less than the previously approved exception amount (See Attachment 5). Based on your review of the provider's letter and documentation submitted to your office, you allowed this provider to retain its previously approved training rates per your letter dated March 13, 2000 (See Attachment 6).

Based on the documentation submitted with this exception request, HCFA determined that the provider's training program has not remained the same. HCFA's Attachment 2 shows that the provider based its training sessions on 8 hours in its 1994 exception request, while the documentation submitted with this request shows that the provider's treatment time is significantly less than the 8 hours previously reported. Also, the CPT for CAPD and CCPD training for FY 98, 99, and 00 is significantly less than the previously approved training rates. Consequently, the provider must be paid its composite rate plus the add-on for CAPD training and CCPD training. As March 1, 2000, the provider's CAPD training rate is $146.95 ($134.95 + $12.00) and the provider's CCPD training rate is $154.95 ($134.95 + $20.00). In the event that you have over paid these training modalities since March 1, 2000, please re-coup any overpayments that you may have made. The previously approved exception amounts for CAPD training and CCPD training terminated as of the close of business on the date prior to the effective date of the new exception cycle, namely, February 29, 2000 (See Program Memorandum A-99-59).

Recommendations

Based on the foregoing, you may consider making the following recommendations to LLUKC because LLUKC may wish to file another exception request under the Atypical Patient Mix in the future.

The burden of proof for justifying an exception request rests with the provider not HCFA nor its intermediary [See 42 CFR 413.180 (g)]. Neither HCFA nor its intermediary is responsible for perfecting the provider's exception request.

Although an in-depth time analysis by modality is not required, it would be helpful in reviewing any future exception request.

It is in the provider's best interest to file as soon as possible. When a provider files on the last day of the exception window, the provider does not have the opportunity to file another exception request. Had the provider filed early in the exception window, it would have had the opportunity to file another exception request. Also, any approved exception amount is effective on the date that the intermediary receives a fully documented and acceptable exception request.

Finally, the provider should be advised that due to the short legislative time span of 60 working days in which to process an exception request and issue a final decision, all information related to the exception request must be submitted with the original exception. The responsibility for furnishing an exception request with all required documentation rests with the facility. HCFA approves or denies the exception request based on the documentation submitted. No additional information is requested.

8

### Other

This provider has received ESRD exception approvals under the 5th ESRD window, which also carried over to the 6th ESRD window, and the 7th ESRD window for CAPD and CCPD training. This is the first time that LLUKC has requested an exception request for atypical services for its outpatient and home program maintenance dialysis. A check of the financial data in the prior exception request showed that LLUKC's CPT for its it outpatient and home program maintenance dialysis was less than its composite rate; therefore, LLUKC did not request an exception for its it outpatient and home program maintenance dialysis costs. HCFA prepared a CPT analysis of the financial data furnished with this exception request and the prior exception request (See Attachment 7). This analysis showed that the number of treatments decreased by 139 from the actual FY92 (19,403) cost reporting period to the projected FY 00 (19,264) cost reporting period, while the cost increased by $1,948,739 from FY 92 ($1,912,747) to FY 00 ($3,861,486). While treatments have stayed consistent (actual decrease in 1997 and 1998) around 19,000 treatments per year, the total costs and CPT have increased considerably.

In light of the cost increases with a fairly stable treatment count, you should determine if an onsite review per § 2720.5 of the PRM is required to verify that the provider is properly allocating costs between the various treatment modalities and is operating an efficient ESRD program. In the event the provider should file an exception request in the future, you may want to thoroughly review the provider's ESRD program before making any recommendation.

### Payment Rate

Based on the above analysis, the provider's exception request is denied. The provider should continue to be paid its composite rate of $134.95 for outpatient maintenance and home program dialysis. If the provider wishes to appeal this decision, the applicable regulation is 42 CFR 413.194 (b)

If you have any questions concerning our response, please contact me on (410) 786-4561.

Sincerely,

*Joseph Logue*

Joseph Logue
Health Insurance Specialist
Division of Chronic Care Management

Attachments

## 2723.   RESPONSIBILITY OF INTERMEDIARIES

All composite rate exception requests filed on or after October 21, 1986, are to be reviewed and processed within 15 working days from the date the exception is filed. Verify that the exception request contains documentation to support the renal facility's position.  When the renal facility fails to submit the required documentation (see §2721), the exception request is returned to the facility. (See §2723.3A.)  The 60 working days starts when the renal facility files an exception request with all required documentation with the intermediary during the intermediary's regular business hours, subject to the 180 day time period for requesting an exception.  (See §2723.3A.)

**2723.1   Inform HCFA Central Office of Composite Rate Exception Requests.--** To track the start of the 60 working day requirement, intermediaries must call HCFA central office the day a composite rate exception request is received.  The contact person is located on telephone number (410) 966-4560.  The following information is provided:

  o   The name and provider number of the renal facility;

  o   The date the exception is received;

  o   The type of exception, e.g., atypical patient mix, training;

  o   The amount requested; and

  o   A phone number and contact person at the intermediary.

**2723.2   Composite Rate Exception Log.--**The intermediary maintains a composite rate exception log.  The purpose of this log is to monitor the 15 working days and to ensure the timely processing of all composite rate exceptions.  In addition, the log documents the starting date for processing composite rate exceptions.  This is in case a renal facility alleges that its composite rate exception was not processed within 60 working days.  The following information is included in the log:

  o   The date the exception is received by the intermediary.    (The intermediary date stamps each request.);

  o   The renal facility's reason for requesting the exception;

  o   The intermediary's reason for returning an exception;

  o   The intermediary's recommendation to either deny or approve the facility's request. (All workpapers supporting the intermediary's decision must accompany the facility's exception request when mailed to HCFA central office.); and

  o   The date the exception is mailed to HCFA central office.    (See §2723.3F.)

**2723.3   Intermediary Review.--**The following procedures are applied after receiving a facility's composite rate exception request.

  A.   **Exception Request Review.--**The intermediary reviews the exception request, the cost report, the facility's projected costs, and any other documentation submitted by the facility to assure that it is complete and accurate.  If the renal facility fails to submit the required documentation, as required by this chapter, the exception request is returned to the facility.

27-38                                                                    Rev. 23

OUTPATIENT MAINTENANCE
DIALYSIS REIMBURSEMENT

A copy of this letter is sent to HCFA central office. The mailing address in §2723.3F is used. HCFA suggests use of the following language in returning the ESRD exception request to the facility.

"A facility that files an exception request has the burden of proving not only that it meets the criteria for being granted an exception but also that its excessive costs are justifiable. See 42 CFR 413.170(f)(5). Since you failed to submit the required documentation in accordance with §2721 of HCFA Pub. 15-I, we are returning your exception request. The 60 working days for processing exceptions, as specified in §1881(b)(7) of the Social Security Act (as added by §9335(a)(2)(B) of the Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509), begins when you have filed an exception request with all the required documentation. Our returning your exception request does not extend the deadline by which you must submit an exception request with all the required documentation. Requests and documentation received in this office after (insert date) will be denied because they were not filed in a timely manner."

Include in the letter the final date the facility may submit its exception request, which is 180 days from the effective date of new composite payment rates or 180 days from the effective date the exception process opened. (See §2720.2.)

   B.   Mailing of Exception Request.--After completing its review of the renal facility's exception request, the intermediary mails the facility's exception request plus its recommendation to HCFA central office. (See §2723.3F.) To expedite the exception process, the intermediary mails all exception requests using an overnight delivery service. In its cover letter, the intermediary must state the date the exception request was received in its office.

   C.   Determination of Reasonable and Allowable Costs.--The intermediary determines that Medicare principles of reimbursement were used to ensure that only reasonable and allowable costs are included in the facility's costs. The intermediary reviews the following reimbursement areas.

   1.   Bad Debts.--Facilities are not to include an allowance for doubtful accounts in reported costs but submit separately the total dollar amount of bad debts actually incurred. Allowable bad debts include only uncollectible deductibles and coinsurance related to covered composite rate services furnished to Part B beneficiaries. Renal facilities may not claim the 50 cents reduction required by §9335(j) of OBRA 1986 as an expense on their Medicare cost reports. The intermediary verifies that renal facilities have properly treated this 50 cents reduction before the facility calculates its reimbursable bad debts or files for an exception request. (See §§300 and 2714.)

   2.   Allowable Compensation for Physician Owners and Medical Directors.-- Compensation, including fringe benefits, paid to a physician owner or medical director may not exceed the reasonable compensation equivalent (RCE) limits currently in effect for a specialty of internal medicine for a metropolitan area of greater than one million people. See §2182 for a description of the RCE limits and §2182.6 for the current salary limit for a specialty of internal medicine  The physician's salary reported as a Medicare allowable cost for administrative services may not exceed the RCE limit. Furthermore, the facility must adjust the RCE limit by the time spent by the physician as owner or medical director performing administrative services for the facility. Based on Medicare program statistics, the median amount of time spent by  physicians in ESRD facilities on administrative duties is 25 percent. If a facility reports that a physician spends more than 25 percent of his or her time performing administrative type services, the facility must document its claim. If no documentation is furnished and the facility is reporting physicians' time in excess of 25 percent, the intermediary limits the physician's  compensation to the lower of the amount claimed or 25 percent of the RCE limit in effect. If the physician as owner or medical director furnishes services to more than one facility, his or her total time may not exceed 25 percent unless the facility has documentation to support its claim

A renal facility may adjust the 25 percent limit to reflect special facts and circumstances, e.g., a medical director may spend more time at a renal facility that furnishes a larger number of treatments and other medical services than most renal facilities. If a renal facility claims a higher percentage of time, it must be able to document the medical director's actual time spent performing administrative duties.

      3.     <u>Allowable Compensation for Owners, Administrators, and Assistant Administrators</u>.-- Reasonable compensation, including fringe benefits, paid to owners, administrators, and assistant administrators is an allowable cost. (See §904.) In most instances, compensation paid to these individuals may not exceed $90,000. When these individuals spend less than 100 percent of their time performing services, adjust the $90,000 to reflect the actual time spent at the facility. If an individual provides services to more than one renal facility, the individual's time must be prorated among the different entities and may not exceed 100 percent. In certain circumstances, a renal facility could claim more than the $90,000 limit, e.g., it may be reasonable for a renal facility furnishing a large volume of dialysis treatments and other medical services to pay an individual in excess of $90,000. In these circumstances, an intermediary may survey other renal facilities to determine if the higher amount is reasonable.

      4.     <u>Depreciation</u>--An appropriate allowance for depreciation on buildings and equipment is an allowable cost. Payment for services includes depreciation on all depreciable type assets that are used to provide covered services to beneficiaries. (See §104.)

      5.     <u>Start-up and/or Organizational Costs</u>.--Start-up and organizational costs are allowable costs under the program. The start-up and organizational costs incurred must be amortized over an appropriate period of time. (See §2132.)

      6.     <u>Interns and Residents</u>.--Reasonable costs for an approved intern and resident teaching program, if comparable to the costs of other similar facilities that have educational programs, are reimbursable to the hospital under the program. (See §404.)

      7.     <u>Nursing School</u>.--An approved nursing education program must be operated by a provider (or jointly by a group of providers) for students of the provider(s) for Medicare to recognize the costs of the program as allowable costs of the provider(s). (See §404.)

      8.     <u>Medical Records</u>.--The reasonable cost of medical records is reimbursable under the program.

      9.     <u>Cost to Related Organizations</u>.--This cost represents the cost applicable to services, facilities, and supplies furnished to the facilities by organizations related to the facility by common ownership or control and is included in the allowable cost of the facility at the cost to the related organization. (See §1005.)

      10.    <u>Home Office Costs</u>.--These costs directly related to those services performed for individual facilities which relate to patient care plus an appropriate share of indirect costs (overhead, rent, administrative salaries, etc.) are allowable to the extent they are reasonable. (See §2150.)

11. Prudent Buyer.--Facilities are to utilize the prudent buyer concept by refusing to pay more than the going price for an item or service. This is especially so when the buyer is an institution or organization which makes bulk purchases and can, therefore, often obtain discounts because of the size of its purchases. (See §2103.)

12. Return on Equity Capital.--Proprietary facilities are not to include return on equity capital in their reported total costs. Since the purpose of the rate is to give facilities an incentive to reduce costs to realize a profit from the rate, reimbursement of equity capital is inappropriate. (See §1200.)

13. Dietary.--Facilities are not to include the cost of meals served to patients in the outpatient renal department in their reported total costs. However, the reasonable cost of dieticians' salaries is reimbursable under the program.

D. Reasonableness of Cost and Comparison to Peer Group.--The intermediary reviews and determines the reasonableness of each component cost of outpatient maintenance dialysis (infacility and home patients) in lieu of lump sum costs. The intermediary compares the aberrant costs to the costs of the peer group of ESRD facilities in the intermediary's geographical area. All significant differences from the peer group must be explained. The intermediary must submit peer comparisons with each exception request sent to HCFA. If there are only a few facilities in the intermediary's geographical area and the intermediary has previously submitted a peer group of all its facilities, the intermediary submits a copy of the workpapers previously submitted with any other subsequently filed exception requests. Peer group comparisons are updated for each exception window. The intermediary must also submit a peer review with an isolated essential facility (IEF) exception request. For example, if an independent facility files for an exception as an IEF, then the intermediary compares it to other independent facilities that it services.

In addition to the peer comparison submitted by the intermediary, HCFA uses national data and general program statistics in evaluating the reasonableness of a facility's component costs shown in its exception request. HCFA's median cost per treatment data is as follows:

| Cost Component | Amount |
|---|---|
| Salaries | $40 |
| Supplies | $33 |
| Overhead excluding Employee Benefits | $47 |
| Overhead including Employee Benefits | $54 |
| Employee Benefits | $ 7 |
| Laboratory | $ 3 |

E. Cost Report Review.--The intermediary performs a limited review of the cost reports prior to submitting to HCFA.

1. The intermediary reviews all the cost reporting forms and information submitted in accordance with HCFA Pub. 15-II to ensure that all the applicable items have been properly completed. All cost reporting forms must be completed. Those items not applicable are submitted and annotated as N/A (not applicable).

714

2.    The intermediary identifies changes in the cost per treatment, lists the requested cost per treatment by modality (i.e., hemodialysis, peritoneal dialysis, and home program), and compares this data with the cost per treatment in the most current cost report. Then, the intermediary determines whether the facility has adequately explained any variances in its narrative documentation as required by §2721E.

3.    The intermediary performs a clerical review by cross footing cost item columns.

F.    Submission of Documentation.--The intermediary submits the exception request, a preliminary recommendation, including appropriate workpapers and the reason for the decision, and the cost report and supportive documentation to the following address:

> Health Care Financing Administration
> Center for Health Plans and Providers
> Chronic Care Purchasing Policy Group
> Division of Chronic Care Management
> 7500 Security Boulevard
> Baltimore, MD  21244

To provide that all filings by the provider are handled timely by the intermediary, the intermediary instructs the provider to:

o    Mail all exceptions separately from any other material, e.g., Medicare cost reports that are not related to exception requests; and

o    Use specially marked envelopes to forward the exception to the intermediary.

2724.    HCFA CENTRAL OFFICE RESPONSIBILITIES

Upon receipt of the exception request information from the intermediary, HCFA:

o    Reviews all the information submitted;

o    Prepares a decision based on the documentation submitted and advises the intermediary of the decision or the status of HCFA's review; and

o    Notifies the intermediary of any exceptions to the facility's rate. Intermediary pays 80 percent of the payment rate that HCFA established. The beneficiaries are liable for the remaining 20 percent of the payment rate. HCFA reimburses each facility its allowable Medicare bad debts up to the facility's costs as determined under Medicare principles of reimbursement in a lump sum at the end of the facility's cost reporting period. Cost reporting forms have been designed to compute the facility's bad debt payment.

# Program Memorandum
# Intermediaries

**Department of Health and Human Services (DHHS)**

**HEALTH CARE FINANCING ADMINISTRATION (HCFA)**

| Transmittal  A-99-59 | Date:  DECEMBER 1999 |
|---|---|

CHANGE REQUEST 1061

SUBJECT:  New Composite Payment Rates Effective January 1, 2000, and Reopening of the Exception Process Under the End Stage Renal Disease (ESRD) Composite Rate System

## I. NEW COMPOSITE PAYMENT RATES

Section 222 of the Medicare, Medicaid, and SCHIP Balanced Budget Refinement Act of 1999 mandates that the current composite payment rates be increased by 1.2 percent effective for dialysis treatments furnished on or after January 1, 2000. Since the law mandates a 1.2 percent increase, the payment ceiling noted in the Provider Reimbursement Manual (PRM), Part I, §2705, increases from $139.00 to $140.67. Do not pay a renal facility more than $140.67, unless it has an approved exception payment rate.

Table I (Attachment 1) lists the new composite payment rates for renal facilities in urban areas. Table II (Attachment 2) lists the new payment rates for renal facilities in rural areas. These payment rates remain in effect until new payment rates are published. Also, §222 of this Act mandates that for calendar year 2001, composite payment rates in effect as of January 1, 2000 be increased by 1.2 percent effective January 1, 2001. A separate Program Memorandum (PM) will be issued at the end of calendar year 2000, explaining that the rates established by this PM will expire on December 31, 2000. This separate PM will also include the rate changes effective for services furnished on or after January 1, 2001.

## II. NEW EXCEPTION CYCLE

As a result of the increase in the composite payment rates, a new exception cycle, as defined in 42 CFR 413.180, commences on March 1, 2000. With the establishment of new payment rates and subsequent reopening of an exceptions window, we generally terminate all currently approved exception rates as of the close of business on the date prior to the effective date of a new exception cycle. However, in accordance with the criteria specified at 42 CFR 413.180(e), facilities may elect to retain their previously approved exception rate. If a facility makes this election, it must file its written request with its fiscal intermediary during the 30-day period before the opening of an exception cycle (i.e., 30 days before March 1, 2000). Requests must be received by no later than your close of business on February 29, 2000. Requests received after that date are considered untimely and must be denied. The facility's request must specify that the conditions under which the previous exception was granted have not changed and the request must be approved by the facility's intermediary. Currently approved exception rates for all other facilities will expire February 29, 2000.

Renal facilities have 180 days from March 1, 2000, to submit a valid exception request. Composite payment rate exception requests received by you after August 28, 2000, will be considered untimely and must be denied. Please note that the official 180-day period ends on August 27, 2000, but since this date falls on a Sunday, we have extended the deadline to Monday, August 28, 2000. Any renal facility that has excess costs attributable to an exception criterion may request an exception to its payment rate in accordance with the procedures in 42 CFR 413.180 and the PRM, Part I, Chapter 27. However, if the facility fails to adequately justify its exception request in accordance with the regulations or program instructions, its exception request will be denied.

**HCFA-Pub. 60A**

2

## III. **INTERMEDIARY INSTRUCTIONS**

Provide written notification to **each** renal facility you service of its new composite payment rate. This notification should be issued as soon as possible, but no later than 30 days before the opening of the new exception cycle on March 1, 2000. (See §2704 of the PRM, Part I.) Thus, you must issue this notification before January 31, 2000. For facilities that do not currently have approved exception rates, the new composite rates are effective January 1, 2000. For facilities that have approved exceptions, this notice must state that all currently approved exception rates expire February 29, 2000 and the new composite rate becomes effective March 1, 2000. In order to be eligible to receive a payment rate higher than the composite payment rate, those renal facilities with excess costs attributable to an exception criterion must file a request for exception to its composite payment rate (with all required documentation) no later than August 28, 2000, during your regular business hours.

Also notify renal facilities of their option to elect to retain their previously approved exception rate. In order for this request to be considered timely, it must be filed with you before the opening of the new exception cycle on March 1, 2000. If the facility does not continue to meet the exception criteria, the intermediary will notify the facility that, effective with the opening of the new exception cycle, the currently approved exception rate will expire and the new composite rate will go into effect. If this facility still believes it is entitled to an exception during this exception cycle, it can file a complete exception request during the remainder of the 180-day cycle.

Please send copies of the written notifications to:

> Health Care Financing Administration
> Center for Health Plans and Providers
> Chronic Care Purchasing Policy Group
> Division of Chronic Care Management
> C5-05-27
> 7500 Security Boulevard
> Baltimore, Maryland 21244-1850

Delivery of exception requests must be accomplished through a method which documents the date of receipt. A postmark or other similar date does not serve as documentation of the date of receipt. HCFA will deny any request for exception which is not received by your close of business on February 29, 2000 for retention requests, and August 28, 2000 for regular requests. Neither HCFA nor you may extend either of these filing deadlines.

If you return a facility's regular exception request (not a retention request) because it is incomplete, the facility must resubmit a complete request by August 28, 2000. (See §2720.2 of the PRM, Part I.)

Since the last exception cycle was some time ago, we are reminding you of your responsibilities for processing and controlling ESRD exception requests as outlined in §2723 of the PRM, Part I. These responsibilities include:

- Reviewing for completeness and accuracy the exception request, the cost report, the facility's projected costs, and any other documentation submitted by the facility to support its exception;

- Maintaining a composite rate exception log. Because of the statutory deadline that an exception request is deemed approved unless we disapprove it within 60 working days (15 working days for the intermediary and 45 working days for HCFA) , it is essential that all exceptions be processed timely. In order to track the start of the 60 working day requirement, intermediaries must call HCFA central office (CO) the day a composite rate exception request is received. The telephone number in CO is (410) 786-4533, and the following information should be provided: (a) Name and provider number of the renal facility; (b) The date the exception is received; (c) The type of exception; (d) The amount requested; and (e) The phone number and contact person at the intermediary.

756.2

3

- Developing the content of the letter used to return the exception request to the facility; and

- Determining whether the facility's costs are reasonable and allowable.

NOTE:  **Pay all claims for dialysis services rendered on or after January 1, 2000 using the composite rates listed in Tables I and II, unless the facility has a currently approved exception rate.**

**Pay all claims for dialysis services rendered on or after March 1, 2000 based on the January 1, 2000 composite payment rates unless you approve the facility's request to retain its current exceptions amount.**

*The effective date for this PM is January 1, 2000.*

*The implementation date for this PM is January 17, 2000 in conjunction with the January 1, 2000 payment updates.*

**These instructions should be implemented within your current operating budget.**

**This PM may be discarded after January 1, 2001.**

**If you have any questions, contact Michael Powell on (410) 786-4557.**

Attachments:

Table I:   Composite Payment Rates Effective January 1, 2000 for Urban Renal Facilities

Table II:  Composite Payment Rates Effective January 1, 2000 for Rural Renal Facilities



**CMS/**
CENTERS for MEDICARE & MEDICAID SERVICES

| PART A INTERMEDIARY | NATIONAL FQHC INTERMEDIARY | MEDICARE |
|---|---|---|
| REGIONAL HOME HEALTH INTERMEDIARY | | PHONE 805-367-0800 |

October 4, 2005

Suzanne Cochran, Chairperson
Provider Reimbursement Review Board
2520 Lord Baltimore Drive, Suite L
Baltimore, MD 21244-2670

Re:    SUBPOENA DUCES TECUM
       Provider Name: Loma Linda University Medical Ctr.
       Provider No. 05-0327
       FYE: 12/31/00
       PRRB Case No.:01-2871 and 01-2871

**RECEIVED**

OCT 1 1 2005

PROVIDER REIMBURSEMENT
REVIEW BOARD

Dear Ms. Cochran,

In response to your SUBPOENA DUCES TECUM dated September 14, 2004 (attached). We searched our records but unfortunately were not able to find the letter dated November 15, 2005 from CMS as you have ordered per Exhibit A of the SUBPOENA DUCES TECUM.

If you have any questions, please call Alex O. Cardero at (805) 367-0671.

Sincerely,

George R. Garcia
Supervisor, Appeals
Provider Audit Department

Cc:   Robert Trainor, UGS
      Wilson Leong, BCBSA
      Bernard Talbert, BCBSA
      Jack Ahern, J. Ahern & Associates

UNITED GOVERNMENT SERVICES, LLC.

P.O. Box 9150, Oxnard, California 93031-9150 • Corporate Headquarters located in Milwaukee, WI
A CMS CONTRACTED INTERMEDIARY

**The Provider Reimbursement Review Board**

**SUBPOENA DUCES TECUM**

| | | |
|---|---|---|
| Provider-Loma Linda University Kidney Center | * | |
| | * | |
| Provider No: 05-0327 | * | PRRB Case No. 01-2872 |
| | * | |
| v. | * | FYE 12/31/00 |
| | * | |
| | * | |
| Intermediary- United Government Services, | * | |
| LLC-CA/ Blue Cross &Blue Shield Association | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TO: George Garcia
    United Government Services, LLC-CA
    Provider Audit/ Reimbursement Appeals
    Oxnard, CA 93031

1. You are hereby ordered by the Provider Reimbursement Review Board, on own
   motion, to produce and permit inspection and copying of the documents described
   on Exhibit "A" at the offices of the Provider Reimbursement Review Board 2520
   Lord Baltimore Drive, Suite L, Baltimore, MD 21244-2670 on or before October
   31, 2005.

2. If you fail to comply as requested by this subpoena, you may be subject to the
   provisions of 42 U.S.C. §405(e) which deals with contempt.

SO ORDERED by the Provider Reimbursement Review Board pursuant to the authority
set forth in 42 U.S.C. § 1395 oo(e) and 42 C.F.R. § 405.1857.

Suzanne Cochran, Esq.
Chairperson

Date:
cc: Bernard Talbert, Wilson Leong, BCBSA
    Jack Ahern, Provider Representative

Attachments: Exhibit A

RECEIVED
PADCR2C

SEP 1 9 2005

P/M  9·19·05

**Exhibit "A"** (PRRB Case No. 01-2872)

The envelope which contained the letter (<u>see</u> Provider Exhibit 2) dated November 15, 2000 from Joseph Logue, Health Insurance Specialist, Centers for Medicare and Medicaid Services (formerly the "Health Care Financing Administration") to Michael S. Foxx, Manager, United Government Services, and any and all other evidence in your possession which substantiates the exact date such letter was mailed from the Centers for Medicare and Medicaid Services to United Government Services.

## CERTIFICATE OF SERVICE

I hereby certify that the attached subpoena has been sent to the person named below by certified mail:

George Garcia
United Government Services, LLC-CA
Provider Audit/ Reimbursement Appeals
Oxnard, CA 93031

Suzanne Cochran, Esq.
Chairperson

Date: **14 SEP 2005**

400
64

## The Provider Reimbursement Review Board

### SUBPOENA DUCES TECUM

| | | |
|---|---|---|
| Provider-Loma Linda University Medical Center | * | |
| | * | |
| Provider No: 05-0327 | * | PRRB Case No. 01-2871 |
| | * | |
| v. | * | FYE 12/31/00 |
| | * | |
| | * | |
| Intermediary- United Government Services, | * | |
| LLC-CA/ Blue Cross &Blue Shield Association | * | |
| | * | |

*****************************************************************

TO: George Garcia
    United Government Services, LLC-CA
    Provider Audit/ Reimbursement Appeals
    Oxnard, CA 93031

1.  You are hereby ordered by the Provider Reimbursement Review Board, on own motion, to produce and permit inspection and copying of the documents described on Exhibit "A" at the offices of the Provider Reimbursement Review Board 2520 Lord Baltimore Drive, Suite L, Baltimore, MD 21244-2670 on or before October 31, 2005.

2.  If you fail to comply as requested by this subpoena, you may be subject to the provisions of 42 U.S.C. §405(e) which deals with contempt.

SO ORDERED by the Provider Reimbursement Review Board pursuant to the authority set forth in 42 U.S.C. § 1395 oo(e) and 42 C.F.R. § 405.1857.

Suzanne Cochran, Esq.
Chairperson

Date:
cc:  Bernard Talbert, Wilson Leong, BCBSA
     Jack Ahern, Provider Representative

Attachments: Exhibit A

RECEIVED
PADCR2C

SEP 1 9 2005

P/M 9·19·05          AP

NSPS

794

**Exhibit "A"** (PRRB Case No. 01-2871)

The envelope which contained the letter (see Provider Exhibit 2) dated November 15, 2000 from Joseph Logue, Health Insurance Specialist, Centers for Medicare and Medicaid Services (formerly the "Health Care Financing Administration") to Brenda Merriweather, Manager, United Government Services, and any and all other evidence in your possession which substantiates the exact date such letter was mailed from the Centers for Medicare and Medicaid Services to United Government Services.

## CERTIFICATE OF SERVICE

I hereby certify that the attached subpoena has been sent to the person named below by certified mail:

George Garcia
United Government Services, LLC-CA
Provider Audit/ Reimbursement Appeals
Oxnard, CA 93031

Suzanne Cochran, Esq.
Chairperson

Date:
14 SEP 2005

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
·Baltimore MD 21244-2670
Phone: 410-786-2671          FAX: 410-786-5298

Suzanne Cochran, Esq., Chairperson
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Anjali Mulchandani-West

Refer to.

01-2872
CERTIFIED MAIL

'14 SEP 2005

Jack Ahern and Associates
841 South Racine Avenue
Suite C
Chicago, IL 60607

Bernard M. Talbert, Esq.
Blue Cross and Blue Shield Association
225 North Michigan Avenue
Chicago, IL 60601-7680

Re: Loma Linda University Kidney Center
     Pro. No. 05-2550
     FYE: 12/31/2000
     PRRB Case No: 01-2872

Dear Mr. Ahern and Mr. Talbert:

Enclosed is a copy of the Provider's Reimbursement Review Board's subpoena issued on
its own motion for this case.  The subpoena has been sent via certified mail to
George Garcia in accordance with 42 U.S.C. §§405(d) and 1395oo(e).

FOR THE BOARD

Suzanne Cochran, Esq.
Chairperson

cc:  Wilson C. Leong , BCBSA

797

**The Provider Reimbursement Review Board**

**SUBPOENA DUCES TECUM**

| | | |
|---|---|---|
| Provider-Loma Linda University Kidney Center | * | |
| | * | |
| Provider No: 05-0327 | * | PRRB Case No. 01-2872 |
| | * | |
| v. | * | FYE 12/31/00 |
| | * | |
| | * | |
| Intermediary- United Government Services, | * | |
| LLC-CA/ Blue Cross &Blue Shield Association | * | |
| | * | |

*****************************************************************

TO: George Garcia
    United Government Services, LLC-CA
    Provider Audit/ Reimbursement Appeals
    Oxnard, CA 93031

1. You are hereby ordered by the Provider Reimbursement Review Board, on own motion, to produce and permit inspection and copying of the documents described on Exhibit "A" at the offices of the Provider Reimbursement Review Board 2520 Lord Baltimore Drive, Suite L, Baltimore, MD 21244-2670 on or before October 31, 2005.

2. If you fail to comply as requested by this subpoena, you may be subject to the provisions of 42 U.S.C. §405(e) which deals with contempt.

SO ORDERED by the Provider Reimbursement Review Board pursuant to the authority set forth in 42 U.S.C. § 1395 oo(e) and 42 C.F.R. § 405.1857.

Suzanne Cochran, Esq.
Chairperson

Date:
cc: Bernard Talbert, Wilson Leong, BCBSA
    Jack Ahern, Provider Representative

Attachments: Exhibit A

**Exhibit "A"** (PRRB Case No. 01-2872)

The envelope which contained the letter (<u>see</u> Provider Exhibit 2) dated November 15, 2000 from Joseph Logue, Health Insurance Specialist, Centers for Medicare and Medicaid Services (formerly the "Health Care Financing Administration") to Michael S. Foxx, Manager, United Government Services, and any and all other evidence in your possession which substantiates the exact date such letter was mailed from the Centers for Medicare and Medicaid Services to United Government Services.

## CERTIFICATE OF SERVICE

I hereby certify that the attached subpoena has been sent to the person named below by certified mail:

George Garcia
United Government Services, LLC-CA
Provider Audit/ Reimbursement Appeals
Oxnard, CA 93031

Suzanne Cochran, Esq.
Chairperson

Date: **14 SEP 2005**

C1-2872
SNA
5|10|01

# J. Ahern & Associates

841 South Racine Ave.          Phone: (312) 997-2177
Suite C                        Fax:   (312) 997-2177
Chicago, IL 60607              Email: mjahern@gsbpop.uchicago.edu
                                     JAhernAssociates@aol.com

April 12, 2001

TO:          Chairman
             Provider Reimbursement Review Board
             7500 Security Boulevard
             Room C1-09-13                        **RECEIVED**
             Baltimore, MD   21244-1850

                                                  APR 17 2001
FROM:        Jack Ahern
             841 "C" South Racine Avenue          **PROVIDER REIMBURSEMENT**
             Chicago, Illinois 60607                    **REVIEW BOARD**

RE:          Renal Dialysis Exception Request Denial

             Provider:                **Loma Linda University Kidney Center**
             Provider Number:          **05-2550**

PERTINENT DATES:   Exception Request Submission:    August 28, 2000
                   Denial Letter from Intermediary: December 11, 2000
                   Request to PRRB for Appeal:      April 12, 2001

Dear Mr. Chairman:

In accordance with 42 CFR 405.1835 and 405.1890, provider number **05-2550, Loma Linda University Kidney Center (LLUKC)**, requests a Provider Reimbursement Review Board (PRRB) hearing for the recent denial of a renal dialysis exception request.

Fiscal Years in Question

The Exception Request is for the time period beginning, **August 28, 2000** and continuing until such time as the submission of a new complete renal dialysis Exception Request would be required by the Health Care Financing Administration (HCFA) in order to maintain any increase granted.

Amount in Controversy

The amount in controversy will vary directly with the duration of the exception which depends on when HCFA ultimately cancels those exceptions to the composite rate payment granted in the exception request window closing August 28, 2000. However, with LLUKC's treatment volume even a single year's increased reimbursement at the requested rate would have resulted in more than $ 10,000 of additional revenue for **LLUKC**.

Sincerely,

Jack Ahern
Jack Ahern
President

Cc: Brenda Merriweather, United Government Services

8'''4