# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### CONSOLIDATED NO'S 06CV1926 (TFH), 06CV1927 (TFH)
_____

## LOMA LINDA UNIVERSITY KIDNEY CENTER

**Plaintiff**

v.

## MICHAEL O. LEAVITT, SECRETARY OF HEALTH AND HUMAN SERVICES

**Defendant**
_____

## JOINT APPENDIX
## LOMA LINDA UNIVERSITY MEDICAL CENTER
## CASE NO. 06CV1927
_____

**JEFFREY A. LOVITKY**

Attorney at Law
1776 K. Street, N.W.,
Ste. 200
Washington, DC 20006
T: (202) 429-3393
F: (202) 318-4013

IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LOMA LINDA UNIVERSITY | ) | |
| MEDICAL CENTER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | Case No. 1:06CV01927 |
| | ) | |
| | ) | |
| MICHAEL O. LEAVITT, SECRETARY | ) | |
| DEPARTMENT OF HEALTH AND | ) | |
| HUMAN SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |

C E R T I F I C A T I O N

I, Jacqueline R. Vaughn, Attorney Advisor, Centers for Medicare and Medicaid Services, Department of Health and Human Services, under authority delegated by the Secretary, certify that the documents attached constitute a true and accurate transcript of the official file as furnished by the Provider Reimbursement Review Board (PRRB). These documents are the record of the PRRB proceedings and decision and the Administrator's review of that decision concerning monies claimed by Loma Linda University Medical Center for cost reporting period ending August 30, 2000, under Title XVIII of the Social Security Act, as amended.

Date: January 21, 2007

Jacqueline R. Vaughn

Loma Linda University Medical Center
PRRB Decision No. 2006-D39

## COURT TRANSCRIPTS INDEX

| | Page No(s) |
|---|---|
| Notice, dated September 15, 2006, of Administrator's Decision | 1 |
| Administrator's Decision, dated September 12, 2006 | 2-8 |
| Provider's Comments, dated August 22, 2006 | 9-14 |
| Notices, dated August 17, 2006 and August 9, 2006 regarding Review by the Administrator | 15-18 |
| Comments from Center for Medicare Management, dated August 7, 2006 | 19-21 |
| Notices, dated July 27, 2006 and August 11,2006 of PRRB Decision | 22-24 |
| PRRB Decision No. 2006-D39, dated July 27, 2006 | 25-32 |
| Provider's Post Hearing Brief, with Exhibits | 33-98 |
| Transcripts of Oral Hearing, held June 10, 2004 | 99-160 |
| Provider's Witness List | 161-163 |
| Provider's Position Paper with Exhibits | 164-794 |
| Intermediary's Position Paper with Exhibits | 795-967 |
| Notice of Hearing, with Acknowledgements | 968-972 |
| Correspondence regarding Subpoenas | 973-983 |
| Correspondence regarding Representation | 984 |
| Correspondence regarding Appeal | 985-986 |
| Correspondence regarding Issues | 987-988 |
| Notice, dated December 22, 2003, regarding Intermediary's Response to request for Mediation | 989 |

Loma Linda University Medical Center
PRRB Decision No. 2006-D39

## COURT TRANSCRIPTS INDEX

|  | Page No(s) |
|---|---|
| Correspondence regarding Mediation | 990-992 |
| Notice, dated September 18, 2003, Provider's request for Mediation | 993 |
| Correspondence regarding Request for Documents and Interrogatories | 994-1020 |
| PRRB's Acknowledgement and Instructions | 1021-1022 |
| Provider's Requests, for Hearing, with Notices of Program Reimbursement, and Supporting Documents | 1023-1035 |

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043



**CENTERS for MEDICARE & MEDICAID SERVICES**

**Office of the Attorney Advisor**

SEP 1 5 2006

**VIA CERTIFIED MAIL**

Mr. Jack Ahern
Ahern & Associates
841 C South Racine Avenue
Chicago, IL 60607

Re: <u>Loma Linda University Medical Center</u>, PRRB Decision No. 2006-D39

Dear Mr. Ahern:

Enclosed is a copy of the Administrator's decision in the above case reversing the decision of the

Provider Reimbursement Review Board. This constitutes the final administrative decision of the

Secretary of the Health and Human Services. Pursuant to Section 1878(f) of the Social Security

Act and 42 CFR 405.1877, the Provider may obtain judicial review by filing a civil action within

60 days of receipt of this decision.

Sincerely yours,

Jacqueline R. Vaughn
Attorney Advisor

Enclosure

cc: Bernard M. Talbert, Esquire, Intermediary's Representative

# CENTERS FOR MEDICARE AND MEDICAID SERVICES

## *Decision of the Administrator*

| | |
|---|---|
| **In the case of:** | **Claim for:** |
| **Loma Linda University Medical Center** **Loma Linda, California** | **Provider Cost Reimbursement Determination of Reasonable Costs for ESRD Window End Date - August 30, 2000** |
| **Provider** | |
| **vs.** | |
| **Blue Cross Blue Shield Association/ United Government Services, LLC - CA** | **Review of:** |
| **Intermediary** | **PRRB Dec. No. 2006-D39 Dated: July 27, 2006** |

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the decision of the Provider Reimbursement Review Board (Board). The review is during the 60-day period in Section 1878(f)(1) of the Social Security Act (Act), as amended (42 USC 1395oo(f)). The Provider and Center for Medicare Management (CMM) submitted comments in this case. Accordingly, this case is now before the Administrator for final administrative review.

## BACKGROUND

End Stage Renal Disease (ESRD) facilities are reimbursed for outpatient dialysis services under the composite payment rate[1] system. In the instant case, the ESRD window end date was August 30, 2000. The parties stipulated to the following facts. The Provider, an outpatient renal dialysis facility, filed a composite rate exception

---

[1] The term, "composite payment rate," and the term used in the regulations, "prospective payment rate" refer to the same payments. The prospective payment system (PPS) establishes a per-dialysis treatment composite payment rate, which consists of a labor portion and a non-labor portion. There are two base composite rates: one for hospital based ESRD facilities, and the other for independent facilities. Composite rates, including exception payment rates, remain in effect until CMS announces new payment rates. See 42 CFR.413.170(b) and §2702 *et seq.* of the Provider Reimbursement Manual (PRM).

request with its Intermediary, by letter dated August 28, 2000, seeking additional payment for outpatient dialysis services.[2] The Provider sought a payment rate of $381.10 per treatment, which is the total of the base composite rate ($138.08) plus an additional exception amount of $243.01 per treatment.[3] The Intermediary forwarded the Provider's composite rate exception request and its recommendation to CMS. By letter dated on November 15, 2000, CMS notified the Intermediary of its decision that the Provider should continue to be paid its composite rate of $138.08 for outpatient maintenance dialysis.[4] The Provider was not notified in writing of the status of the composite rate exception request until November 29, 2000, which was 67 working days after it was filed. On December 11, 2000, the Intermediary issued an exception request denial to the Provider[5] enclosing the CMS' November 15, 2000 letter.[6]

## ISSUE AND BOARD DECISION

The issue before the Administrator is whether the denial of the Provider's request for an exception to the end stage renal disease (ERSD) composite rate by the Centers for Medicare and Medicaid Services (CMS) was proper, or whether it should be deemed to have been approved pursuant to §1881(b)(7) of the Act.

The Board majority found that pursuant to §1881(b)(7) of the Act [42 U.S.C. §1395rr(b)(7) and 42 C.F.R. §413.180(h)], the exception request was automatically deemed approved as CMS' determination was sent to the Provider after the 60 working day deadline. The Board majority concluded, as noted in prior decisions,[7] since CMS strictly enforces the time limits regarding the submission of composite rate exceptions requests, CMS should also strictly self-enforce purported notice requirements when rendering a determination. The Board majority further found that, once an intermediary receives a provider's timely filed exception request, the burden shifts to CMS to render a decision within the 60 working day window, and to give the provider actual notice of its determination within that same 60 working day window. According to the Board majority, the statutory and regulatory time limit

---

[2] See Provider Exhibit 11, Intermediary Ex. 1.

[3] Provider Ex. 1, p.7 (Exception Request)

[4] See Intermediary Ex. 1, Provider Ex. 2. The Board notes that on September 19, 2005, the Board issued a subpoena *duces tecum* to the Intermediary requesting the envelope containing CMS' November 15, 2000 letter as well as any and all other evidence in the Intermediary's possession which substantiates the exact date such letter was mailed from CMS to the Intermediary. On October 4, 2005, the Intermediary responded that it was unable to find the November 15, 2000 letter.

[5] Provider Ex. 3.

[6] Provider Ex. 2.

[7] See e.g. Mount Clemens General Hospital, PRRB Dec. No. 2002-D26.

for disapproval should be interpreted as including all essential elements of the entire disapproval process, including transmission of the notice.

The Board majority found that CMS did not comply with the statute when it rendered its determination within the 60 working day window, but failed to issue actual notice until after the 60-day limit. Thus, as a result of the failure of CMS to notify the Provider of the determination within 60 working days as required by §1881(b)(7) the Provider's exception request is deemed approved.

Two members of the Board dissented on the grounds that the statute, regulations and program guidance required only that CMS render its determination not later than 60 days after the exception request is filed. In the instant case, that action did occur. The Dissent argued that CMS made its decision to deny Loma Linda's exception request within the 60 working day time limit specified in the statute, regulation, and manual. The Dissent acknowledged that in a previous case involving the 60-day limit issue (Mount Clemens General Hospital, PRRB Dec. No. 2002-D26), the Provider did not receive notice of the disapproval until 14 months after the end of the 60 day working period, and the Board found that such inordinate delay may seriously prejudiced that provider's rights, including the option to drop out of the program. The Dissent maintained, however, that in the present case the Provider did not submit its exception request until the final day of the opening "window," and prior to receipt of CMS' denial, the Provider made no inquiry of CMS regarding the decision. The Dissent argued that since CMS' denial was communicated to the Provider within seven working days after the end of the 60 working day period, no claim of prejudice of Provider's rights can reasonably be made. The Dissent argued that CMS' November 15, 2000 disapproval of Provider's exception request satisfied the regulatory requirements in that it was made within 60 working days after the request was filed with Provider's Intermediary, and was therefore timely.

## SUMMARY OF COMMENTS

CMM commented, requesting reversal of the Board's decision. CMM argued that the applicable statute, regulation and manual provision require that "an exception request is deemed approved unless it is disapproved within 60 working days after it is filed with its intermediary." CMM argued that CMS made its decision to deny the Provider's exception request within the 60 working day time limit specified in the statute, regulation and manual. CMM noted that prior decisions of the Administrator have upheld this position.[8] Thus, CMM concluded that CMS' November 15, 2000 disapproval of the Provider's exception request satisfied the regulatory requirements

---

[8] Tri-State Memorial Hospital, PRRB Dec. No. 2000-D25, rev'd Admr. May 11, 2000, and Charlotte Hungerford Hospital, PRRB Dec. No. 96-D64, rev'd Admr. Nov. 8, 1996.

in that it was made within 60 working days after the request was filed timely with the Provider's Intermediary.

The Provider argued that the Board's decision was consistent with Medicare law and due process notions of agency notice. The Provider asserted that the notice of denial was submitted to the Intermediary after the 60 day deadline had already expired, as the Provider received notice of CMS' denial 67 days after it was filed. The Provider asserted that prompt notification of the Intermediary was not made in the instant case, which differed substantially from the cases referenced by CMM.[9]

The Provider also claimed that pursuant to the record, the Intermediary was unable to find the November 15, 2000 letter which substantiates the exact date the denial notification letter was sent from CMS to the Intermediary. The Provider commented that a letter that is not in the record, and possibly not sent in a timely manner, cannot be the basis for satisfying the 60 day limit. The Provider contended that this case is similar to Board's Decision No. 2002-D26 (Mount Clemens General Hospital), which deemed that an ESRD exception request approved because notice of disapproval was not sent to the Provider within the 60 working day time period allowed for processing the exception, as mandated per §1881(b)(7) of the Social Security Act. The Board's decision to approve the Mt. Clemens exception was affirmed, on limited grounds, because the record did not clearly demonstrate that CMS disapproved a provider's request within the 60-day time limit.

The Provider also contended that in the instant case, CMS did not send its notification to the Intermediary until after the 60-day deadline expired. As such, even assuming *arguendo* that notification of the Provider is not subject to the 60-day time limit, the Provider argued that CMS has not satisfied its requirement to provide notification to the Intermediary within the 60 day period. The Provider claimed that the fact that the Intermediary is unable to produce a copy of the November 15 letter in response to the Board's subpoena raises substantial doubts as to when the letter was created. The Provider concluded its comments by requesting that the Administrator affirm the Board's decision to approve the Provider's exception request.

---

[9] Tri-State Memorial Hospital, PRRB Dec. No. 2000-D25, rev'd Admr. May 11, 2000, and Charlotte Hungerford Hospital, PRRB Dec. No. 96-D64, rev'd Admr. Nov. 8, 1996.

## DISCUSSION

The entire record furnished by the Board has been examined, including all correspondence, position papers, exhibits, and subsequent submissions. All comments timely received have been included in the record and considered.

In general, Medicare Part A reimburses approved providers of renal dialysis services on a prospective payment rate basis pursuant to §1881(b) of the Act, and 42 C.F.R. 413.170 *et seq.* However, providers may apply for exceptions to the prospective payment composite rate pursuant to §1881(b) of the Act, and the implementing regulations at §413.170.[10] The criteria for granting an exception is set forth at §413.170(g), which states that an exception request may be granted if the Provider demonstrates with "convincing objective evidence" that its per treatment costs are reasonable and allowable, and directly attributable to any of the listed criteria. The regulations at §413.170(f) establish that the burden falls upon the provider to demonstrate to the satisfaction of CMS that it has met the criteria for receiving an exception to the prospective payment rate.

In this case, however, the parties dispute not the merits of the denial of the Provider's exception request, but rather the interpretation of the pertinent statutory language governing the timing of CMS determination on composite rate exception requests. The determinative language is found at §1881(b)(7) of the Act, which states:

> [E]ach application for such exception shall be deemed to be approved <u>unless the Secretary disapproves it</u> not later than 60 working days after the date the application is filed. [Emphasis added.]

The Provider did not receive notice of the Board's decision until November 29, 2000. The Provider argues that, because it did not receive notice of CMS' decision within 60 working days after it filed the exception request, the language at §1881(b)(7) renders its request accepted in full as a "deemed approval." CMM argues that the statutory language requires that CMS' disapproval must be only rendered within the 60 days or the exception will be deemed approved.

The Administrator finds that the statute states that an exception request "shall be deemed to be approved unless the Secretary <u>disapproves</u> it not later than 60 working days after the date the application is filed." [Emphasis added] The statute does not state that the actual notice of the disapproval must be <u>received</u> by the provider

---

[10] See also §2720 of the PRM.

within 60 working days after the application is filed. The Administrator notes that the key word in §1881(b)(7) is "disapproves," which is defined in ordinary use as, "to refuse to approve; reject."[11]  The Administrator finds the plain language of the statute using the word "disapproves" requires that CMS render the disapproval of the ESRD exception request within the 60-working day statutory period. The statute does not require that the Provider receive the disapproval, or have notice of the disapproval, within that statutory time period. Thus, the Administrator finds the Board erred in holding that the exception request was deemed approved because the Provider did not receive notice of the disapproval within the 60-working day period.[12]

Thus, the Administrator finds that CMS' November 15, 2000 disapproval of Provider's exception request satisfied the statutory requirements in that it was made within 60 working days after the request was filed with Provider's Intermediary. Therefore, the Administrator finds the disapproval of the request was timely.

---

[11] See American Heritage Dictionary, 4th Ed. (Houghton Mifflin) (2000).

[12] In reference to the Provider's comments regarding a previous case involving the 60-day limit issue (Mount Clemens General Hospital, PRRB Dec. No. 2002-D26), the Administrator applied the word "disapproved" as above. The Administrator found, in that case, that the record did not show that CMS' disapproval was rendered within the statutory 60 day time frame.

## DECISION

The decision of the Board is reversed in accordance with the foregoing opinion.

THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF
THE SECRETARY OF HEALTH AND HUMAN SERVICES.

Date: 7/12/06    _Leslie V. Norwalk_ (signature)

                      Leslie V. Norwalk, Esq.
                      Deputy Administrator
                      Centers for Medicare & Medicaid Services

*Ahern & Associates*

841 C South Racine Ave. Phone: (312) 997-2177
Chicago, IL 60607 Fax: (312) 942-9578
 Email: AhernConsulting@aol.com

rec'd 08/23/2006

Sent Via Fax to: (410) 786 - 0043

Sent Via FedEx: Airbill Number 8464 3606 9204

Date: August 22, 2006

From: Jack Ahern

 Provider Representative

 Loma Linda University Medical Center

Re: Provider Reimbursement Review Board

 Decision No. 2006-D39

 Case No. 01-2871

 Decision Date: July 27, 2006

 Provider: Loma Linda University Medical Center

 Provider Number: 05-0327

To: Jacqueline R. Vaughn

 Attorney Advisor

The Provider respectfully requests that the Board decision be affirmed in the above referenced case.

In the CMS comment submitted to the Administrator, dated Aug 7, 2006, requesting the Board's decision be reversed, CMS does not contest that the applicable statute, regulation and manual provision require that "an exception request is deemed approved unless it is disapproved within 60 working days after it is filed with its intermediary." CMS also does not contest that the Provider received notice of CMS' denial 67 days after it was filed. Nor does CMS contest the PRRB's finding that notice of denial was submitted to the Intermediary after the 60 day deadline had already expired.

CMS asserts that in order to contest the tardiness of exception request disapproval, a claim of prejudice of the Provider's rights must reasonably be made. In essence, CMS contends that if the Provider is not financially or otherwise harmed by late notification, then the time limit for notification exceeds the 60-day limit, and may be extended indefinitely until that point at which the Provider is seriously damaged. However, as the Board concluded in this PRRB decision, 2006-D39, notification is an essential part of the process of exception request adjudication and without notification, the decision process is incomplete, and the decision itself is left unfinished. Moreover, nowhere in the applicable statute, regulation, and manual provisions is there a provision that notification can be delayed until serious damage is incurred by the Provider.

With regards to Administrator review, CMS references several similar cases in which the Administrator reversed PRRB decisions favorable to a provider. These were cases in which CMS failed to completely process an exception request within the 60-day limit. With regard to PRRB decision No. 2000 – D25, *Tri-State Memorial Hospital v. Blue Cross and Blue Shield Association,* the Administrator noted that "*The record included a file copy of the letter, clearly date stamped June 6, 1994 i.e. within 60 working days of the Intermediary's April 11, 1994 receipt of the provider's request.*" CMS also cited an earlier PRRB Case, No. 96-D64, *Charlotte Hungerford Hospital v. Blue Cross and Blue Shield Association / Blue Cross and Blue Shield of Connecticut,* in which the

Administrator's reversal is predicated on the assumption that the decision of the CMS Division of Chronic care was "communicated promptly," to the CMS Intermediary.

The facts of the Loma Linda University Medical Center case differ substantially from the above citations because prompt notification of the Intermediary was not made. CMS argued before the Board that the denial was transmitted to the intermediary before the 60 working day deadline expired. See PRRB Decision at page 4. However, the PRRB explicitly rejected this factual contention. Thus, the PRRB found as follows: *"The Board majority finds that pursuant to 42 U.S.C. 1395rr(b)(7) and 42 C.F.R. 413.180(h), the exception request was automatically deemed approved, as CMS' determination was sent to the Intermediary after the 60 day working deadline."* Moreover, CMS appears to have abandoned its prior contention that it made notification to the intermediary within the 60 day period, as that contention is not repeated in its request for review by the Administrator.

In fact, note 6, page 3 of the PRRB decision states that *"The Board notes that on September 19, 2005, the Board issued a subpoena duces tecum to the Intermediary requesting the envelope containing CMS' November 15, 2000 letter as well as any and all other evidence in the Intermediary's possession which substantiates the exact date such letter was mailed from CMS to the Intermediary. On October 4, 2005, the Intermediary responded that it was unable to find the November 15, 2005 letter."* Logically, a letter that is not in the record, ostensibly never existed, or possibly was not sent in a timely manner, cannot be the basis for satisfying the 60-day limit.

The Provider also wishes to draw the Administrator's attention to the more recent Administrator decision to affirm a decision, favorable to a provider, on the 60-day limit issue. PRRB decision No. 2002-D26 (July 9, 2002), ***Mt. Clemens General Hospital v. Blue Cross and Blue Shield***, deemed that an End Stage Renal Disease exception request be deemed approved because notice of disapproval was not sent to the Provider within the 60 working day time period allowed for processing the exception, as mandated per *§1881(b)(7) of the Social Security Act.*

11

The Board's decision to approve the Mt. Clemens exception was affirmed, on limited grounds, by the CMS Administrator on September 6, 2002, because the record did not clearly demonstrate that CMS disapproved a provider's request within the 60-day time limit.   The background of the Mt. Clemens case is that the Provider was not notified in writing of the status of the composite rate exception request within the 60-day time limit. However, the parties agree that CMS's disapproval took place within the 60-day window.

As with the Loma Linda University Medical Center case, CMS requested that the Administrator reverse the Board's decision, claiming that §1881(b)(7) of the Act, requires that an exception request be deemed approved due to failure to meet the 60-day time limit,  if and only if, it is not disapproved within 60 working days of the filing date. CMS argued further that the provider notification of disapproval is not subject to the 60-day time limitation.

While concurring with CMS that notification is not subject to the 60-day time constraint, the Administrator noted that  "*an issue not addressed by the Board is whether CMS disapproved the ESRD exception request within the 60-working day period.*"  The Administrator's rationale for affirming the Board's decision to approve the Mt. Clemens exception request was founded in the facts of the case:   "*The Administrator finds that, applying the correct interpretation of the law to the record in this case, the record does not clearly demonstrate that the CMS disapproval was rendered within the 60-working day statutory timeframe because of the various clerical and administrative errors reflected by the documents. Accordingly, the Administrator finds that the Provider's ESRD exception request is deemed approved.*"  [emphasis added]

The Provider therefore respectfully requests that the Administrator likewise consider the facts of the Loma Linda University Medical Center case.   Per the Board's decision, CMS did not send its notification to the intermediary until after the 60 day deadline expired. As such, even assuming *arguendo* that notification of the Provider is not subject to the 60-day time limit, CMS has not satisfied its requirement to provide notification to the

Intermediary within the 60 day period. Indeed, the fact that the Intermediary is unable to produce a copy of the November 15 letter in response to the PRRB's subpoena raises substantial doubts as to when that letter was created.

Finally, CMS has not referenced any part of the record to support its August 7, 2006 claim that: "prior to receipt of CMS' denial, the Provider made no inquiry of CMS regarding the decision." In fact, there is no requirement that the Provider should, or must, contact CMS within the 60-day limit to obtain notification of a denial. Moreover, per the Board's findings, the Intermediary itself had no notice of a decision prior to the end of the 60-day period.

In closing, the Provider respectfully requests that considering the intent of the 60-day limit and the facts of this case, the Administrator affirm the Board's decision to approve the Provider's exception request.

Respectfully,

*Jack Ahern*

Jack Ahern

Provider Representative
841C S. Racine Ave
Chicago, IL 60607

13

## CERTIFICATE OF SERVICE

This is to certify that copies have been sent to the following parties via U.S. Mail:

        Janet P. Samen
        Director, Division of Chronic Care Management
        Chronic Care Policy Group
        Center for Medicare Management
        Centers for Medicare and Medicaid Services
        7500 Security Boulevard
        Baltimore, MD  21244 - 1850

        Bernard M. Talbert Esq.
        Blue Cross and Blue Shield Association
        225 North Michigan Avenue
        Chicago, IL 60601-7680

        Mr. George Garcia
        United Government Services
        P.O.  Box 9150
        Oxnard, CA 93031

*Jack Ahern*

Jack Ahern

Provider Representative
841C  S. Racine Ave
Chicago, Il 60607

August 22, 2006

14

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Phone 410-786-3176 Facsimile 410-786-0043



**CENTERS for MEDICARE & MEDICAID SERVICES**

**Office of the Attorney Advisor**

**VIA FACSIMILE**
AUG 17 2006

Bernard M. Talbert, Esq.
Blue Cross and Blue Shield Association
225 N. Michigan Avenue
Chicago, IL 60601-7680

Re:  <u>Loma Linda University Medical Center</u>, PRRB Dec. No. 2006D-39 (07/27/06)
(FYE 08/30/2000)

Dear Mr. Talbert:

This is to notify you that the Notice of Review (NOR) faxed on August 9, 2006 has been rescinded.  The Provider Reimbursement Review Board's (Board) re-issued the above referenced case on August 11, 2006.  Comments have been received from the Centers for Medicare Management, Centers for Medicare & Medicaid Services.  These comments seek the Administrator's review of the Board decision concerning the Provider's request for an exception to the end-stage renal disease (ESRD) composite rates.  Accordingly, this case will be before the Administrator within the next few weeks to determine whether to reverse, affirm, modify or remand the Board's decision.  Involved will be whether the Board's decision is in keeping with the pertinent laws, regulations, and other criteria cited by the Board and by the parties in their comments.  The Board's decision will be reviewed in light of prior decisions of the Administrator and relevant court decisions.

The governing regulations published at 42 C.F.R. § 405.1875 explains the procedures in conducting final agency review of decisions made by the Board.  You have a right to submit comments within 15 days of your receipt of this letter.  **If you do submit comments, we would appreciate your faxing them to this office at (410) 786-0043, in order to ensure receipt of the comments by this office.**  An Administrator's decision must be rendered within 60 days after the Provider received the Board's decision.  I will promptly send you a copy of the decision after it is rendered.

Sincerely,

Jacqueline R. Vaughn
Attorney Advisor

cc:  Jack Ahern, Provider's Representative
     Center for Medicare Management, CMS

15

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Phone 410-786-3176 Facsimile 410-786-0043



**Office of the Attorney Advisor**

VIA FACSIMILE
AUG 17 2006

Jack Ahern
Ahern & Associates
841 South Racine Avenue, Suite C
Chicago, IL 60607

Re:     Loma Linda University Medical Center, PRRB Dec. No. 2006D-39 (07/27/06)
        (FYE 08/30/2000)

Dear Mr. Ahern:

This is to notify you that the Notice of Review (NOR) faxed on August 9, 2006 has been rescinded. The Provider Reimbursement Review Board's (Board) re-issued the above referenced case on August 11, 2006. Comments have been received from the Centers for Medicare Management, Centers for Medicare & Medicaid Services. These comments seek the Administrator's review of the Board decision concerning the Provider's request for an exception to the end-stage renal disease (ESRD) composite rates. Accordingly, this case will be before the Administrator within the next few weeks to determine whether to reverse, affirm, modify or remand the Board's decision. Involved will be whether the Board's decision is in keeping with the pertinent laws, regulations, and other criteria cited by the Board and by the parties in their comments. The Board's decision will be reviewed in light of prior decisions of the Administrator and relevant court decisions.

The governing regulations published at 42 C.F.R. § 405.1875 explains the procedures in conducting final agency review of decisions made by the Board. You have a right to submit comments within 15 days of your receipt of this letter. **If you do submit comments, we would appreciate your faxing them to this office at (410) 786-0043, in order to ensure receipt of the comments by this office.** An Administrator's decision must be rendered within 60 days after the Provider received the Board's decision. I will promptly send you a copy of the decision after it is rendered.

Sincerely,

Jacqueline R. Vaughn
Attorney Advisor

cc:     Bernard M. Talbert, Esq., Intermediary's Representative
        Center for Medicare Management, CMS

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Phone 410-786-3176 Facsimile 410-786-0043



**Office of the Attorney Advisor**
**VIA FACSIMILE**

AUG - 9 2006

Jack Ahern
Ahern & Associates
841 South Racine Avenue, Suite C
Chicago, IL 60607

Re:    <u>Loma Linda University Medical Center</u>, PRRB Dec. No. 2006D-39 (07/27/06)
       (FYE 08/30/2000)

Dear Mr. Ahern:

This is to notify you that comment have been timely received from the Centers for Medicare Management, Centers for Medicare & Medicaid Services.    These comments seek the Administrator's review of the Provider Reimbursement Review Board's (Board) decision concerning the Provider's request for an exception to the ESRD composite rates. Accordingly, this case will be before the Administrator within the next few weeks to determine whether to reverse, affirm, modify or remand the Board's decision.  Involved will be whether the Board's decision is in keeping with the pertinent laws, regulations, and other criteria cited by the Board and by the parties in their comments.    The Board's decision will be reviewed in light of prior decisions of the Administrator and relevant court decisions.

The governing regulations published at 42 C.F.R.  § 405.1875 explains the procedures in conducting final agency review of decisions made by the Board.  You have a right to submit comments within 15 days of your receipt of this letter.  **If you do submit comments, we would appreciate your faxing them to this office at (410) 786-0043, in order to ensure receipt of the comments by this office.**  An Administrator's decision must be rendered within 60 days after the Provider received the Board's decision.   I will promptly send you a copy of the decision after it is rendered.

Sincerely,

Jacqueline R. Vaughn
Attorney Advisor

cc:    Bernard M. Talbert, Esq., Intermediary's Representative
       Center for Medicare Management, CMS

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore. Maryland 21244-1850
Phone 410-786-3176 Facsimile 410-786-0043



**Office of the Attorney Advisor**
**VIA FACSIMILE**

Bernard M. Talbert, Esq.                    AUG - 9 2006
Blue Cross and Blue Shield Association
225 N. Michigan Avenue
Chicago, IL 60601-7680

Re:    Loma Linda University Medical Center, PRRB Dec. No. 2006D-39 (07/27/06)
       (FYE 08/30/2000)

Dear Mr. Talbert:

This is to notify you that comment have been timely received from the Centers for Medicare Management, Centers for Medicare & Medicaid Services. These comments seek the Administrator's review of the Provider Reimbursement Review Board's (Board) decision concerning the Provider's request for an exception to the end-stage renal disease (ESRD) composite rates. Accordingly, this case will be before the Administrator within the next few weeks to determine whether to reverse, affirm, modify or remand the Board's decision. Involved will be whether the Board's decision is in keeping with the pertinent laws, regulations, and other criteria cited by the Board and by the parties in their comments. The Board's decision will be reviewed in light of prior decisions of the Administrator and relevant court decisions.

The governing regulations published at 42 C.F.R. § 405.1875 explains the procedures in conducting final agency review of decisions made by the Board. You have a right to submit comments within 15 days of your receipt of this letter. **If you do submit comments, we would appreciate your faxing them to this office at (410) 786-0043, in order to ensure receipt of the comments by this office.** An Administrator's decision must be rendered within 60 days after the Provider received the Board's decision. I will promptly send you a copy of the decision after it is rendered.

                              Sincerely,

                              Jacqueline R. Vaughn
                              Attorney Advisor


cc:    Jack Ahern, Provider's Representative
       Center for Medicare Management, CMS

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Centers for Medicare & Medicaid Services

7500 Security Boulevard
Baltimore, MD 21244-1850

Date:        August 7, 2006

From:        Director
             Division of Chronic Care Management
             Chronic Care Policy Group
             Center for Medicare Management

*rec'd.*
*8/9/06*
*DOG*

Subject:     Loma Linda University Medical Center (Provider), Provider
             Reimbursement Review Board (Board) Decision No.2006-D39, Case No.
             01-2871, July 27, 2006

To:          Director
             Office of the Attorney Advisor

CMS respectfully disagrees with the Board's thin majority decision (representing 3 out of
5 Board members-2 Board members gave a dissenting opinion) that the Provider's
exception request must be deemed approved because the Provider was not notified of
CMS' decision disapproving the request within 60 working days.

The applicable statute, regulation and manual provision require that "an exception request
is deemed approved unless it is disapproved within 60 working days after it is filed with
its intermediary." CMS made its decision to deny the Provider's exception request within
the 60 working day time limit specified in the statute, regulation and manual.

The exception request at issue in this case was submitted on August 28, 2000. CMS
made its determination to deny the request on November 15, 2000. The Provider
maintains that to be timely, the 60 working day limit required that it receive notification
of CMS' final determination on or before November 24, 2000, but that the denial was not
communicated to the Provider until November 29, 2000. *(Please note, however, that the
60th working day after August 28, 2000 is November 20, 2000, not November 24 per the
Provider's count of working days.)* Therefore, the Provider did not receive notice of
CMS' denial of the exception request until 67 working days after it was filed.

Board member Blodgett acknowledged that in a previous case involving the 60-day limit
issue (Mount Clemens General Hospital, PRRB Dec. No. 2002-D26), he agreed with the
Board majority that the provider's exception request should have been deemed approved.
However, in the Mount Clemens case the provider did not receive notice of the
disapproval until 14 months after the end of the 60 working day period, and the Board
majority found that such an inordinate delay may have seriously prejudiced that
provider's rights, including its option to drop out of the program.

In this case, the Provider did not submit its exception request until the final day of the
180 day "exception window". Moreover, prior to receipt of CMS' denial, the Provider

made no inquiry of CMS regarding the decision. Since CMS' denial was communicated to the Provider within seven working days after the end of the 60 working day period, no claim of prejudice of Provider's rights can reasonably be made.

We believe, as did the dissenting opinion of two Board members, that CMS' November 15, 2000 disapproval of the Provider's exception request satisfied the regulatory requirements in that it was made within 60 working days after the request was filed timely with the Provider's Intermediary. Therefore, we believe that the disapproval of the Provider's request was timely.

Please note, to support CMS's request to reverse the above Board decision, we are citing two previous HCFA Administrator's Decisions that reversed previous unfavorable Board decisions on the exact same "60 work day" issue.

The first Decision was rendered on November 8, 1996, Charlotte Hungerford Hospital v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Connecticut.

In this case, PRRB Dec. No. 96-D64, the Board held that HCFA's denial of the provider's exception request was not proper. The provider submitted an exception request which the Intermediary accepted as complete on February 2, 1990. Although HCFA denied the provider's exception request on April 12, 1990 because it lacked necessary documentation and was therefore incomplete, neither HCFA nor the Intermediary communicated the denial to the provider until May 21, 1990. The period from February 2, 1990 to May 21, 1990 is 75 working days. The Board disagreed with the Intermediary's argument that HCFA disapproved the provider's exception request within 60 working days and that notification to the provider is not relevant. HCFA's denial of the exception request was communicated promptly to the Intermediary, but due to a misunderstanding, the Intermediary did not relay notification of the denial to the provider. The provider learned of HCFA's denial of the exception request on May 21, 1990, when it telephoned the Intermediary, inquiring as to the status of the exception request. Following the telephone call, the Intermediary telefaxed that same day a copy of HCFA's April 12, 1990 denial of the exception request. The Board found that the provider's request should be deemed approved under section 1881(b)(7) because the provider was not notified of HCFA's disapproval of the request until after 60 working days from the date its exception request was filed. The Administrator, however, does not agree with the Board's finding that the provider's request for exception should be deemed approved. The Administrator disagrees with the Board's finding that section 1881(b)(7) provides that an exception request will be deemed approved unless notification of the disapproval is given within 60 working days of the filing of the application. The Administration finds that the plain language of section 1881(b)(7) states that a provider's request for an exception is deemed approved only if the Secretary fails to *disapprove* it within 60 working days of the filing of the request; there is no requirement that the Secretary notify the provider of its disapproval within 60 working days.

The second Decision was rendered on May 8, 2000, Tri-State Memorial Hospital v. Blue Cross and Blue Shield Association.

In this case, PRRB Decision No. 2000-D25, the Board held that HCFA's denial of the provider's exception request was not proper. The provider submitted an exception request which the Intermediary accepted as complete on April 11, 1994. The Board found that HCFA's June 6, 1994 denial of the provider's exception was not received by the provider until September 17, 1994. The Board noted that the Intermediary acknowledged it did not receive a copy of HCFA's June 6, 1994 denial letter until it followed up with HCFA for the determination pursuant to the provider's August 17, 1994 letter. With respect to the timeliness, the Administrator finds that the record supports that HCFA's denial was made within 60 working days of the provider's exception request filing. The record includes a file copy of the letter, clearly date stamped June 6, 1994, i.e., within 60 working days of the Intermediary's April 11, 1994 receipt of the provider's request. The statute states only that an exception request "shall be deemed approved unless the Secretary disapproves not later than 60 working days after the date the application is filed". The statute does not require that the disapproval must be received by the provider within 60 working days after the application is filed. Thus, in light of the statutory language and HCFA's unrebutted evidence that the denial letter was on June 6, 1994, the Administrator finds that HCFA met the requirement of disapproving the provider's exception request in a timely manner.

For the reasons cited above, CMS met the requirement of disapproving the Provider's exception request in a timely manner, and we respectfully request that the Board decision be reversed.


Janet P. Samen

This is to certify that copies have been sent to the following parties:

Mr. Jack Ahern
Ahern & Associates
841 South Racine Avenue, Suite C
Chicago, IL 60607

Bernard M. Talbert, Esq.
Blue Cross & Blue Shield Association
225 North Michigan Avenue
Chicago, IL 60601-7680

Mr. George Garcia
United Government Services
P.O. Box 9150
Oxnard, CA 93031-9150



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671          FAX: 410-786-5298

Suzanne Cochran, Esq., Chairperson
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Anjali Mulchandani-West
Yvette C. Hayes

Refer to

AUG 1 1 2006

Case No.:  01-2871
Decision No.:  2006-D39

**CERTIFIED MAIL**

Mr. Jack Ahern
President
Ahern & Associates
841 South Racine Avenue
Suite C
Chicago, IL  60607

RE:  Loma Linda University Medical Center
     Provider No.:  05-0327
     ESRD Window End Date - August 30, 2000

Dear Mr. Ahern:

A copy of the Provider Reimbursement Review Board's decision on
the above-referenced appeal is enclosed.  Please see enclosure
for review and appeal information.

If you have any questions, please call (410) 786-2671.

Sincerely,

Paul J. Crofton, Director
Division of Hearings and Decisions

5 Enclosures
    Final Decision Review and Appeal Information
    Decision
    42 USC 1395oo(f)
    42 CFR 405.1875 and 405.1877

272

DEPARTMENT OF HEALTH AND HUMAN SERVICES
PROVIDER REIMBURSEMENT REVIEW BOARD
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670

Phone: 410-786-2671          FAX: 410-786-5298

Suzanne Cochran, Esq., Chairperson
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Anjali Mulchandani-West
Yvette C. Hayes

Refer to

JUL 2 7 2006

Case No.: 01-2871
Decision No.  2006-D39

**CERTIFIED MAIL**

Mr. Bernard M. Talbert, Esquire
Associate Counsel
BlueCross BlueShield Association
225 North Michigan Avenue
Chicago, IL  60601-7680

RE:  Loma Linda University Medical Center
     Provider No.:  05-0327
     ESRD Window End Date - August 30, 2000

Dear Mr. Talbert:

A copy of the Provider Reimbursement Review Board's decision on the above-referenced appeal is enclosed.  Please see enclosure for review and appeal information.

If you have any questions, please call (410) 786-2671.

Sincerely,

Paul J. Crofton, Director
Division of Hearings and Decisions

cc:  United Government Services, LLC-CA

5 Enclosures
   Final Decision Review and Appeal Information
   Decision
   42 USC. 1395oo(f)
   42 CFR 405.1875 and 405.1877

2006

| OFFICE | SURNAME | DATE | OFFICE | SURNAME | DATE |
|--------|---------|------|--------|---------|------|
| Cohen  | β       | 1/27/06 |      |         |      |
|        | PC      | 7/27 |        |         |      |
|        |         |      |        |         |      |
|        |         |      |        |         |      |

**File Copy**

23



DEPARTMENT OF HEALTH AND HUMAN SERVICES
PROVIDER REIMBURSEMENT REVIEW BOARD
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671                    FAX: 410-786-5298

Suzanne Cochran, Esq., Chairperson
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Anjali Mulchandani-West
Yvette C. Hayes

JUL 2 7 2006

Refer to: Case No.:   01-2871
          Decision No.:   2006-D39


Dr. Mark B. McClellan, M.D., Ph.D.
Administrator
Centers for Medicare and Medicaid Services
7500 Security Boulevard
Mailstop:  C5-16-03
Baltimore, Maryland 21244-1850


RE:  Loma Linda University Medical Center
     Provider No.:   05-0327
     ESRD Window End Date - August 30, 2000


Dear Dr. McClellan:

A copy of the Provider Reimbursement Review Board's decision on
the above-referenced appeal is enclosed.

Also, by copy hereof, the decision and the official case file
containing all items listed in the index are forwarded to the
Attorney Advisor to be returned intact upon completion of the
"Own Motion" review.

Additional information will be furnished upon request.

If you have any questions, please call (410) 786-2671.

Sincerely,



Paul J. Crofton, Director
Division of Hearings and Decisions

Enclosure

cc:  Deputy Chief Counsel for Litigation
     Director, Centers for Medicare Management
     Attorney Advisor


2006

| OFFICE | SURNAME | DATE | OFFICE | SURNAME | DATE |
|--------|---------|------|--------|---------|------|
| Cohen, B | | 7/27 0C | | | |
| | PC | 7/27 | | | |
| | | | | | |
| | | | | | |

**File Copy**

24

# PROVIDER REIMBURSEMENT REVIEW BOARD DECISION

## 2006-D39

**PROVIDER -**
Loma Linda University Medical Center
Loma Linda, California

Provider No.: 05-0327

**vs.**

**INTERMEDIARY -**
BlueCross BlueShield Association/
United Government Services, LLC - CA

**DATE OF HEARING -**
June 10, 2004

**ESRD Window End Date -**
August 30, 2000

**CASE NO.** 01-2871

## INDEX

| | Page No |
|---|---|
| Issue............................................................................................................ | 2 |
| Medicare Statutory and Regulatory Background............................................................ | 2 |
| Statement of the Case and Procedural History................................................................ | 3 |
| Findings of Fact, Conclusions of Law and Discussion...................................................... | 4 |
| Decision and Order............................................................................................ | 5 |
| Dissenting Opinion of Gary B. Blodgett, D.D.S and Elaine Crews Powell, C.P.A.................... | 7 |

ISSUE:

Whether the denial of the Provider's request for an exception to the end stage renal disease (ESRD) composite rate by the Centers for Medicare and Medicaid Services (CMS) was proper.

MEDICARE STATUTORY AND REGULATORY BACKGROUND:

This is a dispute over the amount of Medicare payments due a provider of dialysis services for ESRD.

The Medicare program was established to provide health insurance to the aged and disabled. 42 U.S.C. §§1395-1395cc. The Centers for Medicare and Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA), is the operating component of the Department of Health and Human Services charged with administering the Medicare program. CMS' payment and audit functions under the Medicare program are contracted out to insurance companies known as fiscal intermediaries. Fiscal intermediaries determine payment amounts due the providers under Medicare law and under interpretive guidelines published by CMS. See 42 U.S.C. §1395h, 42 C.F.R. §§413.20(b) and 413.24(b).

ESRD facilities are reimbursed for outpatient dialysis services under the "composite rate" system.[1] Under this system, a provider of dialysis services receives a prospectively determined payment for each dialysis treatment that it furnishes. An ESRD facility must accept the composite prospective payment rate established by CMS as payment in full for covered outpatient dialysis unless it qualifies for one of the exceptions in accordance with the procedures established under 42 C.F.R. §413.180, et seq.

Regarding the exception request, 42 U.S.C. §1395rr(b)(7) states, in relevant part, that:

> Each application for such an exception shall be deemed to be approved unless the Secretary disapproves it by no later than 60 working days after the date the application is filed.

Similarly, 42 C.F.R. §413.180(h)(2000)[2] states:

> Approval of an exception request. An exception request is deemed approved unless it is disapproved within 60 working days after it is filed with the intermediary.

This case involves whether the denial was timely under these provisions.

---

[1] 42 U.S.C. §1395rr and the regulations at 42 C.F.R. §413.180 et seq.

[2] 70 Fed. Reg. 70116, 70331 (November 21, 2005), recodified this subsection, in full text, effective January 1, 2006, to 42 C.F.R. §413.80(g).

STATEMENT OF THE CASE AND PROCEDURAL HISTORY:

Loma Linda University Kidney Center (Provider) is located in Loma Linda, California. The Provider performs dialysis services for kidney patients and has filed an appeal pertaining to the denial of the Providers application for relief from the composite payment rate established for its Medicare certified renal dialysis facility.

The procedural history of this case upon which the Board's findings and conclusions are based is as follows:

August 28, 2000 –The record indicates that the Provider's request for an exception to the composite payment rate was received by United Government Services, LLC-CA (Intermediary) on this date.[3]  The Provider sought a payment rate of $381.10 per treatment, which is the total of the based composite rate ($138.08) plus an additional exception amount of $243.01 per treatment.[4]

September 18, 2000- The Intermediary issues a letter to CMS recommending a composite rate of $225.40 for maintenance hemodialysis (or an increase of $87.32 for salaries and employee benefits).[5]

November 15, 2000- CMS issues a letter to the Intermediary stating that the Provider should continue to be paid its composite rate of $138.08 for outpatient maintenance dialysis.[6]

December 11, 2000- The Intermediary issues an exception request denial to the Provider[7] enclosing CMS's November 15, 2000 letter.

April 16, 2001- The Provider filed a timely request for a hearing with the Provider Reimbursement Review Board (Board) and has met the jurisdictional requirements of 42 C.F.R. §§405.1835-1841.

The Provider was represented by Jack Ahern and Jeffrey A. Lovitky, Esq.  The Intermediary was represented by Bernard Talbert, Esquire, of Blue Cross and Blue Shield Association.

---

[3] See Provider Exhibit (Ex.) 11, Intermediary Ex.1.

[4] Provider Ex. 1, p.7 (Exception Request).

[5] See references at Intermediary Ex 1, p.1 (copy of September 18, 2000 letter is not in this record)

[6] See Intermediary Ex.1, Provider Ex.2. The Board notes that on September 19, 2005, the Board issued a subpoena duces tecum to the Intermediary requesting the envelope containing CMS' November 15, 2000 letter as well as any and all other evidence in the Intermediary's possession which substantiates the exact date such letter was mailed from CMS to the Intermediary. On October 4, 2005, the Intermediary responded that it was unable to find the November 15, 2005 letter.

[7] Provider Ex. 3.

CN: 01-2871

Provider position:

The Provider contends that because it did not receive notification of the denial of its
exception within 60 days after the date the application was filed, the request should be
approved pursuant to 42 U.S.C. §1395rr(b)(7) and 42 C.F.R. §413.180(h).  The Provider
explains that to have been timely, ". . . the 60 day working days limit required that
notification of the CMS determination . . . [b]e received by the Provider on or before
November 24, 2000."[8]  Also, the Intermediary's belief that the Exception Request was
timely processed by virtue of CMS' November 15, 2000 letter contradicts Congress'
intent to simplify and expedite the exception request process.  Moreover, previous PRRB
decisions established that the date of the CMS decision did not necessarily stop the 60
working day clock.[9]

Intermediary/CMS position:

The Intermediary argues that the denial was timely made by CMS and transmitted before
the 60 working-day deadline expired.[10]  Moreover, the Administrator has rejected the
Provider's position that actual notice of CMS disapproval be received by the Provider
within 60 working days.[11]

FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION:

The Board majority finds that pursuant to 42 U.S.C. §1395rr(b)(7) and  42
C.F.R.§413.180(h), the exception request was automatically deemed approved as CMS'
determination was sent to the Intermediary after the 60 working day deadline.

Congress imposed the deadline in the statute, thereby indicating its concern about CMS
delays.  Prior Board cases and the legislative history illustrate that Congress' concern was
well founded.[12]  Congressional intent is frustrated if CMS fails to timely send notice of
its decision.  The 60-day limit is meaningless without communication.  As the Board has
noted in prior decisions,[13] the regulation has been interpreted as allowing CMS to strictly

---

[8] Provider Post-Hearing Brief at 29, Provider Ex. 11
[9] Supra, note 9.  Tri-State Memorial Hospital  v. Blue Cross and Blue Shield Association
   et.al., PRRB Dec. No. 2000-D-25 (Mar. 6, 2000), modified CMS Admr.  (May 8,
   2000).
[10] Tr. at 21-23.
[11] Charlotte Hungerford Hospital v. Blue Cross and Blue Shield Ass'n et.al, PRRB Dec.
   No 1996-D64 (Sept. 11, 1996), rev'd CMS Admr. Dec. (November 8, 1996); Mt.
   Clemens General Hospital, PRRB Dec. No. 2002-D26 (July 9, 2002) aff'd, on limited
   grounds, CMS Admr. (Sept. 6, 2002).
[12] See e.g. Mount Clemens General Hospital v. Blue Cross and Blue Shield
   Association/United Government Services,   PRRB Dec. No 2002-D26, July 9, 2002 ;
   Providers Post-Hearing Brief at 24.
[13] Id.

enforce time limits applicable to providers making an exception request.[14] It is only reasonable that the same strict enforcement principles found in the same regulations apply to time limits for CMS.

If CMS had promulgated a regulation that addressed time limits for the full process, including notice, and that established a regulatory grace period for transmission of the decision within a reasonable time after the decision was made, such regulation would likely pass muster as being consistent with the statute. But CMS chose instead to establish a cumbersome two-tiered notification system despite the 60-day limit and to describe the action required only as "disapproval." Because the regulations are silent as to time limits for other steps in the process, we believe that the statutory and regulatory time limit for disapproval must therefore be interpreted as including all essential elements of the entire disapproval process, including transmission of the notice. The notice was not sent until after the 60-day limit; therefore, it must be deemed approved.

The Board majority does not dispute that the deeming regulation could be read literally as only requiring the CMS *decision* to be made within the 60-day period. Indeed, a literal reading would not even require that CMS' determination be made in writing within the 60-day time limit. However, that interpretation ignores the reality that notice is essential to the exception process and to fundamental notions of due process. Notice is not a mere formality; it triggers appeal rights and permits the Provider to reasonably budget or restructure to avoid future losses.

DECISION AND ORDER:

As a result of the failure of CMS to notify the Provider of the determination within 60 working days as required by 42 U.S.C. §1395rr(b)(7), the Provider's exception request is deemed approved. Accordingly, the substantive issue as to whether the exception denial was otherwise proper is moot.[15]

BOARD MEMBERS PARTICIPATING:

Suzanne Cochran, Esq.
Gary B. Blodgett, D.D.S. (dissenting)
Elaine Crews Powell, C.P.A. (dissenting)
Anjali Mulchandani-West
Yvette C. Hayes

---

[14] Children's Hospital of Buffalo v. Shalala, No 00-6187, 2001 App. Lexis 979 (Jan. 24, 2001).

[15] See Provider Post Hearing Brief at 28-29. The Provider claims that the Intermediary's failure to reach a conclusion on all determinative issue (i.e., atypical patient acuity) is insufficient to meet the 60-day processing deadline.

CN: 01-2871

FOR THE BOARD:

JUL 2 7 2006

Suzanne Cochran. Esq.
Chairperson

Dissenting Opinion of Gary B. Blodgett, D.D.S. and Elaine Crews Powell, C.P.A.

We respectfully disagree with the majority's opinion that the Provider's exception request must be deemed approved because the Provider was not notified of CMS' decision disapproving the request within 60 working days.

The applicable statute, regulation and manual provision require that "an exception request is deemed approved unless it is disapproved within 60 working days after it is filed with its intermediary." No mention is made regarding timely notifying the provider of the decision. CMS made its decision to deny Loma Linda's exception request within the 60 working day time limit specified in the statute, regulation and manual.

The exception request at issue in this case was submitted on August 28, 2000. CMS made its determination to deny the request on November 15, 2000. The Provider maintains that to be timely, the 60 working day limit required that it receive notification of CMS' final determination on or before November 24, 2000, but that the denial was not communicated to the Provider until November 29, 2000. (We note, however, that the 60th working day after August 28, 2000 is November 20, 2000, not November 24th per the Provider's count of working days.) Therefore, the Provider did not receive notice of CMS' denial of the exception request until 67 working days after it was filed.

Board member Blodgett acknowledges that in a previous case involving the 60-day limit issue (Mount Clemens General Hospital, PRRB Dec. No. 2002-D26), he agreed with the Board majority that the provider's exception request should have been deemed approved. However, in the Mount Clemens case the provider did not receive notice of the disapproval until **14 months** after the end of the 60 working day period, and the Board majority found that such an inordinate delay may have seriously prejudiced that provider's rights, including its option to drop out of the program.

In the present case the Provider did not submit its exception request until the final day of the opening "window." Moreover, prior to receipt of CMS' denial, Provider made no inquiry of CMS regarding the decision. Since CMS' denial was communicated to the Provider within seven working days after the end of the 60 working day period, no claim of prejudice of Provider's rights can reasonably be made.

We find that CMS' November 15, 2000 disapproval of Provider's exception request satisfied the regulatory requirements in that it was made within 60 working days after the request was filed with Provider's Intermediary. Therefore, the disapproval of the request was timely.

Since the Board Majority deemed the exception request approved, we agree that the substantive issue as to whether the denial of Provider's exception request was proper is moot.

_Gary B. Blodgett_
Gary B. Blodgett, D.D.S.

_Elaine Crews Powell_
Elaine Crews Powell, C.P.A.

## *Ahern & Associates*

841 C South Racine Ave.          Phone: (312) 997-2177
Chicago, IL 60607                Fax:    (312) 942-9578
                                 Email: AhernConsulting@aol.com

August 5, 2004

Via Federal Express No. 8464 4455 0219

RECEIVED

AUG 0 6 2004

Larry Hoffman
Provider Reimbursement Review Board
2520 Lord Baltimore Drive
Suite L
Baltimore, MD 21244-2670

PROVIDER REIMBURSEMENT
REVIEW BOARD

Re:    **Post-Hearing Brief for Loma Linda University Medical Center**
       **Provider Number:**       **05-0327**
       **PRRB Case Number:**      **01-2871**

Dear Larry:

Enclosed are six (6) copies of the Provider's Post-Hearing Brief for the Loma Linda University Medical Center PRRB Hearing held June 10, 2004 in Baltimore.

The six copies of the post-hearing brief are being sent to the board as requested.

If you have any questions, please do not hesitate to call me at (312) 997-2177.

Sincerely,

Jack Ahern
President

Cc:    Bernard Talbert, Esq., via FedEx No. 8464 4455 0193
       Steve Mohr, LLUMC, via FedEx No. 8464 4455 0220
       Marge Strutt, LLKC, via FedEx No.  8464 4455 0220

Encl.  Loma Linda University Medical Center Post-Hearing Brief, PRRB Case 01-2871

JKA/mw

# Loma Linda University Medical Center

## <u>Post Hearing Brief</u>

**Provider No:**      **05-0327**

**PRRB Case No:**  **01-2871**

# *Ahern & Associates*

841 C South Racine Ave.
Chicago, IL 60607

Phone: (312) 997-2177
Fax: (312) 942-9578
Email: AhernConsulting@aol.com

August 5, 2004

Via Federal Express No. 8464 4455 0219

**RECEIVED**

**AUG 0 6 2004**

PROVIDER REIMBURSEMENT
REVIEW BOARD

Larry Hoffman
Provider Reimbursement Review Board
2520 Lord Baltimore Drive
Suite L
Baltimore, MD 21244-2670

Re:    **Post-Hearing Brief for Loma Linda University Medical Center**
       **Provider Number:**       05-0327
       **PRRB Case Number:**      01-2871

Dear Larry:

Enclosed are six (6) copies of the Provider's Post-Hearing Brief for the Loma Linda University Medical Center PRRB Hearing held June 10, 2004 in Baltimore.

The six copies of the post-hearing brief are being sent to the board as requested.

If you have any questions, please do not hesitate to call me at (312) 997-2177.

Sincerely,

Jack Ahern
President

Cc:    Bernard Talbert, Esq., via FedEx No. 8464 4455 0193
       Steve Mohr, LLUMC, via FedEx No. 8464 4455 0220
       Marge Strutt, LLKC, via FedEx No. 8464 4455 0220

Encl.   Loma Linda University Medical Center Post-Hearing Brief, PRRB Case 01-2871

JKA/mw

35


# Contents

**I.    Introduction**

**II.   Statement of the Issue**

**III.  Summary of the Facts**

**IV.   Contentions of the Parties**

> A. **Provider's Contentions:**
>
> > 1. **Provider Satisfied the Atypical Service Intensity Criteria**
> >
> > > a) Provider Met CFR Atypicality Requirements
> > >
> > > b) Provider Satisfied PRM Atypicality Criteria
> > >
> > > c) CMS Agrees that the Provider serves an Atypical Patient Mix
> > >
> > > d) Prior Exception Request Approvals Corroborate Atypicality
> >
> > 2. **Deficiencies in "As- Filed" Cost Report Were Not Sufficient Grounds for Denial since the Exception is Prospective in Nature**
> >
> > > a) Exception Amount is Based on Projected Costs not Historical Costs.
> > >
> > > b) Regulations Merely Require "Proper" Nursing Labor Allocation.
> > >
> > > c) PRM 2720 Requires only Accurate "Estimates" of Projected

LLUMC                                                  Post-Hearing Brief

    d) PRM §2720.1 G - Does not Preclude revision of
       Cost report

    e) Nursing Time For Inpatient Treatments Was Not
       Materially Misstated.

    f) The Provider Used the Approved Statistical
       Basis for Projected

    g) The Provider Accurately Calculated Supply Cost.

    h) Provider Quantified and Qualified its atypical
       supply costs.

    i) CMS Fiscal Intermediary failed to properly audit
       the cost report

    j) CMS Incorrectly Required Time Studies for an
       Approval

    k) CMS's Standards are Arbitrary and Unduly
       Subjective.

3. **The Exception Request Was Not Processed Within
   60 Days, And As Such Should Be Approved.**

    a) The Exception Request has Never been fully
       processed

    **b)** The Provider Was Not Notified Within The 60-
       Day Time Limit.

### B. Intermediary's Contentions

1. That errors in the FY 1999 cost report could not be corrected for, and were sufficient grounds for denial.

2. That lack of auditable time studies was sufficient grounds for denial.

3. That the Provider's supply costs failed to exceed the $ 33 median threshold for an exception.

4. That the Provider's errors in cost reporting, un-auditable time studies and lower than median supply cost, were sufficient grounds to not rule on the exception criterion.

5. No exception relief should be provided for employee benefit cost since no relief was granted for salaries.

### V.    Citations of Law, Regulations, and Program Instructions

### VI.    Proposed Findings and Conclusions

### VII.    Suggested Board Decision.

### VIII.    *List of Provider Exhibits*

* The List of Provider's Exhibits was provided at the hearing and later by FedEx with copies of the additional Provider's Exhibits. It is being provided again here as a convenience to the reviewers.



# BEFORE THE PROVIDER REIMBURSEMENT REVIEW BOARD
## BALTIMORE, MARYLAND

| | |
|---|---|
| LOMA LINDA UNIVERSITY MEDICAL CENTER )<br><br>PROVIDER No. 05-0327 )<br>(Provider) )<br><br>vs. )<br><br>UNITED GOVERNMENT SERVICES )<br>(Fiscal Intermediary) ) | PRRB Case No.<br>01-2871 ESRD |

## PROVIDER'S POST-HEARING BRIEF

## I. INTRODUCTION

**Post-Hearing Brief is Supplemental in Nature**

This post-hearing brief has been prepared to supplement, but generally not

duplicate, the depth of argument and detail presented in the previously

submitted final position paper with accompanying exhibits.

As such, the Provider respectfully asks that, when reaching its decision, the

Board should fully consider and review <u>both</u> the information presented in the

Provider's final position paper and the testimony and additional exhibits presented at the hearing and addressed in this brief.

## Central Elements of Board's Decision

The Board cannot perfect, based on further analysis or testimony presented at the hearing, either the provider's exception request or the CMS decision. The Board must decide however, on several related but separate aspects of this case:

1.  Was CMS correct in denying the Provider's exception solely based on cost allocation deficiencies?

2.  If the board concludes the cost issues were not sufficient grounds for denial, then the Board must decide if:

     a.  Absent any valid objections to the cost issues, is the Provider atypical, and deserving of an exception.

3.  Did CMS fail to process the exception in a timely manner when applying the regulatory 60-day processing limit:

     a.  Counting the processing days from submission to date of Provider notification?

     b.  Counting the processing days from submission to the present. Considering the fact that, when adjudicating the Exception

41

Request, CMS failed to decide whether or not the Provider's

patient population had sufficient atypical patient characteristics

to merit an exception?


**Page Number References and Exception Request References**

Finally, as a practical matter, unless otherwise noted, **all page references**

**correspond to the "<u>hand written</u>" numbers in the lower right hand**

**corner of the exhibit or attachment referenced.**  The hand written

numbers are generally not duplicated and hopefully will clarify what page is

being referenced.  To reduce confusion, "Exhibits" attached to the

Provider's Exception Request will be referenced as "Attachments" to

Provider Exhibit P-1.

Issue

## II. STATEMENT OF THE ISSUE

Representatives from Loma Linda University Medical Center  ("LLUMC"

or "Provider") and United Government Services ("Intermediary")

participated in a hearing before the Provider Reimbursement Review Board

(the "Board") or ("PRRB") on June 10, 2004 for the PRRB to decide the

following issue:

1)    Whether the Centers for Medicare and Medicaid Services (CMS,

formerly HCFA) incorrectly denied Loma Linda University

Medical Center's (LLUMC) request for an exception to the ESRD

composite rate.



## III. STATEMENT OF FACTS

LLUMC provides dialysis to pediatric and adult residents of Loma Linda, California and surrounding areas. LLUMC is primarily a pediatric hospital-based unit, with 72 % of treatments for FY 2000 rendered to patients 18 years old or younger. *[see P-1, Exception Request: Attachment 3B, Patient Data Summary (pg 54), Attachment 9A, Analysis of Pediatric Treatments – Atypical Minutes (pp. 63–67)]*

The Exception Request was prepared by consultants, Ernst and Young, LLP with input and data from LLUMC clinical staff. Provider submitted an exception request to the composite rate for maintenance dialysis services to United Government Services ("Intermediary") on August 28, 2000. The Provider sought a payment rate of $381.10 per treatment, which is the total of the base composite rate plus an additional exception amount of $243.01 per treatment. *[Provider's Exception Request P-1, page 7].* Provider's request was based upon atypical service intensity, and the resulting additional nursing service, supply and administrative costs.

CMS, through its Division of Chronic Care Management, advised its Intermediary that it was rejecting the Intermediary's recommendation to

approve the exception request. *[P-2]* Per references in the CMS internal

correspondence, *[P-2]* dated, November 15, 2000, the Intermediary had

initially recommended approval of the Provider's exception request and an

increased payment of $ 87.32 per treatment.  Despite several requests, the

Intermediary's correspondence has not been released to the Provider's

representative hence the details of the intermediary's letter is unknown to the

Provider. *[P-15 Provider's First Request for Production of Documents, P-17*

*Intermediary's Response to Request for Documents]*

CMS stated that it had <u>not</u> ruled on the exception criterion *[P-2, pg 23]* due

to deficiencies with cost report and other information. On December 11,

2000, the CMS Intermediary advised the Provider that CMS had rejected the

Provider's request for an exception to the composite payment rate. *[P-3]*


On April 16, 2001, the Provider timely filed an appeal to the Provider

Reimbursement Review Board ("PRRB") pursuant to 42 CFR § 413.194.



# IV. CONTENTIONS OF THE PARTIES

## A. PROVIDER'S CONTENTIONS

## 1. Provider Satisfied the Atypical Service Intensity Criteria

### (a) Provider Met CFR Atypicality Requirements

The conditions for an atypical service intensity exception, as laid out in the Code of Federal Regulations (CFR) correspond to a higher than normal medical resource consumption, addressing both the quantity and quality of treatments:

> "A facility must demonstrate that a **substantial proportion** of the facility's outpatient maintenance dialysis **treatments** involve **atypically intense** dialysis services, *special dialysis procedures*, or *supplies* that are medically necessary to *meet special medical needs* of the facility's patients...." See 42 CFR § 413.184(a)(1). [Emphasis added]

Unfortunately, the regulations have not provided numerical definitions for the adjectival qualifiers "substantial" or "intense." Absent numerical standards, these terms nonetheless can reasonably be interpreted in the context of the examples provided by the same regulation.

> "... Examples that may qualify under this criterion are more intense dialysis services that are medically necessary for patients such as--

*(i) Patients who have been referred from other facilities on a temporary basis for more intense care during a period of medical instability and who return to the original facility after stabilization;*

*(ii) Pediatric patients who require a significantly higher staff-to-patient ratio than typical adult patients; or*

*(iii) Patients with medical conditions that are not commonly treated by ESRD facilities and that complicate the dialysis procedure.*

See 42 CFR § 413.184(a) (1)

The Provider's exception request established that it very closely matches all

three of the above scenarios specifically mentioned in both 42 CFR §

413.184(a)(1) and PRM § 2725.1.A :

- "The significantly high percentage of temporary transfer patients (52.38% or 77 out of 147) is seen at LLUMC"  *[P-1, Narrative (p6)]*

  See also:
  *P-1, Attachment 3A, Temporary Patient Transfers, (p52)*
  *P-1, Attachment 3B, Patient Data Summary (p54)]*
  *Tr. 45, line 45*

- "The average staffing ratio for facilities that treat typical patients is 4 patients to 1 staff. As evidenced in Exhibit 10, LLUMC has a higher average staffing ratio of 1.39 to 1 staff." *P-1, Narrative, (p5)*

  *See also*

  *P-1, Attachment 3B, Patient Data Summary (pg 54),*
  *P-1, Attachment 9A, Analysis of Pediatric Treatments- Atypical Minutes (pp. 63–67)]*
  *P-1, Attachment 10, Staff to Pt ratio for FYE 12/31/99,(p83)*
  *Tr. 67 – 69.*

- 72% of LLUMC's <u>treatments</u> are provided to pediatric patients 18 years or younger *[see P-1, Exception Request: Attachments 3B (pg 54), 9A (pp. 63–67).*

- Multiple key clinical statistics used by CMS to assess acuity corroborate the contention that the Provider handles a patient population that requires "atypically intense dialysis services." It should be noted although the majority of "<u>treatments</u>" are provided to <u>pediatric</u> patients; the majority of "<u>patients</u>" are adult. This is because adults, who are stabilizing after an inpatient stay, frequently receive a few treatments before transferring to non-hospital based, free –standing facilities. As such, these high acuity adults count as "<u>patients</u>" in a disproportionate manner as they contribute to the total "<u>treatment</u> count." *(Tr. 44-45)*

|                                   | LLUMC (FY 1999) | National Average [1] |
|-----------------------------------|-----------------|----------------------|
| Diabetic Patients                 | 52.86%          | 34.44%               |
| Hypertensive Patients             | 81.43%          | 24.76%               |
| Cardiac Patients                  | 57.14%          | not available        |
| Hemodialysis – over 64 years old  | 34.01%          | 28.88%               |
| Hemodialysis – below 20 years old | 17.69%          | 0.31%                |
| Transplant Patients               | 8.57%           | 3.43%                |

*[See Exhibit P-1, p 6, Narrative, "National Average Comparison"]*

## (b) Provider Satisfied PRM Atypicality Criteria

Chapter 27 of the Provider Reimbursement Manual (PRM) lists two criteria, either of which is, in and of itself, sufficient justification for an exception to the composite rate. *[See I-3, pp 55-56, PRM § 2725.1 B]*

## PRM § 2725.1 B.1 - Atypically High Nursing Hours per Treatment

*B. Criteria.--In order for an exception to be granted, **any one** of the following criteria must be met.* [Emphasis Added]

*1. Nursing Service Hours Per Treatment.--The provider must submit data which demonstrate that its patients will receive significantly more nursing (refers to RNs, LPNs, technicians, and aides) hours (based on total hours as explained in §2721.B.1.e.) per treatment than patients receive in other facilities. The increased hours of nursing service must be justified by data that demonstrate that the higher hours per treatment and thus the higher per treatment costs are necessitated by the special needs of the patients such as those referred to in the above listing. For example, documentation must show that higher per treatment costs are incurred because of increased nursing hours resulting from services furnished to a substantial number of patients with more complex medical needs or that more nursing care results in fewer inpatient admissions.*

*2. Number of Employees in Outpatient Renal Area.-- ... ....*

With regard to PRM § 2725.1 B.1, Nursing hours per treatment, the Provider has calculated additional clinical labor time by totaling the atypical nursing time associated with its patients. *[See exhibit 9, Summary of Atypical Minutes and Salary Costs]*. The Provider's clinical staff used their best clinical judgment to assess atypical time.

*'The patient care staff prepared this list and identified additional number of nursing minutes per activity and the number of times each activity is performed annually. As these activities to not occur with every dialysis treatment, the renal dialysis staff identified the frequency of these items*

*for their patient population. These activities represent exacerbation of patient's diagnosis and do not occur with routine dialysis treatment and are therefore atypical services.* [Exception Request narrative, p10-11]

Exception Request narrative, pp 12-25, provides narrative justification developed by the nursing staff. LLUMC's clinical staff had no CMS normative standard when determining atypical vs. non-atypical activities. Nonetheless exercising their best professional judgment and performing timings for atypical interventions, clearly provided the nexus between atypical patient acuity and consumption of clinical labor as required by PRM § 2725.1 B.1. It should also be noted that LLUMC's staff assumed that any treatment time in excess of three hours per treatment was atypical nursing time. This assumption that more dialysis time directly equates to more nursing labor is clearly true for pediatric patients requiring a 1 staff to 1 patient ratio as detailed in *[P-1, Attachment 9A]*.

However, not all patients required 1:1 staffing since the overall average staff-to-patient ratio was 0.72, (0.72 = 1.39 patient-to-staff), *[P-1, Attachment 10]*, so the atypical time, in this one category – time exceeding three hours, may have been overstated. All atypical intervention timings are as accurate as possible. The net effect on the CMS approved exception amount is of undefined at best, and usually of

little practical consequence since there are no national standards for what is, or is not, atypical *(Tr. 238 – 239)*. As Mr. Michael Powell, the CMS witness, testified: due to lack of normative data, CMS does not, in practice, base its approval amount on the Provider's calculation of atypical labor time. *(Tr. 236 - 237)*

## PRM § 2725.1 B.2 - Atypically High Nursing Staff-to-patient Ratio:

The Provider also met the second PRM criteria, as quoted below, which addresses atypical clinical resource consumption as measured by the staff-to-patient ratio: *[See I-3, p56, PRM § 2725.1 B.2]*

> 2. *Number of Employees in Outpatient Renal Area.--Data must be submitted that show that higher staff-to-patient ratios represent nursing assessment/intervention based upon patient acuity levels.  The provider must show that the additional nursing hours per treatment is not the result of an excess number of employees in the outpatient maintenance renal area, compared to facilities treating a similar patient mix.  HCFA uses cost report data and information from the ESRD Medical Information System (MIS) relative to providers treating patients nationwide.*

LLUMC's overall staff-to-patient ratio of 0.72, (0.72 = 1 patient to 1.39 staff), exceeds the norm of 0.25, (0.25= 1 to 4), claimed in the exception *[P-1, p11, Narrative; Attachment 10, p83]* and further justified by the

54

Provider's witness, *(Tr. 67 – 69)*.  Even assuming a lower norm of 0.33, (0.33= 1 to 3), the Provider's staff-patient-ratio is notably higher. In addition the Provider has documented that a higher percentage of its staff are necessarily of a higher licensure level (Registered Nurse vs. Licensed Practical Nurse or Dialysis Technician) and that this is necessitated by patient acuity. *[P-1, p11, Narrative; Attachment 10, p83]*

### (c ) CMS Agrees that the Provider serves an Atypical Patient Mix

The original CMS reviewer *[P-2, Denial Letter]* stated "we have not ruled on the exception criterion."  However, the CMS witness, Mr. Powell, reviewed the entire Exception Request, Tr.  158, line 24, and has commented on the atypicality question.  In fact, in response to a question from Board Member, Mr. Hoover, Mr. Powell has specifically testified, Tr. 241, that the Provider undoubtedly serves an atypical patient population and that the only substantive problem regarded documentation of costs:

> *Q.    Probably not, so the Board doesn't have to be concerned with atypicality?*
>
> *A.    I don't think so on either one of them.*
>
> *Q.    Okay.*

A.    *The cost issues are just blatantly horrendous.*

Q.    *Well, that's for us to determine.*

A.    *Well that's just my opinion.*

Q.    *Yeah, I understand. But still the Board has to make a decision
on that. But I just want to be sure that it's CMS's position that
this Provider has met the atypicality standard, and I don't have
– as a Board member I don't have to go into that analysis.*

A.    *I think that's right.*

### (d) Prior Exception Request Approvals Corroborate Atypicality

The Provider has entered into the record [*P-7, 1990 Atypical Service
Intensity Approval Letter)* and *[p-13, 1994 Atypical Service Intensity
Approval Letter]* the two most recent assessments by CMS affirming
Provider's atypicality.  The Provider has no more recent assessments since,
until the year 2000, CMS had not opened the exception request window
since 1994.  Ms. Strutt, Nurse Manager for the Provider testified that there
have been no changes in the Provider's program that would have lowered
average acuity since 1994.  In fact, Ms. Strutt testified that the number of
pediatric patients has increased since 1994. (*Tr. 88.*)

## 2. Deficiencies in "As- Filed" Cost Report Were Not Sufficient Grounds for Denial since the Exception is Prospective in Nature

**(a) Exception Amount is Based on Projected Costs not Historical Costs.**

The regulations are very clear, that although prior year costs and utilization must be used in developing a projected cost per treatment, it is the <u>projection</u> that provides the basis for the exception. <u>At no point do the pertinent regulations infer or state that deficiencies in the prior year's cost report cannot be explained, corrected, and corrections incorporated into projections, which then accurately form the basis of an exception.</u>

MED-REG, MED-GUIDE ¶20,887.180, **42 CFR §413.180,**

**Procedures for requesting exceptions to payment rates.**

(a) *Outpatient maintenance dialysis payments* All payments for outpatient maintenance dialysis furnished at or by facilities are made on the basis of prospective payment rates.

(b) *Criteria for requesting an exception* If a facility <u>projects on the basis of prior year costs and utilization trends that it will have an allowable cost per treatment higher than its prospective rate set under</u> §413.174, and if these excess costs are attributable to one or more of the factors in §413.182, the facility may request, in accordance with paragraph (d) of this section, that HCFA approve an exception to that rate and set a higher prospective payment rate. However, a facility may

only request an exception or seek to retain its previously approved exception rate when authorized under the conditions specified in paragraphs (d) and (e) of this section. *[Emphasis added]*

The Provider went to great lengths to project accurately its cost per treatment based on the three prior years cost reports. *[P-1, Narrative, p 7]*

The provider explained how corrections in the prior year's cost reports were consistently incorporated into the projections:

> *LLUMC provides both inpatient and outpatient hemodialysis service. In Exhibit 2, the projected costs have been allocated between inpatient and outpatient based on projected number of treatments. We noted that in Worksheet I series for fiscal years 1997, 1998 and 1999 that no costs have been allocated to inpatient treatments. The cost per treatment calculations as shown in Exhibit I for these years have therefore been revised to reflect the proper allocation and to be consistent with our cost per treatment calculation for fiscal year 2000.* [P-1, Narrative, p 8]

See also:   *P-1, Attachment, Comparison of Cost per Treatment (pp. 28-35); Attachment 2, Projection for FYE 12/31/2000 and Detail Support (pp. 36-46).*

## ( b) Regulations Merely Require "Proper" Nursing Labor Allocation.

42 CFR §413.184 (a)(3)(i), which addresses the cost - allocation requirements of the atypical Service intensity exception request, merely requires a "proper allocation" of nursing personnel costs.  42 CFR §413.184

(a)(3)(i), does not specify whether the allocation is to be found in "as-filed" or "projected" cost reports or any other schedule:

> **42 CFR §413.184 Payment exception: Atypical service intensity (patient mix).**
>
> (a) To qualify for an exception to the prospective payment rate based on atypical service intensity (patient mix)--
>
> > (1) A facility must demonstrate that a substantial proportion of the facility's outpatient maintenance dialysis treatments involve atypically intense dialysis services, special dialysis procedures, or supplies that are medically .....
> >
> > (2) The facility must demonstrate clearly that these services, procedures, or supplies and its per treatment costs are prudent and reasonable when compared to those of facilities with a similar patient mix.
> >
> > (3) A facility must demonstrate that--
> >
> > **(i) Its nursing personnel costs have been <u>allocated properly</u> between each mode of care; [emphasis added] and**
> >
> > (ii) The additional nursing hours per treatment are not the result of an excess
> >
> > number of employees

### (c ) PRM 2720 Requires only Accurate "Estimates" of Projected Costs

The manual provisions that pertain to the cost component of an exception request are consistent with the regulations and require only accurate pro-forma cost estimates. Flawless prior years' cost reports are not required.

2720. GENERAL INSTRUCTIONS FOR PROCESSING EXCEPTIONS UNDER COMPOSITE RATE REIMBURSEMENT SYSTEM



A hospital-based or independent renal dialysis facility may request HCFA to approve an exception to the composite payment rate and set a higher payment rate, if the facility has an estimated allowable cost per treatment higher than its composite rate, and if the higher costs relate to the exception criteria described below. [Emphasis added]

2720.1  Criteria for Approval of Exception Requests.--HCFA may approve an exception to an ESRD facility's composite rate payment if the facility demonstrates with convincing evidence (see 42 CFR 413.170(f)(5)) that its total **estimated per treatment costs are reasonable and allowable in accordance with Medicare reasonable cost principles** and §2717, and that its per treatment costs in excess of its composite payment rates are directly attributable to any of the following criteria. [Emphasis Added]

A.    Atypical Service Intensity (Patient Mix).-- ....

B.    Submittal of Written Justification.--The facility must provide written justification for supporting the facility's higher cost. The fact that a facility **projects** costs higher than its composite rate payment is not adequate documentation for granting an exception. The facility must provide HCFA with supporting material documenting the reasons that may justify its costs in excess of its composite payment rate(s). In addition, the facility must separately identify those items and services that are in excess of the composite payment rate. [Emphasis added]

**(d ) PRM  §2720.1 G - Does not Preclude revision of Spreadsheets.**

As required by PRM §2720.1 G the Provider submitted the previous year's cost report. *[P-1, Attachment 23]* PRM §2720.1 G does not require revision

or resubmission of the prior years' entire cost report. In order to accurately project costs the Provider, prepared spreadsheet models based on the renal schedules of prior cost reports. The revisions separating inpatient and outpatient costs were made, not to prior <u>cost reports</u>, but to spreadsheet models used for projection purposes. PRM §2720.1 G clearly addresses only the situation when a change of <u>methodology</u> is used in a revised, complete cost report prepared on official cost report forms or software.

> Reporting Actual Cost.--A renal facility must submit a copy of its most recently filed cost report. When the facility submits a **revised cost report**, it must have received prior intermediary approval to change its cost allocation methodology in accordance with cost reporting instructions contained in HCFA Pub. 15-II. No intermediary approval is needed if the facility is changing to the recommended statistics, as described in the cost report instructions.[Emphasis Added] .... *[PRM §2720.1 G]*

Moreover, PRM §2720.1 G is clearly designed to negate the effect of revisions that increase the exception amount by cost shifting.

> If the revised cost allocation is for the purpose of shifting costs to meet the exception criterion or in less costs being allocated to inpatient treatments than outpatient treatments, HCFA disregards the revised cost report and uses the latest actual cost report received by the intermediary. *[PRM §2720.1 G]*

In the Provider's case is the exact reverse of the scenario described in PRM §2720.1 G above: Originally <u>no</u> cost was allocated to inpatient; revisions were made, not to prior cost reports, but to spreadsheet models that allocated costs <u>to</u> inpatient dialysis.

### (e) Nursing Time For Inpatient Treatments Was Not Materially Misstated.

The Provider established in the exception request that 72% of outpatient treatments are pediatric and that pediatric patients require a staff-to-patient ratio close to, or exceeding 1:1 *[P-1, Attachments 3B & 9A]*. The Provider also established that the remaining adult outpatients required notable additional staff time per treatment *[P-9B]*. Inpatient treatments commonly require a 1:1 staff to patient ratio if dialyzed in a patient room. The Provider also dialyzes inpatients in its outpatient unit; this practice lowers the staff to patient ratio for inpatients somewhat because one nurse can handle more than one inpatient. *(Tr. 112)* It is therefore neither unreasonable, nor has CMS in any way established that it is inaccurate, to assume that the Provider's inpatients demand equivalent dialysis nursing time per treatment to pediatric outpatients. Factoring in infants and toddlers, pediatric patients may consume more nursing time per treatment than inpatients. The Provider has also established that those adult outpatients accounting for the other 28%

62

of total outpatients treatments were high acuity patients *[P-1, p20, p62;* *Tr.45-46]*; patients that transfer out when stabilized. As such, the projected Provider nursing labor allocations were substantially accurate.

### (f) The Provider Used the Approved Statistical Basis for Projected Labor Allocation.

The Provider projected renal schedules; *[P-1, Attachment 2, p36 &p 38]* use the approved statistic of nursing hours to allocate labor cost and not, as CMS asserts, treatments.

### (g) The Provider Accurately Calculated Supply Cost.

Inpatient dialysis uses the same machinery and consumes the same supplies as outpatient dialysis, except that, in some facilities, outpatient dialyzers are re-used. The Provider's "As-Filed" FY 1999 Cost Report has clearly established that it does not re-use dialyzers for outpatient dialysis. *[P-1, Attachment 23, "As-Filed" FY 1999 Cost Report, p 197, WS S-5, line 9]*. Prior exception requests and subsequent CMS relief for supply costs above the norm corroborate that non re-use has been the Provider's long standing practice *[P-7, 1990 Approval letter, p67; P-13, 1994 Approval letter, p 168]*.

CMS denied supply relief of $ 1 / treatment based on the completely

inaccurate assumption that this Provider re-used dialyzers. *(Tr. 73. )*

Information, not included in the Provider's Exception Request, was

"transplanted" from another completely separate facility, and taken from

national norms and then inserted into re-use calculations applied to this

Provider. *[P-2, p26]* Thus the rationale for denial has absolutely no basis in

fact.


CMS also used the listing of routine supplies provided as a basis for denial,

citing the fact that costs did not total to more than the CMS median cost of

$ 33. CMS erred in three respects:

- The "norm" of $ 33 is over 20 years old and had not been updated, *(Tr.*
  *212).*

- The listing of routine supplies is not intended to be an average cost per

  treatment, nor can it be since some supplies are "either or" e.g. either a

  catheter or a fistula. *(Tr. 76 – 77)*

- Per 42CFR §413.180, (b) the basis for an exception is projected costs.

  The listing of supplies *[P-1, Attachment 16, p 171]* is simply a list of

  routine supplies. It is not correlated to the cost report, and cannot be used

  as a basis for an exception.  In fact, because the Provider reconciled its

supply costs to projected costs, *[P-1, Attachment 1, p 31]*, the Provider's requested amount was limited to only $ 1 per treatment.

## (h) Provider Quantified and Qualified its atypical supply costs.

The Provider identified the atypical characteristics of its patient population by classifying patients into categories requiring atypical labor. Several of these atypical labor categories included atypical supply consumption. *[P-1, Oxygen, p15; Catheters, p16 & p22]* Each patient consuming the supply is identified as well as the number of treatments per patient. While the clarity of the atypical supply cost presentation is less than ideal, presentation or calculation methodology, is not cited by CMS as a basis for denying supply relief.

## ( i) CMS Fiscal Intermediary failed to properly audit the cost report

The CMS reviewer pointed out that inpatient costs were not separately broken out in three sequential years of cost reports and admonished both the Provider and the Intermediary for errors in cost reports, *[ P-2, p.p21- 25]*. It should be noted that the errors found in the 1999 "As-filed" cost reports were also found in the 1997 "audited" cost report *[P-9]*, the 1998 "as-filed"

cost report *[P-1, Attachment 1]* and the "audited" 1998 cost report *[P-10.*

The Provider has submitted for the Boards review, *[P-9, 1997 Cost Report*

*Audit]*, the renal schedules and audit report of the <u>audited</u> 1997 cost report

and the <u>audited 1998</u> cost report *[P-10]*. In the case of the 1998 cost report

the Intermediary failed to incorporate corrections into the renal schedules

that would break out inpatient costs, even though the Provider specifically

pointed out the problem with the "as-filed" cost report and provided support

documentation. The Intermediary made 91 other audit adjustments, but left

inpatient costs intermingled with outpatient costs.

When exercising due diligence to correct errors, the Provider cannot be held

solely responsible for the allocation irregularities found in the 1997 and

1998 cost reports. PRM 2718 as well as CMS audit instructions *[P-21,*

*Medicare ESRD Hospital Audit Guidelines]* clearly task the Intermediary with

ensuring accurate renal schedules on the cost report:

> A.   **Guidelines for Intermediaries in Processing Cost Report**s.--It is necessary
> for the intermediary to perform a limited review of the cost reports prior to submittal
> to HCFA, focusing on the accuracy and completion of the cost reporting forms.
> Accurate cost data is required since it is used to establish a computerized renal cost
> data base.   The compiled renal cost data is utilized for accumulation of data for
> overall program evaluation, review of exception requests to the composite rate and
> for the determination of future composite rates.  The intermediary:


1.   Reviews all the information submitted, according to cost reporting instructions contained in HCFA Pub. 15-II, for Form HCFA-2552 and Form HCFA-265 to ensure that all the applicable items have been properly completed. Annotates those items not applicable. Completes all applicable cost reporting forms.

2.   Determines that the facilities have utilized the Medicare principles of reimbursement to ensure that only reasonable and allowable costs for furnishing covered services to Medicare beneficiaries are reimbursed.   (See §2717 for exceptions to Medicare ESRD costs.) ...

## (j) CMS Incorrectly Required Periodic Time Sampling

CMS had no basis for requiring atypical intervention time studies that satisfied the periodic time sampling standards for cost reports. The regulation CMS cited, 42CFR 413.198 pertains to cost reports – not atypical patient care time.  Accurate time studies, following periodic time sampling standards (one entire week per month) are prohibitively expensive in terms of labor consumption. *(Tr. 132 – 137.)*

Even if the Provider could afford the time study cost, CMS has not established in any form what items are, or are not, atypical so the Provider has no reasonable basis to know which items CMS needs timed. The Providers atypical timings were developed by professional clinicians with

considerable first hand knowledge of the patient mix. Tr. 65 *[P-1,Narrative, p10]* The times were indeed auditable. *(Tr. 65 – 66.)*

CMS did not require this type of time sampling to approve the Provider's 1990 or 1994 Exception Request 1994 *[P-8, 1990 Approval letter & P-9, Time determination; P-13, 1994 Approval Letter & P-6, 1994 Time Determinations and Patient Categories].*

Finally, the CMS witness, Mr. Powell, unequivocally stated that time studies are neither useful nor required for an approval:

> ***Time studies have nothing to do with any exception request I've ever adjudicated or my fellow workers*** *because we've had in the past many, many attempts like the attempts the were made in these to justify the atypical time by the nurse based on interviews in the preparation of the exception request, never met the test for a valid time study so we never used it, **and yet we approved a very high percentage of exception requests without using those*** (Tr. 236 - 237)

## (k) CMS's Standards are Arbitrary and Unduly Subjective.

The process used by CMS to adjudicate exception requests has not ensured any reasonable level of consistency. For instance, above, CMS's witness adamantly confirmed, both on his own behalf and that of his colleagues, that time studies are not, and have never been required for approval. Yet Mr.

Logue, the author of the denial letter, specifically cited lack of time studies as a basis for denial:

> *The Provider has not presented any time studies to adequately support its patient care staff's identification of the additional time spent by nursing staff. Therefore,* **the provider has failed to adequately document the additional nursing staff services rendered to its atypical patient mix.** ***Data based on patient care staff interviews that cannot be audited is not acceptable.*** *[Emphasis Added]*

Similarly, with respect to quality of cost reporting, the CMS witness had no standard for when errors in cost report data were sufficiently grave to deny an exception request without a ruling on atypicality. *(Tr. 221 – 224.)*

## 3. The Exception Request Was Not Processed Within 60 Days, And As Such Should Be Approved.

The Provider has two parallel, but otherwise unrelated reasons to support the claim that the Exception Request was not processed in a timely manner:

### (a) The Exception Request has Never been fully processed

The Provider notes that CMS addressed the cost issue but never ruled on the second determinative issue of atypical patient acuity. CMS had ample clinical data to a rule on atypicality, which is central to adjudication of an Atypical Service Intensity Exception Request. The Board ruling in the *Maury County Dialysis Associates v. Blue Cross and Blue Shield Association*, **PRRB Hearing** Dec. No. 91-D42, April 25, 1991, confirms that a partial CMS adjudication, addressing only one of the determinative issues of an exception, while reaching no conclusion on other determinative issues, is not sufficient to meet the 60 day processing deadline. To be approved for increase payment, the Provider must demonstrate both higher costs and sicker patients. It follows then that full adjudication must address both issues. Moreover a linkage is required by regulation and so cost issues cannot be adjudicated absent consideration of patient acuity.

**(b) The Provider Was Not Notified Within The 60-Day Time Limit.**

Although LLUMC's exception request was submitted on August 28, 2000,

LLUMC did not receive a response from CMS until December 11, 2000.

> 42 CFR § 413.180(h) clearly states:
>
> *"Approval of an exception request.  An exception request is deemed
> approved unless it is disapproved within 60 working days after it is
> filed with its intermediary."*

The Provider contends that if the Intermediary and CMS do not notify it of

their decision to deny its Exception Request in 60 working days, it must be

deemed approved. The exception request was timely submitted on August

28, 2000.  On November 15, 2000 *[P-2, Denial Letter]* CMS made its

determination to deny the exception request.  However, this denial was not

communicated to the Provider until a letter dated December 11, 2000 *[P-3,*

*Provider Notification]* which is 12 days after the 60 working day period

allowed by statute.  A count totaling the days between the date of

submission of the Exception Request and date of the letter to the Provider

has been prepared *[P-11, Processing Days]*.  To be timely, the 60 working

days limit required that notification of the CMS final determination be

received by the Provider on, or before, November 24, 2000.



The Intermediary asserts that the Exception Request had been processed by CMS on November 15, 2000, within the 60 day period. However, there was merely a failure to notify the Provider of CMS's decision. *(Tr. 23.)* The Provider asserts that this argument is without merit. The Provider asserts that the processing of the Exception Request does not end until the Provider is notified; otherwise, the statutory requirement for prompt notification to the Provider has no meaning.

The Provider has conducted exhaustive legal research on this subject. To date, this issue has not been squarely addressed by any federal court. Therefore, the sole legal authority on this point consists of prior PRRB and Administrator decisions, and most importantly, the legislative history of the statute itself. After reviewing these sources, there can be little doubt that the deemed approval rule is based upon notification to the provider, and not action by CMS.

The statutory authority for the 60 day approval requirement is contained in Section 9335(a)(2)(B) of the Omnibus Budget Reconciliation Act of 1986

(P.L. 99-509), and codified at 42 USCS § 1395rr(b)(7).  The statute provides in pertinent part as follows:

> *"Each application for such an exception shall be deemed to be approved unless the Secretary disapproves it by not later than 60 working days after the date the application is filed."*

The Conference Committee report notes that the provision originated in the House of Representatives, and was acceded to by the Senate during the reconciliation process.  See House Report No. 99-1012 (Comm. of Conference), accompanying H.R. 5300.  House Report No. 99-727 (Comm. on the Budget), accompanying HR 5300, noted that *"numerous complaints have been received that the exceptions process is cumbersome, and that the rules are ambiguous and difficult to comply with, and that determinations are long delayed."*  See Report of the Committee on the Budget to accompany HR 5300, page 76.  Further, the Report states as follows:  *"The Committee bill provides for the appeals process to be streamlined so that an exception would be deemed approved unless the Secretary disapproved it by not later than 45 working days from the date the application was filed with the intermediary.  The Committee intends that the fiscal intermediaries will*

*complete within 15 working days their recommendation so that HHS will*

*have 30 days to make its decision."*  Id. at 454.

The House provision was subsequently enacted into law, with an amendment

to give the Secretary 60 working days to process exception requests.

It is evident from the above that Congress viewed delays in processing

exception requests as part of an overall problem relating to the cumbersome

nature of the entire process.  Thus, the congressional intent was both to

simplify the process, and to expedite the resolution of exception requests.

It is beyond doubt that the legislative purpose would be utterly defeated if

the intermediary were permitted an indefinite amount of time to notify the

Provider as to the resolution of its exception request.  During this period

Providers would have no way of knowing whether their request had been

approved or denied.   The Provider's budgeting and fiscal processes would

be placed in a state of indefinite suspension.  Providers whose requests had

been approved by CMS could be indefinitely delayed in the collection of

reimbursements to which they had already been found to be entitled.

Providers whose request had been denied would be unaware of that fact, and

therefore would be unable to make any alternative arrangements with respect to their dialysis units, including potentially opting out of the dialysis program.

Moreover, previous decisions of the PRRB are generally in accord with this view. In *Charlotte Hungerford Hospital v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Connecticut*, PRRB Dec. No. 96-D64, September 11, 1996, Medicare and Medicaid Guide (CCH) P 44,647, *rev'd* HCFA Administrator Decision, November 8, 1996, Medicare and Medicaid Guide (CCH) P 44,978, the PRRB found that the failure to notify the Provider within the 60 day period deprived the Provider of an opportunity to correct deficiencies in its request. The PRRB found that had the Provider been notified within the 60 days period, it would still have had sufficient time available within the period of the exception window to correct any deficiencies in its request. In the instant case, Provider concedes that no such corrections could have been made as the window closed on the date of its submission, i.e., July 2, 2001. However, the Board's decision nonetheless establishes that the date of determination by CMS is not controlling as to the applicability of the deemed approval requirement.

In *Mount Clemens General Hospital v. Blue Cross and Blue Shield Association/United Government Services*, PRRB Dec. No. 2002-D26, July 9, 2002, Medicare and Medicaid Guide (CCH) P 80,886, *aff'd* HCFA Administrator Decision, September 6, 2002, Medicare and Medicaid Guide (CCH) P 80.943, the PRRB clearly held that the provider must receive notification within 60 days of submittal; otherwise, the request will be deemed approved.

The facts of Mt. Clemens were particularly egregious.  In Mount Clemens, supra, the provider did not receive notification for more than 14 months after the decision had been rendered by CMS.  The PRRB held that this delay was clearly prejudicial, given that the Provider could have opted out of the program had it been provided with earlier notification.

Finally, in *Tri State Memorial Hospital v. Blue Cross and Blue Shield Association/Blue Cross of Washington/Alaska*, PRRB Dec. No. 2000-D25, March 6, 2000, Medicare and Medicaid Guide (CCH) P 80,402, *rev'd* HCFA Administrator Decision, May 8, 2000, Medicare and Medicaid Guide (CCH) P 80,642, HCFA's determination was not received for several months after the 60 working day deadline.  As in Charlotte Hungerford, the PRRB

concluded that this deprived the Provider of an opportunity to submit timely

corrections to any perceived deficiencies in its exception request.

These three decisions establish as a general proposition that the PRRB does

not view the date of the CMS decision as necessarily stopping the 60

working day clock.  Provider recognizes that each of these cases have unique

factual circumstances which are perhaps distinguishable from the instant

case.  However, the overall thrust of the PRRB decision is that the date of

the CMS decision does not stop the 60 working day clock, particularly

where the Provider is able to demonstrate prejudice resulting from any

delay.

However, the Provider contends that the issue of prejudice is essentially

irrelevant in determining whether the CMS decision stops the clock.

Clearly, Congress did not intend that the applicability of the deemed

approval rule be dependent on the facts of each specific case.  Rather,

Congress established a hard and fast deadline; i.e. 60 working days.  The

fact that a deadline exists is evident.  This deadline must necessarily be

either (a) the date of the CMS decision, or (b) the date of notification to

provider.  As PRRB's decisions clearly establish that it is not the former,

Provider asserts that the applicable deadline must necessarily be the latter, i.e. the date of Provider notification. Any other construction will clearly violate the legislative purpose underlying the statute.

Finally, CMS has put into place a system which requires two separate notifications; i.e., one from CMS to the intermediary, and the other from the intermediary to the provider. Any delays resulting from this system should easily have been obviated by CMS simply making direct notification to the provider. Under these circumstances, the delays in notification to the provider should be chargeable to CMS.

Ultimately, it was a CMS decision to implement a cumbersome system of providing provider notification, notwithstanding the clear legislative direction to the contrary. Accordingly, for this reason alone, provider should be given the benefit of the 60-day rule, and its exception request should be deemed approved.

Intermed.

## B. INTERMEDIARY'S CONTENTIONS

The Intermediary contends:

**1. That errors in the FY 1999 cost report could not be corrected for, and were sufficient grounds for denial.**

However the regulations CMS cited, 42 CFR 413.198, 413.20, and 413.24, do not address exception requests. Moreover, the regulations that do address exception requests, 42 CFR 413.180(a), 42 CFR §413.182, clearly state that exceptions are to be based not uniquely on "as-filed" cost reports, but rather on supportable projected costs based on prior years costs.

**2. That lack of auditable time studies was sufficient grounds for denial.**

However, CMS has **no regulatory basis for this demand**, and once again the regulation, 42 CFR 413.198 cited, does not address exception requests. In fact, 42 CFR 413.198, pertains to cost reports, not atypical nursing labor calculations. Moreover, the CMS witness blatantly disagreed with the position stated in the denial letter regarding time studies.

3. **That the Provider's supply costs failed to exceed the $ 33 median threshold for an exception.**

However, CMS **erred factually** with regard to supplies, by falsely assuming that the Provider re-used dialyzers and dividing the Provider's dialyzer cost by a re-use count taken from another facility.

4. **That the Provider's errors in cost reporting, un-auditable time studies and lower than median supply cost, were sufficient grounds to not rule on the exception criterion.**

However, CMS **erred factually** with regards to the time study and supply issues and CMS did not establish that the errors in prior cost reports were sufficient grounds for denial.

5. **No exception relief should be provided for employee benefit cost since no relief was granted for salaries.**

CMS is correct in correlating employee benefit relief with salary relief.



# V. CITATIONS OF LAW, REGULATIONS AND PROGRAM

# INSTRUCTIONS

1. Law --

    42 U.S.C. § 1395rr(b)(7)

2. Regulations –

    42 CFR § 413.180

    42 CFR § 413.180(a)

    42 CFR § 413.180(b)

    42 CFR § 413.180(h)

    42 CFR § 413.182

    42 CFR § 413.184

    42 CFR § 413.184(a)(1)

    42 CFR § 413.184(a)(3)(i)

    42 CFR § 413.194

    42 CFR § 413.198

    42 CFR § 413.20

    42 CFR § 413.24

3. Program Instructions:  Provider Reimbursement Manual Part 1, CMS

Pub 15-1 --

        PRM § 2720

        PRM § 2720.1

        PRM § 2720.1 G

        PRM § 2725.1.A

        PRM § 2725.1 B

        PRM § 2725.1 B.1

        PRM § 2725.1 B.2

        PRM § 2717

        PRM § 2718



# VI.  PROPOSED FINDINGS AND CONCLUSIONS

1.  The Provider submitted adequate documentation to justify its claim that it serves an atypically sick patient population.

2.  Pediatric patients receive 72% of outpatient treatments rendered at the Provider's dialysis unit.

3.  52.86% of the Provider's patients were diabetic which substantially exceeds the national norm of 34.44%.

4.  81.43% of the Provider's patients were Hypertensive which substantially exceeds the national norm of 24.76%.

5.  34.01% of the Provider's patients were over 64 years old which substantially exceeds the national norm of 28.88%.

6.  17.69% of the Provider's patients were below 20 years old which substantially exceeds the national norm of 0.31% of patients who are below 20 years old.

7.  8.57% of the Provider's patients were Transplant Patients which substantially exceeds the national norm of 3.43%.

8.    The Provider submitted adequate documentation to justify its claim that it incurs costs in excess of the norm due to serving an atypically sick patient population.

9.    CMS has not ruled on the atypicality of LLUMC's patient population and as such has not processed the exception request.

10.    Provider's exception request was submitted on August 28, 2000.

11.    In a letter dated November 15, 2000 CMS, Division of Chronic Care Management, notified its Fiscal Intermediary that it was denying the Provider's exception request.

12.    In a letter dated December 11, 2000 the CMS Fiscal Intermediary notified the Provider of the exception request denial.

13.    CMS has not processed the Exception Request within the requisite 60 day time limit.

14.  CMS erred materially in its determination by using re-use counts from another facility to calculate the Provider's supply cost per treatment.

15.  CMS has no basis to require time studies of atypical nursing time used in exception requests that meet the periodic time sampling standards for time studies used in cost reports.

88

# VII.  SUGGESTED BOARD DECISION

The Board finds that CMS improperly denied the Provider's exception request for the following reasons:

(a)    The Exception Request was not processed within the statutory 60-day limit because CMS failed to determine if the patient population was atypical.

(b)    The Exception Request was not processed within the statutory 60-day limit because CMS failed to notify the Provider in a timely manner.

(c)    CMS based its determination on material errors with respect to supply cost per treatment.

(d)    CMS based its determination on a time study requirement not supported by regulation or manual provisions pertaining to exception requests.

(e)     In accordance with 42 CFR § 413.180(h) the Provider's Exception

Request is deemed approved at the amount requested, a composite

rate of $381.10 per treatment.


(f)     The exception rate of $ 381.10 is retroactive to the submission date of

August 28, 2000.




Respectfully Submitted,

Jack Ahern

841 C
South Racine Avenue
Chicago, Illinois 60607
312 997 2177

Provider Representative

Dated August 5, 2004

# CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 5th day of August 2004,

I caused to be delivered via Federal Express, a copy of the foregoing

Provider's Post-Hearing brief to:


Bernard M. Talbert, Esq.
C/o Blue Cross and Blue Shield Association
225 N. Michigan Avenue
9th Floor
Chicago, IL 60601
Via FedEx Number 8464 4455 0193


Mary E. Wiesner

# BEFORE THE PROVIDER REIMBURSEMENT REVIEW BOARD
# BALTIMORE, MARYLAND

| | |
|---|---|
| LOMA LINDA UNIVERSITY MEDICAL CENTER ) ) ) ) | |
| PROVIDER No. 05-0327 ) ) | PRRB Case No. 01-2871 ESRD |
| (Provider) ) ) | |
| vs. ) ) | |
| UNITED GOVERNMENT SERVICES ) ) | |
| (Fiscal Intermediary) ) | |

## PROVIDER'S FINAL POSITION PAPER

### List of Issues

1) The issue is whether HCFA incorrectly denied Loma Linda University Medical Center's (LLUMC) request for an exception to the ESRD composite rate.

### Amounts in Controversy

The reimbursement effect of the FYE 2000 exception request is to increase payment by $ 243.02 for hemodialysis. The cumulative reimbursement effect will vary with the duration of the exception, which depends on the

length of time CMS (formerly HCFA) permits the exception to remain in effect. However, even a single year's increased reimbursement at the requested rate would have resulted in more than $ 10,000 of additional revenue for LLUMC.

## Jurisdiction

The Provider Reimbursement Review Board ("PRRB") has jurisdiction over this matter pursuant to the provisions of 42 CFR § 413.194.

## Statement of Facts

On August 28, 2000, LLUMC submitted an exception to the composite rate for maintenance dialysis service to United Government Services, LLC ("Fiscal Intermediary"). The Provider sought an exception amount of $381.10 or an increase of $ 243.01 per treatment. The basis for the provider's request was atypical service intensity.

The Intermediary recommended an increase of $ 87.32 and sent the exception request to HCFA's Division of Chronic Care Management. Despite several requests, the Intermediary's correspondence has not been released to the Provider's representative hence the date and details of the letter is unknown to the Provider.

On December 11, 2000, the Provider was notified that the exception request had been denied in its entirety by HCFA.

On April 16, 2001, LLUMC timely filed an appeal to the Provider Reimbursement Review Board pursuant to 42 CFR § 413.194. For the following reasons, LLUMC asserts that HCFA improperly rejected the Provider's exception request.

## ARGUMENT

### I.    Provider Satisfied the Atypical Service Intensity Criteria

The criteria for submission of exception requests on the basis of atypical service intensity are stated in 42 CFR § 413.184. Further, the Provider Reimbursement Manual provides additional authority with respect to composite rate exceptions based on atypical service intensity. See PRM § 2725.1.

The applicable regulations states in pertinent part as follows:

> *A facility must demonstrate that a substantial proportion of the facility's outpatient maintenance dialysis treatments involve atypically intense dialysis services, special dialysis procedures, or supplies that are medically necessary to meet special medical needs of the facility's patients.* See 42 CFR § 413.184(a)(1).

The regulations require the provider to submit documentation pertaining to eleven separate categories of information reflecting on a patient's condition. However, these regulations clearly do not require a provider to demonstrate atypicality with respect to each of these eleven separate categories. Rather, it is the totality of the circumstances which must be evaluated by HCFA in deciding whether to grant the request.

The Provider's exception request clearly articulates the basis of the composite rate exception and provides solid evidence that several key indicators demonstrate a higher than national average level of patient acuity. The exception request delineates those clinical factors that are strongly indicative of an atypical patient population. The section of the Provider's narrative entitled "National Average Comparison" [See Exhibit P-1] summarizes these clinical indicators:

|  | LLUMC (FY 1999) | National Average [1] |
|---|---|---|
| Diabetic Patients | 52.86% | 34.44% |
| Hypertensive Patients | 81.43% | 24.76% |
| Cardiac Patients | 57.14% | not available |
| Mortality Rate | 4.29% | 16.00% |
| Hemodialysis – over 64 years old | 34.01% | 28.88% |
| Hemodialysis – below 20 years old | 17.69% | 0.31% |
| Transplant Patients | 8.57% | 3.43% |

(1) Source: United States Renal Data System, 1999 Annual Data Report (USRDS) (Based on 1997 data).

Close review of the clinical statistics shown above reveal that, despite the fact that 18% of LLUMC's patients are pediatric, LLUMC also treats a higher than national average percent of patients over 64!  Each older patient

statistically offsets the percent of younger patients. Consider a hypothetical patient population consisting of twenty 100-year-old men and twenty new born girls would have an average age of 50 years old split evenly between male and female. A median age of 50 might be interpreted by HCFA to reflect that this population is not all that atypical. However, immensely more labor would be required to handle this bimodal age distribution.

So, for LLUMC to have higher than normal percents of <u>both</u> younger and older patients requires that relative to national norms, few patients are in the healthier and more cost effective mid-age range assumed in setting the composite rate. LLUMC also narrated that 52.38% of its patients were temporary transfer patients admitted for stabilization or for complications that cannot be handled at other nearby facilities.

Clearly, LLUMC has proffered ample evidence that it treats atypically sick patients and, as such, has demonstrated compliance with the criteria for atypical service intensity as prescribed in 42 CFR § 413.184, as well as the implementing provisions of PRM § 2725.1.

## II. HCFA Has Not Adequately Processed The Exception Request

Uncontestable cost reporting and perfectly documented proof of costs in excess of the norms is not *per se* sufficient justification for HCFA to grant an exception unless the Provider first establishes that atypically sick patients are being treated. Notably, HCFA does not challenge the atypical nature of the patients treated by LLUMC, but rather HCFA sidesteps clinical issues to focus on cost reporting issues: *However, because of the issues discussed below, we have not ruled on the exception criterion.* [See Exhibit P- 2, p.1] However, because the cost report is designed to calculate or measure the true cost of rendering dialysis services, it is not possible to judiciously assess the veracity and accuracy of the information in a cost report unless some assessment is made of the intensity of dialysis services actually being rendered. Atypically high clinical costs are consistent with and corroborative with the assertion that atypically sick patients are being treated. Atypically high clinical costs without atypically sicker patients would indicate inefficient delivery of care and not warrant an exception. As such, cost reporting information cannot be divorced from clinical indicators. LLUMC presented convincing evidence that it treats extremely sick patients that would not usually be treated at other facilities. HCFA must either accept the Provider's contention of atypicality or present substantial reasons to

174

reject the conclusion that LLUMC treats patients far sicker than the norm for which the composite rate was intended to pay. By refusing to address the atypical service intensity exception criterion, HCFA has failed to process the exception as required.

## III.    The "As Filed" Cost Reports Were Sufficient To Demonstrate Atypical Costs

Per the instructions in § 2721 G of the Provider Reimbursement Manual the Provider submitted with the Exception Request its most recently filed cost report which covered FY 1999 [Provider Exhibit P -1]. Also submitted with the exception was cost report information from 1997 and 1998. The Provider pointed out and made adjustments to correct errors found in these cost reports, in particular to ensure that costs were allocated to inpatient dialysis as well as outpatient dialysis.

### a)    1997 Cost Report Was Audited By HCFA But No Adjustments Made

It should be noted that the 1997 data had been audited by HCFA with no modification. [Exhibit P - 9] HCFA's reviewer, Joseph Logue of the Division of Chronic Care Management, admonished the HCFA Fiscal Intermediary:

*You [the HCFA Auditors] should have verified that the statistics used by LLUMC are in accordance with Medicare program instructions. 42 CFR 413.198 (b) states that each facility must keep adequate records and submit the appropriate HCFA-approved cost report in accordance with §13.29 and provides rules on financial data and reports, and adequate cost data and cost finding, respectively. The Worksheet I series field by LLUMC for its FY 97,98 and 99 cost reports did not use the HCFA-approved statistical basis for allocating costs.*

Although there can be no doubt that the provider made these errors cited by HCFA when filing the cost report, the Provider should not be held responsible for errors made by HCFA auditors while auditing the cost report. It is highly probable, that had the proper adjustments been made in the 1997 audit, the Provider would have corrected the statistics used in the 1998 and 1999 cost reports. [See Provider Exhibit P – 9]

During the 1998 cost report audit, although LLUMC pointed out to the HCFA auditors that the inpatient costs were incorrectly allocated to

outpatient dialysis treatments and the HCFA auditors verbally agreed to review a correct Worksheet I series; no changes were made and the final audited cost report still contains no allocation to inpatient dialysis. Thus the audited final 1998 cost report has no allocation to inpatient dialysis even though considerable effort was made by LLUMC to accurately revise the "as filed" cost report. [See Provider Exhibit P – 10]

**b)      "As Filed" Cost Reports Sufficiently Demonstrated Atypical Costs.**

PRM § 2721.B requires that a provider submit: *Supporting material documenting the reasons that may justify its costs in excess of its composite rate(s).  In addition, the facility must separately identify those items and services that are in excess of the composite rate.* In addition, PRM §2721.E requires that the cost per treatment used in an exception *must reconcile with reported costs.* "

LLUMC submitted a plentitude of documentation that justified its costs in excess of the composite rate.  Moreover, its cost per treatment reconciles perfectly with cost report information; that is to say, there is no irreconcilable difference between the information presented in the cost

report and the cost per treatment being used as a basis for the exception. It

very easy to see how the cost per treatment submitted with the exception is

derived from, or reconciles with, the "As-Filed" cost reports. In cost

accounting, reconciliation can require some mathematical work and, as such

a reconciliation is defined as *A calculation that shows how one balance or

figure derives from another*{Accounting: the Language of Business, Roman Weil, 10th

Ed, ISBN 0-913878-58-8}. For costs to reconcile, does not, however, require

exact perfection preclusive of some adjustment.


The cost reporting issues pertain to management and home office costs

which would have no impact whatsoever on the exception amount unless

HCFA decided to grant additional relief based on overhead costs. Clearly,

HCFA decided to deny an overhead exception; not however because of cost

reporting issues, but rather because of concerns about linkage between sicker

patients and increased overhead costs:

*Since the Medicare principles of cost finding are imposed on all Medicare*
*providers, the mandatory Medicare principles of cost finding are not an*
*acceptable reason for requesting an exception amount. Further, LLUMC*
*stated that certain departments provide services to the ESRD unit. LLUMC*
*has not identified the services furnished to the ESRD patients or the costs*
*involved to furnish those services. Unsubstantiated general statements are*
*not sufficient documentation for the granting of an exception amount.*
*Therefore, we are would be unable to grant an exception amount for*
*overhead, even if the criterion were met.* [See Provider Exhibit P- 2]

The only remaining issue raised with respect to the "as filed" Worksheet I series and one that directly pertains to an atypical service intensity exception request is the failure to allocate direct costs to inpatient dialysis.

In this case HCFA only took issue with the statistical basis used to allocate costs to outpatient dialysis. Granted the total direct clinical labor costs were accurate, simply dividing by total treatments it is still clear that the average labor cost per treatment is far in excess of the $ 40 per treatment threshold. The ease and simplicity of this calculation is demonstrated by Attachment 2 of the Provider's Exhibit 2 of HCFA's review that quickly arrives at a Cost Per Treatment of $ 489 which is over 3.5 times the composite rate payment of $ 138.08.  To perform a similar calculation simply requires looking at the nursing labor cost. The calculation itself takes less than a minute to perform and reveals an average labor cost of $ 168 per treatment in 1999. Both the total Cost per Treatment and Nursing labor cost per treatment calculation were, in fact, submitted in Exhibit 1 of the exception request.

Even for the sake of argument assuming inpatient treatments to take <u>twice</u> as much nursing time as outpatient treatments, an assumption that is extremely conservative, the nursing cost per outpatient treatment would be $ 113 and

inpatient $227 in FY 1999. An even more conservative assumption of <u>three</u> times as much nursing labor per inpatient as compared to outpatient would still yield nursing costs of $ 85.70 per treatment, likewise far in excess of the $ 40 threshold used by HCFA for the national norm.

It should be noted that HCFA did, in fact, make use of what HCFA considered reasonable assumptions when it used a reuse rate of 15 times per dialyzer to lower the supply cost per treatment below the $ 33 threshold for an exception. HCFA should have likewise used reasonable assumptions to test the nursing labor cost per treatment.  Such a test, in combination with payroll records submitted with the exception [Exhibit P-1] that substantiate the nursing labor costs, would have shown that based on the "As Filed" cost report alone, LLUMC incurs costs so far in excess of the norm that without doubt there was sufficient reason to review and consider the clinical evidence included with the exception request.

## IV.  Supplies

### a)      Inappropriate use of External Evidence

HCFA denied the Provider's request for an exception amount based on

supplies by the inappropriate and inaccurate use of information from

external sources.

> *We totaled the supply list shown at Exhibit 16 without the dialyzer
> and arrived a total cost of $ 24.71 for supplies, then we included the
> dialyzer CPT of $ 1.29 for a total supply cost of $26.00.  Since this
> supply cost of $ 26.00 is less than the national average of $ 33, we
> would be unable to grant an exception amount for supplies, even if the
> criterion were met."*

(i)      Inappropriate

LLUMC does not reuse its dialyzers and in accordance with cost report

instructions, did not list the number of reuses.  HCFA however viewed the

Provider's accurate and correct use of the cost reporting form in a negative

light: *"The Worksheet S-5 for FY 97,98 and 99 cost reports did not show*

*that the number of times that LLUMC re-uses its dialyzers."* HCFA then,

with no evidence whatsoever that LLUMC even reused its dialyzers, went

on to assume that the correct Worksheet S-5 re-use figure was 15 re-uses per

dialyzer. *Therefore, in making our calculations for LLUMC, we will use*

*the average medium re-use of 15 times."* This assumption was then used as

justification to deny an exception based on supply costs.  HCFA did not

challenge the statistics or methodology used for arriving at the supply cost



per treatment. Rather HCFA took issue solely with the incremental cost justification or list of items used to dialyze the patient. By HCFA's own admission not all facilities reuse dialyzers *82% of facilities re-use,* which means <u>18% of facilities do not reuse dialyzers</u>. Per HCFA's 1999 National listing of *Medicare Providers Furnishing Kidney Dialysis and Transplant Services,* [Exhibit P-4] there are 3,423 Medicare-approved renal dialysis facilities. This means that over 600 facilities nationally do not re-use. It would seem to be highly inappropriate to assume that LLUMC reused its dialyzers, especially given that in two prior exception requests HCFA had awarded LLUMC an exception amount based on the assumption of no reuse.

(ii)    Inaccurate

Even assuming that LLUMC did not reuse, HCFA's use of the 15 re-use per dialyzer assumption was inaccurate. Firstly, a straight average assumes that all dialyzers are used on an equal percent of patients (100% / 7 dialyzers = 14.3% of patients on each dialyzer) when in reality dialyzers are used based on the unique needs of patients that are not equally distributed. Secondly, the price of dialyzers is not equally distributed by model, Exhibit 16A of the exception request shows dialyzer prices ranging by model from the Baxter PSN 120 @ $11.00 to the Baxter CT 190G @ 28.00. Finally, no cost of

reuse materials has been factored in, if the cost of reuse solutions consumed

with each reuse is about $ 1.00 then 15 reuses, using HCFA's figure would

equate to a cost of ($19.35/15) + $ 15.00 = $16.26 for the dialyzer alone.

Adding the cost of other supplies at $ 26.00 per treatment would put

LLUMC over the $ 33 threshold with a total incremental supply cost of

$42.26.


## V.    <u>Time Studies</u>

Although HCFA refused to rule on the atypical service intensity exception

criterion, HCFA nonetheless took issue with the determination of how the

incremental additional labor cost associated with treating the atypical

patient was calculated:

> *Exhibit 9 lists the additional minutes required for each type of*
> *activity requiring additional nursing. What Exhibit 9 does not show is*
> *the time study used to create or determine the additional minutes. As*
> *explained above, §42 CFR 413.198 requires a provider to keep*
> *adequate financial and cost data. The data must be based on those*
> *financial and statistical records, which must be capable of verification*
> *by qualified auditors. The Provider has not presented any time spent*
> *by the nursing staff. Therefore the provider has failed to adequately*
> *document the additional nursing staff services rendered to its atypical*
> *patient mix. Data based on patient care staff interviews that cannot*
> *be audited is not acceptable."*

Firstly, § 42 CFR 413.198 pertains to cost reporting information for Medicare cost reports which are submitted on an annual basis, not to evidence presented in an exception request submitted during a exception request window which opens at periods as long as six years from each other. Secondly, the methods used in this exception to document incremental atypical labor are essentially the same as those in the exception requests submitted by LLUMC to HCFA in 1990 and 1994. In both cases the exception requests were approved. [See Provider Exhibits 5, 6, 7, 8, & 9] In fact, the same HCFA analyst who in 1994 approved of LLUMC's use of staff estimates of additional time spent with patients deemed identical methodology as "not acceptable" in 2000. In fact, during the more than a decade of exception request processing covering, HCFA has neither by regulation nor by memorandum provided an approved method for determining atypical nursing time.

## VI.    The Exception Request Was Not Processed Within 60 Days, And As Such Should Be Approved.

Although LLUMC's exception request was submitted on August 28, 2000, LLUMC did not receive a response from HCFA until December 11, 2000,



42 CFR § 413.180(h) clearly states:

*"Approval of an exception request.  An exception request is deemed*

*approved unless it is disapproved within 60 working days after it is filed*

*with its intermediary."*

As the PRRB has already ruled in a similar case regarding HCFA's failure to

process an exception request in a timely matter:

> Under <u>Sec. 1881(b)(7) of the Social Security Act</u> and *Provider*
> *Reimbursement Manual* Sec. 2720, *et seq.*, an exception request must
> be processed within 60 working days after the request is filed with the
> intermediary or it will be deemed approved. In this case, the period of
> time taken to deny the request was properly measured from February
> 2, 1990, when the intermediary accepted the request as complete, to
> May 21, 1990, when the hospital learned of HCFA's denial. Although
> HCFA made its determination that documentation was lacking within
> the 60 working day time period and sent a letter informing the
> intermediary of its decision, the intermediary did not notify the
> hospital of the denial until after the required time frame had elapsed.
> PRRB-DEC, MED-GUIDE 1996-2 MED-GUIDE-TB ¶44,647,
> **Charlotte Hungerford Hospital (Torrington, Conn.) v. Blue Cross**
> **and Blue Shield Association/Blue Cross and Blue Shield of**
> **Connecticut.**

## **CONCLUSION**

In conclusion, the Provider submitted adequate documentation to justify its claim that it serves an atypically sick patient population and incurs costs in excess of the national norm of $ 40 per treatment used by HCFA to adjudicate exception requests. Provider provided ample evidence to fulfill the burden of proof. HCFA, on the other hand, has neither ruled on the atypicality of LLUMC's patient population nor processed the Exception Request within the requisite 60 day time limit. As such the exception should have been approved in its entirety.

Respectfully Submitted

*Jack Ahern*

Jack Ahern

841 C
South Racine Avenue
Chicago, Illinois 60607
312 997 2177

Provider Representative

Dated November 27, 2001

## **CONCLUSION**

In conclusion, the Provider submitted adequate documentation to justify its claim that it serves an atypically sick patient population and incurs costs in excess of the national norm of $ 40 per treatment used by HCFA to adjudicate exception requests. Provider provided ample evidence to fulfill the burden of proof. HCFA, on the other hand, has neither ruled on the atypicality of LLUMC's patient population nor processed the Exception Request within the requisite 60 day time limit. As such the exception should have been approved in its entirety.

Respectfully Submitted

*Jack Ahern*

Jack Ahern

841 C
South Racine Avenue
Chicago, Illinois 60607
312 997 2177

Provider Representative

Dated November 27, 2001

| Tab | Date | Contents |
|-----|------|----------|
| P - 1 | 28 Aug 00 (Separately Bound) | Provider's Exception Request, together with all supporting exhibits. This request constitutes the basis for the Provider's Claim for additional compensation under the Medicare Program. The validity of this Exception Request is the subject matter of this proceeding. All patient identifying information has been removed from this document. |
| P-2 | 15 Nov 00 | Letter from HCFA's Division of Chronic Care Management to HCFA Intermediary. This document is relevant because it reflects HCFA's denial of Provider's Exception Request. |
| P-3 | 11 Dec 00 | Letter from HCFA Intermediary to Provider transmitting denial of Exception Request. This document is relevant because it furnishes the basis upon which this appeal is brought and because it documents that the Provider was not notified within the mandated 60 day limit. |
| P-4 | January, 99 | Page 3, National Listing of Medicare Providers Furnishing Kidney Dialysis and Transplant Services |
| P-5 | 15 June, 94 | Atypical Service Intensity Exception Request Approval Letter. This document is relevant because it shows that LLUMC had a history of being viewed by HCFA as a provider of Atypically intense dialysis services. |
| P-6 | 1994 | Incremental Time for Atypical Nursing Services 1994. This document is relevant because it shows that HCFA has previously accepted incremental nursing time determinations that are based on interviews with clinical staff. |
| P-7 | 1990 | Atypical Service Intensity Exception Request Approval Letter. This document is relevant because it shows that LLUMC had a history of being viewed by HCFA as a provider of Atypically intense dialysis services. |
| P-8 | 1990 | Incremental Time for Atypical Nursing Services 1994. This document is relevant because it shows that HCFA has previously accepted incremental nursing time determinations that are based on interviews with clinical staff. |
| P-9 | 22 June, 00 | 1997 Audited Worksheet I with Adjustment report. These documents illustrate that the Intermediary did not take issue with the "As Filed" renal cost report schedules. |
| P-10 | 9 Nov, 01 | 1998 Revised Worksheet I submitted to HCFA by Provider, 1998 Audited Worksheet I. These documents are important because it shows that HCFA auditors have not been concerned about accuracy of the Worksheet I schedules. |

Provider Exhibit 1

| Tab | Date | | Contents |
|---|---|---|---|
| P - 1 | 28 Aug 00<br>(Separately<br>Bound) | | Provider's Exception Request, together with all supporting exhibits. This request constitutes the basis for the Provider's Claim for additional compensation under the Medicare Program. The validity of this Exception Request is the subject matter of this proceeding. All patient identifying information has been removed from this document. |

Provider Exhibit 2

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                              Health Care Financing Administration

---

7500 SECURITY BOULEVARD
BALTIMORE MD 21244-1850

**RECEIVED**
PADCR2C

NOV 2 7 2000

P/M __11/16__

November 15, 2000

Ms. Brenda Merriweather, Manager
Provider Audit Department
Medicare Part A Intermediary
P.O. Box 9159
Oxnard, California 93031-9150

Dear Ms. Merriweather:

I am responding to your letter dated September 18, 2000, concerning the exception
request filed under the prospective (composite rate) payment system by Loma Linda
University Medical Center (LLUMC), provider number 05-0327. LLUMC's exception
request was received in your office on August 28, 2000. LLUMC has requested an
exception amount of $381.10 or an increase of $243.02 for hemodialysis under the atypical
patient mix exception criteria. Based on your review of the documentation submitted by
LLUMC, you recommended a composite payment rate of $225.40 for hemodialysis or an
increase of $87.32 for salaries and employee benefits. As a result of our review of the
documentation submitted by LLUMC and your office, we have the following comments.

Atypical Patient Mix

LLUMC claims that it has an atypical mix. However, because of the issues discussed
below, we have not ruled on the exception criterion.

Cost Reports

On page four of the narrative, the provider stated that "LLUMC provides both
inpatient and outpatient hemodialysis service. In Exhibit 2, the projected costs have been
allocated between inpatient and outpatient based on projected number of treatments. We
noted in Worksheet I series for 1997, 1998 and 1999 that no costs have been allocated to
inpatient treatments. The cost per treatment calculations as shown at Exhibit 1 for these
years have therefore been revised to reflect the proper allocation and to be consistent with
our cost per treatment calculation for fiscal year 2000."

2

On page two of Exhibit 1, the provider stated that $8.9 million for management services was erroneously duplicated in fiscal year (FY) 99. On page ten of Exhibit 2, the provider stated that $11.4 million for home office costs was also erroneously duplicated in FY 99. In your report, you stated that you will have the provider file revised cost reports for FY 99.

Based on the preceding statements, HCFA has the following comments:

First, LLUMC should have filed its Worksheet I series and cost reports in accordance with Medicare program instructions and you should have verified that the statistics used by LLUMC are in accordance with Medicare program instructions. 42 CFR 413.198 (b) states that "each facility must keep adequate records and submit the appropriate HCFA-approved cost report in accordance with §§413.20 and 413.24 which provides rules on financial data and reports, and adequate cost data and cost finding, respectively.". The Worksheets I series filed by LLUMC for its FY 97, 98, and 99 cost reports did not use the HCFA-approved statistical basis for allocating costs. Further, the Worksheet I series furnished at the provider's Exhibit 2 did not use the HCFA-approved statistical basis for allocating costs. §3653 of Part II of the Provider Reimbursement Manual (PRM) (See Attachment 1) identifies the statistical basis that a provider must use in completing its Worksheet I-3.

Second, on page 4 of its narrative the provider stated that "LLUMC provides both inpatient and outpatient hemodialysis service. In Exhibit 2, the projected costs have been allocated between inpatient and outpatient based on projected number of treatments. We noted in Worksheet I series for fiscal years 1997, 1998 and 1999 that no costs have been allocated to inpatient treatments. The cost per treatments calculations as shown in Exhibit 1 for these years have therefore been revised to reflect the proper allocation and to be consistent with our cost per treatment calculation for fiscal year 2000." The intermediary indicated that Exhibits 24 and 25, the provider's fiscal years 1997 and 1998 cost reports were not submitted with the exception request. HCFA noted that LLUMC did allocate its inpatient and outpatient costs to outpatient treatments only on its FY 97, 98 and 99 cost reports. HCFA noted that LLUMC did compute a component cost per treatment (CPT) for its inpatient costs and outpatient costs based on total treatment count on its Exhibit 1. By using the number of treatments for allocation purposes rather than the HCFA-approved statistical basis, the CPT remains the same for both inpatient costs and outpatient costs. Based on our experience, inpatient treatments are more costly than outpatient treatments. By using the number of treatments for allocation purposes rather than the HCFA-approved statistical basis, inpatient costs are inappropriately allocated to its outpatient area, thereby increasing the outpatient CPT and decreasing the inpatient CPT. Consequently, by using the number of treatments for allocation purposes rather than the HCFA-approved statistical basis, the provider has not accounted for the additional costs in treating its sicker inpatients.

Basically, the provider is not making any differentiation between the patient acuity for its inpatient and outpatients. Inpatients receive the highest level of care and require more services; therefore, the inpatient CPT is higher than the outpatient CPT. The same CPT for inpatients and outpatients is not acceptable.

Third, HCFA has prepared an annual CPT analysis based on the provider's documentation and method of allocating costs (See Attachment 2). The CPT on lines 11 and 27 of Attachment 2 shows that the provider did not differentiate between the acuity levels of inpatients and outpatients, since the CPT is the same for both inpatient and outpatient treatments. A percentage analysis of inpatient treatments to total treatments over the four year period indicates that inpatient treatments are approximately 50% of total treatments (See Attachment 3). This is a significant amount of inpatient treatments and under allocating costs of these treatments would seriously distort the costs of the outpatient maintenance dialysis.

Fourth, a revised cost report for 1997, 1998 and 1999 should have been filed with this exception request. Also, the revised cost reports should have been filed with your office using the correct allocation statistics to determine inpatient and outpatient costs. Therefore, LLUMC's cost reports have not been completed properly and the requirements of 42 CFR 413.198 have not been met. Consequently, this request is denied for failure to follow Medicare cost reporting regulations.

Based on the above, the Worksheet I series for FY 97, 98 and 99 are not correct, the financial data reflected at the provider's Exhibit 1 for FY 1997, 1998, and 1999 is not acceptable for historical purposes in reviewing an exception request, and the financial data reflected at the provider's Exhibit 1 and 2 for FY 2000 is, also, not acceptable.

Cost Justification

The provider has requested an exception amount for its CPT in excess of the Health Care Financing Administration's (HCFA's) national data and general program statistics for salaries of $98.92, for employee benefits of $37.10, for supplies of $1.00 and for overhead of $106.00. Therefore, these are the only cost components that HCFA will consider in its review.

Salaries and Employee Benefits

Based on national data and general program statistics, the average CPT for salaries is $40. LLUMC has requested an additional $98.92 for salaries. Since the FY 2000 Worksheet I cost report shown at the provider's Exhibits 1 and 2 did not use the HCFA-approved statistics, this financial data cannot be used in determining an exception amount. Since the historical cost reports for FY 97, 98, 99 are not acceptable, we would be unable to determine whether the amount requested is reasonable when compared to prior cost reports.

Therefore, we would be unable to grant an exception amount for salaries, even if the criterion were met. Further, employee benefits follow salaries. Since an exception amount would not be granted for salaries, an exception amount would not be granted for employee benefits.

Supplies

Based on national data and general program statistics, the average CPT for supplies is $33. LLUMC has requested an additional $1.00 for supplies.

We reviewed the supply list furnished at Exhibit 16 and did not notice anything unusual or out of the ordinary that would cause us to grant an exception for supplies.

The Worksheet S-5 for FY 97, 98, and 99 cost reports did not show that the number of times that LLUMC re-uses its dialyzers. It should be noted that Loma Linda Kidney Center (LLUKC) re-uses its dialyzers 20 times. Based on the latest re-use data published by the Centers for Disease Control and Prevention (CDC) 82% of facilities re-use and the average medium re-use is 15 times. The average medium re-use of 15 times is in line with the 20 re-use times reported by LLUKC. Therefore, in making our calculations for LLUMC, we will use the average medium re-use of 15 times. Exhibit 16A shows that LLUMC used 7 different types of dialyzers. The average cost of these dialyzers is $19.35 ($135.50/7). The CPT per dialyzer is $1.29 ($19.35/15). We totaled the supply list shown at Exhibit 16 without the dialyzer cost and arrived at a total cost of $24.71 for supplies, then we included the dialyzer CPT of $1.29 for a total supply cost of $26.00. Since this supply cost of $26.00 is less than the national average of $33, we would be unable to grant an exception amount for supplies, even if the criterion were met.

Overhead

Based on national data and general program statistics, the average CPT for overhead excluding employee benefits is $47. LLUMC has requested $106.00 for overhead because it has allocated administrative and general expenses in accordance with the Medicare principles of reimbursement based on accumulated cost and other statistics. It should be noted that all facilities that are reimbursed for ESRD services under the Medicare program are required to file cost reports and follow the Medicare cost apportionment and cost finding methodology as specified in the regulations (§§42 CFR 413.20 and 413.24). Since the Medicare principles of cost finding are imposed on all Medicare providers, the mandatory Medicare principles of cost finding are not an acceptable reason for requesting an exception amount. Further, LLUMC stated that certain departments provide services to the ESRD unit. LLUMC has not identified the services furnished to the ESRD patients or the costs involved to furnish those services. Unsubstantiated general statements are not sufficient documentation for the granting of an exception amount. Therefore, we are would be unable to grant an exception amount for overhead, even if the criterion were met.

5

### Time Studies

On pages 5 and 6 of its narrative, the provider stated that "we present in Exhibit 9 a list of diagnoses and related activities that require additional nursing assistance for each group of patients mentioned above. The patient care staff prepared this list and identified the additional number of nursing minutes per activity and the number of times each activity is performed annually."

Exhibit 9 lists the additional minutes required for each type of activity requiring additional nursing. What Exhibit 9 does not show is the time study used to create or determine the additional minutes. As explained above, regulation §42 CFR 413.198 requires a provider to keep adequate financial and cost data. The data must be based on those financial and statistical records, which must be capable of verification by qualified auditors. The provider has not presented any time studies to adequately support its patient care staff's identification of the additional time spent by the nursing staff. Therefore, the provider has failed to adequately document the additional nursing staff services rendered to its atypical patient mix. Data based on patient care staff interviews that cannot be audited is not acceptable. In the event that a time study is used in the future, the general Medicare principles regarding the adequacy of periodic time sampling is described in 2313 of the PRM must be furnished.

### Recommendations

Based on the foregoing, you may consider making the following recommendations to LLUMC because LLUMC may wish to file another exception request under the Atypical Patient Mix in the future.

The burden of proof for justifying an exception request rests with the provider not HCFA nor its intermediary [See 42 CFR 413.180 (g)].

The provider is responsible for meeting the requirements of 42 CFR 413.198

It is in the provider's best interest to file as soon as possible. When a provider files on the last day of the exception window, the provider does not have the opportunity to file another exception request. Had the provider filed early in the exception window, it would have had the opportunity to file another exception request. Also, any approved exception amount is effective on the date that the intermediary receives a fully documented and acceptable exception request.

Finally, the provider should be advised that due to the short legislative time span of 60 working days in which to process an exception request and issue a final decision, all information related to the exception request must be submitted with the original exception.

The responsibility for furnishing an exception request with all required documentation rests with the facility. HCFA approves or denies the exception request based on the documentation submitted. No additional information is requested.

Other

Based on our review of the documentation furnished by LLUMC, LLUMC has furnished 2,163, 2,222, and 2,347 inpatient treatments in FY 97, 98 and 99. Because of the large percent of inpatient treatments, you should verify that these patients do need inpatient ESRD services rather than outpatient services. ESRD patients may not be admitted as an inpatient to a hospital just to receive maintenance dialysis treatments.

In the event that the provider should file an exception request in the future and fails to use the HCFA-approved statistical basis for allocating costs in completing its Worksheets I series, the exception request will be denied. Further, in light of the cost reporting problems discussed above, including the $20.3 ($8.9 + $11.4) million duplication in FY 99, you should determine if an onsite review per § 2720.5 of the PRM is required.

Payment Rate

Based on the above analysis, the provider's exception request is denied. The provider should continue to be paid its composite rate of $138.08 for outpatient maintenance dialysis. If the provider wishes to appeal this decision, the applicable regulation is 42 CFR 413.194 (b)

If you have any questions concerning our response, please contact me on (410) 786-4561.

Sincerely,

Joseph Logue
Health Insurance Specialist
Division of Chronic Care Management

Attachments



**MEDICARE**
Part A Intermediary
National FQHC Intermediary
Regional Home Health Intermediary
Phone 805-367-0800

December 11, 2000

Ms. Teresa Day, Sr. V.P./CFO
Loma Linda University Medical Ctr.
11234 Anderson St., W.H. Rm. B128
Loma Linda, CA 92354

SUBJECT:    EXCEPTION REQUEST TO COMPOSITE RATE FOR
            HEMODIALYSIS

Dear Ms. Day:

This is in response to your request for an exception to the composite rate for hemodialysis which
was received on August 28, 2000.

Based on HCFA's review of our proposal and your documentation, they denied your request for an
exception. We are enclosing their letter to our office for your review which explains the reasons for
the denial.

If you have any questions, please call me at (805) 367-0682.

Sincerely,

Brenda Merriweather, Manager
Provider Audit Department

BM/sa

Enclosures

---

## UNITED GOVERNMENT SERVICES, LLC.

Corporate Headquarters located in Milwaukee, WI • P.O. Box 9150, Oxnard, California 93031-9150
A HCFA CONTRACTED INTERMEDIARY

P- 15

Case 01-2871, FedEx Airbills: 8349 9803 9828-UGS, 8349 9803 9839-CMS, June 12, 2002

# BEFORE THE PROVIDER REIMBURSEMENT REVIEW BOARD
# BALTIMORE, MARYLAND

| | | |
|---|---|---|
| **LOMA LINDA UNIVERSITY** | ) | |
| **MEDICAL CENTER** | ) | |
| | ) | |
|     **Provider No. 05-0327** | ) | |
| | ) | |
|     **(Provider)** | ) | **PRRB Case No. 01-2871** |
| | ) | |
|     **vs.** | ) | |
| | ) | |
| **UNITED GOVERNMENT SERVICES** | ) | |
| | ) | |
|     **(Fiscal Intermediary)** | ) | |

## PROVIDER'S FIRST REQUEST FOR
## PRODUCTION OF DOCUMENTS

    . Pursuant to the rules of the Provider Reimbursement Review Board, Provider hereby submits the following Request for Production of Documents. The documents are to be produced within thirty (30) days after service at the offices of <u>Jack Ahern, 841C South Racine Avenue, Chicago, Illinois, 60607</u> as provided in the rules of the Provider Reimbursement Review Board.

1.  This Request for Production of Documents is continuing in nature. If Intermediary does not have present, sufficient knowledge for a response or a complete response, or if at any time after Intermediary does not have present, sufficient knowledge for a response or a complete response, or if at any times after Intermediary produces documents pursuant to this request, any information becomes available which calls for any supplement or amendment to, or any

175

Page 1 of 10

Case 01-2871, FedEx Airbills: 8349 9803 9828-UGS, 8349 9803 9839-CMS, June 12, 2002

modification, deletion, explanation, or amplification of a previous response, Intermediary is requested to furnish such additional information as soon as possible after it becomes available.

2. The responses should be based on information known to Intermediary or to Intermediary's agents, attorneys, employees, servants, directors, officers, representatives, divisions, branches, or sub-divisions. For purpose of this request, the term "representative" is not limited only to employees of the Centers for Medicare and Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA), but may include any employee of the United States government.

3. Where documents are requested, such request includes documents in the possession of each individual who acts, or who has acted at relevant times, as Intermediary's employee, agent, or representative.

4. The phrase "all documents" shall mean each and every document within a stated category known to Intermediary, and/or documents reasonably subject to identification. Documents which can be located on premises other than Intermediary's premises are specifically included. For purposes of this request, the terms "all documents" shall include any document within the possession of the Centers for Medicare and Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA) or any other agency of the United States government.

5. If any objection is raised with respect to the Request for Production of Documents, or any part thereof, Intermediary shall state with specificity the grounds upon which each such objection is based. Any documents or portions of documents which are being withheld upon any basis, including a claim of privilege, shall be specifically identified as such by providing the identity of any individuals who prepared such documents and the identity of any individuals to whom such documents were furnished, along with the dates thereof. Notwithstanding a claim that a document is privileged, any document so withheld must be produced with the portion claimed to be protected excised.

176

361

Case 01-2871, FedEx Airbills: 8349 9803 9828-UGS, 8349 9803 9839-CMS, June 12, 2002

6. To the extent that Intermediary believes that any of the information sought constitutes trade secrets or other confidential information, Provider will agree to entry of an appropriate protective order limiting the use of such information.

7. Specify which documents are produced in response to each of the numbered paragraphs.

### Definitions

1. "Document" or "documents" or "documentation" means any record, letter, memorandum, telegram, telex, twx, fax, handwritten note, working paper, or any other written, recorded, or transcribed matter. Such definition shall include inter alia, recordings, transcripts, and/or summaries of oral communications, telephonic or otherwise, computer tapes, printouts and computer discs or information stored on computer memory.

2. The term "you" refers to the Intermediary, including any agents, employees, or representatives thereof, and to any agent, employee, or representative of the Health Care Financing Administration.

3. The term "HCFA" or "Health Care Financing Administration" refers to the agency now known as the Centers for Medicare & Medicaid Services.

4. The term "Provider" refers to the party named as such in the caption of this case.

|77

Page 3 of 10

362

## Document Request

1. This specific Document Production Request refers to the following statement in the letter from Mr. Joseph Logue of HCFA to Ms. Brenda Merriweather of United Government Services dated November 15, 2000, denying the Provider's request for an exception to the composite rate for maintenance dialysis services as follows:

   *"I am responding to your letter dated September 18, 2000"*

   a. Please provide a copy of the above referenced letter, dated September 18, 2000.

   b. Please provide all documents, including, but not limited to, all worksheets, computer spreadsheets, and memo's associated with, or attached to, or referencing, the above referenced letter from Ms. Brenda Merriweather, dated September 18, 2000.

   c. Please provide all documents, including, but not limited to, all worksheets, computer spreadsheets, and memo's associated with, or attached to, or referencing, the above referenced letter, from Mr. Joseph Logue of HCFA, dated November 15, 2000.

2. This specific Document Production Request refers to the following statement in HCFA's letter dated November 15, 2000, denying the Provider's request for an exception to the composite rate for maintenance dialysis services as follows:

   *"Based on our experience, inpatient treatments are more costly than outpatient treatments."*

   a. Please provide any documents that support the above statement.

178

303

3. This specific Document Production Request refers to the following statement in HCFA's letter dated <u>November 15, 2000,</u> denying the Provider's request for an exception to the composite rate for maintenance dialysis services as follows:

*"Data based on patient care staff interviews that cannot be audited is not acceptable. In the event that a time study is used in the future, the general Medicare principles regarding the adequacy of periodic time sampling is described in 2313 of the PRM must be furnished."*

   a. Please provide any documents, regulations or instructions of any sort that require the application of § 2313 of the PRM to the atypical service intensity exception request criteria.

   b. Please provide any documents, regulations or instructions of any sort that preclude the use of staff interviews in time calculations used to demonstrate labor above the norm in an atypical service intensity exception request.

   c. Please provide copies of all other renal dialysis exception requests that contained time studies conforming to the criteria described in §2313 of the PRM.

   d. Please provide copies of all other renal dialysis exception requests that contained time studies based on patient care staff interviews that were approved.

   e. Please provide copies of all documents, regulations or instructions of any sort that demonstrate the time study methodology to be used in an atypical intensity renal dialysis exception request.

179

Case 01-2871, FedEx Airbills: 8349 9803 9828-UGS, 8349 9803 9839-CMS, June 12, 2002

4.  This specific Document Production Request refers to Section 2723.3 of HCFA Pub. 15-1, relied upon in HCFA's letter dated <u>November 15, 2000,</u> denying Provider's request for an exception to the composite rate for maintenance dialysis services, which states in pertinent part as follows:

> *In addition to the peer comparison submitted by the intermediary, HCFA uses national data and general program statistics in evaluating the reasonableness of a facility's component costs shown in its exception request. HCFA's median cost per treatment data is as follows:*

| Cost Component | Amount |
|---|---|
| Salaries | $40 |
| Supplies | $33 |
| Overhead excluding Employee Benefits | $47 |
| Overhead including Employee Benefits | $54 |
| Employee Benefits | $ 7 |
| Laboratory | $ 3 |

a.  Please furnish all documents used, supporting, or relied upon in developing the cost standards referenced above.

b.  Please furnish all documents reflecting the sample of facilities from which data was used to arrive at the cost standards referenced above.

c.  With respect to each such facility identified in the immediately preceding Document Production Request, please provide a summary of the cost report information for that facility used by HCFA in arriving at the cost standards referenced above.

d.  Please furnish all documents examining or reflecting upon the continuing validity of the cost standards referenced above subsequent to their development.

e.  Please provide all documents identifying the person(s) responsible for the preparation of any analysis or study used or relied upon in developing the cost standards referenced above.

Case 01-2871, FedEx Airbills: 8349 9803 9828-UGS, 8349 9803 9839-CMS, June 12, 2002

    f.  Please furnish all documents used or relied upon in determining the statistical validity of the cost standards referenced above.

    g.  Please furnish any documentation relevant to or reflecting upon the existence of any cost standards other than the cost standards referenced above.

5. This document request pertains to the guidance and instructions provided to the HCFA reviewer regarding the adjudication and review of exception requests in present and prior windows:

    a.  Please provide any documents directly or indirectly pertaining to the method of adjudication of renal dialysis exception requests in general by the reviewer, Mr. Joseph Logue and his colleagues.

    b.  In particular, please provide all those Atypical Service Intensity exception requests that were approved by the reviewer, Mr. Joseph Logue and his colleagues.

    c.  This document request includes instructions given to reviewers, advice, guidance, standards, template letters of review which could be adapted to individual cases, check lists of items needed for approval, and check lists of items resulting in a denial.

    d.  Granted that in 1990 and again in 1994 HCFA granted **Loma Linda University Medical Center** an exception to the composite rate due to an atypical service intensity exception request, items a –c of this document request, include, but are not limited to, the time span ranging from 1989 to 2001.

Case 01-2871, FedEx Airbills: 8349 9803 9828-UGS, 8349 9803 9839-CMS, June 12, 2002

6.  The following document request pertains to the time limit for processing and adjudicating an exception request:

    a.  Please provide any documents referencing the time limits on processing and adjudicating a renal dialysis exception request. This request includes, but is not limited to instructions given to reviewers, advice, and any other sort of guidance.

    b.  Please provide documents regarding any prior claims by any provider that the processing deadline was not met.

    c.  Please produce any documents pertaining to, or resulting from the claim in the following case in which the PRRB ruled that the 60 day limit had been exceeded: PRRB-DEC, MED-GUIDE 1996-2 MED-GUIDE-TB ¶44,647, **Charlotte Hungerford Hospital (Torrington, Conn.) v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Connecticut.**

7.  Please provide a list of Providers who filed exception requests during the exception request window closing August 28, 2000, detailing provider name and provider number, amount requested, whether it was approved or denied, amount approved, as well as criteria (Atypical Service Intensity, Home Training, Isolated Essential Facility, Frequency of Dialysis, etc.).

8.  Please provide approval and denial letters, including transmittal letters from the Fiscal Intermediary for the Providers who filed exception requests during the exception request window closing August 28, 2000.

9.  Please provide the time study and cost report detail for those providers who received approvals based on the Atypical Service Intensity Criteria during all exception request windows since 1989.

/82



Case 01-2871, FedEx Airbills:  8349 9803 9828-UGS, 8349 9803 9839-CMS, June 12, 2002

Respectfully submitted this 12th day of June

Jack Ahern
8416 South Racine Avenue
Chicago, Illinois  60607
Telephone:  (312) 997-2177
Provider Representative

١٣٣

368



Case 01-2871, FedEx Airbills: 8349 9803 9828-UGS, 8349 9803 9839-CMS, June 12, 2002

### Certificate of Service

I hereby certify under penalty of perjury that on this 11th day of June, I caused to be delivered via FedEx to United Government Services and Centers for Medicare and Medicaid Services and via US mail to Blue Cross Blue Shield Association a copy of the foregoing **Loma Linda University Medical Center's** First Request for Production of Documents to:

Ms. Antoinette Biglang-Awa
United Government Services, LLC-CA
5151 Camino Ruiz, Building B
Camarillo, CA 93012-8696
Via FedEx Airbill No. 8349 9803 9828

Mr. Wilson Leong
Director, Blue Cross Blue Shield Association
225 N. Michigan Avenue
Chicago, IL 60601-7680
Via US Mail

Mr. William E. Cymer
Division of Chronic Care Management
Centers for Medicare & Medicaid Services
7500 Security Blvd.
Baltimore, MD 21244-1850
Via FedEx Airbill No. 8349 9803 9839

_____
Mary Wiesner

184        Page 10 of 10

369

P- 17

# Loma Linda University Medical Center
## Response to the Provider's Document Requests

The following responses appear to be responses to the **Document Requests for the Medical Center rather than the Kidney Center**, although they are submitted as responses to the Kidney Center's Document Requests. Note they have the Medical Center's Provider Number, but the Kidney Center's PRRB Appeal Case Number.



PART A INTERMEDIARY     NATIONAL FQHC INTERMEDIARY     **MEDICARE**

REGIONAL HOME HEALTH INTERMEDIARY     PHONE 805-367-0800

P – 17

June 25, 2002

Mr. Jack Ahern, President
Ahern & Associates
841 C South Racine Ave.
Chicago, Illinois 60607

RE:   **Request for Documents –First Request**
      **Loma Linda Kidney Center**
      **Provider No. 05-0327**
      **FYE:  12/31/00**
      **PRRB Case No. 01-2872**

Dear Mr. Ahern:

In response to your Submission of the Request for Documents  for the subject Provider, attached are
our responses and documentation.  Please note HCFA is being identified as CMS in our responses.

For any questions please Contact Dave Collins, CPA at (805) 367- 0572.

Sincerely,,

Antoinette Biglang-Awa, CPA
Manager
Provider Audit Department

Attachments

Cc:   Wilson Leong, BCBSA
      Steve Kirsh, PRRB

**UNITED GOVERNMENT SERVICES, LLC.**

P.O. Box 9150, Oxnard, California 93031-9150 • Corporate Headquarters located in Milwaukee, WI
A CMS CONTRACTED INTERMEDIARY

199

386

## Responses to Requests for Documentation

1.  You refer to a letter-dated 11/15/2000 from HCFA to Ms. Brenda Merriweather, responding to her letter-dated 9/18/2000.  Regarding your request for a copy of this letter:

    a.  At the time of this response the applicable files containing the 9/18/2000 letter has not been located.  Upon obtaining the documents this will be forwarded to you.

    b.  Regarding the worksheets, computer spreadsheets, and memo's associated to the 9/18/2000 letter, at the time of this response the applicable files containing the 9/18/2000 letter has not been located.  Upon obtaining the documents this will be forwarded to you.

    c.  Regarding the worksheets, computer spreadsheets, and memo's associated to CMS's 11/15/2000 letter, at the time of this response the applicable files containing this information has not been located.  Upon obtaining the documents this will be forwarded to you.

2.  This specific Document Production Request refers to the following statement in HCFA's letter dated November 15, 2000, denying the Provider's request for an exception to the composite rate for maintenance dialysis services as follows:  ***"Based on our experience, inpatient treatments are more costly than outpatient treatments."***

    a.  Documents supporting the above statement must be obtained from CMS.

3.  This specific Document Production Request refers to the following statement in HCFA's letter dated November 15, 2000, denying the Provider's request for an exception to the composite rate for maintenance dialysis services as follows:  ***"Data based on patient care staff interviews that cannot be audited is not acceptable. In the event that a time study is used in the future, the general Medicare principles regarding the adequacy of periodic time sampling is described in 2313 of the PRM must be furnished."***

    a.  Documents, regulations or instructions that require the application of 2313 of the PRM to the atypical service intensity population must be acquired from CMS.

    b.  Documents, regulations or instructions that preclude the use of staff interviews in time calculations used to demonstrate labor above the norm in an atypical services intensity exception request must be acquired from CMS.

    c.  Copies of all other renal dialysis exception requests containing time studies conforming to the criteria described in 2313 of the PRM should be addressed to CMS.

    d.  Copies of all other renal dialysis exception requests containing time studies based on patient care staff interviews that were approved should be addressed to CMS.

200



    e.    Copies of all documents, regulations or instructions of any sort that demonstrate the time study methodology to be used in an atypical intensity renal dialysis exception request should be addressed to CMS.

4.    This specific Document Production Request refers to Section 2723.3 of HCFA Pub. 15-1, relied upon the HCFA's letter dated November 15, 2000, denying Provider's request for an exception to the composite rate for maintenance dialysis services, which states in pertinent part as follows: ***In addition to the peer comparison submitted by the intermediary, HCFA used national data and general program statistics in evaluating the reasonableness of a facility's component costs shown in its exception request. HCFA's median cost per treatment data is as follows:***

| *Cost Component* | *Amount* |
| --- | --- |
| *Salaries* | *$40* |
| *Supplies* | *$33* |
| *Overhead excluding EB* | *$47* |
| *Overhead including EB* | *$54* |
| *Employee Benefits* | *$ 7* |
| *Laboratory* | *$ 3* |

    a.    Documents used, supporting, or relied upon in developing the cost standards above should be obtained from CMS.

    b.    Documents reflecting the sample of facilities from which data was used to arrive at the cost standards above should be obtained from CMS.

    c.    Documents requested in (b) above supported by a summary of the cost report information for each facility in arriving at the cost standards referenced above should be obtained from CMS.

    d.    Documents examining or reflecting upon the continuing validity of the cost standards referenced above subsequent to their development should be obtained from CMS.

    e.    Regarding the identification of person(s) responsible for preparation of any analysis or study used or relied upon in developing the cost standards referenced above should be obtained from CMS.

    f.    Documents used or relied upon in determining the statistical validity of the cost standards referenced above should be obtained from CMS.

    g.    Documentation relevant to or reflecting upon the existence of any cost standards other than the cost standards reference above should be obtained from CMS.

5.    Regarding guidance and instructions provided to the HCFA reviewer regarding the adjudication and review of exception requests in present or prior windows:

201

    a.    Documents pertaining to the method of adjudication of renal dialysis exception requests in general by the reviewer, Mr. Joseph Logue and his colleagues must be addressed to CMS.

    b.    Documents pertaining to all those Atypical Service Intensity exception requests that were approved by the reviewer, Mr. Joseph Logue and his colleagues should be addressed to CMS.

    c.    Instructions given to reviewers, advice, guidance, standards, template letters of review, which could be adapted to individual cases, check lists of items needed for approval, and checklists of items resulting in a denial must be obtained from CMS.

    d.    Regarding the document request pertaining to Loma Linda University Medical Center for 1990 and 1994 should be obtained from CMS.

6.    The following document request pertains to the time limit for processing and adjudicating an exception request:

    a.    Regarding documents referencing the time limits on processing and adjudicating a renal dialysis exception request, To recap the hours at the Intermediary level is not reasonable to expend the time to locate and recap time sheets. At the CMS level, this should be obtained from them.

    b.    Regarding documents on any prior claims by any provider that the processing deadline was not met, to obtain such data is not possible as there is no central recording or storage place to obtain and summarize such data.

    c.    Regarding your request to produce any documents pertaining to, or resulting from the claim in the following case in which the PRRB ruled that the 60 day limit had been exceeded: PRRB – DEC, Charlotte Hungerford Hospital (Torrington, Conn) v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Connecticut, this information is not available and should be requested from Blue Shield of Connecticut and/or BCBSA.

7.    Regarding a list of Providers who filed exception requests during the exception request window closing August 28, 2000, detailing provider name and provider number, amount requested, whether it was approved or denied, amount approved, as well as criteria (Atypical Service Intensity, Home Training, Isolated Essential Facility, Frequency of Dialysis, etc.).

    **Response**---Is not attainable as requests are reviewed and handled individually by audit groups and is not centralized. To obtain would result in an unreasonable amount of time and effort.

8.    Approval and denial letters, including transmittal letters from the Fiscal Intermediary for the Providers who filed exception requests during the exception request window closing August 28, 2000.

*202*



**Response**— Is not attainable as requests are reviewed and handled individually by audit groups and is not centralized. To obtain would result in an unreasonable amount of time and effort.

9. Time study and cost report detail for those providers who received approvals based on the Atypical Service Intensity Criteria during all exception request window since 1989.

**Response**— Is not attainable as requests are reviewed and handled individually by audit groups and is not centralized. To obtain would result in an unreasonable amount of time and effort.

203



## Certificate of Service

I hearby certify under penalty of perjury that on this 25th day of June, I caused to be delivered via US mail to Ahern & Associates and via US mail to Blue Cross Blue Shield Association a copy of the foregoing United Government Services, Inc. responses to Loma Linda University Medical Centers First Request for Production of Documents to:

Mr. Jack Ahern
Ahern & Associates
841 C South Racine Ave.
Chicago, Il 60607

Mr. Wilson Leong
Managing Director
Blue Cross Blue Shield Association
225 N. Michigan Ave.
Chicago, Il. 60601-7680

Mr. Steve Kirsh, Director
Provider Reimbursement Review Board
2520 Lord Baltimore Dr. Suite L
Baltimore, MD 21244-2670

204



*Loma Linda University*

*Medical Center*

## FY 2000

# HOSPITAL DIALYSIS UNIT
## Final Position Paper

## EXHIBIT 1

## EXCEPTION REQUEST

# Provider Reimbursement Review Board

# CASE # 01-2871 ESRD

**(VOLUME 2 OF 2)**

547

RECEIVED

NOV 2 9 2001

PROVIDER REIMBURSEMENT
REVIEW BOARD

**Renal Dialysis Exception Request**
**Atypical Service Intensity/Patient Mix**
**Loma Linda University Medical Center**
**(Hospital-Based Facility)**
**Provider #05-0327**
**FYE December 31, 2000**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................................. 1
   REGULATORY BASIS ......................................................................................................................... 1
   NATIONAL AVERAGE COMPARISON ................................................................................................ 2
   APPROACH TO THE EXCEPTION REQUEST ...................................................................................... 2

CURRENT RATE AND REQUESTED EXCEPTION AMOUNT ..................................................... 3

COST INFORMATION ...................................................................................................................... 3
   COST PER TREATMENT COMPARISON ............................................................................................. 4

ATYPICAL DIALYSIS ACTIVITIES ............................................................................................ 6
   PATIENT TO STAFF RATIO ............................................................................................................... 7

**PEDIATRIC PATIENTS**
DIALYSIS TIME MANAGEMENT ........................................................................................................ 8
SPECIAL EMOTIONAL SUPPORT ...................................................................................................... 8
COMPREHENSIVE PRE-DIALYSIS ASSESSMENT ............................................................................. 8
LANGUAGE BARRIER ....................................................................................................................... 9
DIETARY AND FEEDING PROBLEMS ................................................................................................ 9
GASTRIC OR JEJUNOSTOMY TUBES ................................................................................................ 9
MEDICATION MANAGEMENT ........................................................................................................... 9
CARDIAC MONITORING ................................................................................................................. 10
CRIT-LINE MONITORING ............................................................................................................... 10
OXYGEN ISSUES ............................................................................................................................ 11
CODE/NEAR CODE ........................................................................................................................ 11
ACCESS CLOTTING MANAGEMENT ............................................................................................... 11
STABILIZATION OF ACCESS SITE .................................................................................................. 12
EPISTAXIS (NOSEBLEED)/HEADACHE MANAGEMENT ................................................................. 12
HYPOTENSION ............................................................................................................................... 12
INFECTIOUS DISEASE .................................................................................................................... 13
HEPARIN USE/ ACTIVATED COAGULATION TIME MEASUREMENT ............................................. 13
FAMILY CONFERENCE ................................................................................................................... 14
HEIGHT, WEIGHT AND IMMUNIZATION ....................................................................................... 14
HYPERTENSION ............................................................................................................................. 14
ADMISSION TO HOSPITAL ............................................................................................................. 15
FEVER ........................................................................................................................................... 15
SEIZURE RECOVERY ..................................................................................................................... 15
DEHYDRATION/ELECTROLYTE IMBALANCE ................................................................................. 16
ANESTHETIC MANAGEMENT ......................................................................................................... 16

**ADULTS AND OTHER PEDIATRIC PATIENTS**
DIALYSIS TIME MANAGEMENT ...................................................................................................... 16
TEMPORARY PATIENT TRANSFERS ............................................................................................... 16
PATIENTS REQUIRING ASSISTANCE .............................................................................................. 17
NEUROPATHY PROBLEM ............................................................................................................... 18
ACCESS MANAGEMENT ................................................................................................................. 18
NEW PATIENTS TRAINING ............................................................................................................. 19
DIABETIC MANAGEMENT .............................................................................................................. 19
HYPERTENSION ............................................................................................................................. 19
HYPOTENSION ............................................................................................................................... 20

2

# TABLE OF CONTENTS (Cont'd)

CARDIAC PROBLEM ......................................................................................................................20
INFECTIOUS DISEASE MANAGEMENT...........................................................................................21
SEIZURE AND STROKE PRECAUTION ...........................................................................................21
OTHER PEDIATRIC PATIENTS ......................................................................................................21
**SUPPLEMENTAL INFORMATION** ............................................................................................21
PERSONNEL ....................................................................................................................................22
STAFFING PATTERN.......................................................................................................................22
OVERHEAD .....................................................................................................................................22
ROUTINE LABORATORY TESTS......................................................................................................22
ROUTINE PHARMACY USED..........................................................................................................22
ROUTINE SUPPLIES USED ............................................................................................................22
MACHINE DEPRECIATION .............................................................................................................22
ROUTINE ANCILLARY COSTS.........................................................................................................22
INPATIENT/OUTPATIEN DIALYSIS COSTS.....................................................................................23
HOME PROGRAM AND HOME DIALYSIS TRAINING COSTS ..........................................................23
MEDICARE COST REPORTS ...........................................................................................................23
ABBREVIATION................................................................................................................................23

**EXHIBITS**

*3*

## LIST OF EXHIBITS

Exhibit 1:     Comparison of Cost Per Treatment
Exhibit 2:     Projection for FYE 12/31/000 and Detail Support
Exhibit 3:     Patient Data Summary for FYE 12/31/99
Exhibit 4:     Patient Mortality Data Summary for FYE 12/31/99
Exhibit 5:     Inpatient Admits Summary for FYE 12/31/99
Exhibit 6:     Transplant Patients and Awaiting Transplant for FYE 12/31/99 and
               Projected Transplants
Exhibit 7:     Patient Transfer Summary for FYE 12/31/99
Exhibit 8:     Patients Utilizing Catheters for  FYE 12/31/99
Exhibit 9:     Atypical Nursing Services for Hemodialysis - Summary
Exhibit 10:    Patient to Staff Ratio for FYE 12/31/99
Exhibit 11:    Payroll Report for FYE 12/31/99
Exhibit 12:    New Hires and Terminated Employees for FYE 12/31/99
Exhibit 13:    Job Description and Responsibilities
Exhibit 14:    Routine Laboratory Tests
Exhibit 15:    Routine Pharmacy Used
Exhibit 16:    Routine Supplies Used in a Single Treatment and List of Dialyzer Used
Exhibit 17:    Separately Billable Laboratory Tests
Exhibit 18:    Separately Billable Drugs
Exhibit 19:    Separately Billable Supplies
Exhibit 20:    Major Movable Equipment and Machine Depreciation for FYE 12/31/99
Exhibit 21:    USRDS Tables
Exhibit 22:    Abbreviation Definition
Exhibit 23:    Medicare Cost Report for FYE 12/31/99 (Excerpts Only)

4

## INTRODUCTION

The Loma Linda University Medical Center ("LLUMC") is a non-profit facility, which operates a hospital-based renal dialysis center located in Loma Linda, California. It operates twelve (12) stations in its outpatient dialysis unit and provides Hemodialysis to both adult and pediatric patients. The LLUMC Medicare provider number is 05-0327. LLUMC hereby requests, by means of this document, an exception to the composite payment rate for outpatient Hemodialysis in accordance with Medicare regulations as set forth below.

### Regulatory Basis

Section 1861(v)(1) of the Social Security Act (the Act) defines the concept of reasonable cost under the Medicare principles of reimbursement. Section 1881(b)(2) and (b)(7) of the Act specifies facilities that furnish dialysis services to Medicare patients with End-Stage Renal Dialysis ("ESRD") are paid a prospectively determined rate for each treatment.

The Code of Federal Regulations, 42 CFR 413.170 identifies the scope under which Health Care Financing Administration ("HCFA") is authorized to establish a prospective payment system for outpatient maintenance dialysis furnished in an ESRD facility. The specific criteria to qualify for an exception to the ESRD facility's prospective payment rate are identified at 42 CFR 413.182. This code specifies that a provider may obtain relief under the following conditions:

- Atypical service intensity
- Isolated essential facility
- Extraordinary circumstances
- Self-dialysis training costs
- Frequency of dialysis

LLUMC is requesting an exception to the ESRD facility's prospective payment rate based upon "Atypical Service Intensity". The atypical services result from LLUMC providing care to a high percentage of pediatric (under age 20), hypertensive/hypotensive patients, patients requiring assistance, patients with clotted access and other complex patient care cases as discussed in detail below. LLUMC's renal patient population also include patients who are unable to receive treatment from other nearby facilities due to their special needs such as patients with clotted access and patients who need to be stabilized post surgery. Documentation is provided herein to support this request in the remaining sections of this report.

1

5

**National Average Comparison**

Below is a comparison of LLUMC patients with the national average:

|  | LLUMC (FY 1999) | National Average (1) |
|---|---|---|
| Diabetic Patients (Exhibit 3) | 52.86% | 34.44% |
| Hypertensive Patients (Exhibit 3) | 81.43% | 24.76% |
| Cardiac Patients (Exhibit 3) | 57.14% | not available |
| Mortality Rate (Exhibit 4) | 4.29% | 16.00% |
| Hemodialysis - over 64 years old (Exhibit 3) | 34.01% | 28.88% |
| Hemodialysis - below 20 years old (Exhibit 3) | 17.69% | .31% |
| Transplant Patients (Exhibit 6) | 8.57% | 3.43% |

(1) Source: United States Renal Data System, 1999 Annual Data Report (USRDS) (Based on 1997 data). Refer to Exhibit 21.

As shown above LLUMC indeed treats a higher percentage of diabetic, hypertensive and geriatric hemodialysis patients. Diabetic and hypertensive patients require additional time for frequent vital signs monitoring to prevent any complications during dialysis. Elderly patients often require assistance with ambulation, obtaining weights pre and post dialysis because of poor vision, typically have less stable dialysis treatments because of weakening cardiac status, and experience more frequent hypotensive incidents than that of younger patients. It will be noted that LLUMC's pediatric population is significantly greater than the national average. The atypical activities relating to pediatric patients are discussed separately below. The significantly high percentage of temporary transfer patients (52.38% or 77 out of 147 patients) is seen at LLUMC. These patients are admitted at LLUMC for stabilization or for complications that cannot be handled at other nearby facilities. Additionally, Exhibit 5 shows an average length of stay for dialysis patient hospital admissions of 8.06 days whereas the average length of stay for LLUMC for its adults and pediatrics patients for fiscal year 1999 is only 4.21 days. These factors illustrate the fact that LLUMC is servicing an acutely ill population, which requires additional time as discussed below.

**Approach to the Exception Request**

In accordance with PRM-1, Chapter 27, numerous statistical data were gathered and analytical procedures were performed to document the necessity of the exception request. These procedures are described briefly as follows:

1. Compare the fiscal year 2000-projected cost per treatment with the composite rate and with fiscal year 1997, 1998 and 1999 costs to show historical trend and determine the reasonableness of the costs in excess of the composite rate.

2

2. Describe the different atypical activities and determine the additional time involved in providing outpatient dialysis treatment to LLUMC patients to justify the excess costs incurred.
3. Describe and determine the additional labor cost per hour involved in providing outpatient dialysis treatment to the atypical LLUMC patients to justify the excess costs incurred.
4. Describe and determine the additional employee benefit, overhead and supply costs involved in providing outpatient dialysis treatment to the LLUMC patients.
5. Statistically show that LLUMC treats a higher percentage of patients with medical and social complexities when compared with a typical renal dialysis facility and the national averages from the 1999 United States Renal Data System ("USRDS") Annual Report.

## CURRENT RATE AND REQUESTED EXCEPTION AMOUNT

Based on the information contained in this document the following is a summary of our current and requested exception adjustment due to the atypically intense dialysis services, which exceed the composite payment rate.

|  |  | **Hemodialysis** |
|---|---|---|
| A. | Current Rate (FY 2000) | $138.08 |
| B. | Atypical Salary Cost Per Treatment (Exhibit 9) | 98.92 |
| C. | Atypical Employee Benefit Cost Per Treatment (Per Exhibit 1 - FY 2000 = 37.62% of Salaries) | 37.10 |
| D. | Atypical Overhead Cost Per Treatment (Exhibit 1) | 106.00 |
| E. | Atypical Supplies Cost Per Treatment (Exhibit 1) | 1.00 |
| | **Total Requested Exception Amount** | **$381.10** |

## COST INFORMATION

We are enclosing for your review our Medicare cost report for the fiscal years ending 12/31/97, 12/31/98 and 12/31/99 (Exhibits 23, 24 and 25). We also prepared a pro-forma cost report and attached supporting documents for fiscal year ending 12/31/00 (Exhibit 2). The cost reports were used as basis to compare projected per treatment costs for the past three years to determine its reasonableness and support the fact that LLUMC's costs historically exceed the composite rate. Our projection for fiscal year 12/31/00 is based on actual costs, labor hours and patient treatment information for the five-month period ending 5/31/00 annualized for the whole year. Overhead costs are allocated to the renal dialysis department based on the step-down methodology in accordance with Medicare

7

3

principles. The projected overhead allocation for fiscal year ending 12/31/00 was based on the fiscal year ending 12/31/99 filed Medicare cost report allocation as a percentage of direct costs applied to the projected direct costs.

**Cost Per Treatment Comparison**

The cost comparison of our outpatient programs for fiscal years 1997, 1998, and 1999 and projected 2000 including explanations for significant changes can be found in Exhibit 1. We have developed a cost per treatment analyses for three years so that a comparison from one year to the next can be viewed and determined that the progression of costs is rational. LLUMC's projected cost and number of treatments for fiscal year 2000 as calculated in Exhibit 2 are presented as follows:

|  |  |  |  |
|---|---|---|---|
| | | **Projected for FY 2000** | |
| **Modality** | **Cost** | **Treatments** | **Cost per Treatment** |
| OP Hemodialysis | $1,232,968 | 2,825 | $436.45 |
| Composite Rate for Hospital-Based Facilities | | | $138.08 |
| **Costs in Excess of the Composite Rate** | | | **$298.37** |

LLUMC provides both inpatient and outpatient hemodialysis service. In Exhibit 2, the projected costs have been allocated between inpatient and outpatient based on projected number of treatments. We noted in Worksheet I series for fiscal years 1997, 1998 and 1999 that no costs have been allocated to inpatient treatments. The cost per treatment calculations as shown in Exhibit 1 for these years have therefore been revised to reflect the proper allocation and to be consistent with our cost per treatment calculation for fiscal year 2000.

As required by PRM-1, Chapter 27, we compared our fiscal year 2000 projected costs with the prior year using HCFA recommended standards and categories. Additionally, we compared these costs with HCFA median cost treatment data as indicated in PRM-1 Section 2723.3. A yearly comparison and explanation of significant variances of the cost per treatment for fiscal years 1997, 1998, 1999 and 2000 are presented in Exhibit 1. We noted that cost per treatment for the past three years ranges from $445.00 to $489.00. The annual overall increase of cost per treatment from year to year is between 2% to 6%. The projected cost per treatment for fiscal year 2000 of $436.454 is reasonable when compared with previous years and historically had been above the composite rate. Discussed in the succeeding paragraphs are the justifications for the atypical costs for each component, i.e., salaries (both hour and rate differentials), employee benefits, supplies and overhead costs.

4

A. **Salaries and Employee Benefit Cost Comparison**

It is our understanding that per HCFA median cost data, patient care labor blended rate and employee benefit costs are $40.00 and $7.00 per treatment, respectively. Our projected salaries costs for fiscal year 2000 as shown in Exhibit 1 equate to approximately $169.00 per treatment. Our employee benefit costs, a function of the salaries, is approximately $68.00 per treatment. The direct patient care labor and benefit costs exceeding the median are attributed to the severity of illness in our patient population. The nursing labor costs and hours recorded in the renal dialysis unit represent the actual tie spent in the unit. LLUMC's payroll system directly charges the department for the labor costs and hours where the nursing staff may have spent time outside of the renal dialysis unit. The Patient Data Summary for fiscal year ending 12/31/99 shown in Exhibit 3 provides information on LLUMC's patient mix, percentage of hypertensive patients, pediatric patients, temporary transfer patients (also listed separately in Exhibit 3A) and patients requiring assistance. LLUMC also treats an average of 25 pediatric patients, including infants as young as 6 months old, who typically require more intensive nursing care and thus require more staff time to deal with their more complex medical and social problems. Exhibit 9 provides a summary of the different atypical activities and the amount of additional time in minutes associated with caring for each type of patient grouped into three categories, namely, pediatrics that includes mostly infants, other pediatrics, which includes teenagers, and adult and geriatric patients. The "Atypical Activities" section of this narrative describes in detail each of these activities and provides justification for the additional nursing time. The average staffing ratio for facilities that treat typical patients is 4 patients to 1 staff. As evidenced in Exhibit 10, LLUMC has a higher average staffing ratio of 1.39 patients to 1 staff. Additionally, a typical hospital-based facility of the same size as LLUMC, operating 12 stations, has one registered nurse ("RN") on staff. Based on 4 to 1 ratio, total FTE's required for 12 patients being dialyzed in 12 stations is 3 including 1 RN or 33% RN. As shown in Exhibit 10, LLUMC uses an average of 10.51 RN's or 93.79% of FTE's on staff per shift as a result of severe patient acuity. The additional total salaries and benefits costs related to additional staff time incurred and staffing mix is approximately $384,257 ($136.02 X 2,825 treatments). We believe the incremental salaries and benefits costs per treatment of $137.18, requested herein, fairly represent the additional labor and benefits costs associated with treatment of our patient mix and operating our facility.

B. **Overhead Costs**

The national median cost per treatment for overhead excluding employee benefits is $47.00. Our projected overhead costs for fiscal year 2000 equate to approximately $153.00 per treatment (from Exhibit 1). LLUMC's overhead costs include administrative and general costs; capital costs, housekeeping, repairs and maintenance costs allocated to the renal dialysis unit in accordance with the Medicare principles of reimbursement. Examples of these costs include non-patient telephone, data processing, purchasing, patient admitting, business office and medical records costs, which are mostly allocated, based on accumulated costs. The renal dialysis department receives a significant portion

9

5

of this overhead cost allocation just as a function of its high direct costs incurred associated with providing care to patients with complexities. Therefore, we believe the overhead cost per treatment is justified and related to the treatment of atypical patients.

## C.    Supply Costs

The national median cost per treatment for supplies is $33.00. Our projected supply costs for fiscal year 2000 equate to approximately $34.00 per treatment (from Exhibit 1). We believe the documentation regarding the severity of illness of our patient population supports our supply cost per treatment. Additionally, LLUMC acts as a prudent buyer of supplies as evidenced by its being part of a purchasing group and avails itself of a volume discount. The $1.00 small overage is justified when you compare our acutely ill population to that of other facilities.

As required by PRM-1 Section 2721, we present in Exhibit 16 a list of supplies typically used in a single dialysis treatment and a listing of dialyzer used with the make and model. It also requires that we reconcile the supply cost per treatment with the reported cost report in Exhibit 1. LLUMC provides dialysis to patients with different ages, diagnoses and complications. The supply cost per treatment on the cost report is an overall average of all supplies used for all patients and may vary for each type of patient.

## ATYPICAL ACTIVITES

The Code of Federal Regulations 42 CFR 413.182 (a)(1) states:
**"A facility must demonstrate that a substantial proportion of the facility's outpatient maintenance dialysis treatments involve atypically intense dialysis services...Examples that may qualify under this criterion are more intense dialysis services that are medically necessary for patients such as:**
**(i) Patients who are referred from other facilities on a temporary basis for more intense care during a period of medical instability and who return to the original facility after stabilization;**
**(ii) Pediatric patients who require a significantly higher patient to staff ratio than typical adult patients;**
**(iii) Patients who are not commonly treated by most dialysis facilities, because of complex medical needs which complicate the dialysis procedure, and thereby directly increase the cost"**

In compliance with 42 CFR 413.182 we are submitting the following written justification and evidence supporting the atypically intense and medically necessary services provided to LLUMC renal dialysis patients. The succeeding paragraphs explain how LLUMC meet all of the above criteria. These atypical activities are discussed separately for pediatric and adult patients.

We present in Exhibit 9 a list of diagnoses and related activities that require additional nursing assistance for each group of patients as mentioned above. The patient care staff prepared this list and identified the additional number of nursing minutes per activity and

10

6

527

the number of times each activity is performed annually. As these activities do not occur with every dialysis treatment, the renal dialysis staff identified the frequency of these items for their patient population. These activities represent exacerbation of patient's diagnoses, and do not occur with routine dialysis treatment and are therefore atypical services. The related costs are not included in the composite rate paid by Medicare and represent an exception.

**Patient to Staff Ratio Management and Staffing Mix**

LLUMC dialysis nurses are primarily RNs. This is a prudent staffing mix due to the California State licensure restrictions concerning Licensed Vocational Nurses ("LVN") and the LLUMC pediatric dialysis population. As an example, are not allowed to perform independent assessments, take physician's orders for intravenous medications, or administer intravenous medications. An LVN would have to be covered by a RN for dialysis. The acuity of the patient population at LLUMC does not support this type of "step-down" coverage for the majority of patients. From time-to-time more stable patient care is assigned to an LVN, although the LVN is not regularly scheduled, since the availability of 'stable' patients cannot be predicted. The national staff to patient coverage for typical adults is 1 staff to 4 adult patients. The LLUMC dialysis unit requires a staff to patient ratio of 1:1 or 1:2, due to the complex needs of the patients. We calculated the atypical minutes indicated in Exhibit 9A and 9B take into account the number of staff involved. For example, if an activity requires additional 5 minutes and two staff are involved, the minutes indicated in Exhibit 9A and 9B would be 10 minutes. Additionally, a hospital-based dialysis facility of the same size as LLUMC operating 12 stations typically has one RN on staff per patient shift for hemodialysis. As shown in Exhibit 10, LLUMC has an average of 4.73 RN's on staff per patient shift as a result of the higher patient acuity. We calculated the difference in salary cost due to the higher RN ratio in Exhibit 10. Exhibit 9 summarizes the atypical labor costs related to both the additional time incurred and the staffing mix.

The succeeding narrative describing the various atypical activities is divided into two categories; (1) pediatric patients which include infants and a few teenagers with complications presented in Exhibit 9A and (2) adults and other pediatric patients which include adults and all other pediatric patients excluded from the first group presented in Exhibit 9B.

## PEDIATRIC PATIENTS

We discuss under this section below the different atypical activities relating to the first group of patients and determine the related atypical minutes based upon the patient data for the twelve-month period ending May 31, 2000. Due to the unique condition and situation of the patients under this group, we present in Exhibit 9A series the detail information on how we arrived at the atypical minutes for each patient classified under this group.

7

**Dialysis Time Management**                               **104,385 Atypical Minutes**

Dialysis removes dissolved waste solutes and excess fluid from the blood and, consequently, reduces blood volume and blood pressure. Smaller individuals, such as children, have a smaller blood volume and are at a higher risk for hypotension (low blood pressure) when any volume is removed. Therefore, during hemodialysis, children must be dialyzed more slowly to avoid risk of hypotension and/or electrolyte imbalance. The average time to dialyze an adult is 3 to 4 hours. The average time to dialyze a child is up to 4.5 hours due to the smaller blood volume of a child, and to allow for more complete cleansing of the blood to enhance growth of the child. The total additional dialysis time per year for LLUMC pediatric patients is 104,385 minutes (Exhibit 9A).

**Special Emotional Needs and Support Management**        **26,905 Atypical Minutes**

*All of the 19 pediatric patients in this report required extra nursing time for special emotional needs and support management.*

Children receiving dialysis have usually been ill for most of their lives. Emotionally, they are less mature than healthy children of the same age and less prepared to deal with stress compared to adult dialysis patients. They have usually had prior traumatic medical experiences regarding "shots" and "needles." fear of medical experience, pain, etc. Children on dialysis are small for their ages and are generally debilitated. Complex medical conditions specific to each child result in close management of clinical laboratory blood values, medication adjustments, and dietary management

Anti-anxiety medications such as Benadryl are rarely administered, due to sedative effects on blood pressure. Therefore, every dialysis treatment necessitates addressing the emotional needs of children by the nursing staff. The nursing staff spends from one hour to an entire day addressing the anxiety and fears of these children prior to assessments and treatments. Anxiety levels can become so intense that treatment may have to be deferred until a later day. Additional atypical time spent for the LLUMC children in addressing their emotional needs is 26,905 minutes (Exhibit 9A).

**Comprehensive Pre-Dialysis Assessment Management**     **3,625 Atypical minutes**

*Of the 19 pediatric patients in this report, all but two patients required comprehensive pre-dialysis assessment management. Of these, one patient required this atypical nursing care time 100% of his visits, and another patient required it 68% of his visits.*

There is a comprehensive pre-dialysis assessment performed on each child by the nursing staff. All children are weighed before and after treatment. Vital signs are taken every 30 minutes on stable children and every 15 minutes or more frequently if unstable.

The medical complexity of hereditary/genetic or congenital defects complicates the pre-dialysis assessments and increase labor hours during the dialysis treatment. Children who

12

8

are born with renal failure almost always have accompanying multiple organ failure, such as liver failure and/or gastrointestinal insufficiency. There are times when the children come to dialysis with other medical problems requiring time for assessment, contacting the appropriate physician and/or specialist for consult and care of the problems. Since the nurses see these children most often as the dialysis staff, it falls mostly on their shoulders to coordinate or perform these additional duties in addition to providing routine dialysis care.

Additional atypical time required to complete these processes for children is 10 to 15 minutes per treatment for a total of 3,625 minutes (Exhibit 9A).

**Language Barrier**                                       **3,175 Atypical Minutes**

*Of the 19 pediatric patients in this report, 5 patients required additional atypical minutes of nursing care due to language problems. Of these, 3 had significant problems and up to 56% of their total nursing care time was devoted to handling language problems.*

LLUMC is located in a highly populated metropolitan area near the US/Mexican Border. Frequent need for interpreters for Spanish-speaking families increases the time for medically necessary communication. Often, this communication problem is heightened by a lack of understanding of basic medical terminology, and additional time is needed to explain basic information. The total atypical minutes related to language barrier are 3,175 (Exhibit 9A).

**Dietary and Feeding Problems**                            **7,315 Atypical Minutes**

*Of the 19 pediatric patients in this report, every child required this type of atypical nursing supportive care. Of these, 7 or 37% required over 30% of their total visits to include nursing management of dietary and feeding problems.*

Pediatric dialysis patients are required to be on a strict diet for control of potassium, phosphorus and sodium levels. Infants and toddlers have essential needs for nutrition to enhance growth. Dietary management for children is more involved than for adults, with education/understanding required for both the children and their parents. This is above and beyond the dietitian involvement. Atypical time spent on diet instruction or assessment/instruction on changing or management of feedings is 7,315 minutes (Exhibit 9A).

**Gastric or Jejunostomy Tubes**                           **1,080 Atypical Minutes**

*Of the 19 pediatric patients, only 2 required this type of additional nursing care. However, these 2 required the extra nursing time for each visit, 100% of the time.*

13

530

Pediatric patients with medically complex genetic or congenital diagnoses often have gastro-intestinal insufficiency requiring placement of a special tube through the abdominal wall and directly into the intestines. Infants require special formulas and sometimes specialized gastric tube feedings, to which the parents must add additional nutrients and medications. Atypical time is 10 – 15 minutes for determining appropriate placement of tubes, performing feeding, and patient/parent education is often required. The total atypical minutes relating to this activity are 1,080 (Exhibit 9A).

**Medication Management**                                    **6,500 Atypical Minutes**

*Of the 19 pediatric patients, every child required this extra nursing care, while 5 (26%) required more than 30% of their total visits have medication management by the RNs. Of these, 3 required 54-74% of the total time was devoted to this atypical nursing care.*

Compliance in taking medications by children is typically lower than in adults, due to their lack of maturity and understanding of physiological consequences. Instructions for new medications or dose changes must be given to both the child and parents. For infants, additional instruction must be given to the parents on how to mix and measure the medications. Because they are growing and because of the effect of renal failure on a child's smaller body, more frequent dose changes are seen, especially with management of hypertension. Nurses must be continually aware of the different doses of medications being given to children of different body weights. Additional nursing time required for instruction and reinforcement and documentation of medication regimen is 6,500 minutes (Exhibit 9A).

**Cardiac Monitoring Management**                            **4,480 Atypical Minutes**

*Of the 19 pediatric dialysis patients, 4 required substantial nursing care for cardiac monitoring, 3 children were on constant, 100% cardiac monitoring.*

All infants receiving hemodialysis are placed on a cardiac monitor due to their size and blood volume. Average additional time required for hooking up the monitoring equipment, removing, and then cleaning the equipment is 5 to 10 minutes per treatment. Total atypical time is 4,480 minutes (Exhibit 9A).

**CRIT-LINE Monitoring Management ·**                        **16,348 Atypical Minutes**

*Of the 19 pediatric dialysis patients, 18 required additional, atypical nursing support. Of these, 17 (89%) required more than 30% of their total visits had CRIT-LINE monitoring. In fact, 12 had over 60% of their total visits requiring this atypical nursing care, and 5 required 100% monitoring during each visit.*

A crit-line is used every dialysis treatment for the LLUMC pediatric patients. A crit-line monitors fluid loss during dialysis. Fluid loss monitoring is vital for children due to their already low blood volume. Crit-lines are not typically used on adult patients. Initial

14

10

533

explanations to the children takes 5 to 10 minutes with an additional 5 minutes to connect the monitor and another 2 minutes following dialysis to remove and clean the equipment for a total of 12 to 17 minutes per treatment. Total atypical time is 16,348 minutes (Exhibit 9A).

**Oxygen Issues**                                    **6,065 Atypical Minutes**

*Of the 19 pediatric dialysis patients, 11 required Oxygen monitoring. Of these, 3 children required intensive oxygen monitoring. One child required Oxygen monitoring 68% of his visits, and the other 2 required this monitoring 100% of the time.*

Oxygen is used when the measured oxygen saturation is low. Good oxygenation must be maintained to prevent 'oxygen starvation' in the patient's blood and body tissues. Infants and toddlers frequently must be coaxed into accepting an oxygen facemask, if they accept it at all. Nurses become very creative in developing alternatives that the infant will accept; such as using the familiar object of a styrofoam cup held a few inches from the patients face until the oxygen level increases. Additional nursing labor of 6,065 minutes (Exhibit 9A) is required to come up with a patient accepted method of oxygen delivery.

**Code/Near Code**                                    **3,310 Atypical Minutes**

*Of the 19 pediatric dialysis patients, 6 required this atypical nursing assistance. However, 1 child had 20 codes or "near codes," during the one year period.*

Pediatric patients have multiple medical diagnoses and complications requiring much closer observation and medical care than the typical adult patient. These complicated patients are more likely to have complications on dialysis that result in medical instability. Dialysis may exacerbate underlying disease conditions causing the patient to become very unstable and enter a code or near-code situation. Blood pressures may increase or decrease dramatically, seizures may occur, or underlying heart weakness. The total atypical minutes relating to code/near code problems are 3,310 (Exhibit 9A).

*PLEASE NOTE: During a code or a near code, the staffing ratio is increased from 1 staff to 3 staff per patient. Additional nursing time is required in these situations to respond to the emergency, obtain emergency equipment, administer medications and oxygen, contact physicians and ancillary medical personal, work with family members, and documentation.*

**Access Clotting Management**                        **4,000 Atypical Minutes**

*Of the 19 pediatric dialysis patients, 15 had access clotting problems, requiring additional nursing care. Of these, 1 child had 25 visits in 1 year with this problem, and 1 child experienced access clotting on 12 visits.*

*15*

11

Most children have permanent catheters for dialysis access instead of fistulas or grafts, because of their smaller size and the related complexity of surgical procedures and dialysis needle placements. We present in Exhibit 8 a list of all patients and the type of catheter used. These catheters frequently develop fibrin sheaths at the tip, causing flow problems and clotting of the catheter and/or the dialyzer and tubing. Dialysis time must sometimes be increased, due to inadequate clearances with poor blood flows. A cathetergram is ordered in many cases, requiring time to contact the MD and scheduling for the procedure. In addition, anticoagulation agents (i.e. Urokinase or TPA) may be used: either for one hour or more before dialysis can be started, or as a two-hour infusion during or after dialysis. With the few children who have primary fistulas, there is a prolonged maturation time with their smaller and more fragile vasculature, and fistulograms are occasionally required when problems are encountered with needle placements. Additional staff time used for arranging for procedures, giving anticoagulant medications, and for more difficult needle placements is 4,000 minutes (Exhibit 9A).

**Stabilization of Access Site Management**                    **12,530 Atypical Minutes**

*Of the 19 pediatric dialysis patients, 16 had problems with stablizing their access site, requiring and unusual amount of additional, atypical nursing care.*

Children with needle placement in fistulas need close observation of the sites and sometimes stabilization with an armboard, because of their more fragile and less developed vasculature. Toddlers and infants need to be prevented from pulling on or scratching at their catheters and need monitoring of their movements, as they don't understand the need to stay still during their treatments. Interventions that facilitate this are educating the parents, having the infants wear "onesies", using special Medipore tape for dressings and securing the whole catheter between treatments, and occasionally having the MD replace the suture when it becomes detached. Atypical time needed is 12,530 minutes (Exhibit 9A).

**Epistaxis (Nosebleed)/Headache Management**          **1,255 Atypical Minutes**

*Of the 19 pediatric dialysis patients, 12 had these problems. However, 1 child had over 60% of his visits with this problem.*

Epistaxis and/or headaches may develop along with hypertension. Additional staff time is involved when the child develops headaches and/or nose bleeds delaying treatment 20 minutes to an hour for an average of 40 minutes. Total atypical time is 1,255 minutes (Exhibit 9A).

**Hypotension Management**                              **12,175 Atypical Minutes**

*Of the 19 pediatric dialysis patients, 16 had problems with hypotension, requiring atypical amounts of nursing care. Of these, 8 had over 30% of their total visits with*

16

12

533

*this problem, and of the 8, 4 required atypical nursing care for hypotension more than 60% of their visits.*

Hypotension (low blood pressure), when severe, necessitates returning the blood and requires as much as an hour to 90 minutes additional dialysis and staff time. Staff must call the physician for orders for volume expanders, the medication must be obtained from pharmacy, the medication must be administered slowly to the patient, and then the event must be documented in the medical record. Additionally, the vital signs must be monitored more frequently, every 15 minutes versus every 30 minutes. The additional staff time required due to hypotension issues is an average 25 minutes every other treatment for these patients. Total atypical time is 12,175 minutes (Exhibit 9A).

**Infectious Disease Management**                    **14,700 Atypical Minutes**

*Of the 19 pediatric dialysis patients, 3 required this type of atypical nursing care. However, two required this infectious disease management 100% of the time, for each visit.*

Protective techniques such as gloving, masking, skin and/or graft preparations for needle sticks, and special needle disposal procedures are examples of routine precautions for every dialysis patient. Other precautions include such activities as doubling of laboratory bags and labeling blood products as isolation before submitting for lab testing. Additional isolation precautions may be necessary to protect the staff and other patients from communicable diseases such as hepatitis, active tuberculosis, and viral pneumonia, for examples. Special isolation precautions may also be necessary to protect patients with especially weak/compromised immune systems from possible contagions from staff, other patients, and from the environment in general. Prior to entering the isolation room staff follow isolation techniques to gown, glove, and mask. The staff must discard the attire upon leaving the room for any reason, and must repeat the proper dressing process to re-enter isolation. Additional time to dress for isolation requires 15 minutes per treatment. Additional time to clean the room and equipment is 15 minutes per treatment. Due to overlapping activities, a conservative estimate of additional time for isolation patients is 30 minutes per treatment. Total atypical time is 14,700 minutes (Exhibit 9A).

**Heparin Use Management/Activated Coagulation Time Measurement**
                                                **9,385 Atypical Minutes**

*Of the 19 pediatric dialysis patients, every single one required heparin use management. Of the 19, 7 required this atypical nursing care more than 30% of their total visits for the year.*

Measurement of blood coagulation is performed at initiation of dialysis and as needed later, to avoid blood access and dialyzer circuit clotting with the administration of Heparin. Caution must be used with infants, due to their smaller body size and blood volume. The Heparin dose is adjusted, based on ACT results and any clotting, in the

17

13

circuit. This is required more frequently when anemia is present and corrected, and with other related medical problems, which is a common occurrence in children. Total atypical time is 9,385 minutes (Exhibit 9A).

**Family Conference Management**                    **4,700 Atypical Minutes**

*Of the 19 pediatric dialysis patients, every one required family education management resulting in atypical nursing care.*

The multi-disciplinary team, including the nurses meets monthly to review each patient's treatment course and regimen. The constant interaction of the multidisciplinary team and the patient/family on a daily basis provides constant support of the patient. Specific Nursing staff conferences with the children's families are conducted on an as-needed basis. The conferences take an average of 20 minutes. Total atypical time required is 4,700 minutes (Exhibit 9A).

**Height, Weight and Immunization**                    **1,530 Atypical Minutes**

*Of the 19 pediatric dialysis patients, all but 2 required height, weight and immunization monitoring from the nursing staff, resulting in atypical care time.*

Children on dialysis are usually chronically debilitated. Their heights are recorded every three months. Dry weights require being adjusted frequently, as the children grow or medical problems cause them to temporarily lose weight. A copy of their immunization records is kept on the chart, and the nursing staff monitors these with the parents to keep them updated. At times, the nursing staff is responsible for administering the immunizations, e.g. Hepatitis B. Documentation requires 10 minutes of staff time per month per patient for both hemodialysis and peritoneal dialysis patients. Total atypical time is 1,530 minutes (Exhibit 9A).

**Hypertension Management**                    **20,626 Atypical Minutes**

**Of the 19 pediatric dialysis patients, 13 had problems with hypertension, resulting in atypical nursing care. Of these, 8 had over 50% of their total visits with this situation.**

Hypertensive patients generally experience a rise in blood pressure prior to initiation of dialysis. This occurs because of fluid/weight gain in between dialysis treatments. A hypertensive patient's blood pressure adjusts to normal levels after dialysis and with medication control. Occasionally during dialysis, hypertensive patients experience dangerously high blood pressure readings, requiring immediate oral or intravenous medication. The patient's blood pressure must be checked closely after medication administration to assure the blood pressure does not drop too low. Sometimes high blood pressure affects post dialysis hemostasis (problems with clotting) of the access. Patients access site will bleed for prolonged periods of time because of the high pressure within

18

14

their arteries and veins. The additional nursing minutes required to care for exacerbation of hypertensive episodes includes: additional dialysis time; otherwise, an additional 5 minutes to give anti-hypertensive medications, 15 minutes to teach patient/family to take blood pressure at home, 5 minutes to schedule an MD appointment for hypertensive issues, 5 minutes to call MD for orders to treat hypertension, and 15 minutes of additional care for prolonged bleeding. Total time involved is 40 minutes per episode. Total atypical time is 20,626 minutes (Exhibit 9A).

**Admissions to Hospital**                                    **800 Atypical Minutes**

*Of the 19 pediatric dialysis patients, there were 7 patients admitted to the hospital.*

Patients may require hospital admission due to medical situations that are unrelated to the dialysis procedure (pneumonia, infection, cardiac involvement), for problems that arise during dialysis (seizure, hypertension), or for dialysis-related conditions (clotted access, fever of unknown origin, etc.). Additional nursing time ranging from 30 to 60 minutes is required to contact physicians, patient's family, complete admission paperwork, draw blood specimens, transfer patient to the emergency room or to the patient's room. The total atypical minutes relating to patients admitted to the hospital are 800 (Exhibit 9A).

**Fever**                                                    **1,770 Atypical Minutes**

*Of the 19 pediatric dialysis patients, 14 had problems with fever management, resulting in atypical nursing care time.*

Children with multiple medical conditions and with renal failure have decreased immune response and are more susceptible to disease/infection. Children who come to dialysis with a fever require additional emotional support and assessment. Additional nursing time between 20 to 30 minutes is required to contact physicians, draw bloodwork, obtain and administer medications and cooling measures, montior the patient for increase or decrease in temperature, and documentation. The total atypical minutes relating to fever issues is 1,770 (Exhibit 9A).

**Seizure Recovery**                                         **15 Atypical Minutes**

*Of the 19 pediatric dialysis patients, 1 had seizure problems resulting in atypical nursing care time.*

Children with chronic hypertension are subject to seizure activity. Additionally heparin induced bleeding coupled with hypertension may result in a stroke. Frequent monitoring of blood pressure and the patient's general level of awareness is required. Staffing ratio is increased from 1 staff to 2 staff per patient. The total atypical minutes relating to seizure problems are 15 (Exhibit 9A).

19

15

588

Dehydration /Electrolyte Imbalance Management          **4,325 Atypical Minutes**

*Of the 19 pediatric dialysis patients, all but 1 had problems with electrolyte imbalance, resulting in atypical nursing care time.*

Children may come to dialysis with dehydration and electrolyte imbalance for a variety of reasons. Primary of those reasons would be flu symptoms, refusal to eat, or a medical condition of gastro-intestinal insufficiency or failure to thrive. Additional nursing time between 25 to 45 minutes labor is required to assess the patient, talk with the family, contact physicians, draw blood work, obtain and administer medications, and documentation. The total atypical minutes relating to dehydration are 4,325 (Exhibit 9A).

Anesthetic Management          **3,930 Atypical Minutes**

*Of the 19 pediatric dialysis patients, only 3 required anesthetic management resulting in atypical nursing care time. However, each of these 3 required more than 60% of their visits with anesthetic management.*

Children with fistulas or grafts for dialysis blood access often are afraid of the pain associated with placing needles. Additional nursing time between 10 to 20 minutes is required to calm or restrain the patient, getting them to hold still and accept the anesthetic required to decrease the pain. This is especially traumatic to some children, requiring many minutes of convincing. The total atypical minutes relating to anesthetic management are 3,930 (Exhibit 9A).

## ADULTS AND OTHER PEDIATRIC PATIENTS

Below is a discussion of atypical activities relating to adults and other pediatric patients not covered in the first group above.

Dialysis Time Management          **69,120 Atypical Minutes**

Dialysis time averages 3 hours per treatment. The adult patient population at LLUMC is more complex requiring additional time for treatments. The average dialysis time for the adult patients at LLUMC is 4 hours. The additional time of 60 minutes per treatment represents atypical time for a total of 69,120 minutes (Exhibit 9B).

Temporary Patient Transfers          **25,810 Atypical Minutes**

Frequently patients are transferred to the hospital-based facility because their condition is considered too unstable for dialysis in other facilities in the area. The hospital-based outpatient adult dialysis unit operates 6 days per week. Currently, there are 6 chronic adult dialysis patients receiving treatments 3 days per week for 4 hours per treatment. These is acute dialysis adult patients referred to as temporary patient visitors. The visitors

20

16

537

are treated at LLUMC for special complex problems and also usually have problems with clotted access. In 1999, 77 out of the 147 patients were temporary patient transfers. We also present in Exhibit 7 a list of permanent patient transfers. Note that 7 out of the 10 patients were transferred due to complication such as severe infection, fever and due to deteriorating condition of patients who were on peritoneal dialysis but now require hemodialysis.

*In compliance with Chapter 27.1 of the Provider Reimbursement Manual, which states that: a provider must show that the dialysis services it provides are more intense and medically necessary for its patients who are "referred" from other facilities on a temporary basis for more intense care during a period of medical instability and who return to the original facility after stabilization "and" patients who are not commonly treated by most medical facilities because of the complex needs which complicate the dialysis procedure and thereby directly increase costs; we present this group of patients in Exhibit 3A.*

A review of transfers to LLUMC who will eventually transfer back to the referring dialysis center, indicates the following reasons for transfer:

- extremely low blood pressure;
- poor access with limited ability to successfully cannulate the access;
- repeated access infections; placement and/or treatment via a temporary catheter;
- stabilization of newly diagnosed dialysis patients;
- cardiac problems requiring cardiac monitoring; and
- patients requiring ambulance transportation.

Additionally, estimated additional staff time to care for these patients is an average 30 minutes per treatment. Eighty per cent of the adult patients are newly diagnosed and unstable. Pre-dialysis time for each treatment for these patients is 40 minutes. Total atypical time is 25,810 minutes (Exhibit 9A).

**Patients Requiring Assistance**                    **18,745 Atypical Minutes**

Many patients at LLUMC require some type of ambulation assistance. Typical patient populations include patients walking into facilities without assistance. Atypical patients require a variety of transfer assistance including walkers or canes, wheelchairs, stretchers and ambulance transportation.

Upon arrival to the dialysis facility, each patient must be weighed and transferred to a dialysis chair. Dialysis cannot be performed in wheelchairs due to numerous hypotensive episodes. Hypotensive episodes require patients to be placed in "shock" or Trendelenburg position where the legs and feet are higher than the heart and head. Trendelenburg position cannot be accomplished in a wheelchair.

21

17

508

For patients using walkers and wheelchairs, the weighing and transfer process is time consuming. Patients using walkers or canes require a minimum of 1:1 assistance while those confined to a wheelchair require 1:1 or 2:1 assistance. Wheelchair scales are available to accommodate patients that cannot support themselves long enough to be weighed. This process requires additional nursing time to weigh the wheelchair with and without the patient, then to subtract the wheelchair weight from the combined weight. Additionally, wheelchair bound patients are encouraged to use the bathroom prior to being connected to the dialysis machine to avoid interruptions during their treatment. This requires additional assistance by the dialysis unit staff.

Patients transported by stretcher and ambulance is obviously more ill by the nature of transportation. Stretchers present additional obstacles to the weighing process. Ambulance transport requires additional nursing time to call for the ambulance when patients are ready for discharge and to provide a condition report to the medics.

Exhibit 3 identifies the patients and the type of assistance required. The additional nursing time for ambulation assistance is presented in Exhibit 9B. This represents a total of 18,745 extra nursing minutes per year

**Neuropathy Problem Management**                    **1,215 Atypical Minutes**

Neuropathy is a degenerative condition affecting the nervous system. Many patients with progressive neuropathy develop sensory deficits. Special nursing precautions are necessary to avoid injury because early warnings of discomfort and pain are diminished. Patients may also have heightened pain sensory necessitating special nursing interventions to continually comfort patients in pain and patients that cannot be still. Patients develop extreme weakness and may move very slowly, requiring additional staff assistance time. Eating disorders develop due to changed and/or diminished taste sensations requiring nursing intervention regarding nutritional well being. Some patients develop partial and/or total blindness requiring additional staff assistance time. In fiscal year 1999, there are 23 patients at LLUMC with neuropathic problems as identified in Exhibit 3. The additional atypical time required for each treatment is between 4-5 minutes. Total additional atypical time is 1,215 minutes (Exhibit 9B).

**Access Management**                                **8,640 Atypical Minutes**

The typical access for hemodialysis is a fistula or a graft. We present in Exhibit 8 a list of the patients and the type of catheter used. The access is cleaned in an aseptic fashion and cannulated with fistula needles prior to each dialysis treatment. A temporary access is used when a patient's fistula or graft is not working, or when permanent access has been deemed medically impossible. Visitors are frequently referred to LLUMC due to poorly functioning access requiring additional time to work to flush the lines, place a declotting medication in the lines, communicate with the doctor, schedule for radiology, and schedule for surgery. Additional nursing labor is spent in frequent re-positioning the

22

18

539

dialysis bloodlines and the patient to achieve optimal blood flow during the treatment. Occasionally a patient requires dialysis after a surgical procedure.

Post-surgical patients require more intense nursing labor to take more frequent vital signs, administer medication for pain, provide emotional support, and remove the sheath used for catheter placement. Problems such as clotted access require additional time ranging from 30 to 45 minutes. Additional atypical time due to access is 8,640 minutes (Exhibit 9B).

**New Patients Training**                                    **7,200 Atypical Minutes**

LLUMC receives an average of 40 new referral patients per year. This represents 57% of the non-transfer patient population. The hospital-based dialysis unit at LLUMC primarily admits high-risk patients and once the patients are stabilized, they are transferred to other facilities. A typical dialysis facility normally treats the same chronic dialysis patients and has significantly lower new patients each year. Each new patient receives 30 minutes of special dialysis related training in the process, life style, diet, medications, and every treatment for examples, for the first 2 weeks of treatment. Exhibit 3 identifies the new renal patients admitted for fiscal year ending 12/31/99. Total additional atypical time for the special training for both pediatrics and adult patients is 7,200 minutes (Exhibit 9B).

**Diabetic Management**                                      **6,601 Atypical Minutes**

Frequently, diabetic patients require insulin twice per day at home. They learn to check their own glucose and adjust their diet or call their physician if glucose readings are abnormal. Occasionally while on dialysis, intervention is required to check glucose levels, give medications or feed patients for unusual glucose levels. The additional nursing time required to give IV or oral glucose and monitor this intervention is 15 minutes per occurrence. Testing glucose levels during dialysis requires 10 minutes. Treating wounds associated with diabetic circulatory problems requires 15 to 20 minutes-depending on the extent of the wound. Scheduling an MD follow-up appointment and/or referral appointment requires 10 minutes. Calling an MD for orders to treat hypoglycemia requires 5 minutes. Teaching patients/families to test glucose at home requires 15 minutes. Calling home to request glucose information requires 5 minutes. Scheduling eye consultations requires 5 minutes. Scheduling podiatry consultations requires 5 minutes and assisting blind patients requires 10 to 30 minutes. Average additional staff time to deal with diabetic related issues requires an average of 60 minutes. Total additional time due to diabetes issues for a total of 6,601 minutes per year (Exhibit 9B).

**Hypertension Management**                                  **8,094 Atypical Minutes**

Hypertensive patients generally experience a rise in blood pressure prior to initiation of dialysis. This occurs because of fluid gain in between dialysis treatments. Hypertension/high blood pressure adjusts to usual level during/after dialysis and with medication control. Occasionally during dialysis, hypertension reaches dangerously high

23

19

levels requiring immediate oral, intramuscular, or intravenous medication. The blood pressure must be checked more frequently after medication administration to assure the blood pressure does not drop too low.

Sometimes high blood pressure affects post dialysis hemostatis of the access. Patients access site will bleed for prolonged periods of time because of the high pressure within their arteries and veins. The additional nursing minutes required to care for exacerbation of hypertensive episodes includes: an additional 5 minutes to give anti-hypertensive medications, 15 minutes to teach patient/family to monitor blood pressure at home, and 5 minutes to call MD for orders to treat hypertension. Total additional time required to manage hypertension is time is 25 minutes per episode. Hypertension occurs for 5% of all treatments. The total additional atypical time to manage hypertension is 8,094 minutes (Exhibit 9B).

**Hypotension Management**                          **6,221 Atypical Minutes**

Hypotensive (low blood pressure) episodes require additional nursing time to provide medication(s), additional fluids and evaluate the patient responses to these treatments. Severe episodes of hypotension require hypotonic solution be administered. Additional staff time is required to evaluate the problem; obtain a physician's order for the medication; and obtain, administer, and document of administering the medication. Additionally, vital signs are monitored more frequently – every 15 minutes as opposed to every 30 minutes following administration of the medication and/or upon discovery of hypotension. Total additional time averages 15 minutes per episode. Hypotension occurs in 40% of all treatments. Total atypical time due to hypotension is 6,221 (Exhibit 9B).

**Cardiac Problem Management**                     **15,927 Atypical Minutes**

Cardiac problems may be exacerbated during dialysis treatments. The dialysis treatment removes approximately one unit of blood from the body for cleaning at a time, and renal patients are anemic to begin with. Occasionally this is a stress that extremely poor cardiac muscle cannot tolerate, resulting in chest pain. When chest pain occurs, the dialysis nurses must provide oxygen therapy, medication or adjust the treatment to prevent the patient from having a myocardial infarction (heart attack).

Nursing time for treating exacerbations of cardiac illness includes 3 minutes to apply oxygen therapy, 12 minutes to give medications for chest pain, 10 minutes to call an MD for orders to treat problems such as chest pain, 15 minutes for increased additional vital signs monitoring, Total additional time is 40 minutes per episode. The total atypical minutes due to cardiac problem is 15,927 minutes (Exhibit 9B).

24

541



**Infectious Disease Management**                          **15,489 Atypical Minutes**

Protective techniques such as gloving, masking, skin and/or graft preparations for needle sticks, and special needle disposal procedures are examples of routine precautions for every dialysis patient. Additional isolation precautions may be necessary to protect the staff and other patients from communicable diseases such as hepatitis, active tuberculosis, and viral pneumonia. Special isolation precautions may also be necessary to protect patients with especially weak/compromised immune systems from possible contagions from staff, other patients, and from the environment in general. For these circumstances, a specific isolation room is provided with an appropriate air filtration system. Prior to entering the isolation room staff follow isolation technique to gown, glove, mask, and cover shoes upon entering the room. The staff must discard the attire upon leaving the room for any reason, and must repeat the proper dressing process to re-enter isolation.

Additional time to dress for isolation requires 15 minutes per treatment. Additional time to clean the room and equipment is 10 minutes per treatment. Additionally, one staff is usually assigned to the isolation patient rooms to minimize cross contamination exposure Exhibit 3 identifies the 4 adult patients who required isolation three times per week due to Hepatitis B, VRE and MRSA in 1999. Total additional time is 15,489 minutes (Exhibit 9B).

**Seizure and Stroke Precaution Management**              **1,340 Atypical Minutes**

Seizure and stroke precautions may require a variety of nursing assessments from monitoring neurological, vital, and cognitive signs. The nurse may perform examinations of the pupils for reaction to light, testing equality in strength and stimulus of extremities, and assessing cognitive awareness, for examples. Additionally, the treatment area must be equipped with special supplies and medications in preparation for potential seizure and/or stroke. Estimated additional time for assessments is 5 minutes per hour or 20 minutes per treatment. There is at least one patient three times per week requiring such precautions every treatment. Total additional atypical time for seizure and stroke precaution management is 1,340 minutes (Exhibit 9B).

**Other Pediatric Patients**                              **13,975 Atypical Minutes**

Pediatric patients in general require additional time to provide emotional intervention and to educate the parents and the patient. More frequent vital signs monitoring is also required to prevent any complications during dialysis. The patients under this group are excluded from the Pediatric patients discussed in a separate section above. The related atypical minutes relating to these patients are 13,975 (Exhibit 9B).

**SUPPLEMENTAL INFORMATION**

In accordance with the requirements for cost documentation outlined in PRM Section 2721, we have enclosed the following information                    25

21

1. **Personnel**
   Number of employees and total salary for each employee (Exhibit 11A)
   Number of employers hired and terminated (Exhibit 12)
   Job descriptions and responsibilities (Exhibit 13)

2. **Staffing Pattern**
   Staff per shift (Exhibit 10)
   Patients per shift (Exhibit 10)
   Patient to staff ratio for fiscal year ending 12/31/99 (Exhibit 10)
   Productive and Non Productive Nursing hours (Exhibit 11)

3. **Overhead**
   The administrative and general services are provided by LLUMC. Overhead costs are allocated to the renal dialysis cost center in accordance with the Medicare principles of reimbursement. In Exhibit 2, the projected total overhead costs have been allocated between inpatient and outpatient treatments on statistical allocation basis accepted by Medicare. The hospital-based renal dialysis unit only provides hemodialysis treatments.

4. **Routine Laboratory Tests (Exhibit 14)**
   We have enclosed a list of the laboratory tests used routinely in the dialysis procedure and separately billable tests in Exhibit 17.

5. **Routine Pharmacy Items (Exhibit 15)**
   We have enclosed a list of those pharmacy items furnished to our dialysis patients included in the composite rate and those not included in the composite rate (Exhibit 18).

6. **Supplies (Exhibit 16)**
   We have enclosed a list of supplies used routinely in a single dialysis treatment. We have also enclosed a schedule that lists the make and model number of the dialyzer and cost of dialyzer included in the Renal Dialysis cost center. We also provided a listing of separately billable supplies, which are used to provide separately billable drugs in Exhibit 19.

7. **Machine Depreciation (Exhibit 20)**
   We have enclosed a listing of machines, dates of purchase, estimated useful life and method of depreciation.

8. **Routine Ancillary Costs**
   We have excluded non-routine items and services from our allowable costs, as they are not considered part of the dialysis service costs that are used in computing the composite rate. Exhibits 17, 18 and 19 include a listing of separately billable drugs, supplies and laboratory tests, respectively.

26

543



9.  **Inpatient/Outpatient Costs**
    The hospital-based renal dialysis unit provides hemodialysis services only to both inpatient and outpatient. In Exhibit 2, the projected costs have been allocated between inpatient and outpatient based on the number of treatments similar to the methodology used for cost finding in Worksheet I series. We noted that the Worksheet I series for fiscal years 1997, 1998 and 1999 do not properly reflect a cost allocation to inpatient treatments. Our cost comparison for these years in Exhibit 1 series was calculated to properly reflect the allocation of costs between inpatient and outpatient services.

10. **Home Program and Training Costs**
    LLUMC's hospital-based dialysis provides hemodialysis only; no home program or training costs are included.

11. **The 1999 Medicare Cost Report**
    Excerpts Only (Exhibit 23) included for comparative purposes and was used as a baseline for projecting the fiscal year 2000 overhead cost allocation.

12. **Abbreviation**
    Definition to help explain the diagnoses listed on the Patient Data Summaries (Exhibit 22)

27

544

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Health Care Financing Administration

7500 SECURITY BOULEVARD
BALTIMORE MD 21244-1850

RECEIVED
PADCR2C

NOV 2 7 2000

P/M _____ 1 : | 16 _____

November 15, 2000

Ms. Brenda Merriweather, Manager
Provider Audit Department
Medicare Part A Intermediary
P.O. Box 9159
Oxnard, California 93031-9150

Dear Ms. Merriweather:

I am responding to your letter dated September 18, 2000, concerning the exception request filed under the prospective (composite rate) payment system by Loma Linda University Medical Center (LLUMC), provider number 05-0327. LLUMC's exception request was received in your office on August 28, 2000. LLUMC has requested an exception amount of $381.10 or an increase of $243.02 for hemodialysis under the atypical patient mix exception criteria. Based on your review of the documentation submitted by LLUMC, you recommended a composite payment rate of $225.40 for hemodialysis or an increase of $87.32 for salaries and employee benefits. As a result of our review of the documentation submitted by LLUMC and your office, we have the following comments.

Atypical Patient Mix

LLUMC claims that it has an atypical mix. However, because of the issues discussed below, we have not ruled on the exception criterion.

Cost Reports

On page four of the narrative, the provider stated that "LLUMC provides both inpatient and outpatient hemodialysis service. In Exhibit 2, the projected costs have been allocated between inpatient and outpatient based on projected number of treatments. We noted in Worksheet I series for 1997, 1998 and 1999 that no costs have been allocated to inpatient treatments. The cost per treatment calculations as shown at Exhibit 1 for these years have therefore been revised to reflect the proper allocation and to be consistent with our cost per treatment calculation for fiscal year 2000."

960

2

On page two of Exhibit 1, the provider stated that $8.9 million for management services was erroneously duplicated in fiscal year (FY) 99. On page ten of Exhibit 2, the provider stated that $11.4 million for home office costs was also erroneously duplicated in FY 99. In your report, you stated that you will have the provider file revised cost reports for FY 99.

Based on the preceding statements, HCFA has the following comments:

First, LLUMC should have filed its Worksheet I series and cost reports in accordance with Medicare program instructions and you should have verified that the statistics used by LLUMC are in accordance with Medicare program instructions. 42 CFR 413.198 (b) states that "each facility must keep adequate records and submit the appropriate HCFA-approved cost report in accordance with §§413.20 and 413.24 which provides rules on financial data and reports, and adequate cost data and cost finding, respectively." The Worksheets I series filed by LLUMC for its FY 97, 98, and 99 cost reports did not use the HCFA-approved statistical basis for allocating costs. Further, the Worksheet I series furnished at the provider's Exhibit 2 did not use the HCFA-approved statistical basis for allocating costs. §3653 of Part II of the Provider Reimbursement Manual (PRM) (See Attachment 1) identifies the statistical basis that a provider must use in completing its Worksheet I-3.

Second, on page 4 of its narrative the provider stated that "LLUMC provides both inpatient and outpatient hemodialysis service. In Exhibit 2, the projected costs have been allocated between inpatient and outpatient based on projected number of treatments. We noted in Worksheet I series for fiscal years 1997, 1998 and 1999 that no costs have been allocated to inpatient treatments. The cost per treatments calculations as shown in Exhibit 1 for these years have therefore been revised to reflect the proper allocation and to be consistent with our cost per treatment calculation for fiscal year 2000." The intermediary indicated that Exhibits 24 and 25, the provider's fiscal years 1997 and 1998 cost reports were not submitted with the exception request. HCFA noted that LLUMC did allocate its inpatient and outpatient costs to outpatient treatments only on its FY 97, 98 and 99 cost reports. HCFA noted that LLUMC did compute a component cost per treatment (CPT) for its inpatient costs and outpatient costs based on total treatment count on its Exhibit 1. By using the number of treatments for allocation purposes rather than the HCFA-approved statistical basis, the CPT remains the same for both inpatient costs and outpatient costs. Based on our experience, inpatient treatments are more costly than outpatient treatments. By using the number of treatments for allocation purposes rather than the HCFA-approved statistical basis, inpatient costs are inappropriately allocated to its outpatient area, thereby increasing the outpatient CPT and decreasing the inpatient CPT. Consequently, by using the number of treatments for allocation purposes rather than the HCFA-approved statistical basis, the provider has not accounted for the additional costs in treating its sicker inpatients.

Basically, the provider is not making any differentiation between the patient acuity for its inpatient and outpatients. Inpatients receive the highest level of care and require more services; therefore, the inpatient CPT is higher than the outpatient CPT. The same CPT for inpatients and outpatients is not acceptable.

Third, HCFA has prepared an annual CPT analysis based on the provider's documentation and method of allocating costs (See Attachment 2). The CPT on lines 11 and 27 of Attachment 2 shows that the provider did not differentiate between the acuity levels of inpatients and outpatients, since the CPT is the same for both inpatient and outpatient treatments. A percentage analysis of inpatient treatments to total treatments over the four year period indicates that inpatient treatments are approximately 50% of total treatments (See Attachment 3). This is a significant amount of inpatient treatments and under allocating costs of these treatments would seriously distort the costs of the outpatient maintenance dialysis.

Fourth, a revised cost report for 1997, 1998 and 1999 should have been filed with this exception request. Also, the revised cost reports should have been filed with your office using the correct allocation statistics to determine inpatient and outpatient costs. Therefore, LLUMC's cost reports have not been completed properly and the requirements of 42 CFR 413.198 have not been met. Consequently, this request is denied for failure to follow Medicare cost reporting regulations.

Based on the above, the Worksheet I series for FY 97, 98 and 99 are not correct, the financial data reflected at the provider's Exhibit 1 for FY 1997, 1998, and 1999 is not acceptable for historical purposes in reviewing an exception request, and the financial data reflected at the provider's Exhibit 1 and 2 for FY 2000 is, also, not acceptable.

Cost Justification

The provider has requested an exception amount for its CPT in excess of the Health Care Financing Administration's (HCFA's) national data and general program statistics for salaries of $98.92, for employee benefits of $37.10, for supplies of $1.00 and for overhead of $106.00. Therefore, these are the only cost components that HCFA will consider in its review.

Salaries and Employee Benefits

Based on national data and general program statistics, the average CPT for salaries is $40. LLUMC has requested an additional $98.92 for salaries. Since the FY 2000 Worksheet I cost report shown at the provider's Exhibits 1 and 2 did not use the HCFA-approved statistics, this financial data cannot be used in determining an exception amount. Since the historical cost reports for FY 97, 98, 99 are not acceptable, we would be unable to determine whether the amount requested is reasonable when compared to prior cost reports.

4

Therefore, we would be unable to grant an exception amount for salaries, even if the criterion were met. Further, employee benefits follow salaries. Since an exception amount would not be granted for salaries, an exception amount would not be granted for employee benefits.

<u>Supplies</u>

Based on national data and general program statistics, the average CPT for supplies is $33. LLUMC has requested an additional $1.00 for supplies.

We reviewed the supply list furnished at Exhibit 16 and did not notice anything unusual or out of the ordinary that would cause us to grant an exception for supplies.

The Worksheet S-5 for FY 97, 98, and 99 cost reports did not show that the number of times that LLUMC re-uses its dialyzers. It should be noted that Loma Linda Kidney Center (LLUKC) re-uses its dialyzers 20 times. Based on the latest re-use data published by the Centers for Disease Control and Prevention (CDC) 82% of facilities re-use and the average medium re-use is 15 times. The average medium re-use of 15 times is in line with the 20 re-use times reported by LLUKC. Therefore, in making our calculations for LLUMC, we will use the average medium re-use of 15 times. Exhibit 16A shows that LLUMC used 7 different types of dialyzers. The average cost of these dialyzers is $19.35 ($135.50/7). The CPT per dialyzer is $1.29 ($19.35/15). We totaled the supply list shown at Exhibit 16 without the dialyzer cost and arrived at a total cost of $24.71 for supplies, then we included the dialyzer CPT of $1.29 for a total supply cost of $26.00. Since this supply cost of $26.00 is less than the national average of $33, we would be unable to grant an exception amount for supplies, even if the criterion were met.

<u>Overhead</u>

Based on national data and general program statistics, the average CPT for overhead excluding employee benefits is $47. LLUMC has requested $106.00 for overhead because it has allocated administrative and general expenses in accordance with the Medicare principles of reimbursement based on accumulated cost and other statistics. It should be noted that all facilities that are reimbursed for ESRD services under the Medicare program are required to file cost reports and follow the Medicare cost apportionment and cost finding methodology as specified in the regulations (§§42 CFR 413.20 and 413.24). Since the Medicare principles of cost finding are imposed on all Medicare providers, the mandatory Medicare principles of cost finding are not an acceptable reason for requesting an exception amount. Further, LLUMC stated that certain departments provide services to the ESRD unit. LLUMC has not identified the services furnished to the ESRD patients or the costs involved to furnish those services. Unsubstantiated general statements are not sufficient documentation for the granting of an exception amount. Therefore, we are would be unable to grant an exception amount for overhead, even if the criterion were met.

5

<u>Time Studies</u>

On pages 5 and 6 of its narrative, the provider stated that "we present in Exhibit 9 a list of diagnoses and related activities that require additional nursing assistance for each group of patients mentioned above. The patient care staff prepared this list and identified the additional number of nursing minutes per activity and the number of times each activity is performed annually."

Exhibit 9 lists the additional minutes required for each type of activity requiring additional nursing. What Exhibit 9 does not show is the time study used to create or determine the additional minutes. As explained above, regulation §42 CFR 413.198 requires a provider to keep adequate financial and cost data. The data must be based on those financial and statistical records, which must be capable of verification by qualified auditors. The provider has not presented any time studies to adequately support its patient care staff's identification of the additional time spent by the nursing staff. Therefore, the provider has failed to adequately document the additional nursing staff services rendered to its atypical patient mix. Data based on patient care staff interviews that cannot be audited is not acceptable. In the event that a time study is used in the future, the general Medicare principles regarding the adequacy of periodic time sampling is described in 2313 of the PRM must be furnished.

<u>Recommendations</u>

Based on the foregoing, you may consider making the following recommendations to LLUMC because LLUMC may wish to file another exception request under the Atypical Patient Mix in the future.

The burden of proof for justifying an exception request rests with the provider not HCFA nor its intermediary [See 42 CFR 413.180 (g)].

The provider is responsible for meeting the requirements of 42 CFR 413.198

It is in the provider's best interest to file as soon as possible. When a provider files on the last day of the exception window, the provider does not have the opportunity to file another exception request. Had the provider filed early in the exception window, it would have had the opportunity to file another exception request. Also, any approved exception amount is effective on the date that the intermediary receives a fully documented and acceptable exception request.

Finally, the provider should be advised that due to the short legislative time span of 60 working days in which to process an exception request and issue a final decision, all information related to the exception request must be submitted with the original exception.

6

The responsibility for furnishing an exception request with all required documentation rests with the facility.   HCFA approves or denies the exception request based on the documentation submitted. No additional information is requested.

Other

Based on our review of the documentation furnished by LLUMC,  LLUMC has furnished 2,163, 2,222, and 2,347 inpatient treatments in FY 97, 98 and 99.  Because of the large percent of inpatient treatments, you should verify that these patients do need inpatient ESRD services rather than outpatient services.  ESRD patients may not be admitted as an inpatient to a hospital just to receive maintenance dialysis treatments.

In the event that the provider should file an exception request in the future and fails to use the HCFA-approved statistical basis for allocating costs in completing its Worksheets I series, the exception request will be denied.  Further, in light of the cost reporting problems discussed above, including the $20.3 ($8.9 + $11.4) million duplication in FY 99, you should determine if an onsite review per § 2720.5 of the PRM is required.

Payment Rate

Based on the above analysis, the provider's exception request is denied. The provider should continue to be paid its composite rate of $138.08 for outpatient maintenance dialysis.  If the provider wishes to appeal this decision, the applicable regulation is 42 CFR 413.194 (b)

If you have any questions concerning our response, please contact me on (410) 786-4561.

Sincerely,

Joseph Logue
Health Insurance Specialist
Division of Chronic Care Management

Attachments

**CMS**

CENTERS for MEDICARE & MEDICAID SERVICES

PART A INTERMEDIARY    NATIONAL FQHC INTERMEDIARY    MEDICARE

REGIONAL HOME HEALTH INTERMEDIARY    PHONE 805-367-0800

October 4, 2005

Suzanne Cochran, Chairperson
Provider Reimbursement Review Board
2520 Lord Baltimore Drive, Suite L
Baltimore, MD 21244-2670

RECEIVED

Re:    SUBPOENA DUCES TECUM
       Provider Name: Loma Linda University Medical Ctr.
       Provider No. 05-0327
       FYE: 12/31/00
       PRRB Case No.:01-2871 and 01-2872

OCT 11 2005

PROVIDER REIMBURSEMENT
REVIEW BOARD

Dear Ms. Cochran,

In response to your SUBPOENA DUCES TECUM dated September 14, 2004 (attached). We searched our records but unfortunately were not able to find the letter dated November 15, 2005 from CMS as you have ordered per Exhibit A of the SUBPOENA DUCES TECUM.

If you have any questions, please call Alex O. Cardero at (805) 367-0671.

Sincerely,

George R. Garcia
Supervisor, Appeals
Provider Audit Department

Cc:    Robert Trainor, UGS
       Wilson Leong, BCBSA
       Bernard Talbert, BCBSA
       Jack Ahern, J. Ahern & Associates

UNITED GOVERNMENT SERVICES, LLC.

P.O. Box 9150, Oxnard, California 93031-9150 • Corporate Headquarters located in Milwaukee, WI
A CMS CONTRACTED INTERMEDIARY

973

## The Provider Reimbursement Review Board

### SUBPOENA DUCES TECUM

| | |
|---|---|
| Provider-Loma Linda University Kidney Center | * |
| | * |
| Provider No: 05-0327 | *   PRRB Case No. 01-2872 |
| | * |
| v. | *   FYE 12/31/00 |
| | * |
| | * |
| Intermediary- United Government Services, | * |
| LLC-CA/ Blue Cross &Blue Shield Association | * |
| | * |

**************************************************************************

TO: George Garcia
    United Government Services, LLC-CA
    Provider Audit/ Reimbursement Appeals
    Oxnard, CA 93031

1. You are hereby ordered by the Provider Reimbursement Review Board, on own motion, to produce and permit inspection and copying of the documents described on Exhibit "A" at the offices of the Provider Reimbursement Review Board 2520 Lord Baltimore Drive, Suite L, Baltimore, MD 21244-2670 on or before October 31, 2005.

2. If you fail to comply as requested by this subpoena, you may be subject to the provisions of 42 U.S.C. §405(e) which deals with contempt.

SO ORDERED by the Provider Reimbursement Review Board pursuant to the authority set forth in 42 U.S.C. § 1395 oo(e) and 42 C.F.R. § 405.1857.

Suzanne Cochran, Esq.
Chairperson

Date:
cc: Bernard Talbert, Wilson Leong, BCBSA
    Jack Ahern, Provider Representative

Attachments: Exhibit A

RECEIVED
PADCR2C

SEP 1 9 2005
P/M  9·19·05       BC

974

**Exhibit "A"** (PRRB Case No. 01-2872)

The envelope which contained the letter (see Provider Exhibit 2) dated November 15, 2000 from Joseph Logue, Health Insurance Specialist, Centers for Medicare and Medicaid Services (formerly the "Health Care Financing Administration") to Michael S. Foxx, Manager, United Government Services, and any and all other evidence in your possession which substantiates the exact date such letter was mailed from the Centers for Medicare and Medicaid Services to United Government Services.

## CERTIFICATE OF SERVICE

I hereby certify that the attached subpoena has been sent to the person named below by certified mail:

George Garcia
United Government Services, LLC-CA
Provider Audit/ Reimbursement Appeals
Oxnard, CA 93031

Suzanne Cochran, Esq.
Chairperson

Date: **14 SEP 2005**

976

## The Provider Reimbursement Review Board

## SUBPOENA DUCES TECUM

| | | |
|---|---|---|
| Provider-Loma Linda University Medical Center | * | |
| | * | |
| Provider No: 05-0327 | * | PRRB Case No. 01-2871 |
| | * | |
| .              v. | * | FYE 12/31/00 |
| | * | |
| | * | |
| Intermediary- United Government Services, | * | |
| LLC-CA/ Blue Cross &Blue Shield Association | * | |
| | * | |

**************************************************************************

TO: George Garcia
  United Government Services, LLC-CA
  Provider Audit/ Reimbursement Appeals
  Oxnard, CA 93031

1.  You are hereby ordered by the Provider Reimbursement Review Board, on own motion, to produce and permit inspection and copying of the documents described on Exhibit "A" at the offices of the Provider Reimbursement Review Board 2520 Lord Baltimore Drive, Suite L, Baltimore, MD 21244-2670 on or before October 31, 2005.

2.  If you fail to comply as requested by this subpoena, you may be subject to the provisions of 42 U.S.C. §405(e) which deals with contempt.

SO ORDERED by the Provider Reimbursement Review Board pursuant to the authority set forth in 42 U.S.C. § 1395 oo(e) and 42 C.F.R. § 405.1857.

Suzanne Cochran, Esq.
Chairperson

Date:
cc:  Bernard Talbert, Wilson Leong, BCBSA
   Jack Ahern, Provider Representative

Attachments: Exhibit A

RECEIVED
PADCR2C

SEP 1 9 2005
P/M 9·19·05          &

NSPS

977

**Exhibit "A"** (PRRB Case No. 01-2871)

The envelope which contained the letter (see Provider Exhibit 2) dated November 15, 2000 from Joseph Logue, Health Insurance Specialist, Centers for Medicare and Medicaid Services (formerly the "Health Care Financing Administration") to Brenda Merriweather, Manager, United Government Services, and any and all other evidence in your possession which substantiates the exact date such letter was mailed from the Centers for Medicare and Medicaid Services to United Government Services.

**CERTIFICATE OF SERVICE**

I hereby certify that the attached subpoena has been sent to the person named below by certified mail:

> George Garcia
> United Government Services, LLC-CA
> Provider Audit/ Reimbursement Appeals
> Oxnard, CA 93031

Suzanne Cochran, Esq.
Chairperson

Date:    **1 4** SEP 2005

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671          FAX: 410-786-5298

Suzanne Cochran, Esq., Chairperson
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Anjali Mulchandani-West

Refer to:

01-2871
CERTIFIED MAIL

**14 SEP 2005**

Jack Ahern and Associates            Bernard M. Talbert, Esq.
841 South Racine Avenue              Blue Cross and Blue Shield Association
Suite C                              225 North Michigan Avenue
Chicago, IL 60607                    Chicago, IL 60601-7680

Re: Loma Linda University Medical Center
    Pro. No. 05-0327
    FYE: 12/31/2000
    PRRB Case No: 01-2871

Dear Mr. Ahern and Mr. Talbert:

Enclosed is a copy of the Provider's Reimbursement Review Board's subpoena issued on
its own motion for this case. The subpoena has been sent via certified mail to
George Garcia in accordance with 42 U.S.C. §§405(d) and 1395oo(e).

FOR THE BOARD

Suzanne Cochran, Esq.
Chairperson

cc: Wilson C. Leong , BCBSA

## The Provider Reimbursement Review Board

### SUBPOENA DUCES TECUM

| | | |
|---|---|---|
| Provider-Loma Linda University Medical Center | * | |
| | * | |
| Provider No: 05-0327 | * | PRRB Case No. 01-2871 |
| | * | |
| v. | * | FYE 12/31/00 |
| | * | |
| | * | |
| Intermediary- United Government Services, | * | |
| LLC-CA/ Blue Cross &Blue Shield Association | * | |
| | * | |

**************************************************************************

TO: George Garcia
    United Government Services, LLC-CA
    Provider Audit/ Reimbursement Appeals
    Oxnard, CA 93031

1.  You are hereby ordered by the Provider Reimbursement Review Board, on own motion, to produce and permit inspection and copying of the documents described on Exhibit "A" at the offices of the Provider Reimbursement Review Board 2520 Lord Baltimore Drive, Suite L, Baltimore, MD 21244-2670 on or before October 31, 2005.

2.  If you fail to comply as requested by this subpoena, you may be subject to the provisions of 42 U.S.C. §405(e) which deals with contempt.

SO ORDERED by the Provider Reimbursement Review Board pursuant to the authority set forth in 42 U.S.C. § 1395 oo(e) and 42 C.F.R. § 405.1857.

Suzanne Cochran, Esq.
Chairperson

Date:
cc: Bernard Talbert, Wilson Leong, BCBSA
    Jack Ahern, Provider Representative

Attachments: Exhibit A

**Exhibit "A"** (PRRB Case No. 01-2871)

The envelope which contained the letter (see Provider Exhibit 2) dated November 15, 2000 from Joseph Logue, Health Insurance Specialist, Centers for Medicare and Medicaid Services (formerly the "Health Care Financing Administration") to Brenda Merriweather, Manager, United Government Services, and any and all other evidence in your possession which substantiates the exact date such letter was mailed from the Centers for Medicare and Medicaid Services to United Government Services.

## CERTIFICATE OF SERVICE

I hereby certify that the attached subpoena has been sent to the person named below by certified mail:

George Garcia
United Government Services, LLC-CA
Provider Audit/ Reimbursement Appeals
Oxnard, CA 93031

Suzanne Cochran, Esq.
Chairperson

Date:
14 SEP 2005

01-2871
SNA
5/10/01

# *J. Ahern & Associates*

|  |  |
|---|---|
| 841 South Racine Ave. | Phone: (312) 997-2177 |
| Suite C | Fax:   (312) 997-2177 |
| Chicago, IL  60607 | Email: mjahern@gsbpop.uchicago.edu |
|  | JAhernAssociates@aol.com |

April 16, 2001

TO:          Chairman
             Provider Reimbursement Review Board
             7500 Security Boulevard
             Room C1-09-13
             Baltimore, MD   21244-1850

**RECEIVED**

**APR 1 7 2001**

**PROVIDER REIMBURSEMENT REVIEW BOARD**

FROM:        Jack Ahern
             841 "C" South Racine Avenue
             Chicago, Illinois 60607

RE:          <u>Renal Dialysis Exception Request Denial</u>

|  |  |
|---|---|
| Provider: | **Loma Linda University Medical Center** |
| Provider Number: | **05-0327** |

| PERTINENT DATES: | Exception Request Submission: | August 28, 2000 |
|---|---|---|
|  | Denial Letter from Intermediary: | December 11, 2000 |
|  | Request to PRRB for Appeal: | April 12, 2001 |

Dear Mr. Chairman:

In accordance with 42 CFR 405.1835 and 405.1890, provider number **05-0327, Loma Linda University Medical Center (LLUMC)**, requests a Provider Reimbursement Review Board (PRRB) hearing for the recent denial of a renal dialysis exception request.

<u>Fiscal Years in Question</u>

The Exception Request is for the time period beginning, **August 28, 2000** and continuing until such time as the submission of a new complete renal dialysis Exception Request would be required by the Health Care Financing Administration (HCFA) in order to maintain any increase granted.

<u>Amount in Controversy</u>

The amount in controversy will vary directly with the duration of the exception which depends on when HCFA ultimately cancels those exceptions to the composite rate payment granted in the exception request window closing August 28, 2000. However, with LLUMC's treatment volume even a single year's increased reimbursement at the requested rate would have resulted in more than $ 10,000 of additional revenue for **LLUMC**.

Sincerely,

*Jack Ahern*

Jack Ahern
President

Cc: Brenda Merriweather, United Government Services

04/06/01  SUN 21:51 FAX 8085504000    LLUMC ADMIN    003

**HCFA**
Health Care Financing Administration

**MEDICARE**
Part A Intermediary
National FQHC Intermediary
Regional Home Health Intermediary
Phone 805-367-0800

December 11, 2000

Ms. Teresa Day, Sr. V.P./CFO
Loma Linda University Medical Ctr.
11234 Anderson St., W.H. Rm. B128
Loma Linda, CA 92354

SUBJECT:    EXCEPTION REQUEST TO COMPOSITE RATE FOR
            HEMODIALYSIS

**RECEIVED**

APR 1 7 2001

PROVIDER REIMBURSEMENT
REVIEW BOARD

Dear Ms. Day:

This is in response to your request for an exception to the composite rate for hemodialysis which was received on August 28, 2000.

Based on HCFA's review of our proposal and your documentation, they denied your request for an exception. We are enclosing their letter to our office for your review which explains the reasons for the denial.

If you have any questions, please call me at (805) 367-0682.

Sincerely,

Brenda Merriweather, Manager
Provider Audit Department

BM/sa

Enclosures

UNITED GOVERNMENT SERVICES, LLC.

Corporate Headquarters located in Milwaukee, WI • P O. Box 9150, Oxnard, California 93031-9150
A HCFA CONTRACTED INTERMEDIARY